## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

GAIL, JOHN D. and John F. CORVELLO, et al,

        Plaintiffs,

    v. .                           C.A. No. 05-221T

NEW ENGLAND GAS COMPANY, INC.,

        Defendant;

KEVIN BURNS, et al.

        Plaintiffs,

    v.                           C.A. No. 05-274T

SOUTHERN UNION COMPANY dba
FALL RIVER GAS AND NEW ENGLAND GAS

        Defendants;


COLLEEN BIGELOW, et al.

        Plaintiffs,

    v.                           C.A. No. 05-370T

NEW ENGLAND GAS COMPANY, formerly known as
FALL RIVER GAS COMPANY, an
unincorporated division of
SOUTHERN UNION COMPANY,

        Defendants;

SHEILA REIS, et al.

        Plaintiffs,

    v.                           C.A. No. 05-522T

SOUTHERN UNION COMPANY dba
FALL RIVER GAS AND NEW ENGLAND GAS
        Defendants.

1

**MEMORANDUM AND ORDER**

ERNEST C. TORRES, Chief Judge.

The plaintiffs in these four cases reside on and/or own property in Tiverton, Rhode Island. They brought these actions against New England Gas Company ("NE Gas"), an unincorporated division of Southern Union Company ("Southern Union"), alleging that, approximately fifty years ago, hazardous substances that were the by-product of a coal gasification process utilized by Fall River Gas Company ("FRGC"), NE Gas's predecessor, were deposited as fill on the plaintiffs' property.

The multi-count complaints assert claims for negligence, gross negligence, violation of the Rhode Island Hazardous Waste Management Act ("HWMA"), R.I. Gen. Laws § 23-19.1-22, strict liability, infliction of emotional distress, private nuisance, and public nuisance. The relief sought includes monetary damages for the plaintiffs' loss of use and enjoyment of their properties, for diminution of the properties' value and for emotional distress as well as punitive damages, costs and attorneys' fees. Some of the plaintiffs also are requesting declaratory and/or injunctive relief.

NE Gas and Southern Union have moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss all of the plaintiffs' claims. For the reasons hereinafter stated, those motions are granted with respect to the Counts alleging gross negligence, private nuisance,

2

intentional or negligent infliction of emotional harm, and violation of HWMA, but the motions are denied with respect to the Counts alleging negligence, strict liability, and public nuisance. The motions to dismiss also are denied with respect to the punitive damages claims.

## Background Facts

All four complaints allege essentially the same facts and, with one exception, make identical claims.[1] The facts alleged are as follows.

At some unspecified time before it was acquired by Southern Union, FRGC operated an electric power-generating facility near the property now owned by the plaintiffs. The facility produced "coal gasification waste material," some of which allegedly was deposited as fill on or near the plaintiffs' property, apparently by contractors. The Corvello complaint states that the fill was deposited "prior to the construction of homes" in the area. Corvello Compl. ¶ 17.

In August 2002, the Town of Tiverton was installing a sewer interceptor line in an area near the plaintiffs' property. Some of the excavated soil was an unusual blue color and emitted a distinctive odor characteristic of polyaromatic hydrocarbons.

A Rhode Island Department of Environmental Management

---

[1] Only the plaintiffs in Corvello assert claims for infliction of emotional distress and for violation of HWMA.

("RIDEM") investigator determined that the blue color indicated that the soil was "coal gasification waste material" that contained toxic and hazardous substances and that some of the substances, notably polyaromatic hydrocarbons ("PAH's"), cyanide and naphthalene, exceeded RIDEM's established exposure criteria. Further investigation disclosed the presence of these substances in the soil under the streets in the neighborhood and on some of the surrounding property.

RIDEM issued a "letter of responsibility" to the defendants and the Town of Tiverton placed an emergency moratorium on excavation in an area that encompasses the plaintiffs' properties. The moratorium precludes the issuance of building permits for any construction requiring excavation.

The plaintiffs in <u>Corvello</u>, <u>Burns</u>, and <u>Bigelow</u> brought actions in the Rhode Island Superior Court which were removed to this Court.  The plaintiffs in <u>Reis</u> brought an action in the United States District Court for the District of Massachusetts which was transferred to this Court.

