# B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | : | |
| USGen New England, Inc., | : | Case No. 03-30465 (PM) |
| Debtor. | : | Chapter 11 |

**MOTION FOR ORDERS UNDER 11 U.S.C. §§ 105(a), 363 (b), (f) AND (m), 365, AND 1146 (c) AND FED. R. BANKR. P. 2002, 6004, 6006 AND 9014 (A) (i) APPROVING BIDDING PROCEDURES WITH RESPECT TO PROPOSED SALE OF A PORTION OF DEBTOR'S ASSETS [FOSSIL] TO DOMINION ENERGY NEW ENGLAND, INC. OR ITS DESIGNATED SUBSIDIARY, (ii) SCHEDULING HEARING ON APPROVAL OF SALE, (iii) APPROVING FORM AND MANNER OF NOTICE OF SALE, (iv) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT FEE AND (B) (i) APPROVING SALE OF THE TRANSFERRED ASSETS OF DEBTOR FREE AND CLEAR OF ALL LIENS UNDER SECTION 363, (ii) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN ASSIGNED CONTRACTS AND (C) GRANTING RELATED RELIEF**

USGen New England, Inc., debtor and debtor-in-possession ("Debtor" or "Seller"), by counsel, files this motion (the "Motion") for entry of (i) an order (a) approving certain bidding procedures (the "Bidding Procedures") to be employed in connection with the proposed sale of a portion of the Debtor's assets (the "Sale") to Dominion Energy New England, Inc. or their designee ("Buyer") pursuant to and as described in the Asset Purchase and Sale Agreement dated September 3, 2004 (a copy of which is attached hereto as Exhibit "A") (the "Purchase Agreement"), (b) scheduling a hearing (the "Sale Hearing") on approval of the Sale, (c) approving the form and manner of notice of the Sale, and (d) approving the Break-Up Fee (as defined below) and the Expense Reimbursement Fee (as defined below) in favor of Buyer, and approving (ii) the form of order (the "Sale Order") authorizing (a) the Sale, free and clear of all

Liens, (b) the assumption and assignment of certain Assigned Contracts and Leases in connection with the Sale, (c) the assumption by Buyer of the Assumed Liabilities of Debtor in connection with the Sale, and (e) related relief.[1] In support of this Motion[2], Debtor states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicate for the relief sought in this Motion is §§ 105(a), 363(b), (f) and (m), 365 and 1146(c) of title 11 of the United States Code (the "Bankruptcy Code"), as complemented by Rules 6004, 6006 and 9013 of the Federal Rules of Bankruptcy Procedure.

## RELIEF REQUESTED

2. The principal relief requested in this Motion is the Court's entry of a procedures order substantially in the form of the proposed order annexed hereto as Exhibit "B" (the "Bidding Procedures Order"). In addition, Debtor seeks the entry of a sale order that will, among other things:

a. Under §§ 105(a) and 363(b) (f) and (m) of the Bankruptcy Code, approve the terms and conditions of, and authorize Debtor to enter into the Purchase Agreement with Buyer, subject to higher or better offers (in accordance with the procedures, terms and conditions described below) and which provides for the sale of the Transferred Assets (as defined in the Purchase Agreement), free and clear of any and all Liens and Interests with any Liens and Interests to attach to the proceeds of the Sale;

b. Pursuant to § 365 of the Bankruptcy Code, authorize Debtor to assume and assign to Buyer certain Assigned Contracts and unexpired Leases (collectively, the "Assigned Contracts and Leases"), as set forth in the Purchase Agreement;

---

[1] Terms not otherwise defined herein shall have the same meanings as set forth in the Purchase Agreement.
[2] Debtor reserves the right to file a modified Purchase Agreement prior to or at the hearing to approve the Sale.

c. Find that Buyer is a good faith purchaser within the meaning of § 363(m) of the Bankruptcy Code; and

d. Determine that pursuant to § 1146(c) of the Bankruptcy Code, the Sale is exempt from stamp, transfer, recording or similar taxes (collectively, the "Transfer Taxes").

3. The Procedures Order shall (a) set the date for the Sale Hearing, (b) establish the Bidding Procedures and notice requirements with respect to the Sale, (c) establish procedures for the assumption and assignment of executory contracts and (d) approve Debtor's payment of the Break-Up Fee and the Expense Reimbursement Fee to Buyer.

## BACKGROUND

### The Chapter 11 Case

4. On July 8, 2003 (the "Petition Date"), Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, Debtor is continuing to operate its business and manage its properties as a debtor in possession. No trustee or examiner has been appointed in Debtor's chapter 11 case. On July 17, 2003, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee") in Debtor's chapter 11 case.

### Debtor and Its Business Operations

5. Debtor was incorporated on August 1, 1997 for the purpose of acquiring and operating the non-nuclear generating assets of New England Electric System (the "Acquisition"). Debtor is an indirect, wholly owned subsidiary of National Energy & Gas Transmission, Inc. *f/k/a* PG&E National Energy Group, Inc. ("NEGT").

6. Debtor is in the business of owning and operating electric generating facilities in New England (the "Facilities") and buying and selling electricity and other energy-related products at wholesale. All of Debtor's significant sales take place in New England.

**Debtor's Generating Facilities**

7. Debtor owns three Facilities that use coal, oil or natural gas for fuel (collectively, the "Fossil Facilities"): Brayton Point Station, Salem Harbor Station and Manchester Street Station. Debtor also owns two hydroelectric systems (collectively, the "Hydro Facilities"): one spanning the Connecticut River (the "Connecticut River System") and the other spanning the Deerfield River (the "Deerfield River System"). In addition, as of the Petition Date, Debtor leased a pumped-storage facility along the Deerfield River known as the Bear Swamp Facility (as defined below), which Debtor currently operates.

8. The Brayton Point Station is located in Somerset, Massachusetts on a 225-acre site. It generates approximately 1,589 megawatts[3] ("MW") and includes four separate generating units. Three of these four units are primarily fueled with coal but use oil and natural gas as backup fuel. The fourth unit is fueled primarily with oil but uses natural gas as backup fuel. In addition, Brayton Point Station has three small diesel generating units which can generate approximately 9 MW.

9. The Salem Harbor Station is located in Salem, Massachusetts and includes four generating units with an aggregate generating capacity of approximately 745 MW. Three of the units are fueled primarily with coal but burn oil as backup fuel. The fourth unit is fueled with oil.

10. The Manchester Street Station is located in Providence, Rhode Island. It is comprised of three units which are fueled by natural gas with a backup fuel source of oil. The total generating capacity of the facility is 495 MW.

11. The Connecticut River System is a conventional hydroelectric system located along the Connecticut River in New Hampshire and Vermont. Its total capacity is 484 MW. The

system consists of six hydroelectric stations (all located at dams along the river) with a total of 26 generating units.

