# C

**Execution Copy**

# FOSSIL

# ASSET PURCHASE AND SALE AGREEMENT

dated as of September 3, 2004

by and among

USGEN NEW ENGLAND, INC.,

USG SERVICES COMPANY, LLC, and

FIRST MASSACHUSETTS LAND COMPANY, LLC

as Seller Parties,

and

DOMINION ENERGY NEW ENGLAND, INC.

as Buyer

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I. | DEFINITIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Construction | 15 |
| ARTICLE II. | PURCHASE OF ASSETS | 15 |
| 2.1 | Purchase and Sale of Transferred Assets | 15 |
| 2.2 | Excluded Assets | 17 |
| ARTICLE III. | ASSUMED LIABILITIES AND EXCLUDED LIABILITIES | 18 |
| 3.1 | Assumed Liabilities | 18 |
| 3.2 | Excluded Liabilities | 18 |
| ARTICLE IV. | PURCHASE PRICE | 18 |
| 4.1 | Purchase Price | 18 |
| 4.2 | Allocation of Purchase Price | 19 |
| 4.3 | Adjustments to Purchase Price | 20 |
| 4.4 | Proration | 21 |
| 4.5 | Transfer Taxes and Permits | 22 |
| ARTICLE V. | CLOSING | 22 |
| 5.1 | Closing | 22 |
| 5.2 | Deliveries at Closing | 22 |
| 5.3 | Delivery of Transferred Assets | 24 |
| 5.4 | Conditions Precedent to Obligations of Buyer | 24 |
| 5.5 | Conditions Precedent to Obligations of Seller | 25 |
| 5.6 | Conditions Precedent to Obligations of Buyer and the Seller Parties | 26 |
| ARTICLE VI. | REPRESENTATIONS AND WARRANTIES OF SELLER | 26 |
| 6.1 | Organization and Good Standing | 26 |
| 6.2 | Authorization and Effect of the Agreement | 27 |
| 6.3 | No Conflicts | 27 |
| 6.4 | No Third Party Options | 27 |
| 6.5 | Consents and Approvals; Permits and Licenses. | 27 |
| 6.6 | Absence of Material Changes | 28 |
| 6.7 | Litigation | 29 |
| 6.8 | Title to Assets | 29 |
| 6.9 | Material Assigned Contracts | 29 |
| 6.10 | Environmental Matters | 30 |
| 6.11 | Taxes | 30 |
| 6.12 | Real Property. | 31 |
| 6.13 | Financial Statements | 31 |
| 6.14 | Employee-Related Liabilities | 32 |
| 6.15 | Brokers; Finders | 32 |
| 6.16 | Intellectual Property | 32 |
| 6.17 | Sufficiency and Condition of Transferred Assets | 33 |
| 6.18 | No Knowledge of Breach | 33 |
| 6.19 | No Other Representations | 33 |
| ARTICLE VII. | REPRESENTATIONS AND WARRANTIES OF EMPLOYER | 33 |

7.1 Organization and Good Standing ... 33
7.2 Authorization and Effect of the Agreement ... 33
7.3 No Conflicts ... 34
7.4 Consents and Approvals ... 34
7.5 Absence of Material Changes ... 34
7.6 Benefit Plans and Labor Matters ... 34
7.7 Litigation ... 36
7.8 Brokers; Finders ... 37
7.9 No Knowledge of Breach ... 37
7.10 No Other Representations ... 37
ARTICLE VIIA. REPRESENTATIONS AND WARRANTIES OF FMLC ... 37
7.1A Organization and Good Standing ... 37
7.2A Authorization and Effect of the Agreement ... 37
7.3A No Conflicts ... 38
7.4A Consents and Approvals ... 38
7.5A Litigation ... 38
7.6A Taxes ... 38
7.7A Brokers; Finders ... 39
7.8A No Knowledge of Breach ... 39
7.9A No Other Representations ... 39
ARTICLE VIII. REPRESENTATIONS AND WARRANTIES OF BUYER ... 39
8.1 Corporate Organization ... 39
8.2 Authorization and Effect of the Agreement ... 40
8.3 No Conflicts ... 40
8.4 Consents and Approvals ... 40
8.5 Litigation ... 40
8.6 Financing ... 40
8.7 No Knowledge of Breach ... 41
8.8 Brokers; Finders ... 41
ARTICLE IX. PRE-CLOSING COVENANTS ... 41
9.1 Access. ... 41
9.2 Conduct and Preservation of the Transferred Assets. ... 42
9.3 Restrictions on Certain Actions of the Seller Parties. ... 48
9.4 Notification ... 50
9.5 NEPOOL Approval ... 50
9.6 Antitrust and Other Authorizations and Consents. ... 51
9.7 Commercially Reasonable Efforts. ... 52
9.8 Publicity ... 53
9.9 Interconnection and Facilities Sharing Arrangements ... 53
9.10 Procedural Orders and Motions ... 53
9.11 Advice of Changes ... 55
ARTICLE X. POST-CLOSING COVENANTS ... 56
10.1 Maintenance of Books and Records ... 56
10.2 Confidentiality ... 56
10.3 Employee Matters. ... 57
10.4 Further Assurances; Post-Closing Assignments ... 60

10.5 Use of NEGT Marks ..... 61
10.6 Insurance ..... 61
10.7 Tax Matters. ..... 61
ARTICLE XI. NON-SURVIVAL; EXISTENCE ..... 62
11.1 Non-Survival of Representations and Warranties ..... 62
11.2 Existence ..... 62
ARTICLE XII. RISK OF LOSS ..... 62
12.1 Casualty Loss. ..... 62
ARTICLE XIII. TERMINATION ..... 63
13.1 Termination ..... 63
13.2 Procedure and Effect of Termination ..... 64
ARTICLE XIV. MISCELLANEOUS PROVISIONS ..... 65
14.1 Notices ..... 65
14.2 Fees and Expenses ..... 66
14.3 Successors and Assigns ..... 66
14.4 Amendment; Waiver ..... 67
14.5 Entire Agreement; Disclosure Schedules ..... 67
14.6 Governing Law ..... 67
14.7 Execution in Counterparts ..... 67
14.8 Disclosure ..... 67
14.9 Titles and Headings ..... 67
14.10 Invalid Provisions ..... 68
14.11 Mutual Drafting ..... 68
14.12 Submission to Jurisdiction ..... 68
14.13 WAIVER OF JURY TRIAL ..... 68
14.14 Limitation on Liability ..... 68
14.15 Selection of Arbitrator ..... 69
14.16 Disclaimer of Warranties ..... 69

SCHEDULES AND EXHIBITS

Schedules


| | | |
|---|---|---|
| Schedule 1.1(a)(i) | - | FCC Licenses |
| Schedule 1.1(a)(ii) | - | List of Seller Personnel |
| Schedule 1.1(a)(iii) | - | List of Employer Personnel |
| Schedule 1.1(a)(iv) | - | List of Buyer Personnel |
| Schedule 1.1(a)(v) | - | Events Not Constituting a Material Adverse Effect |
| Schedule 1.1(a)(vi) | - | NEGT Marks |
| Schedule 1.1(a)(vii) | - | Permitted Liens |
| Schedule 1.1(a)(viii) | - | Seller's Insurance Policies |
| Schedule 2.1(a) | - | Plants |
| Schedule 2.1(c) | - | Intellectual Property |
| Schedule 2.1(h) | - | Title Commitments |
| Schedule 2.1(j) | - | Emissions Credits |
| Schedule 2.2 | - | Excluded Assets |
| Schedule 3.1 | - | Assumed Liabilities |
| Schedule 3.2(a) | - | Excluded Liabilities |
| Schedule 5.4(f) | - | Governmental Approvals and Consents – Buyer |
| Schedule 5.6(e) | | Governmental Approvals and Consents –Seller and Buyer |
| Schedule 6.3 | - | No Conflicts - Seller |
| Schedule 6.4 | - | Third Party Options |
| Schedule 6.5(a) | - | Seller's Consents and Approvals |
| Schedule 6.5(b) | - | Seller's Permits and Licenses |
| Schedule 6.5(c) | - | FERC Matters |
| Schedule 6.6 | - | Absence of Material Changes - Seller |
| Schedule 6.7 | - | Litigation - Seller |
| Schedule 6.9 | - | Material Assigned Contracts |
| Schedule 6.10(a) | - | Environmental Permits |
| Schedule 6.10(b) | - | Compliance with Environmental Laws |
| Schedule 6.11 | - | Tax Matters |
| Schedule 6.12(a) | - | Material Leases |
| Schedule 6.12(b) | - | Real Estate Surveys |
| Schedule 6.12(c) | - | Proceedings Against Real Estate Assets |
| Schedule 6.12(d) | - | FMLC |
| Schedule 6.13 | - | Financial Statements |
| Schedule 6.14 | - | Employee-Related Matters |
| Schedule 6.15 | - | Brokers; Finders – Seller |
| Schedule 6.16 | - | Ownership and Use of Intellectual Property |
| Schedule 6.17(i) | - | Other Assets |
| Schedule 6.17(ii) | - | Condition of Assets |
| Schedule 7.3 | - | No Conflicts - Employer |
| Schedule 7.4 | - | Employer's Consents and Approvals |
| Schedule 7.5 | - | Absence of Material Changes - Employer |
| Schedule 7.6(a)(i) | - | Plant Employees |

| | | |
|---|---|---|
| Schedule 7.6(a)(ii) | - | Non-Plant Employees |
| Schedule 7.6(b) | - | Benefit Plans |
| Schedule 7.6(d) | - | Retiree Benefits |
| Schedule 7.6(e)(i) | - | Collective Bargaining Agreements |
| Schedule 7.6(e)(ii) | - | Labor Organizations |
| Schedule 7.6(e)(iii) | | Arbitrations, Material Grievances, Unfair Labor or Employment Practice Charges or Complaints |
| Schedule 7.6(e)(iv) | - | Effect of Transaction |
| Schedule 7.7 | - | Litigation – Employer |
| Schedule 7.8 | - | Brokers; Finders - Employer |
| Schedule 7.3A | - | No Conflicts – FMLC |
| Schedule 7.4A | - | Consents and Approvals – FMLC |
| Schedule 7.5A | - | Litigation – FMLC |
| Schedule 7.6A | - | Taxes – FMLC |
| Schedule 7.7A | - | Brokers; Finders – FMLC |
| Schedule 8.4 | - | Buyer's Consents and Approvals |
| Schedule 8.8 | - | Brokers; Finders - Buyer |
| Schedule 9.2(b) | - | Major Capital Spare Parts |
| Schedule 9.2(c)(ii) | | Oxbow Mining LLC Term Sheet |
| Schedule 9.3 | - | Restrictions on Certain Actions of the Seller Parties |
| Schedule 10.3(c)(i) | - | Comparable Benefit Plans |


