contracts, agreements, purchase commitments for materials and other services and personal property leases entered into by Seller relating to the Transferred Assets after the date hereof and to the extent not prohibited by Section 9.3 hereof, there are no additional contracts, personal property leases, agreements, arrangements or commitments material to the Plants, Business or the Transferred Assets or which are included as part of the Transferred Assets being conveyed to Buyer hereunder. True and correct copies of each of the Assigned Contracts entered into prior to the date of this Agreement have been provided to Buyer and as of the Closing, true and correct copies of each Material Assigned Contract entered into between the date hereof and the Closing shall have been provided to Buyer.

6.10 Environmental Matters. Schedule 6.10(a) contains a list of all material permits under Environmental Laws used in or necessary for the Business or the ownership and operation of the Transferred Assets ("Environmental Permits") (and all pending applications for or appeals relating to any such Environmental Permits). Schedule 6.10(a) also identifies which of those Environmental Permits requires Consent, waiver, license, order, permit, transfer or other permit action of any Governmental Authority or any other Person, in connection with the execution, delivery and performance by Seller of this Agreement or the Ancillary Agreements and the consummation by Seller of the transactions contemplated hereby or thereby. Except as set forth on Schedule 6.10(b), (i) Seller is in compliance with all Environmental Laws, which compliance includes the obtaining, maintaining and complying with any and all Environmental Permits by Seller, except for noncompliance that would not result in Seller incurring Environmental Costs and Liabilities in excess of $1,000,000 individually or $3,000,000 in the aggregate; (ii) such Environmental Permits are valid, in good standing, and in full force and effect; (iii) neither Seller nor any Seller Subsidiary has received any outstanding notices or demands or requests for information, or been subject to any Orders, penalties, or Proceedings, alleging the violation of, noncompliance with or liability under any Environmental Law or Environmental Permit or for any Environmental Claim which, if adversely determined, would result in Seller incurring Environmental Costs and Liabilities in excess of $1,000,000 individually or $3,000,000 in the aggregate (collectively, "Environmental Notices"); (iv) no Seller Party has released, and to the knowledge of the Seller Parties there have been no releases, of Hazardous Materials in, on, under or about the Transferred Assets that would result in Seller incurring Environmental Costs and Liabilities in excess of $1,000,000.00 individually, or $3,000,000.00 in the aggregate; (v) Seller has made available to Buyer all material environmental investigations, studies, audits, tests, reviews or other analysis conducted by Seller in relation to the Transferred Assets; and (vi) other than Permitted Liens, no Lien in favor of any Person imposed under Environmental Law relating to or in connection with any Environmental Claim has been filed or has been attached to any of the property or assets which are owned, leased or operated by Seller and which are part of the Transferred Assets. Notwithstanding anything in this Agreement to the contrary, the representations and warranties under this Section 6.10 are the sole and exclusive representations and warranties with respect to Environmental Laws, Environmental Claims, Environmental Permits, and Environmental Costs and Liabilities and Proceedings relating to Environmental Laws, Environmental Claims, Environmental Permits and Environmental Costs and Liabilities.

6.11 Taxes. Except as set forth on Schedule 6.11: (i) there are no Liens for Taxes upon any of the Transferred Assets, except for Permitted Liens, and (ii) Seller is not a foreign person within the meaning of Section 1445 of the Code. Schedule 6.11 sets forth the Tax jurisdictions in which Seller owns assets or conducts business that require a notification to a

Taxing Authority of the transactions contemplated by this Agreement, if the failure to make such notification, or obtain Tax clearances in connection therewith, would either require Buyer to withhold any portion of the Purchase Price or would subject Buyer to any liability for any Taxes of Seller.

6.12 Real Property.

(a) Schedule 6.12(a) sets forth (i) each Lease under which Seller is the lessor of real property primarily used in or primarily relating to the Business and (ii) each Lease under which Seller is the lessee of real property primarily used in or primarily relating to the Business and which lease, in the case of clauses (i) and (ii), (x) requires, in accordance with its terms, an annual base rental in excess of $250,000 or (y) is material to the operation or financial condition of the Business or the Transferred Assets, or any Plant (each of the leases set forth in (i) and (ii) above, a "Material Lease"). Subject to provisions of the Bankruptcy Code and the proceedings before the Bankruptcy Court, each Material Lease is in full force and effect and is a legal, valid and binding agreement, arrangement or commitment of Seller, enforceable against Seller in accordance with its terms and, to the knowledge of Seller, is a valid agreement, arrangement or commitment of each other party thereto, enforceable against such party in accordance with its terms, except in each case where enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally and except where enforceability is subject to the application of equitable principles or remedies. Seller has performed all material obligations required to be performed by it under the relevant Material Lease and is not (solely with or without notice or lapse of time, or both) in breach or default in any material respect thereunder; and, to the knowledge of Seller, no other party to any of the Material Leases is (solely with or without notice or lapse of time, or both) in breach or default in any material respect thereunder, except where such breaches or defaults are capable of cure in accordance with the provisions of Section 365 of the Bankruptcy Code. True and correct copies of each of the Leases have been provided to Buyer.

(b) Seller has heretofore made available to Buyer true and correct copies of (x) the Title Commitments and (y) surveys listed on Schedule 6.12(b).

(c) Except as set forth on Schedule 6.12(c), there is no pending or, to Seller's knowledge, threatened condemnation or other similar Proceeding of any part of the Real Estate Assets that would have a Material Adverse Effect, and no item set forth on Schedule 6.12(c) would have a Material Adverse Effect.

(d) FMLC has no assets, other than cash and the FMLC Land, and has not conducted any operations other than entering into contracts and permits relating to the FMLC Land which are set forth on Schedule 6.12(d).

6.13 Financial Statements. Attached hereto as Schedule 6.13 are the unaudited consolidated balance sheet and income statement of Seller for the three months ended March 31, 2004 and the year ended December 31, 2003 and as at March 31, 2004 and as at December 31, 2003 (collectively, the "Financial Statements"). The Financial Statements fairly present, on a pro forma basis, the financial position of Seller as of the dates indicated, and the results of operations for the periods therein specified.

6.14 Employee-Related Liabilities.

(a) Except as set forth in Schedule 6.14, Seller has no obligation or liability (contingent or otherwise) with respect to (i) any current or former employee; (ii) (A) any "employee benefit plan" within the meaning of Section 3(3) of ERISA; (B) any stock or other equity-related award, restricted stock, stock ownership, stock purchase, stock option, stock appreciation right, phantom stock, retirement, pension, profit sharing, bonus, deferred compensation, incentive compensation, severance or termination pay, retention, salary continuation, hospitalization, medical, dental, life or other insurance, death benefit, disability, accident, vacation, sick leave, leave of absence, layoff, supplemental unemployment benefits, employee loan, educational assistance, dependent care assistance, legal assistance, cafeteria, club membership, employee discount or fringe benefit plan, program, practice, policy or arrangement; or (C) any agreement, policy or other arrangement providing employment-related compensation or benefits; in each case, relating to any current or former employee; or (iii) any labor or collective bargaining agreement.

(b) Seller has not provided, and is not required to provide, security to any Benefit Plan or to any single-employer plan of Employer pursuant to Section 401(a)(29) of the Code.

(c) Neither Seller nor any of its ERISA Affiliates has contributed to or ever had an obligation to contribute to a "multiemployer plan" within the meaning of Section 3(37) of ERISA.

(d) Neither Seller nor any Seller Subsidiary has any employees.

(e) Except as provided in Section 10.3(c)(iii), neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will entitle any Plant Employees or Non-Plant Employees to severance pay or any increase in severance pay or any acceleration of any other benefits upon any termination of employment after the Closing Date, in each case, for which Buyer would be responsible.

6.15 Brokers; Finders. Except as set forth on Schedule 6.15, Seller has not, and none of Seller's Affiliates have retained any financial advisor, broker, agent, or finder or paid or agreed to pay any financial advisor, broker, agent, or finder on account of this Agreement or the transactions contemplated hereby. Buyer shall not have any responsibility or liability with respect to any Person set forth on Schedule 6.15.

6.16 Intellectual Property. Except as otherwise indicated thereon, Schedule 2.1(c) sets forth all intellectual property owned or licensed by Seller primarily relating to the Business and the Transferred Assets, other than (i) enterprise level applications, infrastructure, services and file management applications and (ii) certain software that Seller is currently eliminating or replacing as set forth on Schedule 6.16. Except as set forth on Schedule 2.1(c) or Schedule 6.16, Seller has ownership of, or valid license to use, all Intellectual Property. Seller's use of the Intellectual Property in connection with the Business and the Transferred Assets does not infringe on the intellectual property rights (including trademark, copyright, patent or trade secret rights) of any Third Party, and, to Seller's knowledge, no Third Party's use of such Intellectual

Property infringes on Seller's intellectual property rights therein. Seller has not received notice of any claims or demands of any Third Party pertaining to any such Intellectual Property and no Proceedings have been instituted, or are pending, or to Seller's knowledge, threatened, which challenge the rights of Seller in respect thereof.

6.17 Sufficiency and Condition of Transferred Assets. The Transferred Assets, together with the Excluded Assets and the assets set forth on Schedule 6.17(i), constitute all of the assets necessary and sufficient for the conduct of the Business, as conducted by Seller since January 1, 2004. Except as set forth on Schedule 6.17(ii) and the Real Estate Assets (other than improvements, structures and fixtures thereon), the Transferred Assets are in good operating condition, subject to normal wear and tear.

6.18 No Knowledge of Breach. Seller does not have knowledge of any breach by Buyer of its representations and warranties herein.

6.19 No Other Representations. Except as and to the extent specifically set forth in this Article VI, Seller makes no representations or warranties whatsoever to Buyer and hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by Seller or any Representative of Seller). Without limiting the foregoing, Seller makes no representations or warranties to Buyer regarding the probable success or profitability of the Business or any of the Transferred Assets.

ARTICLE VII.

REPRESENTATIONS AND WARRANTIES OF EMPLOYER

Employer hereby represents and warrants to Buyer as follows:

7.1 Organization and Good Standing. Employer is a limited liability company duly formed and validly existing under the laws of the State of Delaware and has the requisite organizational power and authority to own, lease or otherwise hold its properties and assets and carry on its business as presently conducted. Employer is qualified to do business and is in good standing in every jurisdiction where the nature of the business conducted by it or the properties owned or leased by it requires such qualification, except where the failure thereof individually or in the aggregate would not have a Material Adverse Effect.

7.2 Authorization and Effect of the Agreement. Employer has the requisite power and authority as a limited liability company to enter into this Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder, and the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, and the performance of Employer's obligations hereunder and thereunder, have been duly authorized by all necessary limited liability company action on the part of Employer. This Agreement has been, and each of the Ancillary Agreements to which Employer is a party will be at or prior to Closing, duly and validly executed and delivered by Employer and this Agreement constitutes,

and each of the Ancillary Agreements to which it is a party when so executed and delievered will constitute, a valid and legally binding obligation of Employer, enforceable against Employer in accordance with its terms, except that such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting creditors' rights generally and (ii) equitable principles which may limit the availability of certain equitable remedies (such as specific performance) in certain instances.

7.3 No Conflicts. Assuming all Consents and other actions set forth in Section 7.4 have been made or obtained and all Consents listed on Schedule 7.4 have been made or obtained, and except as set forth on Schedule 7.3 or as may result from any facts or circumstances relating solely to Buyer or its Affiliates, the execution, delivery and performance of this Agreement by Employer and the Ancillary Agreements to which it is a party, the consummation by it of the transactions contemplated hereby and thereby and compliance by Employer with any of the provisions hereof and thereof do not and will not (a) conflict with, violate or breach the certificate of formation or limited liability company agreement of Employer, (b) violate or breach any Applicable Laws binding upon Employer, except as would not have, individually or in the aggregate, a Material Adverse Effect or (c) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the Transferred Assets or on any of the assets or properties of Employer pursuant to any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument to which Employer is a party or by which it or any of its assets or properties is bound or affected, except as would not have, individually or in the aggregate, a Material Adverse Effect.

7.4 Consents and Approvals. No Consent, waiver, license, order or permit of any Governmental Authority, or any other Person, is required to be made or obtained by Employer in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby by Employer, except: (a) as set forth on Schedule 7.4; (b) where the failure to make or obtain such Consents, waivers, licenses, orders or permits (other than Governmental Approvals) would be immaterial; or (c) as may be necessary as a result of any facts or circumstances relating solely to Buyer.

