# SCHEDULE A & B

# Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| STONE & WEBSTER, INCORPORATED, *et al.*, | Case No. 00-02142 (PJW) |
| | Jointly Administered |
| Debtors. | |
| | Related to: 4657 |

**ORDER UNDER 11 U.S.C. §§ 105 AND 502(a) AND FED. R. BANKR. P. 9019 AND 3018 GRANTING DEBTORS' MOTION FOR ORDER APPROVING SETTLEMENT OF CLAIMS WITH SOUTHERN UNION COMPANY AND NARRAGANSETT ELECTRIC COMPANY**

Upon consideration of the Debtors'[1] motion for an order approving settlement of claims with Southern Union Company and Narragansett Electric Company (the "Motion"); and the Court having reviewed the Motion and having determined that granting the relief requested is in the best interests of the Debtors, their estates, creditors, and interest holders, and is a proper exercise of the Debtors' business judgment; and it appearing that proper and adequate notice of the Motion has been given

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Motion.

and that no other or further notice is necessary; and the Court having considered the Motion and all objections thereto; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND THAT:

A. Adequate notice of the Motion and Settlement was served upon all parties with an interest in this contested matter, as well as upon all parties requesting such notice under Fed. R. Bankr. P. 2002.

B. The Settlement is in the best interests of the Debtors, their estates, creditors, and interest holders, and is also in the best interests of Narragansett Electric Company and Southern Union Company (together, the "Claimants"), and their ratepayers.

C. The Settlement is the result of good-faith, arms'-length negotiations and is a proper exercise of the Debtors' business judgment, representing a fair and reasonable compromise of the parties' claims and defenses.

D. All objections to the Motion not otherwise resolved should be overruled, and the Motion should be granted.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Motion is GRANTED.

2. Pursuant to 11 U.S.C. §§ 105 and 502(e), Fed. R. Bankr. P. 9019 and 3018, and the provisions of the Third Amended Joint Plan, the Settlement annexed as Exhibit A to this Order is approved.

3. The Debtors, or their successors, are authorized to execute any documents necessary or desirable to consummate the Settlement.

4. All objections to the Motion not resolved or withdrawn are hereby overruled in their entirety.

5. The Claimants are deemed to hold an allowed claim against the Consolidated SWINC Estate and the Consolidated SWE&C Estate, in the amount of $15,000,000.00 for actual response costs incurred to date at all of the sixteen (16) sites which are the subject of the Claimants' claims in this Court (the "Allowed Remediation Claim"), which Allowed Remediation Claim is

hereby deemed to be a vote to accept the Third Amended Joint Plan in Class 5A and Class 5B.

6. In order to effectuate the foregoing provision, Valley Gas Claim numbers 2422 and 2438 are reinstated and Fall River Claim numbers 5424 through 5429 are deemed timely filed. The Allowed Remediation Claim is an amendment to and a consolidation of claims numbered 2548, 2457, 4221, 2267, 2422, 2438, and 5424 through 5429.

7. On the effective date of the Third Amended Joint Plan, and in accordance therewith, the Claimants will receive a cash distribution of $5,000,000.00 (the "Cash Payment") in payment of the Allowed Remediation Claim. Notwithstanding any provision of the Settlement, the Cash Payment is the maximum amount and sole portion of the Allowed Remediation Claim that will be paid from the Debtors' estates or their successor entities.

8. The Debtors shall use reasonable efforts to obtain recovery from their primary insurers. To the extent the Debtors, through settlement or otherwise, recover any payments from their primary insurers with regard to the Allowed Remediation Claim, the insurance

proceeds will be divided and disbursed 50% to the Claimants, and 25% to each of the Consolidated SWINC Estate and the Consolidated SWE&C Estate until such time as the Claimants are paid an additional $5,000,000.00 (the "Additional Cash Payment"). Until the Additional Cash Payment is received by the Claimants, any settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim will be subject to approval by the Claimants, whose approval will not be unreasonably withheld. This Court shall retain jurisdiction to determine the reasonableness of any proposed settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim to the extent that the Claimants disapprove of any such settlement.

9. Notwithstanding any provision of the Settlement, the Settlement shall not constitute an admission of liability by the Debtors for any purpose other than consummation of the Settlement, and shall not constitute an admission of liability by the Debtors with respect to any sites other than the sixteen (16) sites that are the subject of the Allowed Remediation Claim.

