**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

GAIL, JOHN D. AND JOHN F. CORVELLO, ET AL.,

Plaintiffs,

v.

NEW ENGLAND GAS COMPANY,

Defendant and Third Party Plaintiff,

v.

BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC, ET AL.,

Third Party Defendants.

Case No. 05-221T

KEVIN BURNS, ET AL.,

Plaintiffs,

v.

NEW ENGLAND GAS COMPANY,

Defendant and Third Party Plaintiff,

v.

BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC, ET AL.,

Third Party Defendants.

Case No. 05-274T

| | |
|---|---|
| COLLEEN BIGELOW, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>NEW ENGLAND GAS COMPANY,<br><br>Defendant and Third Party Plaintiff,<br><br>v.<br><br>BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC, ET AL.,<br><br>Third Party Defendants. | Case No. 05-370T |
| SHEILA REIS, DENNIS REIS AND ASHLEY REIS, ET AL.<br><br>Plaintiffs,<br><br>v.<br><br>NEW ENGLAND GAS COMPANY,<br><br>Defendant and Third Party Plaintiff,<br><br>v.<br><br>BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC, ET AL.,<br><br>Third Party Defendants. | Case No. 05-522T |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO STAY AND TRANSFER VENUE OF DOMINION RESOURCES, INC. AND DOMINION ENERGY BRAYTON POINT, LLC**

Third Party Defendants and Counterclaim Plaintiffs Dominion Resources, Inc. ("DRI") and Dominion Energy Brayton Point, LLC ("Brayton Point") (collectively "Dominion Entities"), by counsel, state the following as their Reply Memorandum in support of their Motion to Stay the Third Party Complaint filed by New England Gas Company ("NEG") in this Court, and to Transfer Venue regarding their Counterclaim against NEG to the United States District Court for the District of Maryland, Greenbelt Division:[1]

## ARGUMENT

The Dominion Entities' motion is premised on the undisputed fact that the Brayton Point Power Plant was purchased from USGen New England, Inc. on December 31, 2004 pursuant to a November 23, 2004 Order of the U.S. Bankruptcy Court for the District of Maryland (the "Sale Order"),[2] Case No. 03-30465 (the "Bankruptcy Case"). The sale was "free and clear of all interests and claims of any kind or nature whatsoever." Sale Order at 13 (excepting limited claims that are irrelevant here). NEG's Third Party Complaint against the Dominion Entities relates to air emissions from the Power Plant that allegedly occurred prior to December 31, 2004, and, therefore, directly implicates the interpretation and enforcement of the Sale Order.

## I. NEG FAILED TO ARTICULATE ANY REASON THAT THIS COURT SHOULD NOT STAY THE CASE AS TO THE DOMINION ENTITIES.

NEG admits that this Court has broad discretion to stay the proceedings. NEG Opp. at 9. NEG, however, fails to articulate any prejudice it may suffer from a stay of its claims against the Dominion Entities. NEG's claims for contribution and indemnification against the Dominion

---

[1] The Dominion Entities filed their Motion to Stay/Transfer and Memorandum in Support on October 31, 2007.

[2] Dominion Entities Answer and Counterclaim, Ex. G (filed Oct. 31, 2007).

Entities are contingent because NEG has not been found liable to the Tiverton Plaintiffs. In stark contrast, there is severe prejudice to the Dominion Entities in having to defend a claim that is indisputably barred by the Sale Order.[3] The Sale Order issue is separate and unique from all other aspects of this highly-complex case. The interpretation and enforcement of the Sale Order has no direct impact on any party except for NEG and the Dominion Entities. Not surprisingly, none of the Tiverton Plaintiffs or the other Third Party Defendants oppose the Dominion Entities' request for a stay.

