***BARRY C. AND JANICE M. CARROLL***
***145 JUDSON STREET***
***TIVERTON, RHODE ISLAND 02878***
***401 624-6502***

October 10, 2005

Ms. Louise Durfee
Tiverton Town Council Member
262 Highland Road
Tiverton, Rhode Island 02878

Dear Councilwoman Durfee:

Allow me to introduce myself. My name is Barry Carroll, and I live at 145 Judson Street. I am the individual who asked you the questions concerning the Moratorium on the properties south of Judson Street at the October 4th ENACT meeting. My wife, Mrs. Janice Carroll, and I have owned the residence at 145 Judson Street for 27 years. Mrs. Carroll is a trustee for her parents' trusts: Alvin B. Simpson (deceased) and Georgiana Simpson Revocable Trusts. She has power of attorney for her mother's affairs. Mrs. Simpson is an 84 year old widow who is not capable of adequately representing her interests in this matter, so Mrs. Carroll is acting on her behalf. Mrs. Simpson owns and resides at 123 Judson Street. Other parcels owned by the Simpson Trusts are listed below and include: the Borden Tuell Farm (west of Church St.); the Judson Street Strip (approximately 150' wide parcel beginning to the west of Block 41 Lot 34 to the Bay Street Extension); and the Waterfront Property west of railroad tracks. This letter jointly refers to the interests and concerns of both Mr. & Mrs. Barry Carroll, and Mrs. Georgiana Simpson.

| | | |
|---|---|---|
| Block 41 | Lot 33 | (Carroll residence 145 Judson Street) |
| Block 41 | Lot 34A | (Georgiana Simpson residence 123 Judson Street) |
| Block 181 | Lot 1B | (Borden Tuell Farm - Simpson Trusts 50% owners) |
| Block 41 | Lot 34 | (Lot on Judson Street – Simpson Trusts owners) |
| Block 41 | Lot 35 | (Judson St. Strip - Simpson Trusts owners) |
| Block 24-25-1 and 24-26-1 | | (Waterfront west of railroad Simpson Trusts 50% owners) |

When the Moratorium was originally announced, and the first properties to be tested were named, the properties in question were included in the Moratorium. However, the properties were not included in the areas to be tested. While we understood the Council's concern for public safety that originally inspired the Moratorium, we did not understand why the properties in question were not included in the testing. If there was sufficient concern about the environmental safety of the properties to deprive its owners of the unfettered legal use of their land, and severely affect its value, why wasn't there enough concern to compel testing? We understood that the Moratorium would be in place until such time as the properties were determined to be "safe" or remedial action was taken. However without testing, how would the Moratorium be lifted? The Moratorium action of August 27, 2003, did not include any plan by which property owners could extricate their property from under the Moratorium. How would we regain full use and value of our property?

Our concerns lead us to retain the services of Mr. Gary Kaufman of Ransom Environmental Engineering, 1445 Wampanoag Trail, East Providence, Rhode Island 02915. Mr. Kaufman worked with Mrs. Carroll and Mr. Alvin D. Simpson (trustees of the Simpson Trusts). They reviewed the history of the properties in question, researched public records, and performed on site inspections by professional environmental engineers. In the course of this study, representatives of Ransom were in regular verbal and written contact with the Rhode Island Department of Environmental Management (RIDEM). Mr. Kaufman met with RI DEM on February 25, 2004, and provided documented historical findings regarding the properties. RIDEM

and Ransom representatives performed a site reconnaissance on February 28, 2004. On April 2, 2004, another presentation was made by Mr. Kaufman to RI DEM who further requested this information be submitted in writing. On June 9, 2004, a formal 22 page report was submitted to the RI DEM. During this exchange of information with the RI DEM, it was determined by Ransom and RI DEM, that there was no evidence of contamination, nor the historical likelihood of contamination, on the Borden Tuell Farm property. At the time, Mr. Crawford stated that the land appeared unaffected, but "*without extensive testing one could never be 100% sure of any property, anywhere.*"

However, the Judson Street Strip showed evidence of MGP waste contamination. Despite numerous requests by RI DEM to New England Gas Co. to include the Judson Street Strip in their site investigation, no testing has been done. In June 2005, our Attorneys (McRoberts, Roberts & Rainer L.L.P.) made private arrangements to test a questionable area on the Judson Street Strip. Contamination consistent with that found in the roadway and north of the road was discovered on this property. On July 14, 2005, Attorney Mark Roberts notified RI DEM of the results of these tests and requested that this notification be assigned to the outstanding New England Gas Company/South Union release. These tests confirm the information that was conveyed to RIDEM, primarily through Mr. Jeff Crawford, via numerous telephone conversations, in person, and in writing over the last 20 months. *Reference attached Ransom letter to RI DEM dated August 5, 2004.*

Following the February 28, 2004, "walk over" of the properties and the historical report to RI DEM, our environmental experts recommended that we request a formal response from RIDEM. To that end, we requested Mr. Crawford produce a letter to state that the property in question (Borden Tuell Farm) was free of obvious contamination, or compel New England Gas Company to treat the property on the south side of Judson Street the same as the property to the north: i.e. perform complete and proper testing until clean borders had been established. Mr. Crawford agreed that was the proper course of action, he would "speak to his superiors" and get back to us. After several requests from Ransom engineers, and several months with no response: Mr. Crawford verbally informed us that RIDEM declined to make any official statement, written or otherwise, concerning the property. They did not give any reasons for their refusal. Mr. Crawford did say that RIDEM would "request" that NEGC include the area in the next round of testing. Obviously, the "request" was ignored by NEGC in the second round of testing. We waited patiently for over two years to allow the system to function and either test the property or, failing any evidence of contamination requiring testing, remove the Moratorium and restore our full property rights.