All of the complaints contain claims for negligence, strict liability, private nuisance and public nuisance.  The <u>Corvello</u> and <u>Reis</u> complaints also include claims for gross negligence, and the <u>Corvello</u> complaint includes claims for infliction of emotional

distress, and violation of the HWMA, R.I. Gen. Laws § 23-19.1-22.[2]

## Standard of Review

In ruling on a motion to dismiss made pursuant to Rule 12(b)(6), the Court takes the well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiffs.  <u>Barrios-Velazquez v. Asociacion De Empleados Del Estado Libre Asociado De Puerto Rico</u>, 84 F.3d 487, 489-90 (1st Cir. 1996).  The motion may be granted only if it appears that the plaintiffs cannot prove any set of facts entitling them to relief. <u>Rockwell v. Cape Cod Hosp.</u>, 26 F.3d 254, 255 (1st Cir. 1994). However, the Court need not credit "bald assertions," subjective characterizations or "unsubstantiated conclusions."   <u>Rodi v. Southern New Eng. Sch. Of Law</u>, 389 F.3d 5, 10 (1st Cir. 2004).  Nor may a plaintiff rest on allegations of a "general scenario which could be dominated by unpleaded facts." <u>Dewey v. Univ. of New Hampshire</u>, 694 F.2d 1, 3 (1st Cir. 1982).

## Analysis

I.   <u>Negligence</u>

A.   <u>Breach of Duty</u>

The defendants argue that the negligence claims should be dismissed because the complaints do not allege any facts that would establish the violation of a duty owed by the defendants to the

---

[2] The <u>Burns</u> complaint originally included a claim for Trespass that was voluntarily dismissed at the December 1, 2005 hearing on the motion to dismiss.

plaintiffs.  More specifically, the defendants argue that they have not breached any duty owed to the plaintiffs because the coal gasification waste material was deposited long before the area in question was developed and, therefore, any alleged harm to the plaintiffs was too remote and speculative to be reasonably foreseeable.

The defendants rely on <u>Hydro Manufacturing, Inc. v. Kayser-Roth Corp.</u>, 640 A.2d 950, 955 (R.I. 1994) and <u>Wilson Auto Enters., Inc. v. Mobil Oil Corp.</u>, 778 F. Supp. 101, 104 (D.R.I. 1991), but that reliance is misplaced.  Both cases involved negligence claims against prior owners of the plaintiffs' property for activities that allegedly contaminated the soil and/or ground water.  In each case, the Court rejected the claim on the ground that the possibility that a property owner's use of his property might cause injury to future owners was too remote to impose a duty to future purchasers to refrain from such use.

In <u>Wilson</u>, the contamination allegedly resulted from the defendant's operation of a gas station on the property.  The Court found that allegation insufficient to state a claim because the plaintiffs had an opportunity to inspect the property before purchasing it and, under the doctrine of <u>caveat emptor</u>, they had a responsibility to do so, especially since the property's use as a gas station made the possibility of contamination fairly predictable.  <u>Wilson</u>, 778 F. Supp. at 105.  However, Judge Lagueux

suggested that the result might have been different if a claim of contamination had been asserted by owners of nearby property because, unlike the plaintiff in that case, "Mobil's neighbors in Foster may have had no choice in becoming victims of Mobil's alleged chemical leaks." _Id._

In _Hydro Manufacturing_, the purchaser of property on which the defendant previously had operated a textile plant sought to recover for contamination allegedly caused by the defendant's negligence in allowing hazardous materials to spill on the ground.  The Court affirmed the entry of summary judgment in favor of the defendant holding that prior owners of property do not "owe remote purchasers a duty to maintain the property and to refrain from any activity that may harm the property" because "the duty that sellers owe to subsequent purchasers is established primarily through contracts between the parties who theoretically reach an arm's-length agreement on a sale price that reflects the true value of the land." _Hydro Manufacturing_, 640 A.2d at 955 (citations omitted). The _Hydro Manufacturing_ Court pointed out that a prospective buyer can obtain protection by inspecting the property, obtaining representations or warranties from the seller and seeking indemnity or a reduction in the sale price to reflect the land's actual economic value.  _Id._ at 955-56.

This case is distinguishable from _Wilson_ and _Hydro Manufacturing_ because these plaintiffs are not subsequent

purchasers of FRGC's property.    Accordingly, these plaintiffs presumably, were not alerted to the possibility that waste generated by FRGC had contaminated their property; and, therefore, they would have had no reason to perform environmental tests before buying the property.  Nor did these plaintiffs have any opportunity to bargain with or obtain representations and warranties from FRGC. Rather, the plaintiffs are like the neighbors referred to in <u>Wilson</u> who had no choice about becoming victims of the alleged contamination.

In short, the limited <u>caveat</u> <u>emptor</u> exception that precludes contamination claims by a landowner against a previous owner is not applicable in this case and does not relieve the defendants of their duty to refrain from conduct that contaminates or otherwise harms neighboring properties.  <u>See</u> <u>O'Donnell v. White</u>, 50 A. 333 (R.I. 1901) (municipality held liable for negligently throwing earth and gravel on owner's property while filling in streets).