12. The Deerfield River System is a conventional hydroelectric system located along the Deerfield River in Massachusetts and Vermont. Its total capacity is 83 MW, consisting of seven stations (all located at dams along the river) and 15 generating units.

13. The Bear Swamp facility (the "Bear Swamp Station") is located on approximately 1300 acres along the Deerfield River (the "Bear Swamp Land") and has a generating capacity of 590 MW. There is a small hydroelectric facility, the Fife Brook Station, located at the lower reservoir of Bear Swamp with a capacity of 10 MW (collectively with the Bear Swamp Station, the "Bear Swamp Facility").

**Significant Financial Obligations**

14. Debtor originally financed the approximately $1.6 billion cost of the Acquisition through a combination of approximately $1.1 billion in equity from its parents and the remainder in bank debt. As of the Petition Date, Debtor's bank debt consisted of an unsecured $100 million working capital and revolving credit facility with JPMorgan Chase Bank, as agent, and other banks, maturing on August 30, 2003 (the "Credit Facility"). As of June 30, 2003, Debtor had borrowings under the Credit Facility in the approximate amount of $75 million and amounts outstanding under letters of credit issued under the Credit Facility of approximately $13 million.

15. Shortly after the Acquisition, Debtor sold the Bear Swamp Facility for $479 million and then leased the Bear Swamp Facility back from its owners on a long-term basis. Simultaneously, Debtor leased the Bear Swamp Land to the owners of the Bear Swamp Facility on a long-term basis. Therefore, Debtor is the *operator* — not the owner — of the Bear Swamp

[3] One megawatt of electricity is sufficient for approximately 1,000 homes.

Facility. Proceeds from the sale of the Bear Swamp Facility were used to reduce the bank debt and for other general corporate purposes.

16. As of the Petition Date, the total payments required to be made by Debtor for the remaining term of the Bear Swamp Facility lease exceeded $425 million. For this and other reasons, Debtor moved to reject the Bear Swamp lease and related agreements. Several entities opposed the rejection. In addition, the certificate holders[4] argued that the lease transaction should be recharacterized as a secured financing. Through a negotiated settlement, the parties reserved their rights on the lease recharacterization issue[5] and the Court authorized Debtor to reject the lease as of September 30, 2003. Thereafter, Debtor and the Bear Swamp owners/lessors entered into short-term operating agreements. As a result, the Bear Swamp Facility is excluded from this Sale because Debtor, as a mere operator, cannot entertain any offers for its purchase.[6]

17. At the time of the Acquisition, Debtor assumed from New England Electric System several gas transportation agreements, coal transportation arrangements and certain arrangements to transport electric power from Canada into New England (the "Commodities Transportation Arrangements"). Under the Commodities Transportation Arrangements, Debtor was obligated to pay certain fixed costs related to the respective commodity transportation services, regardless of Debtor's need for such services. Because many of the Commodities Transportation Arrangements had above-market costs, Debtor rejected several of them in the first few months of this case.

---

[4] The certificate holders are certain institutional investors that purchased pass through certificates issued by certain Pass Through Trusts pursuant to an offering under Rule 144A of the Securities Exchange Act of 1993, as amended. The Pass Through Trusts hold certain Lessor Notes issued by the owners/lessors in connection with the acquisition of the Bear Swamp Facility.

[5] A trial on that issue was held the week of June 21, 2004 and no ruling on the matter has been entered as of the date of this Motion.

18. Also, at the time of the Acquisition, Debtor entered into contracts to supply wholesale standard offer service (the "SOAs") with the following subsidiaries of New England Electric System: Massachusetts Electric Company and Nantucket Electric Company (collectively, "MECO") (for Massachusetts customers) and Narragansett Electric Company ("NECO") (for Rhode Island customers).[7] Debtor sells power under the SOAs at contractually established rates to each of MECO and NECO to the extent that a portion of the retail customers of MECO and NECO purchase standard offer service electricity from them. Currently, approximately two-thirds of Debtor's electrical power output is sold under the SOAs, with most of the balance sold into the wholesale energy spot market. The SOA with MECO expires at the end of 2004, and the SOA with NECO expires at the end of 2009.

19. As part of the Acquisition, Debtor also acquired the rights and obligations of New England Power Company ("NEP") to purchase power at contractually established rates under various power purchase agreements between NEP and various independent power producers (the "PPAs"). In addition to the power it purchases under the arrangements with NEP, Debtor also purchases power directly from several other independent power producers, again at contractually established rates. Virtually all of the PPAs, including those involving NEP, have above-market costs. As a result, Debtor rejected several of them early in this case.

**<u>Reasons for Chapter 11 Filing</u>**

20. Debtor 's decision to seek relief under chapter 11 of the Bankruptcy Code resulted from a confluence of factors. First, Debtor's indirect parent, NEGT, is also operating as a debtor in possession in a case pending before this Court (but a plan of reorganization has been

---

[6] Potential buyers of the Bear Swamp Facility should contact the agent for the owners of the Bear Swamp Facility: Mark Hopkins at Conway Del Genio Gries & Co., LLC, 645 Fifth Ave., 11th Floor, New York, NY 10022.

[7] Debtor had also entered into an SOA with Granite State Electric Company (for New Hampshire customers), which is no longer in effect.

confirmed). NEGT was required to file chapter 11 because of a combination of the following non-exclusive reasons: (i) NEGT's default under its credit facility, (ii) Standard & Poor's and Moody's downgrades of NEGT's credit ratings, and (iii) NEGT's resulting defaults under certain master trading agreements entered into between various of its energy trading subsidiaries and counterparties, which contracts it had guaranteed. Thus, NEGT is unable to take any action to address Debtor's financial condition.

21. Second, Debtor's financial condition deteriorated as a result of a host of factors. In particular, (i) as of the Petition Date, Debtor owed approximately $88 million under the Credit Facility which would have matured at the end of August 2003; (ii) Debtor had to use substantial working capital to prepay its fuel requirements as a result of Debtor's deteriorating credit situation; (iii) Debtor faced increasing payments under the Bear Swamp lease (increasing to over $45 million per year in 2004); (iv) the MECO SOA - Debtor's largest sales contract and revenue source – expires at the end of 2004, exposing Debtor to market volatility at a time when supply is expected to exceed demand, potentially resulting in depressed prices; (v) as of the Petition Date, Debtor was saddled with substantially above-market costs related to the PPAs and the Commodity Transportation Arrangements, and (vi) Debtor owed significant sums to ET under the SOA hedges.