<u>Exhibits</u>


| | | |
|---|---|---|
| Exhibit 1.1(a)(i) | - | Form of Bidding Procedures Order |
| Exhibit 1.1(a)(ii) | - | [Reserve] |
| Exhibit 1.1(a)(iii) | - | Form of Sale Order |
| Exhibit 4.1(a) | - | Form of Escrow Agreement |
| Exhibit 5.2(a)(i) | - | Form of Bill of Sale |
| Exhibit 5.2(a)(ii) | - | Form of Assignment and Assumption Agreement |
| Exhibit 5.2(a)(iv) | - | Form of Deed |
| Exhibit 9.2(e)(v) | - | Gemma Term Sheet and VFL Term Sheet |

# FOSSIL ASSET PURCHASE AND SALE AGREEMENT

This Fossil Asset Purchase and Sale Agreement (this "Agreement") is made and entered into as of September 3, 2004, by and among USGen New England, Inc., a Delaware corporation ("Seller"), USG Services Company, LLC, a Delaware limited liability company ("Employer"), First Massachusetts Land Company, LLC, a Delaware limited liability company ("FMLC"), and Dominion Energy New England, Inc., a Massachusetts corporation ("Buyer"). Seller, Employer and FMLC are referred to herein sometimes individually as a "Seller Party" and collectively as the "Seller Parties". Each Seller Party and Buyer are referred to herein sometimes individually as a "Party" and collectively as the "Parties."

WHEREAS, on July 8, 2003 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (as hereinafter defined);

WHEREAS, each Seller Party desires to sell to Buyer, and Buyer desires to purchase from each Seller Party, the Transferred Assets (as hereinafter defined), and Buyer desires to assume the Assumed Liabilities (as hereinafter defined), and the Parties wish to enter into certain transactions related thereto upon the terms and subject to the conditions of this Agreement, including receipt of an order approving such sale under Sections 105, 363, 365, and 1146 of the Bankruptcy Code;

WHEREAS, Employer is an Affiliate (as hereinafter defined) of Seller which employs substantially all of the Plant Employees (as hereinafter defined) and Non-Plant Employees (as hereinafter defined);

WHEREAS, FMLC is a wholly-owned subsidiary of Seller which owns the FMLC Land (as hereinafter defined);

WHEREAS, Buyer is a wholly-owned, indirect subsidiary of Dominion Resources, Inc., a Virginia corporation ("Buyer Parent"), and Buyer Parent has executed and delivered the Buyer Parent Guarantee (as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and mutual covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

1.1 Definitions. As used in this Agreement, each of the following terms shall have the meanings given to it below:

"AAA" means the American Arbitration Association.

"Additional Hg Reduction Test" shall have the meaning ascribed to such term in Section 9.2(f)(ii).

"Adjustment Amount" shall have the meaning ascribed to such term in Section 4.3(a).

"Adjustment Statement" shall have the meaning ascribed to such term in Section 4.3(a).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and "Affiliate", with respect to Buyer, shall be deemed to include Buyer Parent and its Affiliates and, with respect to Seller, shall include PG&E Corporation. For the purposes of this definition, "control" means, when used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Agreement" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Allocation Schedule" shall have the meaning ascribed to such term in Section 4.2.

"Alternative Transaction" means any transaction (regardless of the form thereof) involving a sale of all or any portion of the Transferred Assets (except as permitted under Section 9.3) by the Seller Parties to a purchaser or purchasers other than Buyer, or the filing by Seller with the Bankruptcy Court of a plan of reorganization or liquidation that does not contemplate the sale of the Transferred Assets by the Seller Parties to Buyer in accordance with the terms of this Agreement.

"Ancillary Agreements" means, collectively, the Bills of Sale, the Assignment and Assumption Agreements, the Escrow Agreement, the Buyer Parent Guarantee, the Deeds and the certificates referred to in Sections 5.2(a)(v), (a)(vi), (a)(vii), (a)(viii) and (a)(xi) and 5.2(b)(ii), (b)(iii) and (iv).

"Applicable Laws" means any statute, law, code, rule, or regulation, or any Order, of, any Governmental Authority to which a specified Person or its property is subject.

"Arbitrator" shall have the meaning ascribed to such term in Section 4.2.

"Assigned Contracts" shall have the meaning ascribed to such term in Section 2.1(e).

"Assignment and Assumption Agreements" shall have the meaning ascribed to such term in Section 5.2(a)(ii).

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 3.1.

"Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"Bankruptcy Code" means title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Maryland, Greenbelt Division, or any other court having jurisdiction over Seller's bankruptcy case from time to time.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Benefit Plan" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA; (ii) any stock or other equity-related award, restricted stock, stock ownership, stock purchase, stock option, stock appreciation right, phantom stock, retirement, pension, profit sharing, bonus, deferred compensation, incentive compensation, severance or termination pay, retention, salary continuation, hospitalization, medical, dental, life or other insurance, death benefit, disability, accident, vacation, sick leave, leave of absence, layoff, supplemental unemployment benefits, employee loan, educational assistance, dependent care assistance, legal assistance, cafeteria, club membership, employee discount or fringe benefit plan, program, practice, policy or arrangement; or (iii) any agreement, policy or other arrangement providing employment-related compensation or benefits; in each case, relating to any current or former Plant Employee or Non-Plant Employee.

"Bidding Procedures Order" means an Order of the Bankruptcy Court (substantially in the form of Exhibit 1.1(a)(i) attached hereto) approving, among other things, the payment of the Break-Up Fee and Expense Reimbursement Fee to Buyer and otherwise establishing the procedures for noticing the approval of this Agreement and any Auction that may be required and otherwise approving the terms of the Agreement relating to such payment and such procedures, and the Escrow Agreement.

"Bills of Sale" shall have the meaning ascribed to such term in Section 5.2(a)(i).

"Brayton Point $SO_2$ Baseline" shall have the meaning ascribed to such term in Section 9.2(d)(ii).

"Break-Up Fee" means the fee, if any, to be paid by Seller to Buyer in accordance with the provisions of Section 9.10(d)(i).

"Business" means all of the Seller Parties' business of owning, operating and generating electricity from the Plants and the machinery, equipment and facilities related thereto.

"Business Day" means any day other than a Saturday, Sunday or a legal holiday on which banking institutions in New York, New York are authorized or required by law to close.

"Buyer" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Buyer Employees" shall have the meaning ascribed to such term in Section 10.3(a)(iv).

"Buyer Parent" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Buyer Parent Guarantee" means the guarantee dated as of the date hereof of Buyer Parent, for the benefit of the Seller Parties.

"Buyer Plans" shall have the meaning ascribed to such term in Section 10.3(c)(i).

"Buyer Welfare Plans" shall have the meaning ascribed to such term in Section 10.3(c)(ii).

"Capital Expenditures" means those capital expenditures which are identified as capital expenditures on Schedule 9.3.

"Closing" shall have the meaning ascribed to such term in Section 5.1.

"Closing Amount" shall have the meaning ascribed to such term in Section 4.1.

"Closing Date" shall have the meaning ascribed to such term in Section 5.1.

"COBRA" means Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA and the rules and regulations promulgated thereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreements" means the collective bargaining agreements set forth on Schedule 7.6(e)(i), as such agreements may be amended or replaced between the date hereof and the Closing Date in accordance with this Agreement.

"Commercially Reasonable Efforts" means efforts in accordance with reasonable commercial practice for exempt wholesale generators, as defined under PUHCA, operating assets similar to the Transferred Assets and without the incurrence of unreasonable expense.

"Confidentiality Agreement" means that certain confidentiality agreement between Seller and Dominion Energy, Inc., dated February 4, 2004.

"Consent" means any consent, approval or authorization of, notice to, or designation, registration, declaration or filing with, any Person.

"Cure-Amounts" means all amounts required to be paid by Seller in order to cure any pre- or post-petition monetary or other defaults under any Assigned Contracts or Leases in accordance with the provisions of Section 365 of the Bankruptcy Code, the Bidding Procedures Order and the Sale Order.

"Deeds" shall have the meaning ascribed to such term in Section 5.2(a)(iv).

"Deposit Amount" shall have the meaning ascribed to such term in Section 4.1.

"Dollar" or "$"means the official currency of the United States of America.