7.5 Absence of Material Changes. Except as disclosed on Schedule 7.5 or pursuant to retention programs whereby all payments to Plant Employees under such program will be made by Seller and/or Employer on or prior to the Closing Date, since March 31, 2004 until the date hereof, Employer has not made any material changes in the manner in which Plant Employees or Non-Plant Employees are generally compensated, or any provision of material additional or supplemental benefits for Plant Employees or Non-Plant Employees generally, except normal periodic increases or promotions effected in the ordinary course of business.

7.6 Benefit Plans and Labor Matters.

(a) Employees.

(i) Plant Employees. Schedule 7.6(a)(i) sets forth a true and correct list, as of August 31, 2004, of the employees of Employer who work primarily at the Plants (the "Plant Employees") and, with respect to each such individual (as applicable) (A) location; (B) job title; and (C) whether a Represented Employee or Non-Represented Employee. Except as set forth on Schedule 7.6(a)(i), none of Employer, Seller Subsidiaries or the businesses or operations comprising the Transferred Assets are parties to any employment or service agreements or arrangements with any of the Plant Employees or Non-Plant Employees.

(ii) Non-Plant Employees. Schedule 7.6(a)(ii) sets forth a true and correct list, as of August 31, 2004, of employees who provide services primarily related to the Transferred Assets, but are not otherwise listed on Schedule 7.6(a)(i) as Plant Employees ("Non-Plant Employees").

(b) Benefit Plans. Schedule 7.6(b) sets forth a true and correct list of all Benefit Plans as of the date hereof, which Schedule 7.6(b) shall be updated as of the Closing to reflect any new Benefit Plans adopted by Seller or Employer (or their respective Affiliates, but only to the extent relating to Plant Employees or Non-Plant Employees) between the date hereof and the Closing to the extent permitted by Section 9.3 hereof, including those approved by Buyer. With respect to each Benefit Plan, true and correct copies of the following documents (if applicable) have been made available to Buyer or its counsel: (i) the most recent plan document constituting the Benefit Plan and all amendments thereto, (ii) the most recent summary plan description, and (iii) the most recent IRS determination letter, or if unavailable, an opinion of counsel stating that such Benefit Plans comply in form with the applicable requirements of the Code. None of the Benefit Plans is a Title IV Plan. Except as set forth on Schedule 7.6(b), neither Employer nor any of its ERISA Affiliates has contributed to or ever had an obligation to contribute to a "multiemployer plan" within the meaning of Section 3(37) of ERISA. Employer has not provided, and is not required to provide, security to any Benefit Plan or to any single-employer plan of Employer pursuant to Section 401(a)(29) of the Code.

(c) Compliance; Tax Qualification. Each of the Benefit Plans complies and has been administered and operated in compliance in all material respects with its terms and all Applicable Laws. The Benefit Plans intended to qualify under Section 401 of the Code are, to the knowledge of Employer, so qualified and the trusts maintained pursuant thereto are exempt from federal income taxation under Section 501 of the Code, and nothing has occurred with respect to the operation of the Benefit Plans which would cause the loss of such qualification or exemption.

(d) Retiree Benefits. Except as set forth in Schedule 7.6(d), none of the Benefit Plans provide for post-employment life or health insurance, benefits or coverage for any participant or any beneficiary thereof, except as may be required under COBRA, and at the expense of the participant or beneficiary.

(e) Labor Matters.

(i) Except as set forth on Schedule 7.6(e)(i), Employer (with respect to the Transferred Assets) is not party to any collective bargaining agreement and

there are no collective bargaining agreements that pertain to the Plant Employees. Employer has heretofore made available to Buyer true and correct copies of the labor or collective bargaining agreements listed on Schedule 7.6(e)(i), together with all amendments, modifications or supplements thereto as agreed upon by Employer and any authorized representative of any labor organization representing Plant Employees.

(ii) Except as set forth on Schedule 7.6(e)(ii), no Plant Employees are represented by any labor organization. Since January 1, 2002, no labor organization or group of Plant Employees has made a pending demand for recognition or certification and there are no representation proceedings presently pending before the National Labor Relations Board or threatened in writing to be filed. To the knowledge of Employer (with respect to the Transferred Assets), there are no pending organizing activities involving any labor organization or group of Plant Employees. The Non-Plant Employees are not represented by any labor organization, and to Employer's knowledge, there are no pending organizing activities involving any labor organization or group of Non-Plant Employees.

(iii) There are no strikes, work stoppages, slowdowns, lockouts or similar labor disputes pending. Except as set forth on Schedule 7.6(e)(iii), there are no unfair labor practice charges, arbitrations, material grievances, unfair employment practice charges or complaints, or other claims or complaints against Employer (with respect to the Business or the Transferred Assets), pending or, to the knowledge of Employer, threatened in writing to be filed with any public or governmental authority, arbitral forum, or court based on, arising out of, in connection with or otherwise relating to the employment or termination of employment of any Plant Employees or Non-Plant Employees.

(iv) Except as set forth on Schedule 7.6(e)(iv), the transactions contemplated by this Agreement will not result (either alone or in combination with any other event) in: (i) any payment of, or increase in, remuneration or benefit, to any individual, (ii) the acceleration of any payment or benefit to any individual or (iii) the vesting of any payment or benefit to any individual, in each case which would result in any obligation or liability with respect to the Business.

7.7 Litigation. Except as set forth on Schedule 7.7 or Schedule 7.6(e)(iii), there are no Proceedings pending or, to Employer's knowledge, threatened which question the validity of this Agreement or any action taken or to be taken by Employer in connection with this Agreement. Except as set forth on Schedule 7.7, there are no Proceedings relating to the ownership or use of Employer's assets or conduct of Employer's business or otherwise affecting Employer's assets pending, or, to Employer's knowledge, threatened against Employer which would have, individually or in the aggregate, a material adverse effect. Except as set forth on Schedule 7.7, there are no Orders of any Governmental Authority binding on Employer that relate to Employer's assets or operations or otherwise affect Employer's assets or operations which would have, individually or in the aggregate, a material adverse effect. Employer is not in violation in any material respect of the terms of any Order entered by any Governmental

Authority and outstanding against it relating to or with respect to any of Employer's assets or operations.

7.8 Brokers; Finders. Except as set forth on Schedule 7.8, Employer has not, and none of Employer's Affiliates has retained any financial advisor, broker, agent, or finder or paid or agreed to pay any financial advisor, broker, agent, or finder on account of this Agreement or the transactions contemplated hereby. Buyer shall not have any responsibility or liability with respect to any Person set forth on Schedule 7.8.

7.9 No Knowledge of Breach. Employer does not have knowledge of any breach by Buyer of its representations and warranties herein.

7.10 No Other Representations. Except as and to the extent specifically set forth in this Article VII, Employer makes no representations or warranties whatsoever to Buyer and hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by Seller or any Representative of Seller). Without limiting the foregoing, Employer makes no representations or warranties to Buyer regarding the probable success or profitability of the Business or any of the Transferred Assets.

## ARTICLE VIIA.

## REPRESENTATIONS AND WARRANTIES OF FMLC

FMLC hereby represents and warrants to Buyer as follows:

7.1A Organization and Good Standing. FMLC is a limited liability company duly formed and validly existing under the laws of the State of Delaware and has the requisite organizational power and authority to own, lease or otherwise hold its properties and assets and carry on its business as presently conducted. FMLC is qualified to do business and is in good standing in every jurisdiction where the nature of the business conducted by it or the properties owned or leased by it requires such qualification, except where the failure thereof individually or in the aggregate would not have a Material Adverse Effect.

7.2A Authorization and Effect of the Agreement. FMLC has the requisite power and authority as a limited liability company to enter into this Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder, and the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, and the performance of FMLC's obligations hereunder and thereunder, have been duly authorized by all necessary limited liability company action on the part of FMLC. This Agreement has been, and each of the Ancillary Agreements to which FMLC is a party will be at or prior to Closing, duly and validly executed and delivered by FMLC and this Agreement constitutes, and each of the Ancillary Agreements to which it is a party when so executed and delivered will constitute, a valid and legally binding obligation of FMLC, enforceable against FMLC in accordance with its terms, except that such enforceability may be limited by (i) applicable bankruptcy, insolvency,

reorganization, moratorium, and similar laws affecting creditors' rights generally and (ii) equitable principles which may limit the availability of certain equitable remedies (such as specific performance) in certain instances.

7.3A No Conflicts. Assuming all Consents and other actions set forth in Section 7.4A have been made or obtained and all Consents listed on Schedule 7.3A have been made or obtained, and except as set forth on Schedule 7.3A or as may result from any facts or circumstances relating solely to Buyer or its Affiliates, the execution, delivery and performance of this Agreement by FMLC and the Ancillary Agreements to which it is a party, the consummation by it of the transactions contemplated hereby and thereby and compliance by FMLC with any of the provisions hereof and thereof do not and will not (a) conflict with, violate or breach the certificate of formation or limited liability company agreement of FMLC, (b) violate or breach any Applicable Laws binding upon FMLC, except as would not have, individually or in the aggregate, a Material Adverse Effect or (c) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the Transferred Assets or on any of the assets or properties of FMLC pursuant to any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument to which FMLC is a party or by which it or any of its assets or properties is bound or affected, except as would not have, individually or in the aggregate, a Material Adverse Effect.

7.4A Consents and Approvals. No Consent, waiver, license, order or permit of any Governmental Authority, or any other Person, is required to be made or obtained by FMLC in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby by FMLC, except: (a) as set forth on Schedule 7.4A; (b) where the failure to make or obtain such Consents, waivers, licenses, orders or permits (other than Governmental Approvals) would be immaterial.

7.5A Litigation. Except as set forth on Schedule 7.5A, there are no Proceedings pending or, to Seller's knowledge, threatened which question the validity of this Agreement or any action taken or to be taken by FMLC in connection with this Agreement. Except as set forth on Schedule 7.5A, there are no Proceedings relating to the ownership or use of FMLC's assets or conduct of FMLC's business or otherwise affecting FMLC's assets pending, or, to FMLC's knowledge, threatened against FMLC which would have, individually or in the aggregate, a material adverse effect. Except as set forth on Schedule 7.5A, there are no Orders of any Governmental Authority binding on FMLC that relate to the FMLC's assets or operations or otherwise affect FMLC's assets or operations which would have, individually or in the aggregate, a material adverse effect. FMLC is not in violation in any material respect of the terms of any Order entered by any Governmental Authority and outstanding against it relating to or with respect to any of the FMLC's assets or operations.

7.6A Taxes. Except as set forth on Schedule 7.6.A: (i) there are no Liens for Taxes upon any of the Transferred Assets, except for Permitted Liens, and (ii) FMLC is not a foreign person within the meaning of Section 1445 of the Code. Schedule 7.6.A sets forth the Tax jurisdictions in which FMLC owns assets or conducts business that require a notification to a

Taxing Authority of the transactions contemplated by this Agreement, if the failure to make such notification, or obtain Tax clearances in connection therewith, would either require Buyer to withhold any portion of the Purchase Price or would subject Buyer to any liability for any Taxes of FMLC. Except as set forth in Schedule 7.6A, FMLC has not received any notice of deficiency or assessment from any Taxing Authority with respect to liabilities for Taxes of FMLC in respect of the FMLC Land, which have not been fully paid or finally settled, and any such deficiency shown in such Schedule 7.6A is being contested in good faith through appropriate proceedings. Except as set forth in Schedule 7.6A, there are no outstanding agreements or waivers extending the applicable statutory periods of limitation for Taxes associated with the FMLC Land for any period.

7.7A Brokers; Finders. Except as set forth on Schedule 7.7A, FMLC has not, and none of FMLC's Affiliates has retained any financial advisor, broker, agent, or finder or paid or agreed to pay any financial advisor, broker, agent, or finder on account of this Agreement or the transactions contemplated hereby. Buyer shall not have any responsibility or liability with respect to any Person set forth on Schedule 7.7A.

7.8A No Knowledge of Breach. FMLC does not have knowledge of any breach by Buyer of its representations and warranties herein.

7.9A No Other Representations. Except as and to the extent specifically set forth in this Article VIIA, FMLC makes no representations or warranties whatsoever to Buyer and hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by Seller or any Representative of Seller). Without limiting the foregoing, FMLC makes no representations or warranties to Buyer regarding the probable success or profitability of the Business or any of the Transferred Assets.