No third-party beneficiaries are intended in the Settlement, and no party other than the Claimants is a beneficiary thereof. Other than the Claimants, no party may rely on any admission of liability by the Debtors in the Settlement for any purpose whatsoever. The approval of the Settlement by this Order does not constitute a finding of any liability by the Debtors for any purpose whatsoever.

10. It is not this Court's intention to cause the findings in paragraphs B and C of this Order to be given collateral estoppel, res judicata, or other claim or issue preclusion effects in any court presiding over any insurance coverage litigation. However, this Court makes no ruling as to the rights of any party in any insurance coverage litigation to contend that the findings in paragraphs B and C of this Order have collateral estoppel, res judicata, or other claim or issue preclusion effects, as well as the rights of any party in any insurance coverage litigation to contend that there are no such collateral estoppel, res judicata, or other claim or issue preclusion effects.

11. The rights of the Debtors' insurers to contest coverage for the Allowed Remediation Claim or any remediation claims related to the sites set forth in recitals D and E of the Settlement, as well as the Debtors' rights to assert that such insurers are obligated to provide such coverage, are fully preserved.

12. The rights, if any, of the Debtors' insurers to contend that the Debtors' are not jointly and severally liable to the Claimants for the payment of 66 and 2/3% of future response costs at the sites identified in recitals D and E of the Settlement, as well as the Debtors' right to contest such contention, are fully preserved.

13. All motions, objections and other pleadings identified in Recital J of the Settlement are hereby deemed withdrawn.

14. The failure of this order to include any provision of the Settlement shall not vitiate the validity or effect or such provision.

15. The rights of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, and their successors regarding the allocation of the Allowed Remediation

Claim and the allocation of the insurance proceeds re-ferred to in paragraph 8 of this Order between them are fully preserved.

Dated: Wilmington, Delaware
January 9, 2004

Honorable Peter J. Walsh
United States Bankruptcy Judge

# EXHIBIT A

283167.02-Wilmington S1A

# SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT (the "Agreement") by and between Stone & Webster, Incorporated and its subsidiaries and affiliates that are also debtors and debtors-in-possession in the Chapter 11 cases jointly administered under Case No. 00-02142(PJW) (the "Debtors") and Southern Union Company and its subsidiaries and affiliates ("Southern Union") and The Narragansett Electric Company and its subsidiaries and affiliates ("NEC"):

## RECITALS

A. On June 2, 2000 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code. On July 18, 2000, an order was entered establishing August 25, 2000 as the deadline for timely filing proofs of claim against the Debtors (the "Bar Date").

B. The Fall River Gas Company (f/k/a the "Fall River Gas Works Company" and collectively, "Fall River Gas") and the Blackstone Valley Gas & Electric Company ("BVG&E") were utility companies that operated manufactured gas plants ("MGP's) in Rhode Island and Massachusetts. Valley Gas Company ("Valley Gas") acquired the gas utility assets of BVG&E. In September 2000, Southern Union acquired Fall River Gas and Valley Gas. NEC acquired Blackstone Valley Electric Company in May 2000.

C. Environmental contamination exists or may exist at certain sites in Rhode Island and Massachusetts where Fall River Gas and BVG&E or others manufactured and stored gas and by-products of the MGP process and allegedly deposited such materials. These potentially contaminated sites are referred to in this Agreement as the "Fall River Sites" and the "BVG&E Sites."

D. The Fall River Sites consist of the following: (1) the Charles & Bay former MGP in Fall River, Massachusetts; (2) the 5th and Hartwell former MGP in Fall River, Massachusetts; (3) the Pond & Anawan former MGP in Fall River, Massachusetts; (4) the Robeson & Cherry former manufactured gas holder site in Fall River, Massachusetts; (5) the Turner & Davol former manufactured gas holder site in Fall River, Massachusetts; (6) the Cory's Lane / Andrade alleged disposal site in Tiverton, Rhode Island; (7) the Plympton former MGP in Plympton, Massachusetts; (8) the Plympton alleged disposal site in Plympton, Massachusetts; and (9) the Bay Street Neighborhood Study Area in Tiverton, Rhode Island.