## II. NEG FAILED TO IDENTIFY ANY FACTORS THAT WEIGH AGAINST TRANSFER TO THE BANKRUPTCY COURT.

On the last page of its response – and in a single paragraph – NEG finally addresses the factors to be considered in determining a motion to transfer. NEG Opp. at 10.[4] NEG argues that this Court is more convenient because "not only are the plaintiffs and Tiverton located within the District, but Brayton Point is located in nearby Somerset, Massachusetts." *Id.* However, the geographic proximity to this Court of the Tiverton Plaintiffs, the Town of Tiverton, and all of the other Third Party Defendants is totally irrelevant to the interpretation and implementation of the Sale Order *vis a vis* the Dominion Entities and NEG.

NEG fails to identify a single witness who may be called to testify regarding the Dominion Entities' Counterclaim (assuming any witnesses are necessary to a court's interpretation and enforcement of the unambiguous Sale Order), much less demonstrate that it

[3] For example, NEG has noticed nearly three dozen depositions of Tiverton Plaintiffs and plans to conduct upwards of one hundred additional plaintiffs' depositions in the coming weeks.

[4] The relevant factors include: (1) ease of access to sources of proof; (2) availability of compulsory process to compel attendance of witnesses; (3) cost of attendance of willing witnesses; (4) ease of view of premises, if necessary; (5) enforceability of the judgment, if obtained; (6) advantages and obstacles to a fair trial; (7) status of the court's trial calendar; and (8) familiarity of the forum with applicable state law. *Boothroyd Dewhurst, Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 1993 U.S. Dist. LEXIS 20855, at *18-19 (D.R.I. July 8, 1993); *see also McGlynn v. Credit Store, Inc.*, 234 B.R. 576, 582 (D.R.I. 1999).

would be inconvenient for any potential witness to testify in the District of Maryland. *See generally* NEG Opp. at 9. NEG fails to explain why any court would need to view the Power Plant or the Tiverton area to construe and enforce the text of the Sale Order either. *See id.* at 10 ("ease of viewing Brayton Point").

Moreover, at a recent Rule 30(b)(6) deposition of NEG[5] involving in large part the alleged Tiverton contamination, NEG's corporate designee traveled from Texas to New York (rather than Providence), triggering a parade of attorneys traveling to New York from Providence, Richmond and other cities to attend this deposition. NEG's views regarding "inconvenience" are flexible when scheduling its own witnesses, apparently.

NEG makes the incredulous statement that the Bankruptcy Court's familiarity with the "bankruptcy proceedings and orders is of no moment." NEG Opp. at 10. In doing so, NEG fails to mention, much less address, the law cited by the Dominion Entities that "it is well settled that the 'bankruptcy court is undoubtedly the best qualified to interpret and enforce its own orders including those providing for discharge and injunction.'" *In re U.S.H. Corp. of N.Y.*, 280 B.R. 330, 335 (Bankr. S.D.N.Y. 2002).

Two cases cited by NEG actually support transfer for this very reason. *See* NEG Opp. at 7, 9. In *Mesiti v. Microdot, Inc.*, 156 B.R. 113 (D.N.H. 1993), Mesiti filed suit against Microdot claiming that Microdot contaminated his property. Microdot filed a third party contribution claim against B&M Corporation. B&M, however, was the reorganized company that emerged from the bankruptcy of a former railroad company. The issue was whether the bankruptcy court's consummation order for the reorganization barred Microdot's claim against B&M.

---

[5] *See infra* text accompanying n.10.

The District Court in New Hampshire ordered that the matter be transferred to the District Court in Massachusetts that entered the consummation order (*i.e.*, the Reorganization Court). The New Hampshire court recognized that the issues "require interpretation or construction of the Consummation Order in light of applicable law" and that the "Reorganization Court" was in the "best position to interpret and apply the terms of its own injunctive and retention of jurisdiction orders." 156 B.R. at 118-19.