That brings me to my questions directed to you and Mr. Crawford at the ENACT meeting on October 4th, 2005. As you may recall, I asked if there was a good reason why the land south of Judson Street was not included in the first or second round of testing, particularly since test borings on the south edge of Judson Street indicated contamination. Mr. Crawford said that based on the information supplied by Ransom Engineering and the fact that "*I walked the property..... Everything south of Judson looked good when I walked on it. On the contaminated properties it* (contamination) *was easy to find, it was obvious. The property south of Judson was much different .... No obvious contamination.*" In his opinion, no further testing was indicated. When asked how one determined the clean margins or borders of contaminated areas he stated: "*The southern border of contamination has been clearly defined.*" His statement indicated that the southern border was "*Judson Street.*" I took notes at the time, and while I am not a stenographer, and the quote may not be precise, it is accurate, and it accurately conveys Mr. Crawford's statement to the audience. (The meeting was video taped, so a more precise record will be available if necessary.) To my knowledge this is the first time anyone from RIDEM has made a public statement regarding their knowledge of the properties in question.

My follow up question to Mr. Crawford was: "*What do the property owners need to do to have the Moratorium lifted?*" His response was that the Moratorium was a town matter, and RIDEM had no

involvement whatsoever. I then asked if RIDEM had plans to make further "requests" of NEGC for additional testing on the property in question. Mr. Crawford stated that based on the research made available from Ransom, and his personal inspection of the property, further testing was not indicated.

I then asked Councilwoman Durfee what was needed to lift the Moratorium on the property in question. She stated that: "*The Council needs assurance.*" (Again, I am working from notes, and if there are concerns about the exact wording, I believe the video may be helpful.) I asked Councilwoman Durfee what would constitute adequate "assurance", given the statements of Mr. Crawford, and the refusal to date of RIDEM to put anything in writing. The response to this question was that "*the Council will request from RIDEM reasons why or why not the Moratorium should be lifted in the area in question.*" I asked, not too bluntly I hope, who specifically on the Council would contact RIDEM? Who would be responsible for following through? Councilwoman Durfee stated that she would be the person who would follow through. She would see to it. Therefore, while this letter is intended for the entire Tiverton Town Council, we have specifically addressed it to Councilwoman Durfee at her direction.

We have been patient. Like other property owners in the affected area, for over two years we have had the use and enjoyment of our property severely restricted. There is substantial impact on the value of the property, not to mention the emotional toll it has taken on all the residents of this area, we included. Unlike the other residents, we alone have suffered the uncertainties and hardships of possible contamination and the Moratorium without any governmental action of any kind to alleviate them. We find ourselves in a classic "Catch 22." RIDEM doesn't want to risk any type of liability, so they won't make a statement about the condition of the property. It isn't their business because they did not enact the Moratorium. The Town Council won't lift the Moratorium without "assurances" supposedly from RIDEM. Neither RIDEM nor the Town Council can or will compel NEGC to conduct testing that would indicate the property is not contaminated.

The irony here is that RIDEM has sufficient evidence of no contamination. It does not want to spend its limited time and resources fighting a useless battle with NEGC to compel testing on property they know to be clean. At the same time, as stated by Mr. Crawford, ***no one can give absolute assurances about any piece of property virtually anywhere, without expensive testing.*** He stated that RIDEM would not do that for any property, supposedly because of potential liability. That leaves the property owners in a position with no options and no way out. We waited two years to have the property tested or have the Moratorium removed. Based on Mr. Crawford's statements at the meeting, there is no evidence to indicate testing is needed. It hasn't happened to date, and it is not likely to. We have received no support from RIDEM. The Town "needs assurance": but what constitutes "assurance?" My question to you Councilwoman Durfee is: If this were your property, or the asset that your 84 year old mother was counting on for her support, what would you do?

Several times during the meeting, private research and information was mentioned. It was gathered by Ransom Environmental Engineering at our personal expense. That information was made available to RIDEM for their evaluation. It also has been made available to the law firm of McRoberts, Roberts & Rainer LLP for use in the lawsuit against NEGC by a large number of residents in the neighborhood. We will copy Mr. Crawford at RIDEM with this letter, and thereby request him to share all the information provided to RIDEM on our behalf by Ransom Engineering. I feel that it would be more appropriate for the Town Council to receive this information directly from RIDEM, so that you know precisely what information they have, and what they are using to form their opinions. However, if you are not satisfied with the promptness of the response from RIDEM, or if you wish to receive the information from us directly, or have other questions regarding this letter, I encourage you to contact Mrs. Janice Carroll at your earliest convenience.

Based on the information complied by Ransom Engineering and provided to RIDEM, Mr. Crawford's personal inspection of the property, and his statements at the ENACT meeting of October 4, 2005, we respectfully request that the Tiverton Town Council review their position on the Moratorium for the properties in question. The exception is Block 41 Lot 35. It is likely that this specific Block and Lot has MGP contamination based on historic research, eye witness accounts, and private testing which has been submitted to RIDEM. We would like whatever assistance that the Tiverton Town Council may be able to provide to support our request to RIDEM that Block 41 Lot 35 be tested immediately. Furthermore, failing direct evidence of contamination that would refute the findings of Ransom Engineering and Mr. Crawford of RIDEM, the Moratorium be lifted immediately from the rest of the properties in question.

Sincerely,

Barry C. Carroll    Alvin D. Simpson, Trustee    Janice M. Carroll, Trustee

CC: Ms. Joanne Arruda, Mr. Cecil Leonard, Mr. Arthur Wyman, Mr. Paul Carroll
Mr. Brian Medeiros, Mr. Don Bollin
Mrs. Gail Corvelho, ENACT
Mr. Jeffrey Crawford, RI DEM
Attorney Mark Roberts