B.    <u>Violation of Section 23-19.1-22</u>

In addition to their claim for an alleged violation of the Rhode Island Hazardous Waste Management Act, R.I. Gen. Laws § 23-19.1-22 (the "HWMA"), the plaintiffs cite that alleged violation in support of their negligence claim.

Under Rhode Island law, violation of a statute is evidence of negligence.  <u>Wallace v. United States</u>, 335 F. Supp. 2d 252, 264 (D.R.I. 2004) (citing <u>Clements v. Tashjoin</u>, 168 A.2d 472, 474 (R.I.

1961) and <u>Sitco v. Jastrzebski</u>, 27 A.2d 178, 179 (R.I. 1942)).
Consequently, a showing that the defendants caused coal
gasification waste to be deposited on the plaintiffs' property in
violation of the HWMA may be admissible as evidence of negligence
if the statute was in effect at the time that the defendants
acted.[3]   Since the complaints fail to state when the coal
gasification wastes were deposited on the plaintiffs' property,
this Court cannot say that the plaintiffs will be unable to show
that the HWMA was in effect at that time.

II.  <u>Gross Negligence</u>

With one very limited exception, Rhode Island does not
distinguish between degrees of negligence and, therefore, does not
recognize a separate cause of action for gross negligence.  <u>Labree</u>
<u>v. Major</u>, 306 A.2d 808, 816 (R.I. 1973); <u>Wilson</u>, 778 F. Supp. at
104.  The exception is set forth in the "good samaritan" statute
which immunizes emergency medical technicians ("EMTs") from
liability for conduct during the performance of their duties unless
they are guilty of gross negligence or willful misconduct.  <u>See</u>
R.I. Gen. Laws § 23-4.1-12.

In support of their gross negligence claims, the plaintiffs
cite <u>Contois v. West Warwick</u>, 865 A.2d 1019 (R.I. 2004) and <u>Leite</u>

---

[3] It is possible that actual liability for an alleged
violation of the HWMA might be imposed retroactively, <u>see</u> <u>Charter</u>
<u>Int'l Oil Co. v. United States</u>, 925 F. Supp. 104, 110 (D.R.I.
1996).

v. City of Providence, 463 F. Supp. 585, 591 (D.R.I. 1978), but
these cases do not support their claims.   Contois dealt with a
negligence action against an EMT and addressed gross negligence
only in order to determine whether the EMT was entitled to immunity
under the Good Samaritan statute.   Moreover, in Leite, the gross
negligence claim was asserted in connection with a Section 1983
claim under federal law, not a claim based on Rhode Island law.

Consequently, while the plaintiffs might be entitled to
recover on the theory that the defendants were negligent, they
cannot maintain a separate claim for gross negligence.

## III. Strict Liability

A defendant who knowingly engages in abnormally dangerous
activity or causes an abnormally dangerous condition to exist, may
be held liable for any resulting harm to persons or property even
if the defendant exercised reasonable care.   Restatement (Second)
of Torts § 519(1) (1977).

The Rhode Island Supreme Court has said that "whether a
defendant should be held strictly liable for ultra-hazardous or
abnormally dangerous activities is a question of law." Splendorio
v. Bilray Demolition Co., Inc., 682 A.2d 461, 465 (R.I. 1996).[4]
However, it also has stated that determining whether an activity is
ultra-hazardous or abnormally dangerous requires consideration of

_____

[4]Splendorio overruled Rose v. Sacouny-Vacuum Corp., 54 R.I.
411; 173 A. 627 (1934) which declined to follow the doctrine of
strict liability first expressed in Rylands v. Fletcher.

a variety of factors set forth in the Restatement (Second) of Torts and that "[t]he weight apportioned to each [factor] should be dependent upon the facts in each particular case." Splendorio, 682 A.2d at 466.  The factors to be considered are:

> "(a) existence of high degree of risk of some harm to the person, land or chattels of others;
> "(b) likelihood that the harm that results from it will be great;
> "(c) inability to eliminate the risk by the exercise of reasonable care;
> "(d) extent to which the activity is not a matter of common usage;
> "(e) inappropriateness of the activity to the place where it is carried on; and
> "(f) extent to which its value to the community is outweighed by its dangerous attributes."

Id. (quoting Restatement (Second) of Torts § 520 (1977)).