22. Third, Debtor may be required to make substantial capital investments at its Brayton Point and Salem Harbor Facilities in order to meet new environmental requirements imposed by the federal and state governments with respect to air emissions and water discharges. These investments could exceed $400 million over the next three years. In early January, the Court authorized Debtor to commence certain environmental upgrades at its Brayton Point Facility in the approximate amount of $100 million. In June, the Court authorized Debtor to

enter into a contract that would allow for third parties to finance certain environmental upgrades at its Salem Harbor Facility in the approximate amount of $85 million. On September 3, 2004 Debtor filed a motion seeking authority to implement an ash reduction process at its Brayton Point Facility in the approximate amount of $43 million. As Debtor informed the Court in connection with those matters, Debtor does not itself have access to the capital needed to make all of the desired upgrades to its Facilities, which could result ultimately in a cessation of operations at one or more Facilities.

**The Marketing Process**

23. In an attempt to address these stark economic realities in 2002, Debtor and its affiliates sought a buyer for certain of Debtor's assets and/or the outright sale of Debtor and its business as a means to raise capital. However, despite its marketing efforts, Debtor and its affiliates were unable to close on a sale of Debtor or its assets at a positive net value prior to filing chapter 11. Specifically, in January 2002, NEGT engaged Goldman Sachs as an advisor and conducted a formal two-stage auction of the Salem Harbor Station, the Manchester Street Station and the Bear Swamp Facility. While over 25 companies reviewed the materials, signed confidentiality agreements and conducted some measure of due diligence, only one reasonable bid was received, and it was for the Manchester Street Station only. Debtor fully negotiated the deal but the buyer decided not to proceed at the last minute.

24. Separately, in the fall of 2002, NEGT engaged Lehman Brothers as an advisor to explore the sale of all or part of NEGT and its subsidiaries. That process resulted in one prospective buyer conducting detailed due diligence and negotiating for the sale of Debtor, but definitive agreements were never executed.

25. Also, in July 2002, Debtor received an offer to sublease the Bear Swamp Facility for 17 years at an amount significantly lower than the existing lease payments. The sublease required consent from the lessor, which Debtor was unable to obtain.

26. Further, in addition to seeking to develop a business plan that might serve as the basis of a plan of reorganization, Debtor and its investment banking advisor, Lazard Freres & Co. LLC ("Lazard"), have marketed the Transferred Assets. Toward this end, Debtor and Lazard have conducted a marketing program to solicit third-party proposals and offers to purchase the Transferred Assets, which included contacting numerous entities (including many familiar with Debtor's industry in general and Debtor in particular). In March 2004, Lazard and Debtor prepared and distributed a marketing package with respect to all or part of the Transferred Assets to potential acquirers.

27. After meaningful input from various creditor constituencies, Lazard contacted 88 potential strategic and financial buyers. 73 entities requested confidentiality agreements and 52 interested parties signed confidentiality agreements. Lazard conducted a first round bid process to encourage parties to provide Debtors with expressions of interest for any of Debtor's Hydro Facilities or Fossil Facilities (or for the entire portfolio). 16 Bidders submitted conforming initial bids by the deadline of May 27, 2004. Thereafter, Debtor and Lazard identified several entities that appeared the most qualified to acquire Debtor's assets and participate in a second round of bidding (which concluded on August 6, 2004) and began to coordinate extensive due diligence with those entities. The extended due diligence included detailed management presentations at Debtor's headquarters for each of these entities and coordinated in-depth site examinations of Debtor's generating facilities. After conducting an extensive analysis of the second round of competing offers received from these entities and after detailed consultation

with the Committee,[8] Debtor selected Buyer's offer for the Fossil Facilities (as well as certain other assets relating thereto, including, without limitation, Assigned Contracts, Leases and Assumed Liabilities, equipment, inventory, Intellectual Property, real property, Emissions Credits and books and records, all as more fully set forth in the Purchase Agreement and which are defined as the Transferred Assets) because it represented the best opportunity to maximize the value of the Transferred Assets. Debtor has also received several offers for the remainder of its assets (i.e. the Hydro Facilities and related assets) and hopes to file a motion in the near future (once negotiations have been completed) seeking to approve bidding procedures, break up fees and expense reimbursement fees in connection with the sale of Debtor's remaining assets (Hydro Facilities).

**The Need For A Prompt Sale Process**

28. Debtor has determined in its sound business judgment that the Sale of the Transferred Assets, under present conditions, is the best way to preserve the value of the company, protect the jobs of the remaining experienced and valued personnel, and preserve the remaining value of the Transferred Assets for the benefit of creditors. This is especially the case given the volatile nature of the pricing for fuels used by the Fossil Facilities. In addition, given this volatility, the Buyer has requested a prompt sale so as to avoid these uncertainties and reduce the possible effects of the same on its bid. Debtor also has determined, in an exercise of its business judgment, that the Sale (subject to higher and/or better offers) in accordance with the Bidding Procedures will garner the best return on the Transferred Assets that Debtor can realistically hope to obtain. At the present time, Debtor believes that the sale process will result

[8] Throughout the process, Lazard and Debtor have been working closely with the Committee and its financial and legal advisors on the sale process. Debtor's efforts have included many detailed presentations of its operational, financial and tactical activities, as well as other issues critical to the Committee's understanding of Debtor and its reorganization efforts.

in a substantial recovery for creditors. However, that conclusion is subject to market changes and ongoing analysis of claims.

**Bidding Procedures**

***A. Overview***

29. **THIS MOTION CONTAINS ONLY A SUMMARY OF TERMS. THEREFORE, ALL INTERESTED PARTIES SHOULD REVIEW THE BIDDING PROCEDURES SET FORTH IN DETAIL IN THE ATTACHED PROPOSED ORDER.**

30. By this Motion, Debtor first requests entry of the Procedures Order, which describes in detail the Bidding Procedures and establishes certain guidelines for the prompt and fair consideration of any competing bids for the Transferred Assets. Debtor seeks to hold the Sale Hearing on or before November 18, 2004.[9] Debtor believes that the proposed Bidding Procedures will maximize the realizable value of the Transferred Assets.

31. As noted above, Debtor desires to consummate the Sale (including the assumption and assignment of certain of Debtor's Assigned Contracts and Leases and the assumption of the Assumed Liabilities) as soon as possible. Debtor therefore requests (in accordance with § 9.10 of the Purchase Agreement) that the Court (i) schedule the Sale Hearing for a date no later than November 18, 2004 and (ii) set as a deadline for objecting to the Sale a date that is five days prior to the Sale Hearing date.