"Emissions Credits" means the existing allowances, emission reduction credits (including Emission Reduction Credits), and greenhouse gas credits associated with the Plants set forth on Schedule 2.1(j), and all future allowances, including NOx allowances, $SO_2$ allowances, mercury allowances, any emission reduction credits (including Emissions Reduction Credits), any carbon credits or greenhouse gas allowances and any other substances or natural resources, which are or become regulated, that arise as a result of the Plants' age, size, geographic location, or historical operations, and excluding those $SO_2$ and NOx allowances that are surrendered prior to the Closing as necessary for compliance purposes for the Plants or the Transferred Assets (provided, however, that only $SO_2$ and NOx allowances with respect to the current or earlier vintage years may be so surrendered).

"Emissions Reduction Credits" means a reduction in $SO_2$ emissions at an affected facility below its historical actual emissions, achieved between the effective date of the DEP Regulations (May 11, 2001) and October 1, 2006 (see 310 CMR 7.29(5)(b)(2)).

"Employer" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Employer Welfare Plans" shall have the meaning ascribed to such term in Section 10.3(c)(ii).

"Environmental Claim" means (i) any notice, claim, administrative, regulatory or judicial or equitable action, suit, lien, judgment or demand asserted by any Governmental Authority or Third Party against any Seller Party and (ii) any other written communication by any Governmental Authority or Third Party, in either case alleging or asserting any Seller Party's liability for investigatory costs, cleanup costs, consultants' fees, governmental response costs, damages to natural resources (including wetlands, wildlife, aquatic and terrestrial species and vegetation) or other property, personal injuries, fines or penalties arising out of, based on or resulting from (x) the presence, or release into the environment, of any Hazardous Material at any location, whether or not owned by any Seller Party or (y) circumstances forming the basis of any violation, or alleged violation, of any applicable Environmental Law or Environmental Permit.

"Environmental Costs and Liabilities" means any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, costs and expenses (including fees, disbursements and expenses of legal counsel) arising from or under any Environmental Law or Environmental Permit or related environmental order or contract with any Governmental Authority or Third Party.

"Environmental Law" means any applicable federal, state or local law, statute, code, ordinance, rule, regulation, administrative or judicial order (whether unilateral or consented to) or other requirement relating to the environment, natural resources, or public or

employee health and safety and includes the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 33 U.S.C. § 2601 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq., the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., and the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., as such laws have been amended or supplemented, and the rules and regulations promulgated thereunder, and all analogous or otherwise applicable environmental state or local statutes.

"Environmental Notices" shall have the meaning ascribed to such term in Section 6.10.

"Environmental Permits" shall have the meaning ascribed to such term in Section 6.10.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" with respect to any Person, shall mean any trade or business, whether or not incorporated, which would be deemed a "single employer" with such Person within the meaning of Section 4001(b) of ERISA.

"Escrow Account" shall have the meaning ascribed to such term in Section 4.1.

"Escrow Agreement" shall have the meaning ascribed to such term in Section 4.1.

"Estimated Adjustment Amount" means Seller's good faith reasonable estimate of the Adjustment Amount as of the Closing, which estimate shall be provided to Buyer in writing no later than five (5) Business Days before the Closing.

"EWG" means an "exempt wholesale generator" as defined under PUHCA.

"Excluded Assets" shall have the meaning ascribed to such term in Section 2.2.

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 3.2.

"Expense Reimbursement Fee" shall have the meaning ascribed to such term in Section 9.10(d)(ii).

"FCC" means the Federal Communications Commission.

"FCC License Approval" means the decision of the FCC approving the assignment and/or transfer of control of the radio equipment licenses set forth on Schedule 1.1(a)(i) hereto.

"FERC" means the Federal Energy Regulatory Commission.

"FERC Approval" means the decision of the FERC approving the transactions contemplated by this Agreement pursuant to Section 203 of the FPA.

"Final Order" means any Order of a Governmental Authority after all opportunities for rehearing, reargument, petition for certiorari and appeal are exhausted and any requests for rehearing have been denied, and that has not been revised, stayed, enjoined, set aside, annulled, reversed, remanded, modified or suspended, with respect to which any required waiting period has expired, and to which all conditions to effectiveness prescribed therein or otherwise by law or Order have been satisfied; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such Order.

"Financial Statements" shall have the meaning ascribed to such term in Section 6.13.

"FMLC" shall have the meaning ascribed to such term in the preamble of this Agreement.

"FMLC Land" means the Owned Real Estate described in the Title Commitment captioned "02-BOSS-0099MA/Blaney" on Schedule 2.1(h).

"FPA" shall mean the Federal Power Act of 1935, as amended, and the rules and regulations promulgated thereunder.

"Fuel Inventory" means coal and oil inventories located at, in transit to, or stored off-site for, the Plants.

"GAAP" means United States generally accepted accounting principles as in effect on the date on which the document or calculation to which it refers relates, applied on a consistent basis throughout the periods covered thereby.

"Governmental Approvals" means all Consents of Governmental Authorities, including those required under the HSR Act, the Communications Act of 1934, as amended, the PUHCA and the FPA, that are necessary so that the consummation of the transactions contemplated hereby will be in compliance with Applicable Laws.

"Governmental Authority" shall mean any court or tribunal in any domestic jurisdiction or any federal, state, municipal or local government or other domestic governmental body, agency, authority, department, commission, board, bureau, instrumentality, arbitrator or arbitral body.

"Grandfathered Sick Leave" shall mean the sick leave accounts, if any, for Buyer Employees, as maintained on Employer's payroll records.

"Hazardous Material" means any material, substance or waste classified, characterized, designated or otherwise regulated as hazardous, toxic, pollutant, contaminant,

radioactive or words of similar meaning or effect under any Environmental Law including, petroleum, petroleum products, asbestos, urea, formaldehyde and polychlorinated biphenyls.

"Hg Reduction Test" shall have the meaning ascribed to such term in Section 9.2(f)(i).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and the rules and regulations promulgated thereunder.

"Income Tax" means any federal, state, local or foreign Tax (a) based upon, measured by or calculated with respect to net income or profits (including capital gains Taxes and minimum Taxes) or (b) based upon, measured by or calculated with respect to multiple bases (including, without limitation, corporate franchise taxes) if one or more of the bases on which such Tax may be based, measured by or calculated with respect to, is described in clause (a), in each case together with any interest, penalties or additions to such Tax.

"Independent Accounting Firm" shall have the meaning ascribed to such term in Section 4.3(b).

"Initial Hg Reduction Test" shall have the meaning ascribed to such term in Section 9.2(f)(i).

"Intellectual Property" means all of the intellectual property listed on Schedule 2.1(c).

"Inventory Adjustment Amount" shall have the meaning ascribed to such term in Section 4.3(a).

"Inventory Survey" shall have the meaning ascribed to such term in Section 4.3(a).

"Investment Grade Entity" means any Person with outstanding indebtedness which, as of any date of determination, is rated (a) Baa3 or higher according to Moody's Investors Service and (b) BBB minus or higher according to Standard & Poor's Corporation; provided, in either case, that if the Person's indebtedness is rated Baa3 or BBB minus, such Person is not on credit/negative watch by the applicable agency.

"IRS" means Internal Revenue Service.

"knowledge" or "aware" or any term of similar import means, (a) with respect to the Seller Parties (other than Employer), the actual knowledge after reasonable inquiry of the Persons listed on Schedule 1.1(a)(ii), (b) with respect to Employer, the actual knowledge after reasonable inquiry of the Persons listed on Schedule 1.1(a)(iii), and (c) with respect to Buyer, the actual knowledge after reasonable inquiry of the Persons listed on Schedule 1.1(a)(iv).

"Leased Real Estate" shall have the meaning ascribed to such term in Section 2.1(f).

"Leases" shall have the meaning ascribed to such term in Section 2.1(f).

"Liens" means (i) with respect to real property, liens, charges, pledges, options, mortgages, deeds of trust, security interests, claims, easements, and other encumbrances affecting title to real property and (ii) with respect to personal property, liens, charges, pledges, options and security interests and other encumbrances, and in the case of (i) or (ii), whether imposed by law, agreement, understanding, or otherwise.

"Losses" means, collectively, any and all liabilities, losses, obligations, fines, penalties, assessments, judgments, damages and expenses (including costs of investigation and defense, reasonable attorneys', experts' and consultants' fees and disbursements, and court costs).

"Major Capital Spare Equipment" shall have the meaning ascribed to such term in Section 9.2(b)(iii)(B).

"Major Maintenance and Capital Expenditures Amount" means the aggregate amount of all funds actually expended on Major Maintenance Expenditures and Capital Expenditures by Seller, if any, during the period beginning on January 1, 2004 and ending on the Closing Date, which shall not exceed the total amount set forth on Schedule 9.3.

"Major Maintenance Expenditures" means those maintenance expenditures that are identified as major overhauls on Schedule 9.3.

"Market-Based Rate Authorization" means that authorization to be granted by the FERC to Buyer and its Affiliates pursuant to Section 205 of the FPA, to the extent relating to the transactions contemplated by this Agreement, to sell electric energy, capacity and/or certain ancillary services at rates established in accordance with market conditions.