## ARTICLE VIII.

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Seller Parties as follows:

8.1 Corporate Organization. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts and has the requisite corporate power and authority to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted. Buyer Parent owns, directly or indirectly, one hundred percent (100%) of the equity of Buyer. At the Closing, Buyer will be duly authorized, qualified or licensed to do business as a foreign corporation and in good standing in each of the jurisdictions in which its right, title or interest in or to any of the assets held by it, or the conduct of its business, requires such authorization, qualification or licensing, except where the failure thereof individually or in the aggregate would not have a material adverse effect. Buyer has delivered to Seller true and correct copies of its operating agreement or other organizational documents.

8.2 Authorization and Effect of the Agreement. Buyer has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it will be a party and to perform its obligations hereunder and thereunder. The execution and delivery by Buyer of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, and the performance by it of the Buyer's obligations hereunder and thereunder, have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, subject to the Consent of any Governmental Authority as set forth in Section 8.4, constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, reorganization, fraudulent conveyance, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity. Each of the Ancillary Agreements to which Buyer will be a party, when executed and delivered by Buyer, will constitute a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity.

8.3 No Conflicts. Assuming all Consents and other actions set forth in Section 8.4 have been made or obtained and all Consents listed on Schedule 8.4 have been made or obtained, and except as may result from any facts or circumstances relating solely to any Seller Party, the other Seller Subsidiaries or the Transferred Assets, the execution, delivery and performance of this Agreement by Buyer do not and will not (a) violate or breach any provision of the certificate of incorporation or bylaws of Buyer, (b) violate or breach any Applicable Laws binding upon Buyer, except as would not have, individually or in the aggregate, a material adverse effect or (c) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the assets or properties of Buyer pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument to which Buyer is a party or by which it or any of its assets or properties is bound or affected, except as would not have, individually or in the aggregate, a material adverse effect.

8.4 Consents and Approvals. No Consent, license, order, or permit of any Governmental Authority, or any other Person, is required to be made or obtained by Buyer or any of its Affiliates in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby by Buyer, except: (a) as set forth on Schedules 5.4(f), 5.6(e), 6.10(a) and 8.4; (b) applicable requirements under the HSR Act; (c) the FERC Approval; (d) the FCC License Approval; (e) the Market-Based Rate Authorization; and (f) as may be necessary as a result of any facts or circumstances relating solely to any Seller Party, the other Seller Subsidiaries or the Transferred Assets.

8.5 Litigation. As of the date of this Agreement, there are no Proceedings pending or, to the knowledge of Buyer, threatened that question the validity of this Agreement or any action taken or to be taken by Buyer or Buyer Parent in connection with this Agreement.

8.6 Financing. Buyer has, and at the Closing, will have, access to sufficient unrestricted funds on hand or committed lines of credit to consummate the transactions

contemplated by this Agreement. Buyer Parent is, and at the Closing will be, an Investment Grade Entity.

8.7 No Knowledge of Breach. Buyer does not have knowledge of any breach by any Seller Party of any of their respective representations and warranties herein.

8.8 Brokers; Finders. Except as set forth on Schedule 8.8, Buyer has not, and none of Buyer's Affiliates have retained any financial advisor, broker, agent, or finder or paid or agreed to pay any financial advisor, broker, agent, or finder on account of this Agreement or the transactions contemplated hereby.

ARTICLE IX.

PRE-CLOSING COVENANTS

9.1 Access.

(a) Between the date hereof and the Closing, each Seller Party shall: (i) give Buyer and its authorized representatives reasonable access, during regular business hours and upon reasonable advance Notice, to such employees, the Transferred Assets, and such books and records of such Seller Party, as are reasonably necessary to allow Buyer and its Representatives to make such inspections as they may reasonably require relating to the transactions contemplated by this Agreement and the consummation thereof, (ii) preserve all books and records relating to the operation or ownership of the Transferred Assets and any other information related to the Business and the Transferred Assets on or before the Closing Date consistent with such entities' ordinary course of business, (iii) cause officers and/or limited liability company managers and officers of each such Seller Party to furnish Buyer and its Representatives with such financial and operating data and other information with respect to such Seller Party, to the extent prepared by such Seller Party in the ordinary course of Business, as Buyer may from time to time reasonably request relating to the transactions contemplated by this Agreement and the consummation thereof and (iv) make available to Buyer material environmental investigations, studies, audits, tests, reviews or other analysis conducted by or for such Seller Party in relation to the Business or the Transferred Assets; provided, however, disclosure shall not be required of any information the disclosure of which would cause Seller or any of its Affiliates to breach a confidentiality agreement existing as of the date hereof or if Seller reasonably believes such disclosure would jeopardize the attorney-client privilege. Seller shall have the right to have a Representative present at all times during any such inspections, interviews, and examinations. Buyer agrees that if Buyer or its Representatives receive, or if the information (whether in electronic mail format, on computer hard drives or otherwise) held by any Seller Party, Buyer or its Affiliates as of the Closing includes information that relates to the business operations or other strategic matters of Seller or any of its Affiliates, such information shall be deemed to be part of the Evaluation Materials, as such term is defined in the Confidentiality Agreement, and shall be subject to the terms and conditions set forth therein. Buyer further agrees that if Seller or any of its Affiliates inadvertently furnishes to Buyer copies of or access to information such that Seller or any of its Affiliates is in breach of the Confidentiality Agreement, Buyer shall, upon Seller's request promptly return same to Seller together with any and all extracts therefrom or notes pertaining thereto (whether in electronic or

other format) and delete any e-mail containing any such information after providing copies of such e-mail to Seller. Notwithstanding anything in this Agreement to the contrary, except for background environmental records reviews of any Governmental Authority, (i) prior to Closing, Buyer shall not investigate or inquire as to any matter with any Governmental Authority (other than to the extent required to obtain or make any Governmental Approvals) having jurisdiction over any aspect of the Business or the Transferred Assets, unless and until the written consent of Seller (not to be unreasonably withheld or delayed) to the making of such investigation has been received by Buyer and after consultation with Seller as to the scope and manner of the investigation or inquiry, and (ii) Buyer's right of examination and access pending the Closing with respect to environmental matters relating to the Transferred Assets shall be limited to an examination of existing records and interviews with personnel as authorized in writing by Seller, and in no event shall include physical testing of or collection of samples from the Real Property or the Transferred Assets or contacting staff or officials of any Governmental Authority or any Third Party.

(b) In the interest of facilitating an orderly transition of the Business and in furtherance of Buyer's rights under this Section, each Seller Party shall permit up to two (2) persons designated by Buyer to conduct the transition efforts and to be present at each of the Plants after completion of the Auction and selection of Buyer as the Winning Bidder. Seller shall provide Buyer, at no cost to Buyer, interim furnished office space, utilities and HVAC at each Plant reasonably necessary to allow Buyer and its Representatives to conduct transition efforts through the date of Closing; provided that Buyer shall be responsible for all other costs relating thereto, including telecommunications expenses, the cost of workers' compensation and employer's liability coverage, which will be maintained by Buyer for its employees.

9.2 Conduct and Preservation of the Transferred Assets.

(a) Except as provided in this Agreement (including Section 9.3), and unless (a) otherwise consented to by Buyer, which consent shall not be unreasonably withheld or delayed; or (b) unless approved by the Bankruptcy Court, during the period from the date hereof to the Closing, each Seller Party shall use its Commercially Reasonable Efforts to cause the Business to be conducted in the ordinary course of business consistent with its practice since the Petition Date, including with respect to the operation and maintenance of the Transferred Assets, and shall use its Commercially Reasonable Efforts to (i) preserve the present business operations, organization and goodwill of the Business; (ii) preserve, maintain, and protect the assets, rights, and properties of the Business and the Transferred Assets (but no Seller Party shall be required to make any payments or enter into or amend any contractual agreements, arrangements, or understandings to satisfy the foregoing obligation unless such payment or other action is required by or consistent with past practice since the Petition Date); (iii) comply in all material respects with all post-petition contractual and other obligations applicable to the operation of the Business and the Transferred Assets; and (iv) comply in all material respects with Applicable Laws, including Environmental Laws, Environmental Permits, Material Permits and Permits issued by the FERC insofar as they relate to the Business or the Transferred Assets.

(b) Inventory.

(i) Spare Part Inventory.

Seller shall maintain inventories in the same manner consistent with past practices, and at Closing shall own, or shall have ordered and prepaid, Spare Parts (excluding the Major Capital Spare Equipment) located at, or in transit to, each Plant with the respective values (determined in accordance with Seller's accounting methods used to prepare the Financial Statements) as indicated below:

(A) Brayton Point $7,500,000

(B) Salem Harbor $2,970,000

(C) Manchester Street $3,600,000

; provided, however, that Seller shall not be deemed to have breached this covenant, unless and until the value set forth above, for Spare Parts (excluding the Major Capital Spare Equipment) at any Plant falls below the threshold set forth above and such deficiency is consistent with past practices (x) for Brayton Point, by more than $500,000 (y) for Salem Harbor, by more than $50,000 and (z) for Manchester Street by more than $150,000.

(ii) At Closing, Seller shall own, or shall have ordered and prepaid, the Major Capital Spare Equipment, and such Major Capital Spare Equipment shall be located at, or in transit to, the Plants.

(iii) As used in this Agreement:

(A) "Spare Parts" means Seller's inventory of materials, tools and spare parts which are owned and primarily used in or primarily relating to the operation and maintenance of the Plants, wherever located.

(B) "Major Capital Spare Equipment" means those capital spare parts set forth on Schedule 9.2(b).

(c) Fuel Inventory/Procurement.

(i) At Closing, Seller shall own the following minimum levels of Fuel Inventory:

(A) For Brayton:

30 days of coal supply based on 100% capacity factor (at least 25 days of which shall be located at the Plant)
160,000 barrels of oil

(B) For Salem Harbor:

30 days of coal supply based on 100% capacity factor (at least 25 days of which shall be located at the Plant)
120,000 barrels of oil

(C) For Manchester Street:

12,500 barrels of oil

(ii) Prior to Closing, Seller shall not, without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed, enter into any fuel supply arrangements, except, that (A) prior to Closing, Seller may enter into a fuel supply agreement with Oxbow Mining LLC on terms and conditions in all material respects consistent with those set forth in the term sheet on Schedule 9.2(c)(ii) (provided, that any material changes to such term sheet must be approved by Buyer pursuant to this subsection (c)(ii), which approval shall not be unreasonably withheld or delayed); (B) Seller may, provided it complies with the other provisions contained herein, enter into fuel arrangements which terminate prior to the Closing; and (C) from the date hereof until the Closing, Seller shall be permitted to enter into coal transactions for no more than 120,000 tons in the aggregate; provided that:

(A) Seller shall first deliver to Buyer a copy of the term sheet for any such coal transaction by no later than 12:00 noon on any Business Day; and

(B) Buyer shall, by 3:00 pm on the same such Business Day, (1) consent in writing to Seller entering into such transaction, or (2) consult with Seller regarding potential substitute transactions. If no such consent of Buyer is given or the Parties are unable to reach an agreement by 3:00 pm on the same such Business Day, Seller shall be permitted to enter into such transaction if the price for the purchased coal is no greater than then-current market prices for similar quality coal.

(d) Emissions Credits Strategy.

(i) As of July 31, 2004, Salem Harbor Plant has accumulated 22,495 Emissions Reduction Credits and will continue to generate such Emissions Reduction Credits in the ordinary course of business. The $SO_2$ emission level of 1.0 lbs $SO_2$/MMBTU for Salem Harbor shall be considered the baseline for purposes of this subsection (d) (the "Salem Harbor $SO_2$ Baseline"). To the extent actual $SO_2$ emissions are greater than the Salem Harbor $SO_2$ Emission Baseline, Seller shall compensate Buyer for such greater $SO_2$ emissions. To the extent actual $SO_2$ emissions are less than the Salem Harbor $SO_2$ Emission Baseline, Buyer shall compensate Seller for such lesser $SO_2$ emissions.

(ii) As of July 31, 2004, the Brayton Point Plant has accumulated 21,687 Emissions Reduction Credits and will continue to generate such Emissions Reduction Credits in the ordinary course of business. The $SO_2$ emission level of 0.9 lbs $SO_2$/MMBTU for Brayton Point shall be considered the baseline for purposes of this subsection (d) (the "Brayton Point $SO_2$ Baseline"). To the extent actual $SO_2$ emissions are greater than the Brayton Point $SO_2$ Emission Baseline, Seller shall compensate Buyer for such greater $SO_2$ emissions. To the extent actual $SO_2$ emissions are less than the Brayton Point $SO_2$ Emission Baseline, Buyer shall compensate Seller for such lesser $SO_2$ emissions.