E. The BVG&E Sites consist of the following: (1) the Tidewater former MGP in Pawtucket, Rhode Island; (2) the Hamlet Avenue former MGP in Woonsocket, Rhode Island; (3) the Pond Street former manufactured gas holder site in Woonsocket, Rhode Island; (4) the Exchange Street former manufactured gas holder site in Pawtucket, Rhode Island; (5) the Mendon Road alleged disposal site in Attleboro, Massachusetts;

(6) the Lawn Street alleged disposal site in Attleboro, Massachusetts; (7) the Cumberland alleged disposal site in Pawtucket, Rhode Island; and (8) the High Street former MGP in Central Falls, Rhode Island.

F. To date, NEC claims to have incurred $13,083,911.00 in costs of "response" (as defined for purposes of this Settlement Agreement, in the Comprehensive Environmental Response, Compensation and Liability Act, as amended) to actual and/or threatened releases of hazardous substances at or from the BVG&E Sites. To date, Southern Union claims to have incurred an additional $979,651.10 in costs of response to actual and/or threatened releases of hazardous substances at or from the BVG&E Sites. Investigation and remediation of the BVG&E Sites is ongoing. To date, Southern Union claims to have incurred $1,066,883.90 in costs of response to actual and/or threatened releases of hazardous substances at or from the Fall River Sites. Investigation and remediation of the Fall River Sites is ongoing.

G. NEC and Southern Union believe that BVG&E was under the management, operation and control of Stone & Webster, Incorporated ("SWINC"), Stone & Webster Engineering Corporation ("SWEC") and Stone & Webster Management Consultants ("SWMC") when the environmental contamination occurred at the BVG&E Sites. NEC and Southern Union further believe that these Debtors are jointly and severally liable for the response costs at the BVG&E Sites. NEC and Southern Union filed proofs of claim (respectively, the "NEC Claims" and the "Valley Gas Claims") against SWINC, SWEC and SWMC asserting that these Debtors are jointly and severally liable to them for indemnity against or contribution to all of their past and future response costs with respect to the BVG&E Sites. The NEC Claims are claim numbers 2548, 2457 and 4221. The Valley Gas Claims are claim numbers 2267, 2422 and 2438. Pursuant to a Bankruptcy Court order entered on December 13, 2000, Valley Gas Claim numbers 2422 and 2438 were expunged as being duplicative of Valley Gas Claim number 2267.

H. Southern Union believes that Fall River Gas was under the management, operation and control of SWINC, SWEC and SWMC when the environmental contamination occurred at the Fall River Sites. Southern Union further believes that these Debtors are jointly and severally liable for the response costs at the Fall River Sites. On May 20, 2003, Southern Union filed proofs of claim (the "Fall River Claims") against SWINC, SWEC and SWMC asserting that these Debtors are jointly and severally liable to it for indemnity against or contribution to all of its past and future response costs with respect to the Fall River Sites. The Fall River Claims are claim numbers 5424 through 5429.

I. The Debtors disputed that they managed, operated or controlled BVG&E or Fall River Gas, or that the Debtors are liable for any response costs relating to the Fall River Sites and the BVG&E Sites.

J. On September 16, 2003, the Debtors filed their Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4502) (the "Objection"). On October 1, 2003, the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed a Limited Objection [] to Debtors' Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4561). On October 1, 2003, Southern Union filed its Reply and Response to Debtors' Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4562) (the "Response"). Also on October 1, 2003, NEC filed a Motion to Estimate Claims for Purposes of Voting and Establishing Reserves Under the Plan Pursuant to Fed. R. Bankr. P. 3018 and 3020 (Docket No. 4560) (the "NEC Motion"). On October 16, 2003, Southern Union filed its Motion to Deem Certain Proofs of Claim Timely Filed (Docket No. 4605) (the "Timeliness Motion") and its Motion to Reinstate Certain Expunged Proofs of Claim Pursuant to 11 U.S.C. § 502(j) and Fed. R. Bankr. P. 3008 and 9024 (Docket No. 4606) (the "Reinstatement Motion"). On October 20, 2003, Southern Union and NEC each filed objections to the confirmation of the Joint Plan (Docket Nos. 4622 and 4623) (the "Confirmation Objections"). The Creditors' Committee filed an objection to the Reinstatement Motion on October 22 (Docket No. 4634) and an objection to the Timeliness Motion on October 23 (Docket No. 4637). The Official Committee of Equity Security Holders (the "Equity Committee") filed a limited joinder in support of Southern Union's Reinstatement Motion on October 24 (Docket No. 4645). Additionally, the parties served multiple deposition notices in connection with the foregoing motions and objections. This Agreement resolves all of the foregoing motions and objections, without the need for any further discovery in connection thereto.