Likewise, in *In Re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 974 F.2d 775 (7th Cir. 1992), the issue was whether an environmental claim against a post-bankruptcy successor to the debtor was barred by the confirmation order. The successor company filed for injunctive relief in the district court that issued the confirmation order. The creditor/claimant sought to transfer the case to the district court where the environmental matter was pending. That request was denied on the grounds that "the court which entered an order is in the best position to interpret that order." 974 F.2d at 789. "Furthermore, the reorganization court, which was uniquely familiar with the history of the prior bankruptcy proceedings, was well equipped to deal with the issues relating to these bankruptcy proceedings." *Id.*

NEG not only ignores the holdings of these two cases, it sidesteps the Maryland Bankruptcy Court's express power to enjoin claims that might be improperly brought in the future against Dominion Energy New England, Inc. and its assigns based on the legal theory of "successor liability." *Compare* Sale Order at 13 *with* NEG Opp. at 6, n.6 (mistakenly insisting that the Dominion Entities' liability will arise post-closing regardless of when the alleged pollution actually occurred, and wrongfully concluding that successor liability is not an issue).

NEG ignores the Bankruptcy Court's express retention of jurisdiction to "Protect Buyer" from such claims and to "enjoin" the commencement of such actions. *See* Sale Order at 13.[6]

In yet another startling instance of ignoring the facts supporting the Dominion Entities' Motion, NEG fails to mention that it is a creditor in the USGen Bankruptcy Case and that NEG received actual notice of the sale of the Power Plant. *Compare* Dominion Entities' Counterclaim ¶¶ 8, 9, 14-17 & 19 *with* NEG's Answer ¶¶ 8, 9, 14-17 & 19 ("documents speak for themselves"). Moreover, on or about March 17, 2003 NEG received the Letter of Responsibility from RIDEM regarding the alleged Tiverton contamination – eight months before NEG entered an appearance in the USGen Bankruptcy Case and eighteen months before USGen filed the Sale Motion regarding Brayton Point. In short, NEG's status as a creditor in the very proceeding whereby USGen sold the Power Plant means that NEG remains subject to the jurisdiction of the Bankruptcy Court, and any judgment on the Dominion Entities' Counterclaim against NEG should be enforceable in the District of Maryland.

Without any factual or legal support, NEG states that its claims against the Dominion Entities do not implicate the ongoing "post-confirmation proceedings" in the Bankruptcy Case. This statement is dubious at best. If the Dominion Entities are correct that NEG has no claim against them because any such liabilities remained with the Debtor, the Bankruptcy Court will have to determine whether such a finding in favor of the Dominion Entities has any implications in the Bankruptcy Case, including whether NEG has any viable claim against the debtor (USGen). Those are purely issues of bankruptcy law.[7]

---

[6] In the *Mesiti* case, the reorganization court retained exclusive jurisdiction over its order whereas the Maryland Bankruptcy Court's retention of jurisdiction over the Sale Order is not exclusive. This makes no difference as the rationale for transfer is the same.

[7] It is not surprising that half of the cases cited by NEG are bankruptcy cases.

In a nutshell, NEG fails to identify a single factor weighing against transfer. NEG has no room to complain that it must return to the Bankruptcy Court because NEG availed itself of that court in the first instance as a creditor of USGen. There is no prejudice to NEG to have to return to that court to allow it to interpret and enforce its Sale Order regarding NEG's claims concerning the very asset which was the subject of this order. As stated in the Dominion Entities' opening memorandum, NEG should have filed an action for declaratory relief in the District of Maryland to determine the scope and effect of the Sale Order, and its Third Party Complaint against the Dominion Entities was premature and unnecessary.

## III. NEG MISSTATES THE LAW REGARDING THE ACCRUAL OF AN ENVIRONMENTAL CLAIM IN BANKRUPTCY.

NEG correctly states that courts in dealing with environmental liabilities of bankrupt entities must reconcile the competing objectives of environmental law, which promote assessment and cleanup of contamination, with the objectives of the Bankruptcy Code, which provide debtors with a fresh start and allow for the debtor's assets to be bought "free and clear" of certain environmental liabilities. NEG Opp. at 7. NEG is also correct that courts around the country have adopted several tests to do so. *See, e.g., Signature Combs, Inc. v. United States of America*, 253 F. Supp. 2d 1028 (W.D. Tenn. 2003) (discussing the four tests).