Generally, "[a]n activity is not abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care." Splendorio, 682 A.2d at 466 (quoting G.J. Leasing Co. v. Union Elec. Co., 854 F. Supp. 539, 568 (S.D. Ill. 1994)).

The mere fact that an activity involves an ultra-hazardous or abnormally dangerous substance is not, by itself, sufficient to trigger strict liability.  As the Splendorio Court stated, "if the rule were otherwise, virtually any commercial activity involving substances which are dangerous in the abstract automatically would be deemed as abnormally dangerous.  This result would be intolerable." Splendorio, 682 A.2d at 465-66 (quoting G.J. Leasing Co., 854 F. Supp. at 568).  Accordingly, the abnormal risk of harm must arise from the manner in which the defendant dealt with a dangerous substance. Splendorio, 682 A.2d at 466.  Put another

11

way, the substance must be used in a way that creates an unreasonable risk of harm.

In Splendorio, the Court upheld the entry of summary judgment in favor of a company hired to develop an abatement plan for any asbestos found in buildings that were being demolished. The plaintiffs claimed that asbestos in the debris removed from the site by the demolition company contaminated their property and that the defendant, as the architect of the plan, was strictly liable. However, the Court found that, even though asbestos may be an abnormally dangerous substance, strict liability did not apply because the task performed by the defendant was not inherently dangerous and its "value to the community . . . far outweighed its dangerous attributes." Id. at 466.

In this case, although the determination as to whether the defendants' activities were ultra-hazardous or abnormally dangerous ultimately may be a question of law, that determination cannot be made until evidence is presented with respect to the facts upon which the determination must be based. At this juncture, the relevant facts are unknown. There is no evidence regarding such matters as exactly what substances were deposited on or near the plaintiffs' property, what role the defendants may have played in depositing them, exactly what dangers the substances pose, whether that danger was recognizable at the time of disposition and whether the danger could have been eliminated by the exercise of reasonable

12

care.  Therefore, this Court cannot say that the plaintiffs will be unable to prove any facts that may entitle them to relief on their strict liability claims.

IV.  The Nuisance Claim

A.   Nuisance, in General

As so aptly stated by the late Professor Prosser, "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance'" the application of which too often has demonstrated a tendency "to seize upon a catchword as a substitute for any analysis of a problem." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 86, at 617 (5th ed. 1984) [hereinafter "Prosser"].   The lack of analysis and seeming inconsistency in dealing with nuisance claims stems, partly, from the historical development of nuisance doctrine; partly, from a failure to clearly define what constitutes a nuisance; and, partly, from differences in describing the kinds of conduct required to support a nuisance claim.  Id.  Much of the uncertainty is rooted in the fact that the causes of action for both private and public nuisance developed on a case-by-case basis, along separate tracks and based on different principles.

Historically, claims for private nuisance have been "narrowly restricted to the invasion of interests in the use or enjoyment of land" caused by a defendant's use of his own property.  Id. at 618.  By contrast, claims of public nuisance "extend[ed] to virtually any

form of annoyance or inconvenience interfering with common public rights." Id. Moreover, until recently, an action for public nuisance, generally, could be maintained only by a duly authorized representative of the public. See id. § 90, at 643-46.

A great deal of the confusion surrounding present day nuisance law arises from a failure to recognize that "[n]uisance, either public or private, is a field, or rather two distinct fields, of tort liability." Restatement (Second) of Torts § 822 cmt. a (1979). Fortunately, Rhode Island law generally recognizes the historical distinction between the two types of nuisance claims and also defines "nuisance" as a substantial and unreasonable interference with a plaintiff's protected interests. Hydro Manufacturing, Inc. v. Kayser-Roth Corp., 640 A.2d 950, 957 (R.I. 1994).

Under Rhode Island law, "[a] cause of action for private nuisance 'arises from the unreasonable use of one's property that materially interferes with a neighbor's physical comfort or the neighbor's use of his real estate'" and "a public nuisance is an 'unreasonable interference with a right common to the general public.'" Id. (quoting Weida v. Ferry, 493 A.2d 824, 826 (R.I. 1985)). See Restatement (Second) of Torts §§ 821B, 821D (1979). As Prosser states, "[t]he interference with the protected interest must not only be substantial, but it must also be unreasonable." Prosser § 87, at 629.

14

The conduct giving rise to a nuisance claim may consist of "an act; or a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the . . . invasion [of the protected interest]." Restatement (Second) of Torts § 824. Liability also may be predicated on the conduct of servants, agents or independent contractors. Id. cmt. c.