***B. Notice Provisions***

32. In order to provide adequate notice of the Bidding Procedures to all parties so entitled, Debtor proposes that, within 3 business days of the entry of the Bidding Procedures Order, it (or its agents) will serve this Motion (which includes as an exhibit the Purchase



118274.01600/11342799v10

Agreement), a copy of the Procedures Order and a copy of the Sale Notice in the form attached to the Procedures Order by first class mail, postage pre-paid, upon (i) Office of the United States Trustee for the District of Maryland (Greenbelt Division); (ii) counsel for Buyer; (iii) counsel for the Committee; (iv) any entities known to have an interest in a merger or acquisition transaction regarding the Debtor or any of its assets during the past six (6) months; (v) all entities known to have, or to have asserted, any lien, claim, encumbrance, right of first refusal, or other property interest in or upon any of the Transferred Assets which are to be sold pursuant to the Purchase Agreement; (vi) all taxing authorities for those jurisdictions in which the Transferred Assets re located; (vii) the Securities and Exchange commission; (viii) the District Director of the Internal Revenue Service; (ix) the United States attorney for the District of Maryland; (x) the Attorney General for the Commonwealth of Massachusetts; (xi) the Attorney General for the State of Rhode Island; (xii) the Massachusetts Department of Environmental Protection; (xiii) the Rhode Island Department of Environmental Management; (xiv) the United States Environmental Protection Agency; (xv) ISO New England, Inc.; (xvi) the Federal Energy Regulatory Commission; (xvii) New England Power Pool; (xviii) New England Power Company; (xix) all holders of Assumed and Excluded Liabilities; (xx) all parties to executory contracts or unexpired leases proposed to be assumed and assigned under the Purchase Agreement; (xxi) all entities that filed a notice of appearance and request for service of papers in this case in accordance with Bankruptcy Rule 2002; (xxii) all entities required to be served under Bankruptcy Rule 2002; and (xxiii) such other entities as may be reasonably requested by Buyer.

33. As part of this Motion, Debtor will seek to assume and assign the Assigned Contracts and Leases. Debtor seeks authority to file with the Court and serve on all non-Debtor

---

[9] In the event an Auction occurs on November 15, 2004, the Purchase Agreement provides that the Sale Hearing may be scheduled for a later date. Debtor reserves the right to request a later date for the Sale Hearing consistent

parties to written Assigned Contracts and Leases, a notice (the "Assumption Notice") of Debtor's intention to assume and assign that party's Assigned Contracts and Leases to Buyer. Debtor further proposes that: the Assumption Notice shall contain the cure (if any) necessary to assume the Assigned Contracts and Leases thru October 1, 2004 (the "Cure") and the identity of Buyer (with contact information for any further inquiries regarding adequate assurance under Section 365) and be mailed no later than seven days after the entry of the Bidding Procedures Order. The party to the Assigned Contracts and Leases shall have until 4:00 p.m. (EST) on the date which is 2 days before the Auction (as defined below)) to object to the Cure and raise any objections relating to adequate assurance issues (collectively, "Initial Objections"). The Initial Objections shall state with specificity what cure is required (with appropriate documentation in support thereof and if any adequate assurance issues under Section 365). If no objection is timely received, the Cure set forth in Debtor's Assumption Notice shall be controlling notwithstanding anything to the contrary in any Assigned Contracts and Leases or other document. The notice will also provide that Debtor, in consultation with Buyer, may withdraw the request to assume and assign any Assigned Contracts and Leases at any time on or before the Sale Hearing. In addition, if Debtor is proceeding with the Sale to a party other than Buyer as a result of the receipt of a higher and/or better offer, then Debtor shall (a) give all effected parties to the Assigned Contracts and Leases notice (the "Second Notice") by overnight delivery, within three (3) days after the conclusion of the Auction, of the identity of the Winning Bidder (as defined below) and (b) give any other parties to executory contracts which will be designated as Assigned Contracts and Leases by the Winning Bidder notice of the (i) Cure with respect to such additional Assigned Contracts and Leases and (ii) identity of the Winning Bidder with contact information for any further inquiries regarding adequate assurance under Section 365. A party to

with the terms of the Purchase Agreement and subject to the Court's availability.

the Assigned Contracts and Leases who receives a Second Notice shall file any objections or supplements to any Initial Objections (the "Supplemental Objections") on or before 4:00 p.m. on November 24, 2004, (i.e. within 3 days of the receipt of the Second Notice). The hearing to consider the Initial Objections and the Supplemental Objections shall be the same date scheduled for the Sale Hearing.

34. Debtor also proposes, pursuant to Fed. R. Bankr. P. 2002(1) and 2002(d), that notice be given to (i) equity security holders of Debtor, (ii) parties to oral contracts, if any, with Debtor, and (iii) any other interested parties whose identities are unknown to Debtor, by having the Sale Notice published once in (i) The National Edition of the Wall Street Journal, The Boston Globe and The Providence Journal (in the form attached to the Procedures Order) within five (5) business days after the entry of the Bidding Procedures Order.

35. Debtor further requests, pursuant to Fed. R. Bankr. P. 9014, that the Court order that objections, if any, to the Sale or the relief requested therein (including (i) the assumption by Debtor and assignment to Buyer of Assigned Contracts and Leases, and (ii) the assumption by Buyer of the Assumed Liabilities (a) be in writing, (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules, (c) be filed with the Clerk of the Bankruptcy Court with a courtesy copy to (i) general counsel for Debtor, USGen New England, Inc, 7600 Wisconsin Avenue, Bethesda, MD 20814, Attention: General Counsel; (ii) counsel for Debtor, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, Attention: Marc E. Richards, Esquire; (iii) Blank Rome LLP, One Logan Square, Philadelphia, PA 19103, Attention: Ronald Fisher, Esquire; (iv) counsel for the Committee, Reed Smith LLP, 435 Sixth Avenue, Pittsburgh, PA 15219, Attention: Eric Schaffer, Esquire; (v) Reed Smith LLP, 2500 One Liberty Place, 1650 Market Street, Philadelphia, PA 19103, Attention:

Claudia Z. Springer, Esquire; (vi) financial advisors to Debtor, Lazard LLC, 30 Rockefeller Plaza, New York, NY 10020, Attention: J. Blake O'Dowd, Managing Director, (vii) counsel for the Buyer, McGuireWoods LLP, One James Center, 901 East Cary Street, Richmond, Virginia 23219-4030; Attention: Dion W. Hayes, Esquire; and (viii) counsel for Buyer, Dominion Energy New England, Inc., 120 Tredegar Street, Richmond, Virginia 23219; Attention: Rudolph Bumgardner, IV, Managing Counsel, so that they are received by each such party no later than 4:00 p.m. (EST) on November 12, 2004.[10]

36. Debtor further requests, pursuant to Fed. R. Bankr. P. 9014, that the Court order that the failure of any objecting person or entity to file its objection timely and in accordance with the requirements of the Procedures Order will be a bar to the assertion, at the Sale/Confirmation Hearing or thereafter, of any objection to Debtor's and Buyer's consummation and performance of the Purchase Agreement (including the Sale of Transferred Assets and assumption and assignment of Assigned Contracts and Leases free and clear of Liens, and the assumption of the Assumed Liabilities by Buyer).