"Material Adverse Effect" means (a) any change or effect that would be materially adverse to the Business or the Transferred Assets, taken as a whole, or the financial condition of the Business or the results of operations of the Business or the Transferred Assets, taken as a whole, or (b) any change or effect that would prevent or materially impair or materially delay the ability of any Seller Party to perform its obligations under this Agreement; provided, however, that Material Adverse Effect shall exclude any change or effect arising or resulting from (i) circumstances or events that affect the international, national, regional or local electric market as a whole, (ii) changes in the international, national, regional or local wholesale or retail markets or prices for natural gas, gas liquids, electricity, oil, coal or other energy commodities or services, (iii) changes in the North American, national, regional or local electricity transmission systems or operations thereof, (iv) changes in general economic conditions, interest rates or securities markets in the United States or worldwide, (v) changes in any laws, statutes, rules, regulations, ordinances, judgments, orders or decrees that apply generally to similarly situated Persons, (vi) changes or effects constituting or involving an Excluded Asset or Excluded Liability, (vii) any change in or effect on the Transferred Assets that is cured (including by the payment of money) before the earlier of the Closing and the termination of this Agreement pursuant to Section 13.1, (viii) any default of any obligation by an Affiliate of Seller or any insolvency or filing of a bankruptcy petition by or against any Affiliate

of Seller, so long as such would not prevent or materially impair or delay the obligations of any Seller Party to perform its obligations under this Agreement or the Ancillary Agreements, (ix) any acts of war or terrorist activities, (x) strikes, work stoppages or other labor disturbances that are not specific to the Plants, or any Seller Party, (xi) any matter to the extent that (A) it is disclosed in reasonable detail in Schedules delivered by any Seller Party and (B) such disclosed matter does not worsen in a material manner, (xii) any change or effect arising by reason of or relating to the announcement or pendency of the transactions provided for in this Agreement, and (xiii) the matters set forth on Schedule 1.1(a)(v).

"Material Assigned Contracts" shall have the meaning ascribed to such term in Section 6.9.

"Material Lease" shall have the meaning ascribed to such term in Section 6.12(a).

"Material Permits" shall have the meaning assigned to such term in Section 6.5(b).

"Motion" shall have the meaning ascribed to such term in Section 9.10(a).

"NEGT" means National Energy & Gas Transmission, Inc., a Delaware corporation.

"NEGT Marks" means the name "NEGT" and the other trademarks, service marks and trade names owned by Seller and its Affiliates including those set forth on Schedule 1.1(a)(vi) hereto.

"NEPOOL" means the New England Power Pool, as created under and governed by the Restated New England Power Pool Agreement, as amended, modified or supplemented from time to time, and the Persons collectively participating in the New England Power Pool as participants.

"NEPOOL Approval" means the establishment of all settlement accounts and any other agreements or authorizations with or by NEPOOL necessary for Buyer or its Affiliates to sell the output of the Plants to NEPOOL.

"NEPOOL Rules" means NEPOOL System Rules, as defined in the Restated New England Power Pool Agreement, as amended, modified or supplemented from time to time.

"Non-Plant Employees" shall have the meaning ascribed to such term in Section 7.6(a)(ii).

"Non-Represented Employees" means all Plant Employees set forth on Schedule 7.6(a)(i) who are not represented by a labor organization.

"Notice" shall have the meaning ascribed to such term in Section 14.1.

"Order" means any order, injunction, judgment, decree, ruling, writ or assessment.

"Outside Date" shall have the meaning ascribed to such term in Section 13.1(c).

"Owned Real Estate" shall have the meaning ascribed to such term in Section 2.1(h).

"Party" and "Parties" shall have the meaning ascribed to such terms in the preamble to this Agreement.

"Permits" means all permits, licenses, approvals, franchises, notices, variances, exemptions and other authorizations issued by any Governmental Authority (and any pending applications therefor) that relate to or otherwise are used or are necessary in connection with the ownership, operation or other use of any of the Transferred Assets.

"Permitted Liens" means (i) Liens created by Buyer, or its successors and assigns, (ii) Liens for Taxes not yet due and payable, (iii) Liens of record as of the effective date of, and set forth in, the Title Commitments, (iv) Liens of record after the date of the Title Commitments up to and including the Closing Date that Buyer's title company has agreed to affirmatively insure against any Loss caused thereby in the applicable title policy at no additional premium costs to Buyer, (v) Liens set forth on Schedule 1.1(a)(vii) as of the date hereof, (vi) materialmen's, mechanics', repairmen's, landlord's and other similar Liens arising before Closing in the ordinary course of business securing payments not yet due and payable, but which shall not be Permitted Liens as of the Closing for purposes of this Agreement and shall also not be Permitted Liens for purposes of the Sale Order, and (vii) such Liens, defects, imperfections and irregularities of title as are, individually or in the aggregate, immaterial in character, scope or amount. Notwithstanding the foregoing, no matter contained in the Title Commitments which (i) creates a security interest or mortgage interest in any of the Transferred Assets, or (ii) subjects any of the Transferred Assets to a divestiture of title shall be a Permitted Lien. Buyer shall give Notice to Seller not later than thirty (30) days after the date hereof of any other matter contained in the Title Commitments as of the date hereof which Buyer believes would (A) impair Buyer's ability to operate the Business in a manner similar to that in which Seller operated the Business prior to the Closing or (B) adversely affect in any material respect the value of a Transferred Asset (in either case, an "Unpermitted Exception"). If Buyer notifies Seller of any Unpermitted Exceptions, Seller shall use Commercially Reasonable Efforts to cure such Unpermitted Exceptions. Notwithstanding the above provisions of this definition, Permitted Liens shall not include any Unpermitted Exception that is not so cured to Buyer's satisfaction prior to the Closing.

"Person" shall mean any individual, general partnership, limited partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Plant Employees" shall have the meaning ascribed to such term in Section 7.6(a)(i).

"Plants" means Seller's fossil fuel powerhouses and related buildings located at the Brayton Point facility and the Salem Harbor facility in the State of Massachusetts, and the Manchester Street facility in the State of Rhode Island, in each case, as further set forth on Schedule 2.1(a).

"Proceedings" means all proceedings, actions, claims, suits and investigations by or before any Governmental Authority.

"PUHCA" means the Public Utility Holding Company Act of 1935, as amended, and the rules and regulations promulgated thereunder.

"Purchase Price" shall have the meaning ascribed to such term in Section 4.1.

"Qualified Bid" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"Qualifying Offer" means an offer of employment to a Non-Represented Employee that (i) provides for (A) base salary equivalent in value to the base salary provided by Employer to such individual immediately prior to the Closing Date and (B) employee benefits that are, in the aggregate, generally similar in value to the employee benefits as set forth on Schedule 10.3(c)(i) provided by Employer to such individual immediately prior to the Closing Date and (ii) does not require such employee's location of employment to be more than 50 driving miles from his or her residence (unless, in such case, such location of employment is no farther in driving miles from his or her residence than his or her location of employment on the Closing Date).

"Real Estate Assets" shall have the meaning ascribed to such term in Section 2.1(h).

"Reliability Agreement" means the form of Reliability Agreement between ISO New England, Inc. and Seller regarding Salem Harbor Station filed with FERC, Docket No. ER04-841-000, as of the date hereof.

"Representatives" of a Person means, collectively, such Person's Affiliates and its and their respective directors, officers, partners, members, employees, representatives, agents, advisors (including accountants, legal counsel, environmental consultants, engineering consultants and financial advisors), parent entities and other controlling Persons.

"Represented Employees" means all Plant Employees set forth on Schedule 7.6(a)(i) who are represented by a labor organization.

"RIPUC Approval" means the registration by Buyer as a "non-regulated power producer" with the Rhode Island Public Utilities Commission, to the extent relating to the transactions contemplated by this Agreement.

"Salem Harbor $SO_2$ Baseline" shall have the meaning ascribed to such term in Section 9.2(d)(i).

"Sale Order" shall mean an Order of the Bankruptcy Court (substantially in the form of Exhibit 1.1(a)(iii) attached hereto) approving the terms and conditions of this Agreement, including the sale of the Transferred Assets and the transfer of the Assumed Liabilities under Sections 363 and 1146 of the Bankruptcy Code, and the assignment, assumption and sale of the Assigned Contracts and Leases in accordance with the provisions of Sections 105, 363 and 365 of the Bankruptcy Code, and containing a finding that Buyer is entering into the transactions set forth herein in "good faith" as such term is used in Section 363(m) of the Bankruptcy Code, and a finding that the sale price was not controlled by an agreement among potential bidders, as set forth in Section 363(n) of the Bankruptcy Code.

"SCR Contract" shall have the meaning ascribed to such term in Section 9.2(e)(ii).

"Seller" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Seller Insurance Policies" means those policies of insurance, surety bonds and financial assurance arrangements, which NEGT or any Seller Party maintains or have been issued to or deposited with any Person (other than any Seller Party) for the benefit of any Seller Party or any other Seller Subsidiary as of the date hereof, but only with respect to the Business or the Transferred Assets, including policies for all liability, property, workers' compensation, directors' and officers' liability and other insurance policies currently in effect that insure the Business or the Transferred Assets, including those material policies, bonds and arrangements that are set forth on Schedule 1.1(a)(viii).

"Seller Party" and "Seller Parties" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Seller Subsidiaries" means USGen Services and FMLC.

"Seller Subsidiaries Interests" means the outstanding limited liability company membership interests of the Seller Subsidiaries.

"Severance Plan" shall have the meaning ascribed to such term in Section 10.3(c)(iii).

"Spare Parts" shall have the meaning ascribed to such term in Section 9.2(b).

"Specified Projects" shall have the meaning ascribed to such term in Section 9.2(e)(i).

"Superior Offer" means one or more Qualified Bids received by the Seller Parties from one or more Qualified Bidders (as defined in the Bidding Procedures Order) pursuant to the terms of the Bidding Procedures Order, which Qualified Bids provide for the acquisition of all or a portion of the Transferred Assets, provided that, in the aggregate, such Qualified Bids shall be for all Transferred Assets, and assumption of all or a portion of the Assumed Liabilities (including Assigned Contracts and Leases), for an aggregate purchase price that is at least $30,000,000 more than the Closing Amount, plus the agreement by such Qualified Bidders to

reimburse Seller for the Major Maintenance and Capital Expenditures Amount and pay Seller the Inventory Adjustment Amount, on terms and conditions no less favorable to the Seller Parties in the aggregate than those set forth in this Agreement.