(iii) The compensation amount contemplated by the immediately preceding subparagraphs (i) and (ii) shall be determined from the date hereof to and including the date immediately prior to the Closing Date and shall be paid at the Closing to the extent then determinable but in no event later than thirty (30) days after the Closing Date, as follows:

(A) For coal delivered under contracts with an $SO_2$ price adjustment, the amount shall be the price adjustment of the "as received" $SO_2$ content of any shipment of coal as defined in each respective coal contract multiplied by the tons of coal received (and prepaid coal in transit) with respect to such coal contract; and

(B) For coal delivered under contracts without an $SO_2$ price adjustment, the amount shall equal (1) the number of $SO_2$ allowances above or below that amount which would have been required under the Salem Harbor $SO_2$ Baseline amount or the Brayton Point $SO_2$ Baseline amount, as the case may be, times (2) the market value of $SO_2$ allowances as of the Closing Date.

(iv) The accumulated Emissions Reduction Credits will be updated and provided to Buyer on October 31, 2004, January 31, 2005 and April 30, 2005 unless Closing shall occur prior to any such date.

(e) Major Maintenance Expenditures and Capital Expenditures.

(i) Seller shall have completed and made the expenditures for the Major Maintenance Expenditures and Capital Expenditures projects for each quarter as provided on Schedule 9.3 (excluding the SCR projects, the ARP project, the BP1 Baghouse and the BP2 Baghouse, as captioned on Schedule 9.3 (collectively, the "Specified Projects")); provided, that, it shall not be considered a breach of this covenant unless and until (A) Seller has incurred less than eighty (80%) percent or has experienced cost overruns of more than twenty (20%) percent, of the scheduled amounts on any given Major Maintenance and Capital Expenditures project for such quarter or (B) Seller has incurred less than ninety (90%) percent or has experienced cost overruns of more than ten (10%) percent, of the aggregate scheduled amounts on all Major Maintenance and Capital Expenditures projects for such quarter and provided further and notwithstanding anything contained herein to the contrary that at Closing, that the Major

Maintenance and Capital Expenditures Amount shall not exceed in the aggregate the total respective amounts set forth on Schedule 9.3.

(ii) With respect to the Specified Projects, Seller shall complete such projects and expend such amounts in accordance with the schedule set forth on Schedule 9.3, provided that no provision hereof is intended to restrict Seller's ability to withhold payments under the SCR Contract in accordance with the terms thereof. Seller shall provide Buyer with monthly progress reports pursuant to Article 12, Section 5 of the Turnkey Construction Contract between Seller and Babcock Power Environmental Inc. dated January 6, 2004 (the "SCR Contract").

(iii) Seller shall provide Buyer with copies of monthly management progress reports customarily prepared by Seller with respect to the Major Maintenance Expenditures and Capital Expenditures projects (other than with respect to the SCR projects).

(iv) Seller shall not, without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed, enter into or submit any change orders to Capital Expenditures projects or Major Maintenance Expenditures projects as follows:

(A) (1) with respect to the SCR projects, any change order of $500,000 individually or $1,000,000 in the aggregate; and

(B) (2) with respect to Capital Expenditures projects or Major Maintenance Expenditure projects, any change order of $500,000 individually or $1,000,000 in the aggregate.

(v) Seller (x) shall use Commercially Reasonable Efforts to obtain the approval of the Bankruptcy Court for approval to implement the ash reduction project (consisting of the combination of (A) the ARP license agreement with Progress Materials, Inc, as licensor, (B) with Gemma, as contractor, on terms and conditions in all material respects consistent with those set forth in the term sheet annexed hereto as Exhibit 9.2(e)(v) (provided that any material changes to such term sheet must be approved by Buyer, which approval shall not be unreasonably withheld or delayed) and (C) the Ash Marketing Agreement with VFL on terms and conditions in all material respects consistent with those set forth in the term sheet annexed hereto as Exhibit 9.2(e)(v) (provided that any material changes to such term sheet must be approved by Buyer, which approval shall not be unreasonably withheld or delayed) and (y) shall request such approval within forty-five (45) days after execution of this Agreement.

(f) Certain Capital Expenditures.

(i) Seller shall conduct a mercury reduction test on Brayton Point Unit 3 using activated carbon injection (a "Hg Reduction Test") in order to attempt to confirm that Hg reduction meeting compliance with 310 CMR 7.29 for Brayton Point can be achieved while using coal supplied under the agreement dated as of

January 1, 2004 between Seller and Interocean Coal Sales, LDC. The initial Hg Reduction Test (the "Initial Hg Reduction Test") shall be conducted during the month of September with results to be provided to Buyer for review no later than October 1, 2004. Seller shall give Buyer at least five (5) Business Days prior notice of the Initial Hg Reduction Test and Buyer may, at its option, elect to have up to two of its Representatives witness the Initial Hg Reduction Test. In addition, Seller shall give Buyer at least five (5) Business Days prior notice of the protocol for conducting such tests. Buyer may object to such protocols and the protocols to be used for such testing shall be as mutually agreed between Buyer and Seller. If the Initial Hg Reduction Test results confirm that mercury reduction compliance can be achieved on Brayton Point Unit 3 then, notwithstanding anything contained herein to the contrary, Schedule 9.3 shall not be amended to include a baghouse for Brayton Point Unit 3. If the Initial Hg Reduction Test results do not confirm that Hg reduction can be achieved on Brayton Unit 3, then Buyer and Seller shall proceed in accordance with subsections (ii)-(iv) hereof.

(ii) If the Initial Hg Reduction Test does not confirm that mercury reduction compliance can be achieved pursuant to (i) above, then, Seller shall, at Buyer's request, conduct an additional Hg Reduction Test on Brayton Point Unit 3 (the "Additional Hg Reduction Test"). Seller shall cooperate with Buyer as to the timing and protocol (which shall be mutually agreed) of the Additional Hg Reduction Test and Buyer may, at its option, elect to have up to two Representatives witness the Additional Hg Reduction Test. The Additional Hg Reduction Test shall be completed during the month of October with results to be provided to Buyer no later than November 1, 2004. If the Additional Hg Reduction Test results confirm that mercury reduction compliance can be achieved on Brayton Point Unit 3 then, notwithstanding anything contained herein to the contrary, Schedule 9.3 shall not be amended to include a baghouse for Brayton Point Unit 3. If the Additional Hg Reduction Test results do not confirm that Hg reduction can be achieved on Brayton Unit 3, then Buyer and Seller shall proceed in accordance with subsections (iii)-(iv) hereof.

(iii) If the Additional Hg Reduction Test does not confirm that mercury reduction compliance can be achieved pursuant to (ii) above, then Buyer and Seller shall hire an independent nationally recognized consultant who is qualified and expert in the areas of emission control and/or emission monitoring to identify and examine ways to achieve the necessary mercury reduction compliance on Brayton Point Unit 3. The fees and expenses payable to such consultant shall be borne equally by Seller and Buyer. In the event such consultant after detailed examination determines that the use of activated carbon injection will not achieve the Hg reduction, then such consultant shall work with Buyer and Seller to explore other alternatives to achieve the mercury reduction compliance for Brayton Point. Such alternatives shall include but not be limited to the use of alternate equipment or methods, overcompliance on Brayton Point Units 1 and 2, and fuel switch alternatives. If any such alternative achieves the mercury reduction compliance then Buyer and Seller shall prepare a mutually agreeable capital expenditures plan, if necessary, for such amounts and on such schedule as

Buyer and Seller agree and Buyer and Seller shall so amend Schedule 9.3. If after February 1, 2005 no alternative achieves such reduction, then Buyer and Seller shall proceed in accordance with subsection (iv) below.

(iv) If after subsections (i)-(iii) have been exhausted and the mercury reduction compliance for Brayton Point Unit 3 has not been achieved, then Buyer and Seller shall discuss in good faith the use of a baghouse on Brayton Point Unit 3. Only upon an agreement in writing executed by Buyer and Seller shall Schedule 9.3 be amended to add a baghouse on Brayton Point Unit 3 on the schedule as approved by Buyer, it being understood that if such an agreement is reached, Seller shall proceed with the procurement and installation of the baghouse and the new Brayton Point Unit 3 ID fans so as to not impact the Brayton Point Unit 3 SCR project.

9.3 Restrictions on Certain Actions of the Seller Parties.

(a) Without limiting the generality of Section 9.2, and except as set forth on Schedule 9.3, as otherwise provided in this Agreement, or approved by the Bankruptcy Court, prior to the Closing, to the extent relating to the Business or Transferred Assets, no Seller Party shall, without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed:

(i) acquire, sell, lease, transfer, or otherwise dispose of, directly or indirectly, any assets relating to or forming part of the Business or the Transferred Assets with an aggregate value greater than $1,000,000 (except for the depletion of inventory (including Spare Parts inventory) in the ordinary course); provided that the Seller Parties may acquire any such assets as are accounted for in accordance with GAAP as expenses prior to the Closing or as may be required in accordance with good utility practice upon the occurrence of any emergency or other contingency;

(ii) acquire for the Business (by merger, consolidation, or acquisition of stock or assets or otherwise) any corporation, partnership, or other business organization or division thereof;

(iii) (A) amend, modify, or change in any material respect any Assigned Contract or Lease, including the Collective Bargaining Agreements; provided that, notwithstanding any provision hereof to the contrary, Employer may enter into any successor Collective Bargaining Agreement that contains changes (1) in economic terms, including wages and benefit plans, that are in value consistent with the trend for economic increases in past agreements covering the Represented Employees, or (2) in non-economic terms that are not materially different from those existing in the current Collective Bargaining Agreement; or (B) waive, release, settle or assign any rights or claims thereunder which waiver, release, settlement or assignment has an aggregate value of greater than $1,000,000;

(iv) enter into any joint venture, strategic alliance, partnership or similar business relationship with a Third Party that affects or is binding upon the Business or the Transferred Assets;

(v) enter into any agreement that contains a covenant or other provision restricting the ability of the Business or the Transferred Assets (or which, following the Closing, could restrict the ability of Buyer) to compete with any Person in any geographic area or to engage in any activity or business, or pursuant to which any benefit is required to be given or is lost as a result of so competing or engaging;

(vi) enter into any lease of real property, except any renewal of an existing lease in accordance with its terms, or grant any easement, covenant, right-of-way or similar right with respect to any Real Estate Asset that would constitute a Permitted Lien;

(vii) mortgage, pledge or subject to any Liens any of the Transferred Assets (except for Permitted Liens and Liens that will be discharged as of the Closing Date);

(viii) except as contemplated by Section 9.2(c)(ii), enter into any fuel supply agreements or power purchase or sale agreements;

(ix) modify or amend in any material respect or voluntarily terminate prior to the expiration thereof any provision of any material Permit or any Environmental Permit set forth on Schedule 6.10(a), except to the extent that such modification, amendment, or termination is required pursuant to Environmental Law;

(x) other than fuel supply agreements and power purchase or sale agreements (which are governed by clause (viii) above), enter into any arrangement, commitment, lease or contract that will be performed, delivered or provided after the Closing except that would not require the payment individually or in the aggregate, of amounts in excess of $1,000,000;

(xi) [Reserved]

(xii) sell, lease, transfer, or otherwise dispose of, directly or indirectly, any Emission Credits listed on Schedule 2.1(j) (except as provided in the definition thereof);

(xiii) enter into or amend any real or personal property Tax agreement, treaty or settlement;

(xiv) change any current election with respect to Taxes affecting the Transferred Assets;

(xv) fail to maintain in full force and effect insurance policies covering the Transferred Assets, in form and amount consistent with past practice;

(xvi) hire any additional employees with respect to the Business or the Transferred Assets or make any commitment to hire any employees, provided that nothing contained herein shall restrict any Seller Party from terminating the employment of any employees;

(xvii) grant any increase in the compensation of any employees, promote any employees, or, except to the extent required by Applicable Law, amend or modify any Benefit Plan or make any change in the amount or the manner in which the employees are compensated, or any provision of additional or supplemental benefits for employees, or establish any new Benefit Plan with respect to employees, unless such Benefit Plan is a retention program whereby all payments to employees under such program will be made by any Seller Party and/or the other Seller Subsidiaries on or prior to the Closing Date; provided that nothing above shall restrict normal periodic increases, promotions, hiring or changes effected in the ordinary course of business or as required under any Collective Bargaining Agreement, of which Buyer shall be notified; or

(xviii) enter into any contract, agreement, commitment or arrangement, whether written or oral, with respect to any of the transactions set forth in the foregoing paragraphs (i) through (xvii).