K. The Debtors, Southern Union and NEC each conclude that litigation of the above-described motions would be expensive and protracted and pose substantial risks and, therefore, make this Agreement to avoid the cost, risks and delay of continued litigation.

L. The Debtors, Southern Union and NEC each believe that this Agreement is in the best interest of the Debtors, the Consolidated SWINC Estate (which consolidated estate includes SWINC) and its creditors, the Consolidated SWE&C Estate (which consolidated estate includes SWEC and SWMC) and its creditors, the ratepayers of Southern Union, and the ratepayers of NEC.

**NOW, THEREFORE**, in consideration of the foregoing, the covenants and releases set forth below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

1. The Parties agree that the above Recitals are incorporated into the body of this Agreement and shall have the same force and effect as if set forth herein.

2. Upon the Parties execution of and Court approval of this Agreement, NEC and Southern Union (together, the "Claimants") will hold an allowed claim against the Debtors, the Consolidated SWINC Estate and the Consolidated SWE&C Estate of $15,000,000.00 for actual response costs incurred to date at the BVG&E Sites and the Fall River Sites (the "Allowed Remediation Claim"), which Allowed Remediation Claim shall be deemed to be a vote to accept the Joint Plan (as defined in paragraph 5 below) in Class 5A and Class 5B.

3. Upon the Parties execution of and Court approval of this Agreement, Valley Gas Claim numbers 2422 and 2438 will be reinstated and Fall River Claims numbers 5424 through 5429 will be deemed timely filed. In addition, the Allowed Remediation Claim will be an amendment to and consolidation of: (i) NEC Claim numbers 2548, 2457 and 4221; (ii) Valley Gas Claim numbers 2267, 2422 and 2438; and (iii) Fall River Claim number 5424 through 5429.

4. Upon the Court's entry of a final, non-appealable order approving this Agreement, all motions, objections and other pleadings, including those listed in Recital J, will be deemed withdrawn. Each movant and responding party will be responsible for taking appropriate steps to withdraw such pleadings from the Court's docket.

5. On the Effective Date and in accordance with the provisions of the Third Amended Joint Plan of Reorganization of the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone and Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone and Webster Engineers & Constructors, Inc. and Certain of its Subsidiaries and Affiliates (the "Joint Plan"), the Claimants will receive a cash distribution of $5,000,000.00 (the "Cash Payment") in payment of the Allowed Remediation Claim. Except as set forth in paragraphs 6 and 7 of this Agreement, the Cash Payment will constitute the only consideration to be paid or payment to be made by the Debtors, the Consolidated SWINC Estate, the Consolidated SWE&C Estate, or their successors with respect to all past, present and/or future claims held or asserted, or which could have been asserted, by the Claimants against the Debtors, the Consolidated SWINC Estate, the Consolidated SWE&C Estate, or their successors.

6. The Debtors shall use reasonable efforts to obtain recovery from their primary insurers. To the extent the Debtors, through settlement or otherwise, recover any payments from their primary insurers with regard to the Allowed Remediation Claim, the insurance proceeds will be divided and disbursed 50% to the Debtors and 50% to the Claimants until such time as the Claimants are paid an additional $5,000,000.00 (the "Additional Cash Payment"). Until the Additional Cash Payment is received by the Claimants, any settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim will be subject to approval by the Claimants, whose approval will not be unreasonably withheld. The Bankruptcy Court will retain

jurisdiction to determine the reasonableness of any proposed settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim to the extent that the Claimants disapprove of any such proposed settlement.

7. With respect to any of the remediation claims related to the sites set forth in Recitals "D" and "E" herein by the Claimants against the Debtors, the Debtors are jointly and severally liable to the Claimants for the payment of 66-2/3% of all future response costs at the BVG&E Sites and the Fall River Sites. However, any such future response costs will be collectible by the Claimants only from proceeds of Debtors' excess insurance, and not from any funds of the Debtors or their successor entities. The maximum amount that the Debtors' estates will pay under this agreement is the Cash Payment. This paragraph does not apply to any bodily injury claims brought against the Debtors that are related to the BVG&E and Fall River Sites. This agreement: (i) has no effect with respect to the allocation of the Allowed Remediation Claim among the Debtors' estates, and the rights of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, and their successors to litigate the issue of such allocation are preserved, and (ii) does not constitute a finding or admission of liability with respect to any bodily injury claims brought against the Debtors.