NEG focuses on one of those tests, the so-called "fair contemplation" test under which the issue is whether the environmental liability was fairly contemplated during the bankruptcy. NEG Opp. at 8-9.[8] NEG, however, grossly misstates the law regarding which party must have "fairly contemplated" the liability. NEG states that any future liability for contamination in Tiverton "was in no way 'fairly contemplated' by Dominion at the time it purchased Brayton

[8] The Dominion Entities do not concede that the "fair contemplation" standard applies. Under any of the tests, NEG's claim arose before December 31, 2004.

Point." NEG Opp. at 2 (emphasis added). However, it makes no difference what Dominion contemplated or knew. Instead, the issue is whether a creditor such as NEG could fairly contemplate that it had a potential claim against the debtor (USGen) related to the alleged Tiverton contamination prior to or concurrent with the Sale Order, not whether Dominion should have addressed such issues with the seller/debtor in the transaction documents. The rationale for this test is that "creditors [(*e.g.*, NEG)] . . . are entitled to notice by a debtor [(*e.g.*, USGen)] prior to the debtor's liability being discharged by the bankruptcy court." *Signature Combs*, 253 F. Supp.2d at 1036. A claim accrues under this test when the creditor (*e.g.*, NEG) "could have ascertained through the exercise of due diligence that it had a claim against the debtor [(*e.g.*, USGen)] for a hazardous release." *Id.* at 1037.

NEG has clearly misstated the law. NEG referred this Court to *Mesiti v. Microdot, Inc.*, 156 B.R. at 113, for the proposition that "the fair contemplation test is the 'preferred means' of evaluating whether post-bankruptcy environmental claims are discharged." *See* NEG Opp. at 8. The *Microdot* court did consider the fair contemplation test before stating:

> Whether Microdot's CERCLA claims in this case were foreseeable and "arose," or were at least "contingent" for purposes of Section 77, before the consummation order's bar date, will likely depend on what information Microdot actually or constructively had available to it regarding contamination at the Elm Street site; what information it had regarding the B & M Railroad's possible link to the contamination; and whether that information was reasonably available between CERCLA's enactment in 1980 and B & M's consummation date in 1983.

156 B. R. at 118. Similarly, in *In Re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 974 F.2d 775 (7th Cir. 1992), also relied upon by NEG (NEG Opp. at 8), the issue was whether WSDOT's claim against the successor-in-interest to the debtor was barred by the confirmation order entered in the bankruptcy. After discussing the various tests, the court adopted the fair contemplation test. Without question, the focus was on WSDOT (a creditor):

> it is clear that WSDOT had sufficient information to give rise to a claim or contingent CERCLA claim for purposes of Section 77 before the November 25, 1985, consummation date. In fact, any other conclusion would frustrate the bankruptcy court's interest in having all claims before it, and any other conclusion would frustrate CERCLA's goal of providing a speedy cleanup of hazardous sites.

*Id.* at 787.