The critical inquiry in deciding whether an interference with the protected rights of others is "unreasonable" is whether "the gravity of the harm caused outweighs the utility of the conduct," Prosser § 88A, at 630 (5th ed. 1984). See Restatement (Second) of Torts § 826 (enumerating the factors to be considered in determining reasonableness). Put another way, a plaintiff must establish that "the harm or risk . . . is greater than he ought to be required to bear under the circumstances." Citizens for Preservation of Waterman Lake v. Davis, 420 A.2d 53, 59 (R.I. 1980) (citing Restatement (Second) of Torts, § 822 cmt. g at 112).

B.   Private Nuisance

The plaintiffs allege that the disposal of FRGC's coal gasification waste on their property and on nearby properties has created a private nuisance. The defendants argue that the complaints fail to state a claim for private nuisance because they do not allege that the nuisance resulted from activities conducted on the defendants' property or that the plaintiffs' homes and the defendants' facility are "neighboring" properties. Plaintiffs'

15

Mem. at 12.

As already noted, in order to prevail on their private nuisance claims, the plaintiffs must show that the interference resulted from the defendants' unreasonable use of their own property. Hydro Manufacturing, 640 A.2d at 957 (quoting Weida v. Ferry, 492 A.2d 824, 826 (R.I. 1985)); accord Citizens for the Preservation of Waterman Lake, 420 A.2d at 59. Here, the complaints do not allege that the contamination was caused by FRGC's use of its property. Rather, they allege that the contamination resulted from transporting hazardous material from FRGC's property and depositing it on or near the plaintiffs' property. Consequently, although it seems clear that the alleged interference with the plaintiffs' property interests is of a magnitude that satisfies the requirement of substantial interference, and while the plaintiffs may have viable claims against the defendants under theories of negligence, intentional tort and/or strict liability, they have failed to state claims for private nuisance.

C.   Public Nuisance

The plaintiffs allege that the disposal of FRGC's coal gasification waste on their property and on nearby property also has created a public nuisance that harms them. The defendants argue that the complaints fail to state claims upon which relief may be granted because the alleged harm relates only to private

16

properties belonging to the individual plaintiffs and not to any "right common to the general public" as required by Hydro Manufacturing. NE Gas Mem. Mot. Dismiss at 14-15.

In order to prevail on a public nuisance claim, a plaintiff must establish that a defendant unreasonably interfered with a "right common to the general public" and that the plaintiff sustained "special damages" as a result of the interference. Hydro Electric Manufacturing, 640 A.2d 950, 957-58 (citing Iafrate v. Ramsden, 190 A.2d 473, 476 (R.I. 1963)); Clark v. Peckham, 10 R.I. 35 (1871).

A right "common to the general public" is a collective right that is shared by everyone in the community. It differs from a right that is possessed only by certain individual members of the public. See Restatement (Second) of Torts 821B cmt. g. Thus, a public nuisance has been described as something "that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." Citizens for Preservation of Waterman Lake, 420 A.2d at 59.

A public nuisance may consist of an "'aggregation of private injuries [that] becomes so great and extensive as to constitute a public annoyance and inconvenience, and wrong against the community.'" Sullivan v. Amer. Mfg. Co. of Massachusetts, 33 F.2d 690, 692 (4th Cir. 1929) (quoting Wesson v. Washburn Iron Co., 13 Allen 95, 90 Am. Dec. 181 (Mass. 1866)). However, the fact that a

17

condition interferes with the private rights of a substantial number of individuals does not, by itself, make it a public nuisance. See Iafrate, 190 A.2d at 476 (a plaintiff must demonstrate that "the acts complained of interfered with any interest of plaintiffs common to the general public.") (quoting Prosser). The distinction is illustrated by Prosser's example of a polluted stream. The pollution would be a private nuisance if it interferes only with the use and enjoyment of property belonging to a number of riparian owners but it would be a public nuisance if it kills all of the fish, thereby depriving the public of the right to fish in the stream. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 90, at 645 (5th ed. 1984).

An action for public nuisance may be maintained by a private citizen who "suffers special damage, distinct from that common to the public." Hydro Manufacturing, at 957 (quoting Iafrate v. Ramsden, 190 A.2d 473, 476 (1963)). Under Rhode Island law, a private citizen also may bring an action "to abate the nuisance and to perpetually enjoin the person or persons maintaining the nuisance." R. I. Gen. Laws. § 10-1-1.