*C. Bidding Procedures*

37. Section 9.10 of the Purchase Agreement requires that Debtor seek approval of certain specified bidding procedures (the "Bidding Procedures"). Section 13.1(g) of the Purchase Agreement permits Buyer to terminate the Purchase Agreement if, inter alia, the Court fails to enter an order approving the Break-Up Fee and Expense Reimbursement Fee within thirty (30) days of the date of this Motion. Accordingly, Debtor requests that the Court approve the Bidding Procedures set forth below to preserve the benefits of the Purchase Agreement and facilitate the receipt and analysis of competing bids for the Transferred Assets:

---

[10] In the event the Auction occurs and Buyer is not the Winning Bidder, this date will be extended until November 24, 2004.

(a) Qualification as Bidder. Seller, after detailed consultation with the Committee, will determine whether any entity (a "Potential Bidder") that wishes to make a Superior Offer is a "Qualified Bidder." For a Potential Bidder to be considered eligible as a Qualified Bidder, it must provide Seller within ten (10) days of entry of the Bidding Procedures Order (hereinafter "BPO") with: (i) an executed confidentiality agreement substantially identical to the confidentiality agreement executed by Buyer (which shall automatically include all confidentiality agreements submitted to Debtor postpetition on or before August 6, 2004); (ii) current audited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of engaging in a Superior Offer (an "Acquisition Entity"), current audited financial statements of the equity holder(s) of the Potential Bidder or such other financial disclosure acceptable to Seller and the Committee, demonstrating such Potential Bidder's ability to close a proposed transaction; (iii) a written statement by the Potential Bidder stating that it agrees to be bound by the terms and conditions of the BPO and the form of Purchase Agreement (but subject to Paragraph 37(b)(ii) below); (iv) a written statement by the Potential Bidder that it will assume all or a portion of the Assumed Liabilities, to be assumed by Buyer; and (v) if the Potential Bidder is an Acquisition Entity, a written guarantee, letter of credit or other form of credit enhancement acceptable to Seller (after detailed consultation with the Committee) pursuant to which the equity holder(s) of the Potential Bidder are responsible for the Potential Bidder's obligations in connection with the Sale. The Potential Bidder also must establish that it has the ability to consummate its proposed transaction within the timeframe contemplated for consummation of the Purchase Agreement. Buyer is, and at all times shall be deemed to be, a Qualified Bidder entitled to participate in the Auction (as defined below).

(b) Bid Requirements.

i. Seller, after detailed consultation with the Committee, will determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid: (a) the bid must be a written irrevocable offer from a Qualified Bidder containing written evidence of a commitment for financing or other evidence of an ability to consummate the Sale, subject to no conditions other than those set forth in the Purchase Agreement, in either event satisfactory to Seller after detailed consultation with the Committee; (b) the bid must include evidence of authorization and approval from the Qualified Bidder's Board of Directors or comparable governing body indicating that the Qualified Bidder is duly



118274.01600/11342799v10

authorized to perform the transactions in the bid and the BPO; (c) the bid must be for all or a portion of the Transferred Assets; (d) the bid must not be materially more burdensome than the terms of the Purchase Agreement with respect to the Transferred Assets; (e) the bid must not request or entitle the bidder to any termination or break-up fee, expense reimbursement or similar type of payment (unless the Qualified Bidder is the Buyer); and (f) the bid must acknowledge and represent that the Qualified Bidder: (1) has had an opportunity to conduct any and all due diligence regarding Seller's businesses and assets prior to making its offer; (2) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Seller's assets in making its bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Transferred Assets or proposed transaction, or the completeness of any information provided in connection therewith or the Auction (as defined below), except as expressly stated in the BPO or the Purchase Agreement. The Purchase Agreement is deemed a Qualified Bid.

ii. All bids must include clean and blacklined versions of a revised version of the Purchase Agreement (the "Bidder Purchase Agreement"), with (x) the clean version of the Bidder Purchase Agreement being a duly executed original substantially similar to and in the form of the Purchase Agreement, signed by the Qualified Bidder and (y) the blacklined version showing the proposed changes from the Purchase Agreement executed by Buyer.

iii. Deposit. Each Potential Bidder's bid must be accompanied by a deposit in an amount that is five percent (5%) of the total purchase consideration in the subject Bidder Purchase Agreement (the "Deposit"). Prior to the Bid Deadline (as defined below), the Deposit is to be delivered by the Qualified Bidder to the escrow agent under the Deposit Escrow Agreement in the form of a wire transfer to:

[Bank]
[ABA #]

iv. Additional Requirements for Bids. Bids must be: (a) in writing; (b) signed by an individual authorized to bind the Potential Bidder; and (c) received no later than 12:00 noon

(EST) on November 8, 2004 (the "Bid Deadline"), by (i) general counsel for Debtor, USGen New England, Inc., 7600 Wisconsin Avenue, Bethesda, MD 20814, Attention: General Counsel; (ii) counsel for Debtor, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, Attention: Marc E. Richards, Esquire; (iii) Blank Rome LLP, One Logan Square, Philadelphia, PA 19103, Attention: Ronald Fisher, Esquire; (iv) counsel for the Committee, Reed Smith LLP, 435 Sixth Avenue, Pittsburgh, PA 15219, Attention: Eric Schaffer, Esquire; (v) Reed Smith LLP, 2500 One Liberty Place, 1650 Market Street, Philadelphia, PA 19103, Attention: Claudia Z. Springer, Esquire; (vi) financial advisors to Debtor, Lazard LLC, 30 Rockefeller Plaza, New York, NY 10020, Attention: J. Blake O'Dowd, Managing Director; (vi) counsel for the Buyer, McGuireWoods LLP, One James Center, 901 East Cary Street, Richmond, Virginia 23219-4030; Attention: Dion W. Hayes, Esquire; and (vii) counsel for Buyer, Dominion Energy New England, Inc., 120 Tredegar Street, Richmond, Virginia 23219; Attention: Rudolph Bumgardner, IV, Managing Counsel.

v. No Conditions. Any bid must not be subject to financing, due diligence, acquisition of any Excluded Asset, the assignment of any executory contract other than the Assigned Contracts and Leases or any other condition or contingency less favorable to Seller than those set forth in the Purchase Agreement, as determined by Seller in its reasonable discretion after detailed consultation with the Committee.

vi. Initial Overbid. An initial overbid shall be a Superior Offer (as defined in the Purchase Agreement, hereinafter, "Initial Overbid"). The Purchase Agreement defines a Superior Offer as:

One or more Qualified Bids received by the Seller from one or more Qualified Bidders (as defined in the BPO) pursuant to the terms of the BPO, which Qualified Bids provide for the acquisition of all or a portion of the Transferred Assets, provided that, in the aggregate, such Qualified Bids shall be for all Transferred Assets, and assumption of all or a portion of the Assumed Liabilities (including Assigned Contracts and Leases), for an aggregate purchase price that is at least $30,000,000 more than the Closing Amount, plus the agreement by such Qualified Bidders to reimburse Seller for the Major Maintenance and Capital Expenditures



118274.01600/11342799v10

Amount and pay Seller the Inventory Adjustment Amount, on terms and conditions no less favorable to the Seller in the aggregate than those set forth in the Purchase Agreement.

vii. Qualified Bid. Only a bid submitted by a Qualified Bidder that meets the requirements set forth in this section (b) shall be considered a "Qualified Bid."

viii. Bankruptcy Court Approval. All bids, including that of Buyer (whether through the Purchase Agreement or otherwise) shall be subject to the approval of the Bankruptcy Court.

(c) Due Diligence.

i. Diligence and Confidentiality Agreement. Qualified Bidders will be provided with a Confidential Information Memorandum. Seller has established a "data room" containing "due diligence" information and documents related to Seller's businesses and assets as well as the Assigned Contracts and Leases and Assumed Liabilities. Seller will provide each Qualified Bidder compact discs containing the information and documents contained in the data room. Seller will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline. Buyer may continue due diligence, including the submission of supplemental requests, up and until the Bid Deadline. Seller, its affiliates or any of its respective representatives are not obligated to furnish any information to any person except a Qualified Bidder. Any information and documents provided by the Debtor to any Qualified Bidder shall be promptly and, where possible, contemporaneously provided to all Qualified Bidders. Any Qualified Bidder who desires to conduct due diligence should contact Lazard LLC, 30 Rockefeller Center, New York, New York 10020, (212) 632-6000, Attention: J. Blake O'Dowd, financial advisors to Seller, for the due diligence procedures.

(d) Auction.

i. Auction Date and Time. If a Qualified Bid is submitted for the Transferred Assets other than the Buyer's bid contained in the Purchase Agreement, then Seller shall conduct an



118274.01600/11342799v10

auction (the "Auction"). The Auction will be held on November 15, 2004, commencing at 12:00 noon (EST) at the offices of Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York, or such other time and place as may be established by Seller, after detailed consultation with the Committee (and is reasonably acceptable to Buyer), prior to the Sale Hearing Date, for consideration of Qualified Bids. Only the authorized representatives of each of the Qualified Bidders that timely submitted a Qualified Bid, the Committee, Buyer and Seller shall be permitted to attend the Auction.

ii. <u>Auction Procedures.</u> All Qualified Bidders participating in the Auction must be physically present at the Auction. At the Auction, the Seller, in its reasoned business judgment, may adopt rules for the Auction that will promote the goals of the Auction and that are not inconsistent with any other provisions of the BPO or the Purchase Agreement. Any such additional rules shall provide that: (a) all procedures must be fair and open with no participating Qualified Bidder materially disadvantaged as compared to any other participating Qualified Bidder; (b) all bids shall be made on an open basis, and participating Qualified Bidders shall be entitled to be present for all bidding; and (c) the principals of each participating Qualified Bidder shall be fully disclosed to all other participating Qualified Bidders throughout the entire Auction. If no Potential Bidder makes the timely submissions required in paragraph 37 herein and is determined to be a Qualified Bidder, or if no Qualifying Bid (other than that of the Buyer) is received by the Bid Deadline, then no Auction shall take place, and the Debtor shall, at the Sale Hearing, request: (x) that the Purchase Agreement be deemed the highest and best offer for the Transferred Assets, (y) authority to proceed to close the Sale to Buyer pursuant to the Purchase Agreement, and (z) entry of the Sale Order.

iii. <u>Evaluation of Highest or Best Offer.</u> Seller shall, promptly after the Bid Deadline, after detailed consultation with the Committee: (a) evaluate all bids, if any, received, and (b) determine which bids, if any, constitute Qualified Bids. Seller shall provide Buyer and the Committee with copies of all Qualified Bids not more than two (2) business days after receipt. During the course of the Auction, Seller shall inform each participating Qualified Bidder which Qualified Bid or Bids reflect, in Seller's view, upon detailed consultation with the Committee, the highest or best offer.

Seller may accept (in its discretion) two or more lot bids with respect to the Transferred Assets in lieu of a bulk bid if the aggregate amount of the accepted lot bids exceeds the highest bulk bid and the terms and conditions of the accepted lot bids, in the aggregate, are no less favorable to Seller than the terms and conditions of the highest bulk bid, as determined in Seller's discretion, upon detailed consultation with the Committee.

iv. Subsequent Bids. Seller shall not consider any subsequent bid made at the Auction unless the bid is made by a Qualified Bidder who has previously made a Qualified Bid and such subsequent bid exceeds the previous highest or best bid by at least $5,000,000 (subject to the provisions of subsection (v) below).

v. Subsequent Buyer Bids. Buyer shall have the right to credit bid or include the amount of the Break-Up Fee and the maximum possible amount of the Expense Reimbursement Fee in the amount of any subsequent bid that it makes at the Auction. If, as a result of a subsequent bid made by Buyer at the Auction, the Buyer is the Winning Bidder or the Back-Up Bidder (as defined therein), the Buyer shall be entitled to credit the amount of the Break-Up Fee and the maximum possible amount of the Expense Reimbursement Fee against the Purchase Price payable at Closing.

vi. Other Terms. All Qualified Bids, the Auction, and the Bidding Procedures are subject to such other terms and conditions as are announced by Seller, after detailed consultation with the Committee, not inconsistent with the BPO. At the conclusion of the Auction, the winning bid shall be the bid made pursuant to the BPO that represents, in Seller's reasonable discretion, upon detailed consultation with the Committee, the highest or best offer (the "Winning Bid"). The Seller may not solicit, receive or consider bids for the Transferred Assets after the Auction. The bidder submitting such Qualified Bid shall become the "Winning Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the applicable asset purchase agreement. No less than two (2) days prior to the Sale Hearing, the Winning Bidder (if other than the Buyer) shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Winning Bid was made. Seller will not be deemed to have finally accepted any bid

until the bid has been approved by the Bankruptcy Court at the Sale Hearing.

vii. Irrevocability of Certain Bids. The bid of the Winning Bidder shall remain irrevocable in accordance with the terms of the purchase agreement executed by the Winning Bidder. The bid of the Qualified Bidder that submits the next highest or otherwise best bid (the "Back-Up Bidder") shall be irrevocable until the earlier of: (a) 180 days after entry of the Order approving the sale to the Winning Bidder; (b) closing of the sale to the Winning Bidder or the Back-Up Bidder; and (c) May 31, 2005.