"Tax" and "Taxes" means any domestic or foreign federal, state or local taxes, however denominated, including, but not limited to, income, gross receipts, license, payroll, parking, employment, excise, severance, stamp, occupation, premium, windfall profits, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative, add-on minimum, or estimated tax (including any interest, penalty, fines or additions thereto), or customs duties, whether disputed or not, including such item for which a liability arises as a transferee or successor-in-interest.

"Tax Return" means any domestic or foreign federal, state or local tax return or report, declaration, claim for refund, information return or statement relating to Taxes, including any related schedules, attachments or other supporting information, with respect to Taxes, and including any amendment thereto.

"Taxing Authority" means any Governmental Authority responsible for the imposition, administration or collection of any Tax.

"Third Party" means any Person other than any Seller Party, Buyer, or any of their respective Affiliates.

"Third Party Agreement" shall have the meaning ascribed to such term in Section 13.1(d).

"Title Commitments" shall have the meaning ascribed to such term in Section 2.1(h).

"Title IV Plan" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA, which is subject to Title IV of ERISA.

"Transfer Tax" means any Tax imposed upon the sale, transfer, conveyance, assignment or delivery of the Transferred Assets or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer, conveyance, assignment or delivery of the Transferred Assets or any interest therein, including all Taxes within the scope of Section 1146(c) of the Bankruptcy Code.

"Transferred Assets" shall have the meaning ascribed to such term in Section 2.1.

"Treasury Regulations" means those regulations of the Internal Revenue Service promulgated under the Code.

"USGen Services" means USGen Services Company, LLC, a Delaware limited liability company and wholly-owned subsidiary of Seller.

"Warranty" means all claims and rights against Third Parties, if and to the extent the same relate to or arise under the Transferred Assets, including all rights under manufacturers' and vendors' warranties, if any, and all rights of recovery, set offs and credits.

"Winning Bidder" shall have the meaning ascribed to such term in the Bidding Procedures Order.

1.2 Construction. In construing this Agreement, together with the Schedules and Exhibits hereto, the following principles shall be followed:

(a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Article, Section or other subdivision in which any such terms may be employed;

(b) except as otherwise set forth herein, references to Articles, Sections, Schedules, Exhibits and other subdivisions refer to the Articles, Sections, Schedules, Exhibits and other subdivisions of this Agreement;

(c) a reference to any Person shall include such Person's predecessors;

(d) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(e) no consideration shall be given to the captions of the Articles, Sections, Schedules, Exhibits, subdivisions, subsections or clauses, which are inserted for convenience in locating the provisions of this Agreement and not as an aid in its construction;

(f) examples shall not be construed to limit, expressly or by implication, the matter they illustrate;

(g) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including, without limitation," and corresponding syntactical variant expressions;

(h) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined; and

(i) the plural shall be deemed to include the singular and vice versa.

## ARTICLE II.

## PURCHASE OF ASSETS

2.1 Purchase and Sale of Transferred Assets. On the terms and subject to the conditions set forth herein, at the Closing as set forth in Article V, Seller, Employer (only and solely with respect to Section 2.1(k)) and FMLC (only and solely with respect to the FMLC Land) shall sell, transfer, convey, assign and deliver, and Buyer shall purchase and accept, all of

Seller's and Employer's (only and solely with respect to Section 2.1(k)) and FMLC's (only and solely with respect to the FMLC Land) right, title and interest in and to all of their respective assets, rights, privileges, claims, contracts and properties of every kind, nature, character and description, real, personal and mixed, tangible and intangible, absolute or contingent, wherever located, primarily used in or primarily relating to the Business or the Plants as conducted on the date hereof (as further set forth in this Section 2.1 and the Schedules attached hereto), other than the Excluded Assets (collectively, the "Transferred Assets"), free and clear of all Liens, except for Permitted Liens, including the following:

(a) the Plants;

(b) all equipment (including turbines, generators, transformers, tractors, trailers, vehicles and communications equipment), inventory, machinery, goods, supplies, furniture, fixtures, keys, furnishings, tools, Spare Parts and other tangible personal property primarily used in or primarily relating to the operation of the Plants or the conduct of the Business, all computer hardware located at the Plants, and all Warranties and guarantees existing for the benefit of Seller or its Affiliates in connection with the foregoing;

(c) to the extent assignable, all Intellectual Property;

(d) all books, records, maintenance manuals, safety information, employee records (including training, salary, experience, benefits and years of service), drawings, data and plans relating to the Plants or the conduct of the Business in Seller's or its Affiliates' possession or which they have access to regardless of whether existing in hard copy, electronic, paper, microfiche, microfilm or magnetic form, including material operation or generation records and service and repair records primarily used in or primarily relating to the Plants or the conduct of the Business, and operating documents, specifications, and diagrams in Seller's or its Affiliate's possession relating to the ownership, construction, operation and maintenance of the Plants or Transferred Assets (other than books and records relating to employees, which are governed by Section 2.1(k));

(e) other than the Leases, which are governed by Section 2.1(f), each of the contracts, agreements, purchase commitments for materials and other services and personal property leases, whether or not entered into in the ordinary course of business, entered into by Seller primarily relating to the Business or the Plants, any of the facilities operated on or at the Real Estate Assets being purchased or assumed hereunder or any of the other Transferred Assets, and any contracts, agreements, purchase orders or commitments for materials and other services and personal property leases entered into by Seller relating primarily to the Business or the Plants after the date hereof, to the extent permitted by Section 9.3 hereof (including those approved by Buyer), including all of the Material Assigned Contracts set forth on Schedule 6.9 hereto (all such contracts, agreements and the like, the "Assigned Contracts");

(f) all real property leases under which Seller is a lessee or a lessor (the "Leases," and the real estate thereunder, the "Leased Real Estate") and that relate primarily to any Plant, the Owned Real Estate, or otherwise to the Business as conducted on the date hereof;

(g) to the extent assignable, all Permits, including all Environmental Permits, relating primarily to or necessary for the operation of the Business or the Transferred Assets as conducted on the date hereof;

(h) all real property interests described in the title insurance commitments set forth on Schedule 2.1(h) (the "Title Commitments"), together with all improvements, structures and fixtures thereon, and all easements, privileges, rights-of-way, riparian and other water rights, lands underlying any adjacent streets or roads, appurtenances, licenses, and other rights pertaining to or accruing to the benefit of such property (hereinafter collectively referred to as the "Owned Real Estate" and, together with the Leased Real Estate, the "Real Estate Assets");

(i) all of Seller's inventories (including Spare Parts) located at or in transit to the Plants or otherwise primarily used in or primarily relating to the Business;

(j) all Emissions Credits; and

(k) to the extent permitted by Applicable Law, all of Employer's books and records relating to the Buyer Employees.

2.2 Excluded Assets. Notwithstanding anything contained in this Agreement to the contrary, the Transferred Assets shall not include the following assets (collectively, the "Excluded Assets"):

(a) any cash, cash equivalent items, accounts receivable, deposits and pre-paid expenses, including checking accounts, bank accounts, certificates of deposits and securities of Seller;

(b) the rights, properties and assets identified on Schedule 2.2 hereto, including the NEGT Marks and any financial statements of Seller;

(c) Tax refunds and credits to the extent relating to time periods prior to the Closing Date, including Tax refunds from Affiliates of Seller and the Seller Subsidiaries;

(d) assets, rights, privileges, claims, contracts and properties owned or held by Benefit Plans;

(e) except as provided in Section 10.6 and in Article XII hereof, insurance policies and proceeds which are not transferred to Buyer in connection with the transactions contemplated by this Agreement;

(f) except to the extent relating to Buyer's payment, satisfaction or discharge of the Assumed Liabilities from and after the Closing Date, Seller's rights (including indemnification), claims and recoveries under litigation against Third Parties arising out of, or relating to, events prior to the Closing Date or which arise under the Bankruptcy Code or applicable state law, including all avoidance or fraudulent conveyance actions arising under Chapter 5 of the Bankruptcy Code (provided that Excluded Assets shall not include any claims or causes of action that Seller may have arising under Chapter 5 of the Bankruptcy Code against Third Parties to the Assigned Contracts and Leases);

(g) any minute books or other corporate documents of Seller;

(h) the Seller Subsidiaries Interests, together with minute books and other corporate documents, of the Seller Subsidiaries; and

(i) except the Financial Statements, any financial statements with respect to the Business.

ARTICLE III.

ASSUMED LIABILITIES AND EXCLUDED LIABILITIES

3.1 Assumed Liabilities. As additional consideration for the Transferred Assets, from and after the Closing Date, Buyer shall assume and Buyer hereby agrees to pay, satisfy and discharge when due all indebtedness, liabilities and obligations of each Seller Party set forth on Schedule 3.1 (all such indebtedness, liabilities, and obligations referred to herein as the "Assumed Liabilities").

3.2 Excluded Liabilities. Buyer does not assume or agree to pay, satisfy, discharge or perform, and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered in connection with this Agreement, or as a result of the consummation of the transactions contemplated by this Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform any indebtedness, liabilities or obligations of each Seller Party, other than the Assumed Liabilities (all such indebtedness, liabilities and obligations not assumed by Buyer referred to herein as the "Excluded Liabilities"). Without limiting the generality of the foregoing, Buyer shall not assume any of the following:

(a) any liability or obligation listed in Schedule 3.2(a); and

(b) any accounts payable arising prior to the Closing Date.

For purposes of clarity, the foregoing is not intended to, and shall not, relieve Buyer of any of its indebtedness, liabilities or obligations hereunder or under any document delivered in connection with this Agreement.

ARTICLE IV.