(b) [Reserved]

9.4 Notification. Each Seller Party shall promptly notify Buyer, and Buyer shall promptly notify each Seller Party of any Proceeding pending or, to their knowledge, threatened against any Seller Party or Buyer, as the case may be, which challenges or would materially affect the transactions contemplated hereby.

9.5 NEPOOL Approval. Buyer shall, or shall cause its Affiliates to, prepare an application or applications to NEPOOL to obtain the NEPOOL Approval. Such applications shall be filed with NEPOOL as promptly as commercially practicable, but in no event later than fifteen (15) days after completion of the Auction and selection of Buyer as the Winning Bidder. Seller shall use its Commercially Reasonable Efforts to assist Buyer in connection with obtaining the NEPOOL Approval. Buyer and Seller shall cooperate to prepare and file with ISO New England, Inc. at least five (5) Business Days prior to the Closing Date such duly executed forms as shall be necessary under NEPOOL Rules to transfer ownership of the Transferred Assets to Buyer, such ownership under NEPOOL Rules to be effective as of the first day of the month following the month during which the Closing Date occurs, and to designate Buyer as lead participant with respect to the Transferred Assets, such designation to be effective from and after the Closing Date. By no later than 11:00 a.m. on the date immediately preceding the Closing Date, Buyer shall submit to Seller its instructions for bidding the output of the Plants into the NEPOOL day-ahead market for the Closing Date. Seller shall follow such instructions submitted by Buyer for the Closing Date.

9.6 Antitrust and Other Authorizations and Consents.

(a) Filings. Each Party shall use its Commercially Reasonable Efforts to obtain, and to cooperate with the other Party in obtaining, all Consents of any Governmental Authority that may be or become necessary in connection with the consummation of the transactions contemplated by this Agreement, and to take commercially reasonable actions to avoid the entry of any Order by any Governmental Authority prohibiting the consummation of the transactions contemplated hereby, and shall furnish to the other all such information in its possession as may be necessary for the completion of the notifications or applications to be filed by the other. No Party shall withdraw any such filing or submission prior to the termination of this Agreement without the written consent of the other Parties. The filing fee required to be paid in connection with any regulatory filing, premiums relating to any title insurance policy covering the Owned Real Estate for the benefit of Buyer from and after the Closing Date, premiums relating to any insurance policy insuring the Transferred Assets from and after the Closing Date and Transfer Taxes shall each be the sole responsibility of Buyer.

(b) HSR Act. Without limiting the generality of Section 9.6(a), to the extent required by the HSR Act, each Party shall (i) file or cause to be filed, as promptly as practicable after the entry of the Bidding Procedures Order, but in no event later than the second Business Day thereafter, with the United States Federal Trade Commission and the United States Department of Justice, all reports and other documents required to be filed by such Party under the HSR Act concerning the transactions contemplated hereby and (ii) promptly comply with or cause to be complied with any requests by the United States Federal Trade Commission or the United States Department of Justice for additional information concerning such transactions, in each case so that the waiting period applicable to this Agreement and the transactions contemplated hereby under the HSR Act shall expire as soon as practicable after completion of the Auction. Each Party agrees to request, and to cooperate with the other Party in requesting, early termination of any applicable waiting period under the HSR Act. Buyer shall pay the filing fees payable in connection with the filings by the Parties required by the HSR Act.

(c) Energy Regulatory Approval. Without limiting the generality of Section 9.6(a), (i) Seller and Buyer shall work cooperatively and with all due diligence to prepare an application or applications to the FERC to obtain the FERC Approval and (ii) Buyer shall prepare an application to obtain the Market-Based Rate Authorization. Seller shall use its Commercially Reasonable Efforts to assist Buyer in connection with the preparation of the application to obtain the Market-Based Rate Authorization. Such applications shall be filed with FERC as promptly as commercially practicable, but in no event later than fifteen (15) days, after completion of the Auction and selection of the buyer of the Transferred Assets in accordance with the Bidding Procedures Order.

(d) FCC License Approval. Without limiting the generality of Section 9.6(a), Seller and Buyer shall work cooperatively and with all due diligence to prepare an application or applications (on FCC Form 603) to obtain the FCC License Approval. Such application shall be filed with the FCC as promptly as commercially practicable, but in no event later than fifteen (15) days, after completion of the Auction and selection of the buyer of the Transferred Assets in accordance with the Bidding Procedures Order. Further, Seller and Buyer shall comply with or cause to be complied with any request by the FCC for additional information concerning such

transactions. Buyer shall pay the filing fees payable in connection with the filings by the Parties hereto pursuant to this Section 9.6(d).

(e) Third Party Consents. Unless otherwise provided by Order of the Bankruptcy Court, without limiting the generality of Section 9.6(a), Buyer shall (i) use its Commercially Reasonable Efforts to assist the Seller Parties in obtaining any Consents of Third Parties to the extent required under Section 9.10(b), including providing to such Third Parties such financial statements and other publicly available financial information with respect to Buyer as such Third Parties may reasonably request and (ii) take all actions necessary to satisfy the requirements of Section 365(f)(2) of the Bankruptcy Code relating to adequate assurance of future performance, including by providing required witnesses, financial statements and other financial information.

9.7 Commercially Reasonable Efforts.

(a) Upon the terms and subject to the conditions of this Agreement, each Party shall use its Commercially Reasonable Efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable consistent with Applicable Laws to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby, including satisfying the conditions to consummation of such transactions.

(b) (i) [Reserved]

(ii) Employer and Seller shall use their Commercially Reasonable Efforts to assist Buyer or Buyer's designated Affiliate in obtaining agreements with any labor organization necessary or appropriate to effectuate the terms of this Agreement, including the provisions of Section 10.3 hereof.

(c) Seller and Buyer shall act cooperatively to effect a mutually acceptable result concerning any new or pending Permit action by any Governmental Authority. Seller and Buyer acknowledge that Seller's Representatives have frequent communications with Governmental Authorities, and that such communications often occur with short notice. Seller shall promptly notify Buyer of all correspondence from a Governmental Authority relating to new or pending Permit actions, and Seller shall use Commercially Reasonable Efforts to make Buyer a party to any material correspondence, negotiation, consent, agreement, or action taken with such Governmental Authority concerning new or pending Permit actions. Seller covenants and agrees to use Commercially Reasonable Efforts to provide Buyer with timely advance notice of meetings or significant contacts with the Governmental Authority concerning any new or pending Permit actions and all aspects of its pending Permit applications. To the extent practicable, Seller shall consult with Buyer in advance of any such meeting. After the Auction and at least sixty (60) days prior to the Closing, Seller and Buyer shall meet to discuss and facilitate the transition of the Environmental Permits. Seller and Buyer shall arrange meetings which shall be conducted at least thirty (30) days prior to the Closing with the appropriate Governmental Authorities for the purpose of (i) introducing Buyer to such Governmental Authorities and (ii) discussing the transition and determining mechanics for the transfer of the Environmental Permits.

(d) [Reserved]

(e) Except to the extent prohibited by Applicable Law, Seller shall keep Buyer informed of the status and progress of all meetings, notices, actions and other Proceedings with any Governmental Authority, ISO New England, Inc., NEPOOL or any Third Party with respect to the Reliability Agreement. Seller shall not (i) agree to, or enter into, any agreement or commitment with respect to the Reliability Agreement that includes terms inconsistent with the Reliability Agreement, or (ii) submit any baseline compliance cost estimates that would trigger the effectiveness of the Reliability Agreement, to any Governmental Authority, NEPOOL or ISO New England, Inc., without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed. Buyer shall have from time to time the reasonable opportunity to consult with Seller with respect to the Reliability Agreement.

9.8 Publicity. Prior to the filing with the Bankruptcy Court of the motion seeking entry of the Bidding Procedures Order, no Party shall issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior approval of each other Party, except as may be required by Applicable Laws or stock exchange rule (in which case the Parties shall use their best efforts to consult with each other regarding the content of any such press release or statement prior to its release).

9.9 Interconnection and Facilities Sharing Arrangements. Buyer shall use its Commercially Reasonable Efforts to negotiate and enter into an electrical interconnection agreement for the Plants, such agreement to be effective as of the Closing or, in the alternative to obtain interconnetion services for the Plants, including, if necessary, requiring the applicable transmission provider to file an unexecuted interconnection agreement with FERC. Seller shall reasonably cooperate with Buyer with respect to such electrical interconnection agreement and service.

9.10 Procedural Orders and Motions. Between the date of this Agreement and the Closing:

(a) General; Bankruptcy Court Filings. It is the Parties' intention to consummate the transactions contemplated by this Agreement pursuant to a Bankruptcy Court approved sale of the Transferred Assets under Sections 105, 363, and 1146 and other applicable provisions of the Bankruptcy Code and the assignment and assumption of the Assigned Contracts and Leases under Sections 105, 363 and 365 of the Bankruptcy Code. Within five (5) Business Days after this Agreement has been executed by Buyer and Seller, Seller shall file one or more motions (the "Motion") with the Bankruptcy Court:

(i) seeking entry by no later than October 7, 2004 of the Bidding Procedures Order to include approval of the Break-Up Fee and Expense Reimbursement Fee provided for herein and in the Bidding Procedures Order, provided that Seller shall use its reasonable efforts to so seek entry of the Bidding Procedure Order during the week of September 27, 2004;

(ii) establishing bidding procedures governing the transactions contemplated by this Agreement;

(iii) scheduling a hearing on approval of the sale to be held in no event later than the date that is ninety (90) days after the date on which the Bidding Procedures Order is entered;

(iv) seeking approval of the form, manner and notice to be given of the sale;

(v) setting the deadline for filing objections; and

(vi) seeking approval of assignment and assumption of the Assigned Contracts and Leases.

(b) Approvals, Consents and Notice. Within five (5) Business Days after entry of the Bidding Procedures Order, Seller shall promptly give notice of the entry of such order to (i) all third parties to all Assigned Contracts and Leases, (ii) to all parties entitled to receive notice under the Bankruptcy Code and the Bankruptcy Rules, for the purpose of obtaining the written Consent of such Persons whose Consent is necessary pursuant to Section 365 of the Bankruptcy Code, and (iii) to all Persons who assert any Cure-Amounts with respect to the assignments by Seller to Buyer of such Assigned Contracts and Leases. Without limiting the generality of Section 9.7, Seller and Buyer shall use their respective Commercially Reasonable Efforts to obtain all required Consents of all third parties to the Assigned Contracts or Leases, whose Consent is required under Section 365 of the Bankruptcy Code to validly assign such Assigned Contracts or Leases to Buyer on the Closing Date.

(c) Competing Proposals and Overbids.

(i) In the event that Seller or any Representative of Seller shall receive a Qualified Bid from a Qualified Bidder, subject to and in accordance with the Bidding Procedures Order, it shall provide a copy of the Qualified Bid to Buyer within two (2) Business Days thereafter and afford Buyer an opportunity to participate in an Auction to be held in accordance with the terms of the Bidding Procedures Order and as noticed at the offices of bankruptcy counsel for Seller, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174. Subject to the terms of the Bidding Procedures Order, at any Auction so held, bidding shall proceed with the highest Superior Offer and subsequent bids must include additional consideration of at least $5,000,000 over the previous bid. Subject to the terms of the Bidding Procedures Order, in the event no Potential Bidder (as defined in the Bidding Procedures Order) makes the submissions required in paragraph 6(a) of the Bidding Procedures Order, or in the event Seller or any Representative of Seller fails to receive a timely Qualified Bid or Qualified Bids from a Qualified Bidder or Qualified Bidders in accordance with the Bidding Procedures Order which collectively comprise a Superior Offer, then no Auction shall be held, and Seller shall request the Bankruptcy Court at the sale hearing to enter the Sale Order authorizing and approving the transactions set forth herein.

(ii) The Bankruptcy Court sale hearing to confirm the highest or best offer shall be held not later than five (5) Business Days after the conclusion of the

Auction (ten (10) Business Days if Buyer is not the Winning Bidder), and in no event later than the date that is ninety (90) days after the date on which the Bidding Procedures Order is entered.