8. On the Effective Date of the Joint Plan, the Debtors will assign jointly to the Claimants the right to control assertion and settlement of claims and the right to receive any proceeds from any of the Debtors insurance policies (other than the Debtors' primary insurance policies) with respect to losses, liabilities and expenses relating to the remediation of the BVG&E Sites and the Fall River Sites, and the Debtors will cooperate in good faith with the Claimants in providing copies of the applicable policies, and secondary evidence of the existence and terms of such policies.

9. Upon execution of this Agreement, or as soon thereafter as is reasonably practicable, Claimants shall provide Debtors with information regarding losses, liabilities and costs related to the BVG&E Sites and the Fall River Sites (the "Sites"), including but not limited to non-privileged: (i) environmental studies conducted on the Sites, (ii) reports of remediation activities, (iii) correspondence with state, local and national environmental agencies regarding the investigation and remediation of the Sites, (iv) invoices/bills documenting past expenditures at the Sites, (v) estimates of potential future costs at the Sites, (vi) orders or directives by governmental entities, and (vii) claims made by other third parties with regard to or related to the Sites. In addition, Claimants will cooperate in good faith with Debtors in their efforts to obtain insurance coverage for the Sites. Debtors will cooperate in good faith with Claimants in their efforts to obtain insurance coverage for the Sites.

10. This Agreement does not affect Debtors' rights to pursue and/or obtain recovery from any and all of its insurers for any bodily injury claims brought against the Debtors related to the BVG&E Sites and the Fall River Sites or otherwise. This Agreement does not affect Claimants' rights, if any, to pursue and/or obtain recovery

from any and all of Debtors' insurers for any bodily injury claims related to the BVG&E Sites and the Fall River Sites or otherwise. Furthermore, nothing in this Agreement or in the Joint Plan will affect or impair the rights of Southern Union or NEC to take direct actions to recover under policies of insurance where Southern Union or NEC is a "co-insured" or "additional insured" with one of the Debtors.

11. This Agreement may be executed in multiple counterpart originals, each of which will constitute one and the same document and will be deemed an original. This Agreement may be executed by facsimile signatures, which will be deemed to have the same force and effect as an original signature.

12. This Agreement represents a final and complete expression of the understandings between the Parties and this Agreement may not be contradicted by evidence of any prior oral agreement or of a contemporaneous oral agreement or understanding between the Parties. There are no promises, terms, conditions or obligations other than those contained in this Agreement.

13. The Parties represent and warrant that they have read and thoroughly understand the terms and conditions of this Agreement.

14. This Agreement will be binding upon and inure to the benefit of the Parties and their respective heirs, representatives, successors and assigns, including, but not limited to, the Reorganized SWINC, the SWINC Plan Administrator and the SWE&C Liquidating Trust.

15. No amendments to this Agreement shall be effective unless such amendment is in writing and signed by all Parties hereto.

16. Whenever possible, each provision of this Agreement will be interpreted to be effective and valid under applicable law. If any provision of this Agreement is held to be prohibited by or invalid under applicable law, the provision will be ineffective only to the extent of the prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this Agreement.

17. This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.

18. Each Party is to bear its own fees, costs, and expenses in this matter.

19. The Parties hereby agree to execute from time to time all documents that may be necessary or desirable to carry out the terms of this Agreement, or to affect the purpose of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement this ______ day of November 2003.

STONE AND WEBSTER, INCORPORATED, ET AL

______________________________

James P. Carroll
President and Chief Restructuring Officer
44 Milk Street
Boston, MA 02109

SOUTHERN UNION

______________________________

Dennis K. Morgan, Esq.
Executive Vice President – Administration,
General Counsel and Secretary
One PEI Center
535 East Northampton Street
Wilkes Barre, PA 18711

THE NARRAGANSETT ELECTRIC COMPANY

______________________________

John F. Sherman, III
Deputy General Counsel
25 Research Drive
Westboro, MA 01582