These cases make clear that the fair contemplation test focuses on the creditor (NEG). The comparison to the case at bar would be whether at the time of the Sale Order, NEG "fairly contemplated" that it had an indemnity and contribution claim against the debtor, USGen. There is no question that prior to December 31, 2004, NEG not only fairly contemplated but actually knew about the Tiverton contamination and its potential liability. Although buried in a footnote, NEG admits that it received a Letter of Responsibility from the Rhode Island Department of Environmental Management ("RIDEM") dated March 17, 2003 regarding the Tiverton contamination. NEG Opp. at 4, n.4. NEG also admits that RIDEM issued a Notice of Violation to NEG in September 2006. *Id.* at 4. *See* Dominion Entities' Counterclaim ¶¶ 48-49 & Ex. L. The Notice states that on March 19, 2003, NEG responded to RIDEM's March 17, 2003 letter and contracted two environmental consulting firms to prepare a "Site Investigation Work Plan" to investigate 68 Tiverton properties. *Id.*, Ex. L., Notice ¶ (B)(12). The number of properties increased to 75, and on October 31, 2003, NEG submitted the "first Site Investigation Report" to RIDEM. *Id.* ¶ (B)(15). NEG subsequently submitted four additional reports and received comments on its work from RIDEM, and in February 17, 2004 began "conducting additional fieldwork." *Id.* ¶ ¶ (B)(16) and (18). Additional analysis and fieldwork were commenced by NEG in early September. *Id.* ¶ (B)(22).

Therefore, prior to December 31, 2004, NEG was not only designated the responsible party for the contamination, it had incurred actual response costs studying the Tiverton

properties.[9] Moreover, NEG filed a proof of claim in the Stone & Webster bankruptcy proceeding. *In re Stone & Webster, Inc., et al*, Case No. 00-02142 (Bankr. D. Del.). According to the bankruptcy documents attached hereto,[10] Stone & Webster operated or controlled the Fall River Gas Company's manufactured gas plants in Rhode Island and Massachusetts from the early 1990's through the mid-1950's, including the plant that is the alleged source of the Tiverton contamination. On June 2, 2000, Stone & Webster filed for Chapter 11 bankruptcy protection. NEG purchased the Fall River Gas Company in September, 2000. On May 20, 2003 – two months after receiving and responding to the RIDEM Letter of Responsibility – NEG filed a claim in the Stone & Webster bankruptcy for $22,935,168.61 related to "actual past costs in connection with Environmental Claims" and for future claims estimated to "be very substantial." Much of that claim related to the Fall River Gas Company's manufactured gas plants, and it expressly pertained to possible contamination in the "Bay Street Neighborhood Study Area in

---

[9] Contrary to NEG's implication, it is not necessary that response costs be actually incurred before a claim occurs. The court in *Mesiti*, 156 B.R. at 118, held that:

> Even where CERCLA response costs have not actually been incurred, but those costs may or are likely to be incurred, at least a "contingent debt" or "contingent contractual liability" exists for bankruptcy purposes. 11 U.S.C. § 103(a)(8) (1976) (repealed 1978). Thus, a person may have a contingent CERCLA contribution claim under the Bankruptcy Act, without having a ripe claim for adjudication under CERCLA. *See, e.g., Schweitzer . Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985) ("a person may hold a 'contingent claim' and thereby be a 'creditor' within the meaning of the Bankruptcy Act, even though he presently has no cause of action against the debtor . . .. This proposition follows from the broad language of section 77(b) which provides that 'claims' include interests of whatever character."), *cert. denied,* 474 U.S. 864 (1985).

[10] The Dominion Entities have conducted no discovery and, therefore, have little information. However, the Tiverton Plaintiffs recently deposed a corporate designee of NEG regarding the Stone & Webster bankruptcy settlement. Attached to the Tiverton Plaintiffs' Notice of Rule 30(b)(6) Deposition were copies of certain bankruptcy court pleadings and settlement documents confirming the state of NEG's knowledge. Copies of the Tiverton Plaintiffs' Notice of Rule 30(b)(6) Deposition and related exhibits are attached hereto as Exhibit 1.

Tiverton, Rhode Island." *See* Exhibit 1, Settlement Agreement at 1, ¶ D. The Tiverton Plaintiffs' properties are within that Study Area.