In order to satisfy the "special damage" requirement, a private plaintiff must show that he has "'suffered harm of a kind different than that suffered by other members of the public exercising the right common to the general public that was the subject of interference.'" Hydro Manufacturing, 640 A.2d at 958

18

(quoting Restatement (Second) of Torts § 821C(1)).  See Prosser §
90, at 646 ("[a] private individual has no action for the invasion
of the purely public right, unless his damage is in some way to be
distinguished from that sustained by other members of the general
public.").  Consequently, it is not enough for a private plaintiff
to show that he has suffered "the same kind of harm or interference
but to a greater extent or degree" as other members of the public.
Restatement (Second) of Torts § 821C cmt. b (1979).  Rather, the
harm shown must be separate and distinct from the harm suffered by
the general public.  Hydro Manufacturing, 640 A.2d at 958.

     "Special  damages"  may  include  personal  injury  to  the
plaintiff,  damage  to  the  plaintiff's  property  or  substantial
interference  with  the  use  and  enjoyment  of  the  plaintiff's
property; but, in order to be compensable under a public nuisance
theory, the damages must have been caused by interference with the
public right.  See Hydro Manufacturing, 640 A.2d at 957-58; Prosser
§ 90, at 648.  Thus, in Hydro Manufacturing, the Court rejected a
public nuisance claim by a landowner whose property was forfeited
under CERCLA as a result of contamination caused by a prior owner
that polluted the groundwater.  The Court held that the landowner
could not maintain a public nuisance action against the prior owner
because the public right interfered with was "the right to pure
water" and the landowner "did not allege that it suffered special
damages stemming from [the defendant's] interference with [the

plaintiff's] use and enjoyment of the ground water at the site or of its right to pure water." Id. at 958. The Court noted that the landowner's damages flowed from the forfeiture of its property and "not in the exercise of a public right." Id.

In this case, although the complaints do not specifically allege that the coal gasification waste poses a threat to public health or otherwise unreasonably interferes with a right common to the general public; it does allege that the waste contains a number of highly toxic substances and that the presence of those substances has prompted the Town to impose a building moratorium in the area. Consequently, this Court cannot say that the plaintiffs will be unable to prove any facts that would entitle them to relief on their public nuisance claims.

V.   The Emotional Distress Claim

The emotional distress claim set forth in the Corvello complaint does not state whether it is a claim for intentional infliction of emotional distress or negligent infliction of emotional distress. That omission is significant because the elements that must be proven in order to prevail on a claim of intentional infliction of emotional distress differ from the elements that must be proven to prevail on a claim for negligent infliction of emotional distress.

In order to prevail on an intentional infliction claim, a plaintiff must prove, among other things, that, (1) the defendant

20

acted with intent to cause emotional distress or with reckless disregard as to whether emotional distress would result and (2) the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  <u>Swerdlick v. Koch</u>, 721 A.2d 849, 863 (R.I. 1998) (quoting Restatement (Second) of Torts § 46 cmt. d, at 73)).  By contrast, a <u>negligent</u> infliction claim only requires proof that the defendant acted negligently.  <u>Id</u>. at 864.

A second distinction is that, in order to prevail on a claim for negligent infliction, a plaintiff must show that (1) he witnessed the incident allegedly causing the distress, and (2) he was threatened with injury by being "in the zone of physical danger" or he is "closely related" to a person who was seriously injured.  <u>Id</u>.  This requirement reflects courts' reluctance "'to impose potentially unlimited and undeserved liability upon a defendant who is guilty of unintentional conduct.'"  <u>Marchetti v. Parsons</u>, 638 A.2d 1047, 1050 (R.I. 1994) (quoting <u>Reilly v. U.S.</u>, 547 A.2d 894, 897-98 (R.I. 1988)).

Under either theory, a plaintiff also must establish (1) a causal connection between the defendant's conduct and the emotional distress and (2) physical symptoms manifesting the distress which must be linked to the defendant's conduct by medical evidence. <u>Marchetti v. Parsons</u>, 638 A.2d at 1052; see <u>Jalowy v. The Friendly</u>

<u>Home, Inc.</u>, 818 A.2d 698, 710 (R.I. 2003).

At oral argument, counsel stated that the complaint was intended to assert claims for both intentional and negligent infliction of emotional distress. However, in ruling on a motion to dismiss, this Court must base its decision on the complaint as written and not on what counsel , later, may say was intended.

Applying this test, it seems clear that the Corvello complaint asserts a claim for intentional infliction of emotional distress. It describes the defendants' acts and omissions as "outrageous" and "so extreme in degree as to go beyond all possible bounds of decency." Corvello Compl. ¶ 57. It also alleges that the defendant "knew or was reckless in not knowing that its acts and omissions would inflict emotional distress on the plaintiffs." <u>Id</u>. ¶ 58. The allegations address elements that are unique to a cause of action for intentional infliction. Furthermore, the Corvello complaint does not allege that the defendants were negligent or that the plaintiffs are within a zone of physical danger, both of which are elements of a claim for negligent infliction.