viii. Supplemental Deposit Payment. If, upon conclusion of the Auction, the amount of the Deposit delivered by either the Winning Bidder or the Back-Up Bidder is less than an amount equal to five percent (5%) of the total purchase consideration agreed to be paid by either the Winning Bidder or the Back-Up Bidder, respectively, as a result of the Auction, then the Winning Bidder and/or the Back-Up Bidder, as applicable, shall, within three (3) business days after the conclusion of the Auction, wire an amount equal to such difference ("Supplemental Deposit Amount") in accordance with the wiring instructions set forth above.

ix. Retention of Deposit. The Deposit (including any Supplemental Deposit Amount) of the Winning Bidder shall be retained by Seller in accordance with the terms of the purchase agreement executed by the Winning Bidder. The Deposit (including any Supplemental Deposit Amount) of the Back-Up Bidder shall be held until the earlier of: (a) 180 days after entry of the Order approving the sale to the Winning Bidder; (b) closing of the sale to the Winning Bidder or the Back-Up Bidder; and (c) May 31, 2005. The Deposit plus interest of each Qualified Bidder other than the Winning Bidder and the Back-Up Bidder shall be paid to the Qualified Bidder within five (5) business days after the entry of the order of the Bankruptcy Court approving the sale to the Winning Bidder.

x. Failure to Close. In the event a bidder is the Winning Bidder (as determined by Seller, upon detailed consultation with the Committee and as approved by the Bankruptcy Court), and such Winning Bidder fails to consummate the sale as a result of the Winning Bidder's default under the applicable purchase agreement in accordance with the terms of such purchase agreement by the closing date

contemplated in such purchase agreement, Seller shall: (i) retain the Winning Bidder's Deposit (including any Supplemental Deposit Amount) as liquidated damages (except as otherwise specified in the Purchase Agreement); and (ii) upon detailed consultation with the Committee, be free to enter into a new purchase agreement with the Back-Up Bidder at the highest price bid by the Back-Up Bidder at the Auction (or, if the Back-Up Bidder is unable to consummate the Sale at that price, Seller, upon detailed consultation with the Committee, may consummate the Sale with the next highest Qualified Bidder at the Auction) without the need for an additional hearing (or additional Order) before the Bankruptcy Court.

xi. Non-Conforming Bids. Notwithstanding anything to the contrary in this Procedures Order, Seller, upon detailed consultation with the Committee, shall have the right to entertain bids from Qualified Bidders that do not conform to one or more of the requirements specified herein and deem such bids Qualified Bids; provided, however, that no non-conforming bid may be deemed to be a Qualified Bid unless (i) such bid is irrevocable in accordance with the terms of the BPO; (ii) such bid is submitted with a Deposit in the amount specified in paragraphs 37(b)(iii) and 37(d)(viii) above; (iii) such bid is only for all or substantially all of the Transferred Assets; (iv) such bid is in an amount equal to or greater than the amount (including the Initial Overbid amount) required by paragraph 37(b)(vi) above; and (v) the identity of the bidder has been adequately described to participants at the Auction, prior to the commencement of the Auction.

(e) Expenses. Any bidders presenting bids shall bear their own expenses in connection with their bid and the proposed sale, whether or not such sale is ultimately approved, in accordance with the terms of the purchase agreement executed by such bidders. Buyer shall recover the Payments in accordance with the provisions of the Purchase Agreement and the BPO.

(f) Conflict. Any conflict between the terms and conditions of the BPO and any purchase agreement executed by Seller and any of the bidders (including Buyer's Purchase Agreement) shall be resolved in favor of the BPO.

***D. Break-Up Fee and Expense Reimbursement Fee***

38. Buyer has expended considerable time, money and energy pursuing a transaction with Debtor and has engaged in extended, arms' length, good faith negotiations. The Purchase Agreement is the culmination of these efforts.

39. However, if the Purchase Agreement is terminated as a result of Debtor's pursuing a Superior Offer, the Purchase Agreement contemplates that Debtor will reimburse Buyer for its actual reasonable expenses in an amount not to exceed $7,000,000.00 (the "Expense Reimbursement Fee") and pay Buyer a break-up fee in the amount of $18,000,000.00 (the "Break-Up Fee"). The Expense Reimbursement Fee and the Break-Up Fee are intended to constitute an administrative expense under §§ 503(b) and 507(a)(1) of the Bankruptcy Code (and is in full satisfaction of any and all claims of Buyer relating to the termination of the Purchase Agreement), and would be payable in accordance with the terms of the Purchase Agreement.

40. The provisions for the Expense Reimbursement Fee and the Break-Up Fee were material inducements for, and conditions of, Buyer's execution of the Purchase Agreement. Debtor believes that the Expense Reimbursement Fee and the Break-Up Fee are fair and reasonable in view of the extensive analysis, due diligence, investigation and negotiations undertaken by Buyer in connection with the Sale and related transactions. The Bidding Procedures contemplated by the Purchase Agreement will make it easier for potential third-party bidders to make overbids for the Transferred Assets, and will increase the likelihood that such overbids will be received.

41. Buyer is unwilling to hold open its offer to purchase the Transferred Assets under the terms of the Purchase Agreement unless it is assured payment of the Expense Reimbursement Fee and the Break-Up Fee in the manner contemplated by the Purchase Agreement. Without authorization for the payment of the Expense Reimbursement Fee and the Break-Up Fee in the

manner contemplated by the Purchase Agreement, Debtor may lose the opportunity to obtain what it believes to be the best and highest offer for the Transferred Assets.

42. Payment of the Expense Reimbursement Fee and the Break-Up Fee will not diminish Debtor's estate. Debtor will not terminate the Purchase Agreement so as to incur the obligation to pay the Expense Reimbursement Fee and the Break-Up Fee, unless to accept a Superior Offer, which must exceed the price offered by Buyer by an amount sufficient to pay the Expense Reimbursement Fee and the Break-Up Fee (plus $5,000,000.00). Further, the Break-Up Fee (which represents approximately 2.63% of total purchase price before giving effect to Buyer's assumption of various Assigned Contracts and Leases and other obligations) would not be payable unless the transaction proposed by the Superior Offer is actually consummated. Thus, the Expense Reimbursement Fee and the Break-Up Fee would be paid from the proceeds of the Sale pursuant to a Superior Offer.