PURCHASE PRICE

4.1 Purchase Price. In consideration of the conveyance to Buyer of each Seller Party's right, title and interest in and to the Transferred Assets, as set forth in Section 2.1, including the assignment of the Assigned Contracts and the Leases, and subject to the conditions and in accordance with the terms hereof, (a) Buyer shall pay to Seller an aggregate amount in cash equal to the sum of $536,424,000 (the "Closing Amount") plus the Adjustment Amount (collectively, the "Purchase Price"). The Purchase Price shall be payable by Buyer to Seller as follows: (i) within one (1) Business Day after the Bidding Procedures Order has been entered, provided such Bidding Procedure Order shall not have been, and shall not then remain, stayed, Buyer shall pay an amount equal to 5% of the Closing Amount (the "Deposit Amount") by wire

transfer of immediately available funds into an escrow account (the "Escrow Account") pursuant to an escrow agreement substantially in the form of Exhibit 4.1(a) attached hereto (the "Escrow Agreement"); and (ii) on the Closing Date, Buyer shall pay the sum of (A) the remainder of the Closing Amount (i.e., less the Deposit Amount and any interest accrued thereon) plus (B) the Estimated Adjustment Amount by wire transfer (pursuant to wire transfer instructions provided by Seller at least three (3) Business Days prior to the Closing Date) of immediately available funds and (b) Buyer shall assume the Assumed Liabilities.

4.2 Allocation of Purchase Price. No later than sixty (60) days after the date hereof, unless otherwise agreed to in writing by Buyer and Seller, Buyer shall provide Seller with an allocation schedule for the Owned Real Estate. Seller shall have the right to raise objections within thirty (30) days of its receipt thereof. Any dispute relating to any such objections by Seller shall be resolved prior to the Closing in the manner set forth in this Section 4.2 applicable to resolutions of objections by Seller to the Allocation Schedule. Buyer shall, no later than sixty (60) days after final determination of the amount of the Purchase Price in accordance with Section 4.3, prepare and deliver to Seller a schedule (the "Allocation Schedule") allocating the Purchase Price and the Assumed Liabilities among the Transferred Assets other than the Owned Real Estate in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. Seller shall have the right to raise objections within thirty (30) days of its receipt thereof. If Buyer and Seller cannot mutually resolve Seller's objections to the Allocation Schedule within thirty (30) days of Buyer's receipt of such objections, such dispute with respect to the Allocation Schedule shall be presented to an accounting firm (the "Arbitrator") mutually selected by Buyer and Seller, which Arbitrator shall be instructed to endeavor to deliver, within thirty (30) days thereafter, a final, binding and conclusive decision upon each of the Parties. In the event that Buyer and Seller cannot agree on the selection of an accounting firm to act as Arbitrator, either Party may request the AAA to appoint a nationally recognized independent accounting firm, and AAA shall be instructed to promptly, but no later than thirty (30) days, appoint such firm and such appointment shall be final, binding and conclusive on Buyer and Seller. Promptly, but no later than 30 days after acceptance of its appointment as Arbitrator, the Arbitrator shall determine the remaining disputed items and shall render a written report to Buyer and Seller resolving such dispute with respect to the Allocation Schedule. The Arbitrator's decision shall be final, binding and conclusive on all Parties. The Parties shall cooperate with each other, and each other's Representatives and with the Arbitrator in order that any and all matters in dispute shall be resolved as soon as practicable. The fees, costs and expenses of such Arbitrator incurred in connection therewith shall be shared equally by Buyer and Seller. Except to the extent required to comply with the final and unappealable audit determinations of any Tax Authority with jurisdiction over a Party, Buyer and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Taxing Authority or any other Proceedings). Buyer and Seller shall file or cause to be filed any and all forms (including Form 8594), statements and schedules with respect to such allocation, including any amendments to such forms required with respect to any adjustment to the Purchase Price, pursuant to this Agreement. Notwithstanding any other provisions of this Agreement, the agreements set forth in this Section 4.2 shall survive the Closing Date.

4.3 Adjustments to Purchase Price.

(a) Within thirty (30) days after the Closing, Seller shall prepare and deliver to Buyer a statement (the "Adjustment Statement") which reflects (i) the net book value, as reflected on the books of Seller as of the Closing Date, of all Fuel Inventory (the "Inventory Adjustment Amount"), and (ii) the Major Maintenance and Capital Expenditures Amount. The sum of (i) the Inventory Adjustment Amount plus (ii) the Major Maintenance and Capital Expenditures Amount, in each case, as of the Closing Date, is referred to as the "Adjustment Amount." The Inventory Adjustment Amount shall be based on an inventory survey conducted within five (5) days prior to the Closing Date consistent with current Seller inventory procedures (the "Inventory Survey"), as adjusted for fuel inventory delivered to, or consumed by, Seller between the date of the Inventory Survey and the Closing Date. Seller shall permit an employee, or Representative, of Buyer to observe the Inventory Survey. The Adjustment Statement shall be prepared in accordance with GAAP. Buyer shall cooperate with Seller in connection with the preparation of the Adjustment Statement and related information, and shall provide to Seller such books, records and information as may be reasonably requested from time to time.

(b) Buyer may dispute the Inventory Adjustment Amount or the Major Maintenance and Capital Expenditures Amount, or both, as reflected in the Adjustment Statement; provided, however, that Buyer shall notify Seller in writing of the disputed amount, and the basis of such dispute, within thirty (30) days of Buyer's receipt of the Adjustment Statement. If Buyer fails to so notify Seller of any such disputed amount during such thirty (30) day period, then the Adjustment Amount as reflected in the Adjustment Statement shall be final, binding and conclusive on Buyer and Seller. In the event of a dispute with respect to any portion of the Adjustment Amount, Buyer and Seller shall attempt to reconcile such dispute and any resolution by them as to any disputed amount shall be final, binding and conclusive on the parties. If Buyer and Seller are unable to reach a resolution of any dispute within thirty (30) days of receipt by Seller of Buyer's timely written notice of dispute, then Buyer and Seller shall submit the dispute for determination and resolution to a nationally recognized firm of independent certified public accountants mutually acceptable to Buyer and Seller ("Independent Accounting Firm"), which shall be instructed to determine the Adjustment Amount and report to the parties within thirty (30) days after such submission. Upon determination by the Independent Accounting Firm of the Adjustment Amount, its report shall be final, binding and conclusive on Buyer and Seller with respect to the Adjustment Amount. The fees and disbursements of the Independent Accounting Firm shall be borne equally by Seller and Buyer.

(c) Within five (5) Business Days after the final determination of the Adjustment Amount pursuant to Section 4.3(b), either (i) Buyer shall pay Seller the amount by which the Adjustment Amount exceeds the Estimated Adjustment Amount or (ii) Seller shall pay Buyer the amount by which the Estimated Adjustment Amount exceeds the Adjustment Amount. Any amount payable pursuant to this Section 4.3(c) shall be paid, with interest during the period commencing on the Closing Date through, but not including, the date of payment, calculated at the prime rate in effect on the Closing Date, as published in The Wall Street Journal, by wire transfer of immediately available funds.

4.4 Proration.

(a) All of the items normally prorated, including those listed below (but not including Income Tax), relating to the Business and operation of the Transferred Assets shall be prorated as of the Closing Date, with Seller liable to the extent such items relate to any time period prior to the Closing Date, and Buyer liable to the extent such items relate to periods from and after the Closing Date:

(i) personal property, real estate, occupancy, sewerage and water Taxes, assessments and other charges, if any, on or with respect to the Business or the Transferred Assets;

(ii) rent, Taxes and all other items payable by or to any Seller Party or Seller Subsidiaries under any of the Assigned Contracts assigned to and assumed by Buyer hereunder which are associated with the Transferred Assets;

(iii) any permit, license, registration, compliance assurance fees, emission fees or other fees, in each case, with respect to any Permit associated with, or Intellectual Property included in, the Transferred Assets;

(iv) sewer rents and charges for water, telephone, electricity and other utilities; and

(v) rent under any leases of real or personal property included in the Transferred Assets, including the leases set forth on Schedule 6.12(a).

(b) In connection with the prorations referred to in (a) above, in the event that actual figures are not available at the Closing Date, the proration shall be measured by calendar days and be based upon the actual Taxes or fees for the preceding year (or appropriate period) for which actual Taxes or fees are available and such proration of Taxes or fees shall be recalculated and appropriate adjustments shall be paid upon request of either Seller or Buyer, made within sixty (60) days of the date that the actual amounts become available. Seller and Buyer shall furnish each other with such documents and other records as may be reasonably requested in order to confirm all adjustments and proration calculations made pursuant to this Section 4.4.

(c) In the event that the Closing Date does not occur on the first day of any month, Seller shall, and Buyer shall cause its Affiliates to, prorate all of their respective NEPOOL settlement accounts, to the extent relating to the Transferred Assets, such that ownership of the Transferred Assets, for purposes of such accounts, shall inure to the benefit of Seller for periods prior to the Closing Date and of Buyer for periods on and after the Closing Date, notwithstanding that ownership of the Transferred Assets under NEPOOL Rules is effective as of the first day of the month following the month during which the Closing Date occurs. Any payment due as a result of such proration shall be payable by Seller or Buyer, as the case may be, within thirty (30) days after the end of the month during which the Closing Date occurs.