(d) Payment of Break-Up Fee and Expense Reimbursement Costs.

(i) If this Agreement shall be terminated prior to the Closing Date in accordance with Section 13.1(d), (e) or (k), Seller shall, not later than two (2) Business Days after the earlier of (i) the consummation of an Alternative Transaction and (ii) the confirmation of Seller's plan of reorganization or liquidation, pay to Buyer an amount equal to $18,000,000 (the "Break-Up Fee").

(ii) If this Agreement shall be terminated prior to the Closing Date in accordance with Section 13.1 (d), (e) or (k), then upon presentation of a statement setting forth with specificity the nature and amount thereof, Seller shall, not later than two (2) Business Days after the earlier of (i) the consummation of an Alternative Transaction and (ii) the confirmation of Seller's plan of reorganization or liquidation, reimburse Buyer for reasonable out-of-pocket expenses actually incurred by Buyer in connection with this Agreement in an aggregate amount not to exceed $7,000,000 (the "Expense Reimbursement Fee").

(iii) Seller's obligation to pay the Break-Up Fee and to reimburse the Expense Reimbursement Fee shall be subject to the Bidding Procedures Order.

9.11 Advice of Changes. Prior to the Closing, each Party shall advise the other in writing with respect to any matter arising after the date of this Agreement of which that Party obtains knowledge and which, if existing or occurring on or prior to the date of this Agreement, would have been required to be set forth in this Agreement, including any of the Schedules hereto. The Seller Parties, as applicable, shall, from time to time prior to the Closing, promptly supplement or amend the Schedules to this Agreement with respect to (a) any non-material matter that existed as of the date of this Agreement and should have been set forth in any of the Schedules hereto and (b) any non-material matter hereafter arising which, if existing as of the date of this Agreement, would have been required to be set forth in any of the Schedules hereto in order to make any representation or warranty set forth in this Agreement true and correct as of such date; provided, however, that, with respect to clause (a) above, any such supplemental or amended disclosure shall not be deemed to have been disclosed as of the date of this Agreement or as of Closing unless expressly consented to in writing by Buyer; and provided further, that, with respect to clause (b) above, any such supplemental or amended disclosure shall, for purposes of this Agreement, be deemed to have been disclosed as of the Closing to the extent it is not material or as otherwise permitted under Section 9.3. Buyer shall promptly notify Seller of (i) any breach by any Seller Party of any representation or warranty of such Seller Party, or (ii) any other event, fact, condition or circumstance that would excuse Buyer from the timely performance of its obligations hereunder, if any such information becomes aware to Buyer prior to the Closing.

ARTICLE X.

POST-CLOSING COVENANTS

10.1 Maintenance of Books and Records. Each Party shall preserve for a period of at least 2 years from the Closing Date (or, in the case of Seller, until Seller's dissolution or liquidation, if earlier) all records possessed by such Party, or to which such Party has any right or access, relating to the assets, liabilities or operations of the Business and the Transferred Assets prior to the Closing Date. During such period, where there is a legitimate purpose, such Party shall provide the other Party with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to (i) the relevant officers, limited liability company managers, officers and employees of such Party and (ii) the books of account and records of such Party, but, in each case, only to the extent relating to the Business or the Transferred Assets prior to the Closing Date, and the other Party and its Representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of such Party; and provided further that, as to so much of such information as constitutes trade secrets or confidential business information of such Party or could reasonably jeopardize any privilege, the requesting Party and its representatives shall agree not to disclose, furnish or make accessible to anyone or use for its own benefit (other than as contemplated hereby) any such trade secrets or other confidential or proprietary information of another Party except as provided for in the last proviso of Section 10.2; and provided further that notwithstanding anything herein to the contrary, except to the extent required by Applicable Law, neither Seller nor Employer shall be required to disclose performance or disciplinary information pertaining to the Buyer Employees. The Party requesting any such books and records, information, or employees shall bear all of the out-of-pocket costs and expenses (including attorneys' fees and disbursement and reimbursement for the reasonable salaries and employee benefits for those employees who are made available) reasonably incurred in connection with providing such books and records, information, or employees. After such two-year period (or, in the case of Seller, immediately prior to Seller's dissolution or liquidation, if earlier), such records may nevertheless be destroyed by a Party if such Party sends the other Party written Notice of its intent to destroy records, specifying with particularity the contents of the records to be destroyed. Such records may then be destroyed after the 30th day following delivery of such Notice unless the other Party objects to the destruction, in which case the Party seeking to destroy the records shall either agree to retain such records or to deliver such records to the objecting Party at the objecting Party's expense.

10.2 Confidentiality. After the Closing, except to the extent required by Applicable Law, neither Party shall disclose, furnish or make accessible to anyone or use for its own benefit (other than as contemplated hereby) any trade secrets or other confidential or proprietary information of another Party relating to the Seller Parties, Buyer and/or their respective businesses or, in the case of Buyer, Employer (it being understood that from and after the Closing Date, all confidential information relating to the Transferred Assets or Plants shall be Buyer's confidential information), including, information obtained by or revealed to such Party during any investigations, negotiations or review relating to this Agreement and any other document contemplated hereby or thereby or any past or future actions taken in connection with, pursuant to, in accordance with, or under this Agreement, including any business plans,

marketing plans, financial information, strategies, systems, programs, methods and computer programs, but excluding any of the Intellectual Property; provided, however, that such protected information shall not include (i) information required to be disclosed by law, legal or judicial process (including a court order, subpoena or order of a Governmental Authority) or the rules of any stock exchange, (ii) information that is or becomes available to the disclosing Party on a non-confidential basis from a source other than the other Party and not disclosed or obtained in violation of this Agreement or any other agreement and (iii) information known to the public or otherwise in the public domain without violation of this Section 10.2.

10.3 Employee Matters.

(a) Offers.

(i) Buyer or its designated Affiliate shall unconditionally offer employment to all Represented Employees who are employed on the Closing Date, including Represented Employees who, on the Closing Date, are on authorized leave of absence or other authorized temporary absence.

(ii) Buyer or its designated Affiliate shall, subject to Buyer's standard pre-employment medical/drug screenings and background check requirements (which screenings and requirements shall not be effected sooner than thirty (30) days after completion of the Auction and selection of Buyer as the Winning Bidder) with respect to each Non-Represented Employee (or any employee who replaces any such Non-Represented Employee) (A) who is actively employed on the Closing Date or who is temporarily absent from active employment due to vacation, effective as of the Closing Date, or (B) who is temporarily absent from active employment due to disability, military leave or paid time off on the Closing Date, upon termination of such temporary absence within nine months following the Closing Date, provided that such individual is able to perform the essential functions of the position being offered by Buyer (with or without reasonable accommodation), make a Qualifying Offer of employment.

(iii) Buyer or its designated Affiliate may, with respect to each Non-Plant Employee (or any employee who replaces any such Non-Plant Employee) make an offer of employment.

(iv) Plant Employees and Non-Plant Employees, in each case, who actually commence active employment with Buyer or its designated Affiliate (and Plant Employees who are on authorized leave of absence or other temporary absence and accept Buyer's employment offer) shall be referred to herein as "Buyer Employees" from and after the date of such active employment with Buyer or its designated Affiliate.

(v) Except as otherwise specifically set forth herein, no Seller Party nor any of their Affiliates shall have any responsibility whatsoever for any Losses or other obligations which relate in any way to any Buyer Employees' employment or service with Buyer or Buyer's designated Affiliate from and after

the Closing Date. Except as otherwise specifically provided in Sections 3.1, 10.3(b), and 10.3(c), neither Buyer nor any of its Affiliates shall have any responsibility whatsoever for any Losses which relate in any way to (A) employment or service with Employer or its Affiliates of any Buyer Employee prior to the Closing Date including, without limitation, the payment of any wages or bonus or incentive payments relating to periods prior to the Closing Date, (B) employment or service with Employer or its Affiliates at any time of any person who does not become a Buyer Employee and (C) any Benefit Plan at any time.

(b) Assumption of Collective Bargaining Agreements. Effective as of the Closing Date, Buyer or Buyer's designated Affiliate, as applicable, shall (i) recognize the applicable labor organizations that are parties to the Collective Bargaining Agreements as the respective exclusive bargaining representatives of the Represented Employees; (ii) recognize each Buyer Employee's service with Employer (including prior service with Employer's predecessors) for all purposes under the Collective Bargaining Agreements, such that each Buyer Employee's seniority date and years of service remain intact after Closing; and (iii) subject to Section 9.3(a)(iii),to the extent applicable to the Plants, assume each of the Collective Bargaining Agreements, and become the employer of such Represented Employees as if there had been no change in their employer.

(c) Employee Benefit Plans.

(i) Buyer Plans. Effective as of the Closing Date, Buyer or Buyer's designated Affiliate shall cause each Buyer Employee who was a Non-Represented Employee and who was covered under Benefit Plans immediately prior to such date to be covered under employee benefit plans, programs and arrangements maintained or established by Buyer (the "Buyer Plans") which plans provide benefits that for a period of one year are generally similar in value in the aggregate to Benefit Plans in effect immediately prior to the Closing Date and set forth on Schedule 10.3(c)(i); provided that such coverage does not result in any duplication of benefits in conjunction with the obligation of Buyer or Buyer's designated Affiliate to pay severance pursuant to Section 10.3(c)(iii). Buyer shall cause the Buyer Employee's service with Employer as set forth on Schedule 7.6(a)(i) to be recognized under the Buyer Plans, solely for purposes of eligibility to participate, vesting and, to the extent applicable, entitlement to vacation and sick leave but excluding benefit accruals, to the same extent such service (including prior service with Employer's predecessors) is recognized under the corresponding Benefit Plans; provided that such recognition does not result in any duplication of benefits.

(ii) Buyer Welfare Plans. Effective as of the Closing Date, each Buyer Employee shall cease to be covered by NEGT's "employee welfare benefit plans" (as defined in Section 3(1) of ERISA), including plans, programs, policies, and arrangements which provide medical, vision, dental, life insurance, accident insurance and disability coverage (collectively, "Employer Welfare Plans"). NEGT and Employer shall retain responsibility for all medical, vision, dental, life

insurance, accident insurance and disability coverage claims incurred by Plant Employees and Non-Plant Employees and covered under the terms of an applicable Employer Welfare Plan prior to the date they become Buyer Employees. For purposes of this subsection, a claim shall be deemed to have been incurred (i) for medical, vision and dental coverage, on the date the service giving rise to the claim is performed, (ii) for life and accident insurance coverage, on the date of death or accident, and (iii) for disability coverage, on the date of the event which causes the disability. Subject to Section 10.3(c) and Applicable Law, with respect to Buyer Employees, effective as of the date a Plant Employee or Non-Plant Employee becomes a Buyer Employee, Buyer shall cause all applicable Buyer Plans that provide medical, vision, dental, life insurance, accident insurance and disability coverage (collectively, "Buyer Welfare Plans") to waive pre-existing condition exclusions, evidence of insurability provisions (other than with respect to requirements to provide evidence of insurability for life insurance above certain thresholds) and waiting period requirements to the same extent such exclusions, provisions and requirements were waived or satisfied under the applicable Employer Welfare Plan as of the Closing Date. In addition, subject to Section 10.3(c), Buyer shall cause the applicable Buyer Welfare Plans to credit Buyer Employees with amounts credited by Employer under Employer's health, dental and cafeteria plans toward the satisfaction of annual deductible and out-of-pocket maximums under such Buyer health, dental and cafeteria plans during the calendar year in which a Plant Employee or Non-Plant Employee becomes a Buyer Employee.

(iii) Severance. In the event (x) any Buyer Employee is terminated by Buyer other than for cause or (y) Buyer or its designated Affiliate modifies the terms and conditions of a Buyer Employee's employment so that he/she would no longer be considered to have received a Qualifying Offer (if Buyer was required to have given such employee a Qualifying Offer as of Closing), in either case, during the one-year period immediately following the Closing Date, Buyer or its designated Affiliate shall provide such person with a severance benefit which is not less than the severance benefit such person was entitled to receive under the Power Services Amended and Related Severance Plan dated September 24, 2003 (the "Severance Plan"), in the case of a Non-Represented Employee or Non-Plant Employee, or the applicable Collective Bargaining Agreement, in the case of a Represented Employee.