In other words, after NEG bought the Fall River Gas Company, and seventeen months before the Brayton Point Sale Order, NEG filed a claim against Stone & Webster regarding contamination from the operations of the Fall River Gas Plant, which expressly included contamination in the Study Area. Given the knowledge actually held by NEG about the contamination (including actual sampling and analysis performed by NEG and others) and its allegations that the Brayton Point Power Plant is the "largest single source of air pollution in New England," NEG Opp. at 1, there can be no doubt that NEG "could have ascertained through the exercise of due diligence that it had a claim against" the debtor, USGen. *Signature Combs*, 253 F. Supp.2d at 1037. Even if NEG's claims against USGen were "contingent," NEG cannot deny that it could or should have filed a proof of claim in the USGen bankruptcy under the same rationale motivating its prompt action in the Stone & Webster bankruptcy.

In any event, the Bankruptcy Court will have to determine which test to apply to its Sale Order. For purposes of this Motion, it should be patently obvious that bankruptcy law and policy must be applied to the specific facts of the Bankruptcy Case, which application is best handled by the Bankruptcy Court in Maryland.

## IV. NEG'S CLAIM THAT THE DOMINION ENTITIES ARE LIABLE FOR AIR EMISSION FROM THE BRAYTON POINT POWER PLANT AFTER DECEMBER 31, 2004 IS FRIVOLOUS.

In a desperate attempt to keep the Dominion Entities in this case, NEG makes the meritless claim that air emissions from the Power Plant after December 31, 2004 in part caused the contamination on the Tiverton Plaintiffs' properties. *See, e.g.*, NEG Opp. at 2 ("air pollution generated at Brayton Point for years contributed and currently continues to contribute to the

alleged contamination . . . of Tiverton"). This claim (and, in fact, NEG's entire claim against the Dominion Entities) ignores the fact that the Tiverton Plaintiffs are not seeking recovery from NEG for any alleged deposits made within the past few years or even the past several decades. Instead, the Tiverton Plaintiffs:

> allege that the Moratorium Area, which encompasses Plaintiffs' entire neighborhood, was contaminated as a result of coal gasification waste disposal procedures by Defendant NEG as and/or its contractors or agents between the years from approximately 1880 through 1955.

Plaintiffs' Brf. Support of Plaintiffs' Motion to Sever at 8.

However, the Brayton Point Power Plant did not even commence operations until April 25, 1963 (eight years after the conclusion of NEG's allegedly improper coal gasification waste disposal). Thus, it could not possibly have been the source of the contamination at issue. Moreover, the Tiverton Plaintiffs allege that the contamination was discovered in August 2002. Complaint ¶ 4. Any emissions from the Power Plant after that date have nothing to do with the alleged Tiverton contamination. Therefore, NEG's entire case against the Dominion Entities is frivolous.

**Conclusion**

For all of these reasons, Dominion Resources, Inc. and Dominion Energy Brayton Point, LLC respectfully request that this Court stay the Third Party Complaint regarding the Dominion Entities and transfer their Counterclaim to the District of Maryland for further proceedings consistent with the Sale Order.

Third Party Defendants and Counterclaim Plaintiffs
DOMINION RESOURCES, INC. AND
DOMINION ENERGY BRAYTON POINT, LLC,
By Their Attorneys,

/s/ Craig R. Waksler, Esq.

Craig R. Waksler, Esq.
R.I. Bar # 4945
Taylor, Duane, Barton & Gilman, LLP
10 Dorrance Street, Suite 700
Providence, RI 02903
(401) 273-7171
(401) 273-2904 (FAX)

Andrew G. Mauck, Esq., admitted *pro hac vice*
Matthew B. Kirsner, Esq., admitted *pro hac vice*
Troutman Sanders LLP
P. O. Box 1122
Richmond, VA 23218-1122
(804) 697-1200
(804) 698-6001 (FAX)

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and accurate copy of the foregoing document was served by electronic and/or U.S. Mail to:

[SEE ATTACHED COUNSEL LIST]

on December 13, 2007.

/s/ Craig R. Waksler, Esq.
Craig R. Waksler, Esq.