The defendants argue that the complaint fails to state a claim for intentional infliction because the fact that the plaintiffs did not own or occupy their properties when the coal gasification waste allegedly was deposited precludes a finding that the defendants acted with the requisite intent to cause emotional distress <u>to the plaintiffs</u>. This Court finds that argument persuasive.

22

It is well established that intent to cause emotional distress cannot exist in the abstract and, like any other intentional tort, it requires a victim who is the object of the defendant's intentional act. <u>Lewis v. General Elec. Co.</u>, 37 F. Supp. 2d 55, 60 (D. Mass. 1999); <u>Collins v. Olin Corp.</u>, 418 F. Supp. 2d 34, 56 (D. Conn. 2006).    In <u>Lewis</u>, the Court dismissed an intentional infliction of emotional distress claim brought by homeowners against a corporation that allegedly dumped contaminated soil near their properties because there was no indication that the defendants' actions were directed at the plaintiffs. <u>Lewis</u>, 37 F. Supp. 2d at 60.  In doing so, the Court observed that "[t]he focus of cases 'dealing with intentional infliction of emotional distress has been on the emotional distress of a person against whom the extreme and outrageous conduct was directed.'") (quoting <u>Nancy P. v. D'Amato</u>, 517 N.E.2d 824, 827 (Mass. 1988)).   Similarly, in <u>Collins</u>, the Court dismissed a claim of intentional infliction of emotional distress brought by neighboring landowners against a municipality for allowing a wetland to be filled with allegedly contaminated soil because "[t]he plaintiffs were not living at the landfill sites at the time of the dumping; indeed, the area was not developed and their residences were not constructed until after the dumping on that property was long completed." <u>Collins</u>, 418 F. Supp. 2d at 56.  Accordingly, the <u>Collins</u> Court stated that, "it cannot be found as a matter of law that [the municipality] knew or

23

should have known that its actions or omissions would inflict emotional distress on the plaintiffs." Id.

In this case, since the complaint indicates that the coal gasification waste was deposited before the Corvello plaintiffs acquired their property, the defendants' actions could not have been intended to cause emotional distress to the Corvello plaintiffs; and, therefore, the plaintiffs cannot prevail on their intentional infliction claim.

The absence of any allegation that the plaintiffs have physical symptoms resulting from their emotional distress also is fatal to their intentional infliction claim. As already noted, physical manifestations are a sine qua non to recovery for intentional infliction of emotional distress and it would be a waste of time, effort and resources to require the defendants to ferret out, via discovery, the absence of facts that have not been in order to move for summary judgment.

Of course, the plaintiffs' inability to prove claims for the torts of intentional or negligent infliction of emotional distress does not necessarily mean that they are precluded from recovering for any emotional distress that they may have suffered. If the plaintiffs succeed on any of their other surviving claims and can demonstrate some other type of injury, they may be entitled to recover consequential damages for emotional distress suffered in connection with that injury.

VI.   The Statutory Violation Claim

The Corvello complaint asserts a claim for violation of the HWMA based on allegations that the coal gasification waste was disposed of "in a manner or location not authorized by R.I. Gen. Laws § 23-19.1-22 (1956)".   Corvello Compl. ¶ 61.   The defendants argue that this claim should be dismissed because the "statute does not create a private right of action."   NE Gas Mem. Mot. Dismiss at 19.

The HWMA regulates the manner in which hazardous wastes are transported and disposed of.   Section 23-19.1-22(c) of the Act provides:

> The State, by and through the Department of Environmental Management, is a trustee of the air, water, fish, and wildlife of the State.  An action brought pursuant to the provisions of this chapter with respect to environmental damage may be brought by the attorney general or the director of the department of environmental management in the name of the state as trustee for those natural resources.

Section 23-19.1-22(c) (emphasis added).

Nothing in the HWMA authorizes a private individual to sue for a violation of the statute.  Nor do any of the statutory remedies appear to have any application to private litigants.  The statute provides for civil penalties (§ 23-19.1-17); criminal penalties (§ 23-19.1-18); payment of restoration costs (§ 23-19.1-18) and treble damages (§ 23-19.1-22).  However, since the "damages" in § 23-19.1-22 appear to refer to damages to the environment and natural resources and, since § 23-19.1-23 creates an environmental response

25

fund consisting of "any sums as the State may appropriate or sums recovered by any action brought under the authority of this chapter," it seems clear that the General Assembly contemplated that violations would be prosecuted by the State and not by private parties.[5]  Indeed, that is how the Rhode Island Supreme Court has construed the HWMA.  In an unpublished order, that Court stated:

> We are of the opinion that as matter of law the statute does not provide a private right of action for violation of this act, but only for proceedings to be brought in the name of the Director of the Department of Environmental Management and/or by the Attorney General on behalf of the state.