## ARGUMENT

## I. AUTHORIZATION OF THE EXPENSE REIMBURSEMENT FEE AND BREAK-UP FEE IS WARRANTED UNDER APPLICABLE STANDARDS.

43. In In re Integrated Resources, 147 B.R. 650, 658 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d, 49 (2d Cir. 1993), the court held that "a bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arms-length negotiations." Noting that "[b]reakup fee arrangements outside bankruptcy are presumptively valid under the business judgment rule," the court established three basic factors for determining whether to permit such fees in bankruptcy:

(1) Is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation?

(2) Does the fee hamper, rather than encourage, bidding?



118274.01600/11342799v10

(3) Is the amount of the fee unreasonable relative to the purchase price?

Id. at 657.

44. Here, the Expense Reimbursement Fee and the Break-Up Fee are the product of extended good faith, arm's length negotiations between Debtor and Buyer. The Expense Reimbursement Fee and the Break-Up Fee are fair and reasonable, particularly in view of (i) the time, effort and expense that Buyer has already incurred and will continue to incur in conducting due diligence with respect to, and negotiating the terms of, the Purchase Agreement; (ii) the risk to Buyer of being used as a "stalking horse"; (iii) the certainty that the execution of the Purchase Agreement would create for Debtor's business (thereby preserving value for creditors and increasing the likelihood of a successful Superior Offer); and (iv) the value — both in terms of cash to be paid and debts to be assumed — of the Sale and related transactions to the estate and its creditors. Moreover, the promise of the Expense Reimbursement Fee and the Break-Up Fee (i) have already encouraged bidding, insofar as Buyer would not have entered into the Purchase Agreement without such provisions, and (ii) would encourage further bidding, as any Superior Offer that may be received will have been prompted by the notice of the Sale pursuant to the Purchase Agreement. Therefore, approval of the Expense Reimbursement Fee and the Break-Up Fee is warranted under the Integrated Resources criteria.

45. In general, bidding incentives such as the Expense Reimbursement Fee and the Break-Up Fee encourage a potential buyer to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of Debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. Thus, bankruptcy courts have routinely approved bidding incentives similar to those requested in this Motion. See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)

("Breakup fees and other strategies may 'be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking'") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("Agreements to provide break-up fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); see also In re Anchor Glass Container Corporation, Case Nos. 96-1434 (PJW) through 96-1516 (PJW) (Bankr. D. Del. 1996) (unreported order authorizing break-up fee); In re FoxMeyer Corp., et al., Case Nos. 96-1329 (HOB) through 96-1334 (HOB) (Bankr. D. Del. 1996) (unreported order authorizing break-up fee); In re Lomas Financial Corp., et al., Case No. 95-1235 (PJW) (Bankr. D. Del. 1995) (unreported order authorizing break-up fee); Note, An Empirical Survey and Proposed Bankruptcy Code Section Concerning the Propriety of Bidding Incentives in a Bankruptcy Sale of Assets, 93 Col. L. Rev. 720, 733 (April 1993) (observing that "[b]idding incentives are allowed in bankruptcy to enhance the bidding process by encouraging an initial bid"). Accordingly, the Court should approve the Expense Reimbursement and the Break-Up Fee.

## II. BUYER IS A GOOD FAITH PURCHASER UNDER § 363(m) OF THE BANKRUPTCY CODE.

46. Section 363(m) of the Bankruptcy Code provides that the reversal or modification on appeal of a transaction authorized under § 363(b) of the Bankruptcy Code does not affect the validity of the sale to an entity that acquired the property in good faith. See, e.g., In re Stadium Management Corp., 895 F.2d 845 (1st Cir. 1990); In re AdamsonCo., Inc., 759 F.3d 896 (4th Cir. 1998).

47. It is beyond question that (i) Buyer is a good faith purchaser, (ii) the Purchase Agreement was negotiated at arm's length and (iii) Buyer will, subject to this Court's approval,

pay fair and reasonable consideration. Accordingly, the Court should grant to Buyer the protections contained in § 363(m) of the Bankruptcy Code.

## III. THE SALE PROPOSED HEREIN SHOULD BE PROTECTED UNDER § 1146(C) OF THE BANKRUPTCY CODE.

48. Section 1146(c) of the Bankruptcy Code provides that:

> [t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of [the Bankruptcy Code], may not be taxed under any law imposing a stamp or similar tax.

49. The Fourth Circuit has held that § 1146(c) exempts from transfer taxes all estate assets which are transferred after the date of confirmation. In re NVR, LP, 189 F.3d 442, 458 (4th Cir. 1999). The Transferred Assets will not be transferred to Buyer until after plan confirmation because of various regulatory approvals that must be obtained but should be deemed transferred under the plan which the Debtor will file in accordance with Section 1129. As a result, the Transferred Assets are exempt from transfer taxes under the Fourth Circuit's interpretation of § 1146(c) of the Bankruptcy Code.

50. Pursuant to Federal Rule 9013-2, no memorandum of law is being submitted with this Motion. The Committee has confirmed that it supports the proposed transaction.

## CONCLUSION

WHEREFORE, Debtor respectfully requests that the Court grant the relief requested in this Motion, including: (1) entry of the accompanying Procedures Order (A) scheduling the Sale Hearing and setting objection and cure deadlines and procedures, and (B) approving the (i) form and manner of the notice of the Sale and related transactions, including the Sale Notice, the notice to parties whose Assigned Contracts and Leases or debts are to be assumed, and publication notice, (ii) the Bidding Procedures, (iii) the Expense Reimbursement Fee and the Break-Up Fee, and (2) granting Debtor such other and further relief as is just and proper.

**BLANK ROME LLP**

*/s/ John Lucian*
John Lucian (Federal Bar No. 14096)
250 W. Pratt St, Suite 2201
Baltimore, Maryland 21201
(410) 659-3945
(410) 986-2706 (fax)
Lucian@blankrome.com

and

Marc E. Richards
Blank Rome LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 885-5000

and

Ronald Fisher
Joel C. Shapiro
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103
(215) 569-5500

Counsel for Debtor

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of September, 2004, a copy of the foregoing Debtor's Motion for Orders (A) Approving Bidding Procedures With Respect to Proposed Sale of A Portion of Debtor's Assets to Dominion Energy New England, Inc. Or Their Designated Subsidiary, (ii) Scheduling Hearing On Approval Of Sale; (iii) Approving Form And Manner Of Notice Of Sale, (iv) Approving Break-Up Fee And Expense Reimbursement Fee And (B)(i), Approving Sale Of Substantially A Portion of the Debtor's Assets Free and Clear of All Liens Under Sections 363, (ii) Authorizing Assumption And Assignment Of Certain Assigned Contracts And Leases Under Section 365 And (C) Granting Related Relief was e-mailed (where available) to the parties on the updated Service List filed in this case [Dkt No. 903], with a hard copy following by first class, postage prepaid mail.

*/s/ John Lucian*