4.5 Transfer Taxes and Permits. Buyer shall pay (i) all Transfer Taxes, if any, and (ii) the premiums relating to any title insurance policy covering the Owned Real Estate for the benefit of Buyer. Buyer shall directly pay all Transfer Taxes, if any, to the appropriate Third Parties or, if Buyer is prohibited by Applicable Laws from paying such Transfer Taxes, Seller shall pay such Transfer Taxes and Buyer shall promptly, upon Seller's request, reimburse Seller for the entire amount of such Transfer Taxes paid by Seller. Buyer shall (except to the extent prohibited by Applicable Laws, in which event Seller shall) file all necessary documentation and Tax Returns with respect to such Transfer Taxes and Seller (or Buyer, as applicable) shall reasonably cooperate upon Buyer's (or Seller's, as applicable) request. Without limiting the generality of the foregoing, Buyer hereby unconditionally and irrevocably waives any requirement that Seller comply with any bulk sales laws. Buyer shall be responsible for and shall pay the costs of applying for new Permits and obtaining the transfer of existing Permits which may be lawfully transferred. Seller, upon Buyer's request, shall, at its own expense, use Commercially Reasonable Efforts to cooperate with Buyer to assist Buyer in obtaining, any Permit.

## ARTICLE V.

## CLOSING

5.1 Closing. Subject to the satisfaction or waiver of the conditions set forth in this Agreement, the consummation of the transactions contemplated hereby (the "Closing") shall take place at the offices of Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, at 10:00 a.m., New York City time, as soon as practicable, but in no event later than five (5) Business Days, following the satisfaction or waiver of all conditions precedent to the Closing (the "Closing Date"). Notwithstanding anything contained herein to the contrary, the Closing shall be effective for all purposes as of 12:01 a.m. New York City time, on the Closing Date.

5.2 Deliveries at Closing.

(a) Deliveries by Seller Parties. At (or prior to, as indicated) the Closing, the Seller Parties, as appropriate, shall deliver to Buyer the items described in clauses (i) through (xii) below:

(i) one or more bills of sale and assignment, in the form of Exhibit 5.2(a)(i) (the "Bills of Sale"), with respect to the Transferred Assets to be conveyed by Seller and Employer at the Closing duly executed by Seller and Employer, as appropriate;

(ii) one or more assignment and assumption agreements, in the form of Exhibit 5.2(a)(ii) (the "Assignment and Assumption Agreements"), with respect to the Assigned Contracts and Leases, duly executed by Seller and Employer, as appropriate;

(iii) the information and documents comprising the Transferred Assets set forth in Section 2.1(d) and Section 2.1(k), it being understood that such documents shall be deemed delivered if located at the Plants;

(iv) the deeds with respect to the Owned Real Estate, substantially in the form of Exhibit 5.2(a)(iv) (collectively, the "Deeds"), duly executed by Seller and FMLC, as appropriate, and in recordable form, and assignments of Leases with respect to the Leased Real Estate, each in form and substance reasonably satisfactory to Buyer and duly executed by Seller and FMLC, as appropriate, and in recordable form;

(v) the officers' certificates referenced in Section 5.4(c);

(vi) a certificate executed on behalf of each Seller Party by the secretary or assistant secretary or other appropriate officer or limited liability company member, manager or officer of each Seller Party, as applicable, dated the Closing Date, certifying and attaching (A) a good standing certificate for each such Seller Party issued by the Secretary of State for the State of Delaware dated within three (3) Business Days of the Closing, (B) a certified copy of authorizing resolutions of each Seller Party's respective board of directors or limited liability company member or manager(s), as applicable, associated with the approval of the transactions contemplated hereby and (C) specimen signatures of the officers or limited liability company manager(s) or officers of each Seller Party authorized to execute the agreements and documents contemplated hereby, on behalf of each such Seller Party;

(vii) a certificate executed on behalf of Seller by the president, senior vice president or vice president of Seller, dated the Closing Date, representing and certifying that Seller has received, if not otherwise provided by Order of the Bankruptcy Court, the Governmental Approvals and the required Consents, in each case, as set forth on Schedule 6.5(a) with copies of all such Consents;

(viii) an affidavit of non-foreign status that complies with Section 1445 of the Code;

(ix) owner's affidavits and other documents customarily required by Buyer's title company, other than any survey, abstract, title opinion or title insurance policy with respect to the Real Estate Assets;

(x) original vehicle titles, it being understood that such documents shall be deemed delivered if located at the Plants;

(xi) three (3) days prior to the Closing, a certificate executed on behalf of Seller by the president, senior vice president or vice president, representing and certifying the costs and schedule to complete any project, including any Capital Expenditure or Major Maintenance Expenditure, which would require the payment of $5 million or more; and

(xii) all such other documents, certificates and instruments customarily delivered upon consummation of transactions contemplated by this Agreement as may be reasonably requested by Buyer.

(b) Deliveries by Buyer. At the Closing, Buyer shall deliver or cause to be delivered the items described in clauses (i) through (vi) below:

(i) cash in an amount equal to the sum of (A) the Closing Amount (less the Deposit Amount and any interest accrued thereon) plus (B) the Estimated Adjustment Amount, in accordance with Section 4.1;

(ii) the officer's certificate referenced in Section 5.5(c);

(iii) a certificate executed on behalf of Buyer by the secretary or assistant secretary of Buyer, dated the Closing Date, certifying and attaching (A) a good standing certificate for Buyer issued by the Secretary of State for the State of Massachusetts dated within three (3) Business Days of the Closing, (B) a certified copy of all authorizing resolutions of the Buyer's board of directors associated with the approval of the transactions contemplated hereby, and (C) specimen signatures of the officers of Buyer authorized to execute the agreements and documents contemplated hereby, on behalf of Buyer;

(iv) a certificate executed on behalf of Buyer by the president, senior vice president or vice president of Buyer, dated the Closing Date, representing and certifying that Buyer has received the Governmental Approvals referred to in Section 8.4 and the required Consents set forth on Schedule 8.4 with copies of all such Consents;

(v) the Assignment and Assumption Agreements; and

(vi) all such other documents, certificates and instruments customarily delivered upon consummation of transactions contemplated by this Agreement as may be reasonably requested by the Seller Parties.

5.3 Delivery of Transferred Assets. At the Closing, each Seller Party shall take such action as may be reasonably requested by Buyer to place Buyer in possession and ownership of the Transferred Assets.

5.4 Conditions Precedent to Obligations of Buyer. The obligations of Buyer under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing, to the extent permitted by Applicable Laws, at the option of Buyer:

(a) The representations and warranties of each Seller Party contained in this Agreement or the Ancillary Agreements on or prior to the Closing Date shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date, except for changes permitted by this Agreement and except for any such representation and warranty

which is itself qualified as to Material Adverse Effect, materiality or similar qualifier, in which case such representation or warranty must be true and correct in all respects (provided that any representation and warranty that addresses matters only as of a certain date shall be so true and correct as of that certain date).

(b) All of the terms, covenants and conditions to be complied with and performed by the Seller Parties on or prior to the Closing Date shall have been complied with or performed in all material respects (other than those set forth in Sections 9.2(b)(i) and 9.2(e)(i) which shall have been complied with or performed in all respects).

(c) Buyer shall have received a certificate or certificates, dated as of the Closing Date, executed on behalf of each Seller Party, each by an authorized officer thereof, certifying that the conditions specified in Sections 5.4(a) and (b) hereof have been fulfilled.

(d) Buyer shall have received each of the certificates, agreements, instruments and other documents set forth in Section 5.2(a) hereof.

(e) All Liens on the Transferred Assets, other than Permitted Liens, shall have been discharged by Seller or FMLC, as appropriate, or by the Person in whose favor such Liens exist, or pursuant to a Final Order of the Bankruptcy Court, at no expense to Buyer.

(f) If not otherwise provided or obviated by a Final Order of the Bankruptcy Court, the Governmental Approvals and the Consents of any other Person, in each case, set forth in Schedule 5.4(f), shall have been obtained in form and substance reasonably satisfactory to Buyer. The Market-Based Rate Authorization, the RIPUC Approval and the determination, to the extent relating to the transactions contemplated by this Agreement, by FERC that Buyer and its Affiliates are EWGs, shall be a Final Order.

(g) Buyer shall have interconnection service for the Plants in accordance with the terms and conditions of the applicable open access transmission tariff(s) relating to such service as approved by FERC. For the avoidance of doubt, interconnection service under an unexecuted interconnection agreement filed with FERC shall be deemed to have satisfied this condition precedent.

5.5 Conditions Precedent to Obligations of Seller. The obligations of Seller under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of all the following conditions, any one or more of which may be waived in writing, to the extent permitted by Applicable Laws, at the option of Seller:

(a) The representations and warranties of Buyer contained in this Agreement or the Ancillary Agreements on or prior to the Closing Date, shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date, except for changes permitted by this Agreement and except for any such representation and warranty which is itself qualified as to material adverse effect, materiality or similar qualifier, in which case such representation or warranty must be true and correct in all respects (provided that any representation and warranty that addresses matters only as of a certain date shall be so true and correct as of that certain date).

(b) All of the terms, covenants and conditions to be complied with and performed by Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

(c) Seller shall have received a certificate, dated as of the Closing Date, executed on behalf of Buyer by an authorized executive officer thereof, certifying that the conditions specified in Section 5.5(a) and Section 5.5(b) have been fulfilled.

(d) Seller shall have received each of the certificates, agreements, instruments and other documents set forth in Section 5.2(b) hereof.

5.6 Conditions Precedent to Obligations of Buyer and the Seller Parties. The obligations of Buyer and the Seller Parties under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of all of the following conditions:

(a) The Bankruptcy Court shall have entered the Bidding Procedures Order and such order shall be a Final Order.

(b) The Bankruptcy Court shall have entered the Sale Order and such order shall be a Final Order.

(c) No Order of any Governmental Authority and no statute, rule or regulation promulgated or enacted by any Governmental Authority, shall be in effect which restrains, enjoins, prohibits or otherwise makes illegal this Agreement or the consummation of the transactions contemplated hereby.