(iv) COBRA. Employer and its ERISA Affiliates shall be exclusively responsible for complying with COBRA with respect to their employees and their eligible dependents by reason of such employees' termination of employment with Employer and its ERISA Affiliates, and neither Buyer nor any Affiliate thereof shall have any obligation or liability to provide COBRA on account of any such termination of employment. Employer and its ERISA Affiliates shall not take any action after the Closing that would cause Buyer and any Buyer ERISA Affiliate thereof to become a "successor employer" to any "M&A qualified beneficiary" who is not a Buyer Employee within the meaning of IRS Reg. § 54.4980B-9 for purposes of COBRA.

(v) Paid Time Off and Sick Leave. Each Buyer Employee shall be credited by Buyer with any unused paid time off and Grandfathered Sick Leave earned as of the Closing Date with Employer under the paid time off and Grandfathered Sick Leave policies or generally comparable policies of Buyer applicable to such Buyer Employee, and neither NEGT, Seller, Employer nor any of their Affiliates shall have any liability therefor following the Closing Date. Buyer shall recognize service by each Buyer Employee with NEGT, Seller, Employer or any of their Affiliates for purposes of determining entitlement to paid time off or Grandfathered Sick Leave following the Closing Date under the applicable policies of NEGT, Seller or Employer.

(vi) [Reserved]

(d) Alternative Procedure. Subject to Applicable Law, pursuant to the "Alternative Procedure" provided in section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, (i) Buyer and Employer shall report on a predecessor/successor basis as set forth therein, (ii) Employer shall file a Form W-2 with respect to the Plant Employees and Non-Plant Employees who accept Buyer's offer of employment for periods before the Closing Date and (iii) Buyer shall undertake to file (or cause to be filed) a Form W-2 for each such employee for the remainder of the year that includes the Closing Date.

(e) Other Welfare Benefits. From and after the Closing Date, Buyer or Buyer's designated Affiliate, as applicable, shall, and shall cause an Affiliate to, take reasonable steps to avoid any gap in coverage in connection with the transactions contemplated by this Agreement with respect to the group health and life insurance coverage of Buyer Employees and their beneficiaries.

(f) No Requirement to Maintain Employment. Nothing in this Agreement shall require Employer or any Affiliate of Seller to retain the services of any employee.

10.4 Further Assurances; Post-Closing Assignments. From time to time following the Closing, any Seller Party, at Buyer's expense, shall execute, acknowledge and deliver such additional documents, instruments of conveyance, transfer and assignment or assurances and take such other action as Buyer may reasonably request to more effectively assign, convey and transfer to Buyer, and fully vest title in Buyer, with respect to the Transferred Assets. Without limiting the generality of the foregoing, from and after the Closing Date and upon the discovery by any Seller Party of any items included within the definitions of Transferred Assets or Assigned Contracts or Leases but not transferred, conveyed or assigned to or assumed by Buyer in a Bill of Sale, an Assignment and Assumption Agreement or any other applicable instrument of conveyance, such Seller Party, as applicable, shall (i) promptly deliver written Notice to Buyer of the existence and non-transfer or non-assumption of such item and provide Buyer with all the information about and with access to such item as Buyer may reasonably request and (ii) if notified in writing by Buyer within thirty (30) days after the delivery of such Notice by such Seller Party, as applicable, transfer, convey or assign to Buyer such item in the manner and on the terms and conditions as if it were a part of the Transferred Assets or an Assigned Contract or Lease under this Agreement.

10.5 Use of NEGT Marks. NEGT Marks may appear on some of the Transferred Assets, including on signage throughout the Real Estate Assets, and on supplies, materials, stationery, brochures, advertising materials, manuals and similar consumable items forming part of the Transferred Assets. Buyer acknowledges and agrees that it obtains no right, title, interest, license or any other right whatsoever to use the NEGT Marks. In furtherance thereof, Buyer shall, within ninety (90) days after the Closing Date, remove any such NEGT Marks from (or, if appropriate return to Seller or destroy) the Transferred Assets (and if requested, provide written verification thereof) (provided, however, that Buyer shall not be obligated to remove such NEGT Marks from historical books and records). Buyer shall not challenge Seller's (or its Affiliates') ownership of the NEGT Marks or any application for registration thereof or any registration thereof or any rights of Seller or its Affiliates therein as a result, directly or indirectly, of its ownership of the Transferred Assets. Buyer shall not do any business or offer any goods or services under the NEGT Marks. Buyer shall not send, or cause to be sent, any correspondence or other materials to any Person on any stationery that contains any NEGT Marks or otherwise operate the Transferred Assets in any manner which it is aware would confuse any Person into believing that Buyer has any right, title, interest, or license to use the NEGT Marks.

10.6 Insurance. Effective the Closing Date, the Seller Insurance Policies shall be terminated or modified to exclude coverage of all or any portion of the Business and the Transferred Assets, and, as a result, Buyer shall be obligated at or before Closing to obtain at its sole cost and expense replacement insurance or surety bonds, or to provide required financial assurance arrangements, including insurance, surety bonds or financial assurance arrangements required by any Third Party to be maintained in respect of the Business or the Transferred Assets. Buyer further acknowledges and agrees that Buyer shall, to the extent required, provide to certain Governmental Authorities and Third Parties evidence of such replacement or substitute insurance coverage, surety bonds or financial assurance arrangements in respect of Seller's insurance coverage, surety bonds and financial assurance arrangements set forth on Schedule 1.1(a)(viii) for the continued operations of the Business and the Transferred Assets following the Closing. If any claims are made or Losses arise from events or occurrences prior to the Closing Date that relate to the Business or the Transferred Assets (including with respect to employees) and such claims, or the claims associated with such Losses, may be made against the policies of insurance, if any, retained by any Seller Party or their Affiliates or under policies of insurance otherwise retained by any Seller Party or their Affiliates from and after the Closing Date, then, if requested by Buyer or any Seller Party, as appropriate, shall use its Commercially Reasonable Efforts so that Buyer can file, notice, and otherwise continue to pursue these claims pursuant to the terms of such policies of insurance and upon liquidation or dissolution of Seller, at Buyer's request, each Seller Party, as appropriate, shall assign to Buyer, to the extent assignable, any such residual rights or such policies to the extent relating to the operation of the Business or the ownership of the Transferred Assets prior to the Closing Date. Buyer shall reimburse each Seller Party or their Affiliates for any Losses or other costs incurred by such Seller Party or such Affiliates ((i) by way of any reduction in, or loss of, available insurance to cover other insurable losses or associated expenses (including policy deductibles) of any Seller Party or such Affiliates, (ii) retroactive premium payments or (iii) increases in premium) arising out of Buyer pursuing these claims under such policies.

10.7 Tax Matters.

(a) With respect to Taxes to be prorated in accordance with Section 4.4 of this Agreement only, Buyer shall prepare and timely file all Tax Returns required to be filed from and after the Closing Date with respect to the Transferred Assets, if any, and shall, if Seller has not liquidated its operating assets, duly and timely pay all such Taxes shown to be due on such Tax Returns. If Seller and/or FMLC is still in existence when such Tax Returns are prepared, Buyer's preparation thereof shall be subject to Sellers' and/or FMLC's, as the case may be, approval, which approval shall not be unreasonably withheld. Buyer shall make such Tax Returns available for Sellers' and FMLC's review and approval no later than fifteen (15) Business Days prior to the due date for filing such Tax Return. Within ten (10) Business Days after receipt of such Tax Return, Seller and FMLC shall pay to Buyer its proportionate share of the amount shown as due on such Tax Return determined in accordance with Section 4.4 of this Agreement. If Seller and/or FMLC has liquidated its operating assets, Buyer shall pay only such Taxes shown to be due on such Tax Returns with respect to periods from and after the Closing Date. Buyer shall not be responsible for filing any Tax Returns relating to Employer whether for periods prior to, on or after the Closing.

(b) Each of Buyer, Seller and FMLC shall provide the other with such assistance as may reasonably be requested by the other Party in connection with the preparation of any Tax Return, any audit or other examination by any Taxing Authority, or any judicial or administrative proceedings relating to liability for Taxes, and each shall retain and provide the requesting Party with any records or information which may be relevant to such return, audit or examination, proceedings or determination. Any information obtained pursuant to this Section 10.7 or pursuant to any other Section hereof providing for the sharing of information or review of any Tax Return or other schedule relating to Taxes shall be kept confidential by the Parties.

## ARTICLE XI.

## NON-SURVIVAL; EXISTENCE

11.1 Non-Survival of Representations and Warranties. The representations and warranties of the Parties contained in this Agreement (or any certificates delivered by the Parties pursuant to this Agreement) shall terminate upon the earlier of the Closing or the termination of this Agreement pursuant to Article XIII.

11.2 Existence. Notwithstanding any other provision in this Agreement or any Ancillary Agreement to the contrary, including Article X hereof, Buyer acknowledges and agrees that no Seller Party is required to preserve, renew or keep in effect its legal existence, or to have, directly or indirectly, any employees or agents for more than six (6) months after the Closing Date.

## ARTICLE XII.

## RISK OF LOSS

12.1 Casualty Loss.

(a) From the date hereof through the Closing Date, all risk of loss or damage to the Transferred Assets shall be borne by Seller, other than loss or damage caused by the acts or omissions of Buyer involving negligence or willful misconduct, which loss or damage shall be the responsibility of Buyer.

(b) Notwithstanding any provision hereof to the contrary, if, before the Closing Date, all or any portion of the Transferred Assets is (i) condemned or taken by eminent domain or is the subject of a pending or threatened condemnation or taking which has not been consummated, in each case, other than pursuant to Proceedings set forth on Schedule 6.12(c), or (ii) materially damaged or destroyed by fire or other casualty, Seller shall notify Buyer promptly in writing of such fact, and (x) in the case of a condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing and (y) in the case of a fire or other casualty, Seller shall either restore such damage or assign the insurance proceeds therefrom to Buyer at the Closing. Notwithstanding the foregoing, if such condemnation, taking, damage or destruction involves (i) Transferred Assets having a then current market or replacement value in excess of $5,000,000, or (ii) damage or destruction in excess of $5,000,000, Buyer and Seller shall negotiate to resolve the loss resulting from such condemnation, taking, damage or destruction (and such negotiation shall include the negotiation of a fair and equitable adjustment to the Purchase Price). If no such resolution can be agreed upon within ninety (90) days after Seller has notified Buyer of such loss, then Buyer, on the one hand, or Seller, on the other hand, may terminate this Agreement pursuant to Section 13.1(f).

## ARTICLE XIII.

## TERMINATION

13.1 Termination. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing in the following manner:

(a) by mutual written consent of Seller and Buyer;

(b) by either Seller or Buyer (provided that such Party (and in the case of Seller, including the other Seller Parties) is not then in material breach of any provision of this Agreement), upon written notice to the other Parties, if a Governmental Authority shall have issued an Order or taken any other action (which Order or other action the Parties hereto shall use their Commercially Reasonable Efforts to lift), in each case permanently restraining, enjoining or otherwise prohibiting the material transactions contemplated by this Agreement and such Order or other action shall have become final and non-appealable;

(c) by either Seller or Buyer (provided that such Party (and in the case of Seller, including the other Seller Parties) is not then in material breach of any provision of this Agreement), upon written notice to the other Parties, if the Closing shall not have occurred on or before 11:59 p.m., New York City time, by June 30, 2005 (the "Outside Date"); provided, however, that if on such date, the conditions to the Closing set forth in Section 5.4(f) with respect to Governmental Approvals, 5.5(e), 5.6(d) or 5.6(e) with respect to Governmental Approvals shall not have been satisfied (provided such non-satisfaction has not been caused by a Parties' lack of diligent efforts) but all other conditions to the Closing shall have been satisfied or shall

be capable of being satisfied, then the Outside Date shall be extended an additional ninety (90) days;

(d) by either Seller or Buyer, upon written notice to the other Parties, if Seller enters into an agreement or agreements with one or more Third Parties with respect to an Alternative Transaction (each agreement, a "Third Party Agreement");

(e) by Buyer, upon written notice to the other Parties, if there shall have been a breach of any representation, warranty, covenant or agreement set forth in this Agreement on the part of any Seller Party within the meaning of Section 5.4(a) and (b), which breach gives rise to Buyer's right not to close under such Section 5.4 and is incapable of cure or, if capable of cure, shall not have been cured within thirty (30) days following receipt by the breaching Party of Notice of such breach;

(f) by either Buyer or Seller (provided that such Party (and in the case of Seller, including the other Seller Parties) is not then in material breach of any provision of this Agreement), upon written notice to the other Parties, in accordance with the provisions of Section 12.1(b), provided that the Party seeking to so terminate shall have complied with its obligations under Section 12.1;

(g) by Buyer, upon written notice to the other Parties, if the Bankruptcy Court has not entered the Bidding Procedures Order by October 7, 2004;

(h) by Seller, upon written notice to Buyer, if there shall have been a breach of any representation, warranty, covenant or agreement set forth in this Agreement on the part of Buyer within the meaning of Section 5.5(a) and (b), which breach gives rise to Seller's right not to close under such Section 5.5 and is incapable of cure or, if capable of cure, shall not have been cured within thirty (30) days following receipt by Buyer of Notice of such breach;

(i) by Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is ninety (90) days after the date on which the Bidding Procedures Order is entered;

(j) by Buyer, if the Bankruptcy Court converts the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, appoints a Chapter 11 trustee or dismisses the Chapter 11 Case; or

(k) by Buyer, if Seller files a proposed plan of reorganization or liquidation in the Chapter 11 Case which does not provide for the consummation with Buyer of the transactions set forth herein in accordance with the terms of this Agreement.