#1680363v3

Notification via CMECF:

**Gregory L. Benik** - gbenik@jreri.com,mbiagetti@jreri.com

**Jeffrey Bromme** - jeffrey_bromme@aporter.com

**David A. Cetola** - dcetola@mcrobertslaw.com

**David A. Crichlow** - david.crichlow@pillsburylaw.com

**Christina C. Dodds** - CDodds@bishoplondon.com

**Susan B. Forcier** - susan.wilson@dem.ri.gov

**David M. Goldberg** david.goldberg@pillsburylaw.com, catherine.mcculley@pillsburylaw.com, judy.way@pillsburylaw.com

**Eric D. Herschmann** - eherschmann@kasowitz.com

**Heather Spurlock Kennealy** - hskennealy@mcrobertslaw.com

**Neil T. Leifer** - nleifer@tenlaw.com

**Robin-Lee Main** - rmain@haslaw.com,sjfoster@haslaw.com

**John J. McConnell , Jr** - jmcconnell@motleyrice.com

**Robert J. McConnell** - bmcconnell@motleyrice.com,lgrande@motleyrice.com

**Christopher P. McCormack** - cmccormack@pullcom.com

**Brad J. Mitchell** - bmitchell@tenlaw.com

**Michael D Mitchell** - mmitchell@admin.ri.gov

**Anthony F. Muri** - amuri@murilaw.com

**Jonathan D Orent** - jorent@motleyrice.com

**Gerald J. Petros** - gpetros@haslaw.com,clomas@haslaw.com

**Mark W. Roberts** - mroberts@mcrobertslaw.com

**David E. Ross** - dross@kasowitz.com

**Paul M. Sanford** - psanford@burnslev.com,jdurand@burnslev.com

**Gregory S. Schultz** - gregory.schultz@dem.ri.gov

**Jeanne M. Scott** - jeannescott@utrlaw.com

**Kristen W. Sherman** - ksherman@apslaw.com,afontaine@apslaw.com,btallman@apslaw.com

**Kimberly A. Simpson** - ksimpson@vetterandwhite.com

**Matthew B. Smith** - matthew@verdecchialaw.com

**Aileen L. Sprague** - asprague@motleyrice.com

**Christian Bennett White Stephens** - cstephens@taylorduane.com

**John A. Tarantino** - jtarantino@apslaw.com,dhumm@apslaw.com

**Bruce Gregory Tucker** - btucker@legalmgt.com

**Christian F. Uehlein** - cuehlein@tenlaw.com

**Brian A. Wagner** - brian.wagner@dem.ri.gov

**Craig R. Waksler** - cwaksler@taylorduane.com

**Benjamin V. White , III** - bwhite@vetterandwhite.com

**William D Wick** - bwick@ww-envlaw.com

**Lewis S. Wiener** - lewis.wiener@sablaw.com

**David B. Willis** - dwillis@legalmgt.com

**David A. Wollin** - dwollin@apslaw.com,epickett@apslaw.com,dciuffetelli@apslaw.com

Notification via first class mail:

**Seth Davis**
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019

**Matthew B. Kirsner**
Troutman Sanders, LLP
P.O. Box 1122
1001 Haxall Point
Richmond, VA 23208

**Noelle Kowalczyk**
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

**Michael K. Marran**
P.O. Box 6067
321 South Main St.
Suite 200
Providence, RI 02940-6067

**Andrew G. Mauck**
Troutman Sanders LLP
P.O. Box 1122
1001 Haxall Point
Richmond, VA 23208

**Kerry T. Ryan**
Tarlow, Breed, Hart & Rodgers P.C.
101 Huntington Avenue
Prudential Center
Suite 500
Boston, MA 02199

**Emily C. Shanahan**
Tarlow, Breed, Hart & Rodgers, P.C.
101 Huntington Avenue
Prudential Center
Suite 500
Boston, MA 02199