Stoutenburgh v. Dierauf, No. 90-194-Appeal (R.I. Dec. 13, 1990).

Moreover, in Hotel Associates, LLC v. HMS Associates Ltd. P'ship, 2004 W.L. 422812 (R.I. Super. Feb. 20, 2004) the Rhode Island Superior Court, later, reached the same conclusion.  In that case, summary judgment was entered against a landowner who sued, under the HWMA, for damages resulting from contamination of its property allegedly caused by fuel oil left in underground storage tanks by the defendant because the Court found that the HWMA did not confer a private right of action.  The Court said:

> [I]t is clear from the language of the HWMA, in its entirety, that the legislature left the HWMA's liability determination and enforcement in the hands of the RIDEM

---

[5] During oral argument, the Court inquired whether counsel wished to have the Court certify this question to the Rhode Island Supreme Court but counsel for both sides declined that invitation.

and the Attorney General.  This Court finds that language
and purpose of the HWMA convey that the legislature did
not intend to create a private right of action.

Id. at 10.

The plaintiffs rely on Gryguc v. Bendick, 510 A.2d 937 (R.I.
1986) but that case  does not support their contention that a
private right of action exists under the HWMA.   In Gryguc, the
Court dismissed a suit brought by neighbors under the HWMA against
a hazardous waste treatment facility on the ground that the
plaintiffs' property was not within the radius entitling them to
contest the issuance of a permit.   The plaintiffs in this case
argue that the fact that the case was not dismissed on the ground
that the plaintiffs did not have a private cause of action
indicates that a private cause of action exists.   That argument is
too attenuated to be persuasive, especially in light of the
subsequent decisions in Stoutenburgh and Hotel Associates.

VII. Punitive Damages

The defendants argue that any claims for punitive damages
should be dismissed because the complaints fail to allege that FRGC
acted with malice or wickedness.  NE Gas Mem. Mot. Dismiss Corvello
Compl. at 19.

It is true that, under Rhode Island law, the standard for
awarding punitive damages is a very strict one.   Thus, a "party
seeking punitive damages has the burden of producing 'evidence of
such willfulness, recklessness or wickedness, on the part of the

party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" Palmisano v. Toth, 624 A.2d 314, 318 (R.I. 1993) (quoting Sherman v. McDermott, 329 A.2d 195, 196 (R.I. 1974)).  However, while it may be advisable to use those terms where punitive damages are being claimed, there is nothing magical about the words themselves. All that is required is that the allegations in a pleading, if proven, be sufficient to support a finding of malice, recklessness or wickedness.

Here, the complaints satisfy that requirement.  They allege that the "[c]oal gasification waste material contains lead, arsenic, cyanide and other hazardous substances" (Corvello Compl. ¶ 21); that the defendants "knew or should have known that the hazardous substances . . . would cause harm" (Corvello Compl. ¶ 39); and that the defendants "knew or should have known that there was a high degree of risk associated with the handling, disposal and/or release of the hazardous substances" (Corvello Compl. ¶ 44). Based on those allegations, it is possible that the plaintiffs might be able to prove the degree of culpability necessary to support an award of punitive damages.

It is true, as the defendants suggest, that whether evidence is sufficient to support an award of punitive damages is a question of law for the Court. Palmisano, 624 A.2d at 318 (citing Davet v. Maccarone, 973 F.2d 22, 27 (1st Cir. 1992)) (court makes "initial

28

determination whether an award of punitive damages is appropriate in a given case."). However, in most cases, the Court cannot make that determination simply by reading the complaint but, instead, must wait until the evidence is presented. This, clearly, is one of those cases.

### Conclusion

For all of the foregoing reasons, it is hereby ORDERED that the defendants' motion to dismiss is DENIED with respect to the counts contained in the plaintiffs' complaint that assert claims for negligence, strict liability and public nuisance and with respect to the requests for punitive damages. The motion to dismiss is GRANTED with respect to the counts asserting claims for gross negligence, private nuisance, infliction of emotional distress, and violation of the Hazardous Waste Management Act, R.I. Gen. Laws §23-19.1-22.

IT IS SO ORDERED:

Ernest C. Torres
_____
Ernest C. Torres
Chief Judge
Date: November 3 , 2006