(d) Any waiting periods (and any extensions thereof) applicable to this Agreement and the transactions contemplated hereby under the HSR Act shall have expired or been terminated.

(e) If not otherwise provided or obviated by a Final Order of the Bankruptcy Court, all Governmental Approvals set forth on either Schedule 5.6(e) or Schedule 6.5(b), other than the FCC License Approval and boiler permits, shall have been obtained in form and substance reasonably satisfactory to Buyer and Seller. The FERC Approval shall be a Final Order.

ARTICLE VI.

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

6.1 Organization and Good Standing. Seller is a corporation duly organized and validly existing and in good standing under the laws of the State of Delaware and, subject to the Bankruptcy Code, has the requisite corporate power and authority to own, lease or otherwise hold its properties and assets and carry on the Business as presently conducted. Seller is qualified to do business as a foreign corporation and is in good standing in every jurisdiction

where the nature of the Business conducted by it or the properties owned or leased by it requires such qualification, except where the failure thereof individually or in the aggregate would not have a Material Adverse Effect.

6.2 Authorization and Effect of the Agreement. Subject to the entry of the Bidding Procedures Order and the Sale Order, Seller has the requisite power and authority as a corporation to enter into this Agreement and the Ancillary Agreements to which it is a party, and to perform its obligations hereunder and thereunder, and the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, and the performance of Seller's obligations hereunder and thereunder, have been duly authorized by all necessary corporate action on the part of Seller. This Agreement has been, and each of the Ancillary Agreements to which it is a party will be at or prior to the Closing, duly and validly executed and delivered by Seller and, subject to the entry of the Bidding Procedures Order and the Sale Order, this Agreement constitutes, and each of the Ancillary Agreements to which it is a party when so executed and delivered will constitute a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms.

6.3 No Conflicts. Assuming all Consents and other actions set forth in Sections 6.5 and 6.10 have been made or obtained and all Consents listed on Schedules 6.5(a) and 6.5(b) have been made or obtained, and except as set forth in Schedule 6.3 and except as may result from any facts or circumstances relating solely to Buyer or its Affiliates, the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party and the taking of any action or the filing of any instrument or document as contemplated hereunder by Seller, the consummation by Seller of the transactions contemplated hereby and compliance by Seller with any of the provisions hereof do not and will not (a) conflict with, violate or breach the certificate of incorporation or by-laws of Seller, (b) violate or breach any Applicable Laws binding upon Seller, except as would not have, individually or in the aggregate, a Material Adverse Effect, or (c) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the Transferred Assets pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument to which Seller is a party or by which any of the Transferred Assets is bound or affected, except as would not have, individually or in the aggregate, a Material Adverse Effect.

6.4 No Third Party Options. Except as set forth on Schedule 6.4, there are no existing agreements, options or commitments granting to any Person the right to acquire Seller's right, title or interest in or to any of the Transferred Assets or any interest therein.

6.5 Consents and Approvals; Permits and Licenses.

(a) Consents and Approvals. Other than with respect to applicable Environmental Permits, as to which Seller's sole representations and warranties are set forth in Section 6.10, the Bidding Procedures Order and the Sale Order, no Consent, waiver, license, order or permit of any Governmental Authority or any other Person, is required to be made or obtained by Seller for the execution, delivery or performance of this Agreement or the Ancillary

Agreements to which it is a party and the consummation of the transactions on the part of Seller contemplated hereby or thereby, except: (a) as set forth on Schedule 5.6(e), Schedule 6.5(a) (but solely to the extent such Consent, if any, is necessary pursuant to Section 365 of the Bankruptcy Code) or Schedule 6.5(b) or, with respect to Assigned Contracts which are not Material Assigned Contracts; (b) applicable requirements under the HSR Act; (c) the FERC Approval; (d) the FCC License Approval; (e) the entry of the Sale Order and the Bidding Procedures Order; (f) where the failure to make or obtain such Consents, waivers, licenses, orders or permits (other than Governmental Approvals) would be immaterial; or (g) as may be necessary as a result of any facts or circumstances relating solely to Buyer.

(b) Permits and Licenses. Other than with respect to applicable Environmental Permits, as to which Seller's sole representations and warranties are set forth in Section 6.10, and with respect to all Permits issued by FERC, as to which Seller's sole representations and warranties are set forth in Section 6.5(c): (i) Schedule 6.5(b) contains a true and correct list of all Permits used in and material to the operation, maintenance, and ownership of the Business and the Transferred Assets (the "Material Permits") (and all pending applications for any such Material Permits); and (ii) prior to the execution of this Agreement, Seller has made available to Buyer copies of all such Material Permits and all pending applications for any Material Permits. Except as set forth on Schedule 6.5(b), all of such Material Permits are in full force and effect and Seller is in compliance in all material respects with each such Material Permit and all Applicable Laws. Except as set forth on Schedule 6.5(b), no written notice has been received by Seller since January 1, 2002 and no Proceeding is pending or, to the knowledge of Seller, threatened with respect to any alleged failure by Seller to have any such Material Permit or not to be in material compliance therewith, except as would not have, individually or in the aggregate, a Material Adverse Effect.

(c) Schedule 6.5(c) contains a list of all Permits issued by FERC to Seller used in and relating to the Business or operations of the Transferred Assets (and all pending applications by Seller for any such Permits), all of which Permits Seller has made available to Buyer prior to the date of execution of this Agreement.

(d) None of Seller nor any of the Seller Subsidiaries is a "registered holding company" or a "subsidiary company" or an "affiliate" of a "registered holding company" as such terms are defined under PUHCA.

6.6 Absence of Material Changes. Except as disclosed on Schedule 6.6, since March 31, 2004 until the date hereof: (i) there has not been any Material Adverse Effect; (ii) Seller has not mortgaged, pledged or subjected to any Liens any of the Transferred Assets (except for Permitted Liens), (iii) there has not been any material damage, destruction or other casualty or Loss (whether or not covered by insurance) affecting any of the Transferred Assets or any portion thereof; and (iv) Seller has not made any material changes in the manner in which Plant Employees or Non-Plant Employees are generally compensated, or any provision of material additional or supplemental benefits for Plant Employees or Non-Plant Employees generally, except normal periodic increases or promotions effected in the ordinary course of business or pursuant to retention programs whereby all payments to the Plant Employees or Non-Plant Employees under such programs will be made by Seller and/or Employer on or prior to the *Closing Date*.

6.7 Litigation. Other than proceedings and claims pending before the Bankruptcy Court and except as set forth on Schedule 6.7, there are no Proceedings pending or, to Seller's knowledge, threatened which question the validity of this Agreement or any action taken or to be taken by Seller in connection with this Agreement. Other than proceedings and claims pending before the Bankruptcy Court and except as set forth on Schedule 6.7, there are no lawsuits, claims or other Proceedings relating to the ownership or use of the Transferred Assets or conduct of the Business or otherwise affecting the Transferred Assets pending, or, to Seller's knowledge, threatened against Seller which would have, individually or in the aggregate, a Material Adverse Effect. Except as set forth on Schedule 6.7, there are no judgments, Orders or decrees of any Governmental Authority binding on Seller that relate to the Transferred Assets or otherwise affect the Transferred Assets which would have, individually or in the aggregate, a Material Adverse Effect. Seller is not in violation in any material respect of the terms of any Order entered by any Governmental Authority and outstanding against it relating to or with respect to any of the Transferred Assets. Notwithstanding anything in this Agreement to the contrary, this Section 6.7 shall not apply to: (i) Proceedings under applicable Environmental Laws, or otherwise relating to Environmental Claims, Environmental Permits, or Environmental Costs and Liabilities, as to which Seller's sole representations and warranties are set forth in Section 6.10 and (ii) Taxes as to which Seller's sole representations and warranties are set forth in Section 6.11.

6.8 Title to Assets. Seller has not received any written notice alleging that any Third Party has any right, title or ownership interest in or to the Transferred Assets, except Permitted Liens. The Title Commitments cover all real property interests owned by Seller, FMLC and Seller Subsidiaries which are primarily used in or primarily relating to the Plants. Seller has good and marketable title to or a valid leasehold interest in or valid license to use the Transferred Assets, and upon entry of the Sale Order, at the Closing, Buyer shall obtain good and marketable title to, a valid leasehold interest in or a valid license to use, the Transferred Assets, free and clear of all Liens, except for Permitted Liens.

6.9 Material Assigned Contracts. Schedule 6.9 sets forth each Assigned Contract entered into prior to the date of this Agreement, which, by its terms, requires the payment of an amount in excess of $250,000 over the remaining term of the Assigned Contract to or from Seller, which Schedule 6.9 shall be updated as of the Closing to reflect any Assigned Contract entered into by Seller between the date hereof and the Closing to the extent permitted by Section 9.3 hereof, including those approved by Buyer, ("Material Assigned Contracts"). Subject to provisions of the Bankruptcy Code and the proceedings before the Bankruptcy Court, each Material Assigned Contract is in full force and effect and is a legal, valid and binding agreement, arrangement or commitment of Seller, enforceable against Seller in accordance with its terms and, to the knowledge of Seller, is a valid agreement, arrangement or commitment of each other party thereto, enforceable against such party in accordance with its terms, except in each case where enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally and except where enforceability is subject to the application of equitable principles or remedies. Neither Seller nor, to the knowledge of Seller, any other party to any of the Material Assigned Contracts is (with or without notice or lapse of time, or both) in breach or default in any material respect under any Material Assigned Contract, except where such breaches or defaults are capable of cure in accordance with the provisions of Section 365 of the Bankruptcy Code. Other than (a) the Assigned Contracts and the Leases and (b) any