13.2 Procedure and Effect of Termination. Except as set forth in this paragraph, upon any termination of this Agreement, all rights and obligations of the Parties hereunder shall terminate without any liability or obligation of any Party to any other Party, provided that Sections 9.10(d) and 10.2, this Section 13.2, and Article XIV and the Confidentiality Agreement shall survive such termination. In the event that this Agreement is terminated pursuant to Section 13.1(h) above, the Deposit Amount and any interest accrued thereon shall be paid to Seller within five (5) Business Days after such termination. In the event this Agreement is terminated pursuant to any subsection of Section 13.1 other than subsection (h), the Deposit

Amount and any interest accrued thereon shall be paid to Buyer within five (5) Business Days after such termination. The Break-Up Fee and the Expense Reimbursement Fee shall in all events be payable under the circumstances and in accordance with the timing set forth in Section 9.10(d). Any amounts paid to a Party under Section 9.10(d) or this Section 13.2, including the Break-Up Fee, Expense Reimbursement Fee and the Deposit, shall constitute liquidated damages, and no Party shall have any further liability or obligation as a result of such termination. The Parties acknowledge and agree that if this Agreement is terminated pursuant to Sections 13.1, the actual damages incurred will be difficult, if not impossible, to ascertain and accordingly, the Parties have provided for the liquidated damages provided above. It is further agreed that this provision shall not be construed as a penalty, but as a bona fide attempt to establish an agreed measure of damages which Buyer or Seller, as the case may be, will suffer as a result of the termination of this Agreement pursuant to such Sections.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

14.1 Notices. All notices, requests, demands, and other communications required or permitted to be given or made hereunder by any Party (each a "Notice") shall be in writing and shall be deemed to have been duly given or made if (i) delivered personally, (ii) delivered by prepaid overnight courier service, or (iv) delivered by confirmed telecopy or facsimile transmission to the Parties at the following addresses and telecopy or facsimile numbers (or at such other addresses and numbers as shall be specified by the Parties by similar notice):

If to Buyer:

Dominion Energy New England, Inc.
c/o Dominion Energy, Inc.
120 Tredegar Street
Richmond, VA 23219
Attention: General Counsel
Fax: (804) 819-2233
and
Attention: Rudolph Bumgardner IV, Managing Counsel
Fax: (804) 819-2202

with a copy to:

McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 232319
Attention: Joanne Katsantonis
Fax: (804) 698-2090

If to any Seller Party:

USGen New England, Inc.
7600 Wisconsin Avenue
Bethesda, MD 20814
Attention: General Counsel
Fax: (301) 280 6800

with a copy to:

Blank Rome LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Attention: Marc E. Richards
Fax: (212) 885 5002

and

Blank Rome LLP
One Logan Square
Philadelphia, PA 19103
Attention: Ronald Fisher
Fax: (215) 832-5479

Notices shall be effective (i) if delivered personally or by overnight courier service, upon actual receipt by the intended recipient, or (ii) if sent by telecopy or facsimile transmission, when the confirmation of transmission is received by the sender.

14.2 Fees and Expenses. Except as otherwise provided herein, each Party shall pay any fees and expenses incurred by it incident to this Agreement and in preparing to consummate and consummating the transactions provided for herein.

14.3 Successors and Assigns. Subject to the following sentence, this Agreement shall be binding upon and inure to the benefit of the Parties and their successors and assigns. Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned or delegated by any Party without the prior written consent of the other Parties provided that no such written consent of any other Party shall be required for Buyer to (i) assign any of its rights and obligations hereunder to one or more wholly-owned, direct or indirect, subsidiaries of Buyer Parent or (ii) collaterally assign to Buyer's lenders any or all of Buyer's rights and interests hereunder; it being agreed that, in the case of any such assignment under clause (i) or (ii), Buyer shall not be relieved of any of its obligations hereunder. Nothing in this Agreement is intended to or shall confer upon any Person other than the Parties, and their respective successors and assigns, any rights, benefits, or remedies of any nature whatsoever under or by reason of this Agreement or any transaction contemplated by this Agreement. Without limiting the foregoing, except as provided in the Buyer Parent Guarantee, no direct or indirect holder of any equity interests or securities of any Party (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of any Party, nor any Representative of each of the

Parties and their respective Affiliates, shall have any right, liability or obligation arising under this Agreement or the transactions contemplated hereby.

14.4 Amendment; Waiver. This Agreement may not be amended or modified except by an instrument in writing signed by all the Parties, and no performance, term or condition can be waived in whole or in part, except by a writing signed by the Party against whom enforcement of the waiver is sought. Any performance, term or condition of this Agreement may be waived in writing at any time by the Party hereto entitled to the benefit thereof. No delay or failure on the part of any Party in exercising any rights hereunder, and no partial or single exercise thereof, will constitute a waiver of such rights or of any other rights hereunder.

14.5 Entire Agreement; Disclosure Schedules. This Agreement, together with the Schedules and the Exhibits hereto, the Ancillary Agreements and the Confidentiality Agreement, constitutes the entire agreement among the Parties with respect to the subject matter hereof and, other than the Confidentiality Agreement, supersede all prior agreements and understandings, both written and oral, between or among the Parties with respect to the subject matter hereof. There are no restrictions, promises, representations, warranties, covenants or undertakings between or among the Parties, other than those expressly set forth or referred to herein or therein.

14.6 Governing Law. This Agreement shall be governed by and construed and enforced in accordance with (i) the laws of the State of New York, without regard to conflict of laws rules or principles and (ii) the Bankruptcy Code, to the extent applicable.

14.7 Execution in Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

14.8 Disclosure. Disclosure of any matter, fact or circumstance in any Schedule to this Agreement shall be disclosure thereof for purposes of all other Schedules to this Agreement provided that such disclosure is (i) explicitly cross referenced to such other Schedule or (ii) sufficiently detailed so as to be reasonably recognizable to Buyer that such disclosure is relevant and responsive to such other Schedule. Certain information set forth in the Schedules is included solely for informational purposes, is not an admission of liability with respect to the matters covered by the information, and may not be required to be disclosed pursuant to this Agreement. The specification of any Dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Schedules is not intended to imply that such amounts (or higher or lower amounts) or such items are or are not material, and no Party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Schedules in any dispute or controversy among the Parties as to whether any obligation, item, or matter not described herein or included in a Schedule is or is not material for purposes of this Agreement.

14.9 Titles and Headings. Titles and headings to Articles and Sections herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

14.10 Invalid Provisions. If any provision of this Agreement (other than Section 5.4, Section 5.5, Section 5.6, Article II, Article III or Article IV of this Agreement or any part or provision thereof) is held to be illegal, invalid, or unenforceable under any present or future law, and if the rights or obligations under this Agreement of Seller on the one hand and Buyer on the other hand will not be materially and adversely affected thereby, (a) such provision shall be fully severable; (b) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement; and (d) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible. If any provisions of Section 5.4, Section 5.5, Section 5.6, Article II, Article III or Article IV of this Agreement are held to be illegal, invalid or unenforceable this Agreement shall be void and of no further effect.

14.11 Mutual Drafting. This Agreement is the joint product of Buyer and the Seller Parties, each provision hereof has been subject to the mutual consultations, negotiation and agreement of Buyer and the Seller Parties, and shall not be construed for or against any Party hereto as a result of such party having prepared such provision.

14.12 Submission to Jurisdiction. Any litigation arising hereunder or related hereto shall be tried by the Bankruptcy Court or, if the Bankruptcy Court does not have jurisdiction, in the courts of the State of New York, or the United States District Courts, located in the City of New York. Each Party irrevocably consents to and confers personal jurisdiction on the courts referred to above, and irrevocably and unconditionally waives any objection to the venue of such courts, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any lawsuit, action or other Proceeding brought in any such court has been brought in an inconvenient forum. Each Party further agrees that service of process may be made on such Party by mailing a copy of the pleading or other document by registered or certified mail, return receipt requested, to its addresses for the giving of notice provided for in Section 14.1 hereof, with service being deemed to be made five (5) Business Days after the giving of such notice.

14.13 WAIVER OF JURY TRIAL. BUYER AND SELLER PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. FURTHER, BUYER AND SELLER EACH HEREBY CERTIFY THAT NO REPRESENTATIVE OF THE OTHER, OR COUNSEL TO THE OTHER, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT IT WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. BUYER AND SELLER EACH ACKNOWLEDGE THAT THE OTHER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS SECTION 14.13.

14.14 Limitation on Liability. No Party shall have any liability, whether based on contract or tort (including negligence) for any punitive, exemplary, consequential, special,

indirect or incidental loss or damage suffered by another Party, even if such Party is advised of the possibility of such losses or damages.

14.15 Selection of Arbitrator. With respect to any provision contained herein which explicitly requires resolution of a dispute by an arbitrator, if the Parties hereto are unable to agree upon a mutually acceptable arbitrator, then such arbitration shall be conducted before a single arbitrator appointed by the AAA and shall be conducted in accordance with The Commercial Arbitration Rules of the AAA then in effect.

14.16 Disclaimer of Warranties. Notwithstanding anything contained in this Agreement, it is the explicit intent of each Party that neither any Seller Party nor Buyer is making any representations or warranties whatsoever, express or implied, beyond those given in Article VI, Article VII, Article VIIA and Article VIII, as applicable, of this Agreement, and it is understood that, except for the representations and warranties contained herein, Buyer takes the Transferred Assets "as is" and "where is." Without limiting the generality of the immediately foregoing, except for the representations and warranties contained in Article VI, Article VII and Article VIIA, each Seller Party hereby expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to (a) the condition of the Transferred Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) or (b) any infringement by any Seller Party or any of their respective Affiliates of any patent or proprietary right of any Third Party; it being the intention of the Parties that, except as set forth in this Agreement, the Transferred Assets are to be accepted by Buyer in their present condition and state of repair. It is understood and agreed that any cost estimates, projections, or other predictions or other statements or information contained or referred to in the offering materials that have been provided to Buyer are not and shall not be deemed to be representations or warranties of any Seller Party or any of their respective Affiliates.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, each Party has executed and delivered this Fossil Asset Purchase and Sale Agreement as of the day and year first above written.

USGEN NEW ENGLAND, INC.
(Seller)

By: [signature]
Name: E K HAUSER
Title: PRESIDENT

USG SERVICES COMPANY, LLC
(Employer)

By: [signature]
Name: P. CHRISMAN IRIBE
Title: EXECUTIVE VICE PRESIDENT

FIRST MASSACHUSETTS LAND COMPANY, LLC
(FMLC)

By: [signature]
Name: JAMES G. LOTT
Title: V.P.

DOMINION ENERGY NEW ENGLAND, INC.
(Buyer)

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, each Party has executed and delivered this Fossil Asset Purchase and Sale Agreement as of the day and year first above written.

USGEN NEW ENGLAND, INC.
(Seller)

By: ______________________
Name:
Title:

USG SERVICES COMPANY, LLC
(Employer)

By: ______________________
Name:
Title:

FIRST MASSACHUSETTS LAND COMPANY, LLC
(FMLC)

By: ______________________
Name:
Title:

DOMINION ENERGY NEW ENGLAND, INC.
(Buyer)

By: [signature]
Name: James K. Martin
Title: Vice President