LEXSEE 738 F.SUPP 623

**FRIENDS OF THE SAKONNET, AURELIO and FRANCINE LUCCI, MICHAEL and LINDA KENFIELD, and TIM and LINDA BOUDEWYNS v. BERNARD DUTRA, EUGENE LAWRENCE ALOFSIN, DAVID LaROCHE, and Q.L.C.R.I., Inc. JAMES E. O'NEIL, Attorney General of Rhode Island, and ROBERT BENDICK, Jr., Director of Rhode Island Department of Environmental Management v. Q.L.C.R.I., Inc., BERNARD R. DUTRA, DAVID F. LaROCHE, THE LaROCHE GRANTOR INCOME TRUST, DAVID L. BRODSKY, P. ALAN RYAN, CAROLYN ROSE, a.k.a. CAROLYN McELROY, PAUL E. BUFF, DAVISVILLE CREDIT UNION, and SUFFIELD BANK**

**C.A. Nos. 88-704P, 88-705P**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

**738 F. Supp. 623; 1990 U.S. Dist. LEXIS 6451; 32 ERC (BNA) 1157; 21 ELR 20055**

**May 18, 1990**

**COUNSEL:** [**1] Betsy Grossman de Leiris, Newport, Rhode Island, S. Paul Ryan, East Providence, Rhode Island, (Save the Bay, Inc.), Timothy M. Boudewyns, Portsmouth, Rhode Island, (co-counsel to de Leiris), Michael Rubin, SAAG, Providence, Rhode Island, (Pltf in California 88-0705), Charles P. Messina, Kendra Beaver, Esq, Providence, Rhode Island, for Plaintiffs.

James L. Paradise, Pro Se, Middletown, Rhode Island.

Kenneth R. Tremblay, Esq, Tremblay & Gorton, Portsmouth, Rhode Island (Edward & Norma DeArruda), Donato Andre D'Andrea, Esq, Newport, Rhode Island (Donna Barker), Bruce Hunter Cox, Esq, Slepkow, Slepkow & Bettencourt, Inc., East Providence, Rhode Island (Donna Barker), Matthew Medeiros, Esq, Flanders & Medeiros, Providence, Rhode Island, (Suburban Land Co.), John Voorhees, Esq, Tillinghast, Collins & Graham, Providence, Rhode Island, (Davisville Credit Union), William Y. Chaika, Esq, Chaika & Chaika, Cranston, Rhode Island, (Carolyn Rose & Paul Buff), Stephen B. Lang, Esq, Providence, Rhode Island, (P. Alan Ryan), for Defendants.

Barry Kusinitz, Esq, Martin Aisenberg, Esq, Temkin & Miller, Providence, Rhode Island, (LaRoche & Q.L.C.R.I. LaRoche Grantor Income Trust), Thomas H. Quinn, [**2] Jr, Esq, Providence, Rhode Island, (Dutra, Alofson).

**JUDGES:** Raymond J. Pettine, Senior United States District Judge.

**OPINION BY:** PETTINE

**OPINION**

[*626] OPINION AND ORDER

RAYMOND J. PETTINE, SENIOR UNITED STATES DISTRICT JUDGE.

Raw sewage from the Sherwood Village development in Portsmouth, Rhode Island, has been pouring into the Sakonnet River since at least 1969. This has not been a secret; the stretch of river near the development has been closed for twenty years to shellfishing and swimming due to the sewage; the state has issued orders to stop polluting that have gone unheeded and unenforced; a home has been rendered uninhabitable because sewage seeped into its cellar; the town of Portsmouth has made repairs to the septic system so that the sewage would be dumped out in the River instead of oozing down the hill and across the beach to the River; and the town has refused further building permits to the developers -- owners of the failed septic system. But no one has stopped the fouling of the Sakonnet River, and no one has enforced the laws -- laws that were designed to put an end to this kind of disrespect for the environment.

The issue was brought to this Court in two citizen [**3] suits filed in December 1988. The first suit was filed by The Friends of Sakonnet [1] and several individual

homeowners with property on the Sakonnet in the town of Portsmouth. [2] The plaintiffs in this suit charge the defendants -- Q.L.C.R.I., the present corporate owner of the land on which the failed sewage system is located (the land); David LaRoche, the sole trustee of the Trust that owns Q.L.C.R.I.; and Bernard Dutra and Eugene Lawrence Alofsin, former owners of the land -- with violations of the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (federal Clean Water Act) and state nuisance laws. The second citizen's suit was brought by Rhode Island Attorney General James E. O'Neil and the Director of the Rhode Island Department of Environmental Management Robert Bendick (the state plaintiffs) in their respective capacities as state environmental advocate and director of the state agency in charge of enforcing the federal and state water pollution laws. These state plaintiffs have sued Q.L.C.R.I., David LaRoche, the LaRoche Grantor Income Trust (which owns Q.L.C.R.I.), Bernard Dutra (in his capacity as past owner of the land and as a manager for Q.L.C.R.I.), Carolyn [**4] Rose and Paul Buff (in their capacities as employees and managers at Q.L.C.R.I.), David Brodsky and P. Alan Ryan (to whom Q.L.C.R.I. transferred the land for very short periods of time); and the Suffield Bank and the Davisville Credit Union (each of which hold a mortgage on the land). [3] The state plaintiffs claim that [*627] these defendants have violated the federal Clean Water Act, the Rhode Island Clean Water Act (R.I.Gen.Laws §§ 46-12-1 *et seq.*), a 1979 Order from the Rhode Island Department of Environmental Management (DEM) that ordered the then owners of the sewage system to cease discharging into the Sakonnet River without a license, and state public nuisance laws. The plaintiffs are asking for declaratory, injunctive, and monetary relief. [4] The two suits were consolidated by this Court.

1 The Friends of the Sakonnet describes itself as "an unincorporated association of homeowners, organized in 1988 for the purpose, *inter alia*, of promoting, improving and protecting property values in the area represented by the Association, namely those areas of the Town of Portsmouth, County of Newport and State of Rhode Island, which areas are bounded on the east by the Sakonnet River. The purpose of the Association is further to prevent pollution of the beach and shell fishing beds bordering the Sakonnet River. The Association represents approximately 200 members, all off whom are homeowners in the area above described, and many of whom use the said Sakonnet River for recreational activities." *See* Complaint (C.A. No. 88-704) at para. 4.

[**5]

2 Save the Bay, Inc., a non-profit corporation chartered in Rhode Island, has intervened as a plaintiff in this suit. Save the Bay states that its interests have been adversely affected by the discharging of pollutants into the Sakonnet from the Sherwood Village septic system. Complaint of Intervenor Save the Bay, Inc. at para. 3 and 4.

3 The state plaintiffs assert that these institutions should only be held liable if they foreclose on their mortgages.

4 The plaintiffs seek, *inter alia*, a declaration that the defendants have violated the law; injunctions ordering the defendants to cease polluting the Sakonnet River and to replace the sewage system; civil fines for violation of the state and federal clean water acts; compensatory and punitive damages; and costs and fees.

After the complaints were filed, the defendants (Landowners) brought a third-party complaint against the homeowners in the Sherwood Village subdivision (Homeowners) and Donna Barker in her capacity as financial director for the town of Portsmouth. The Landowners claim that the Homeowners should be held jointly [**6] and severally liable if the Landowners are found liable because the Homeowners have a dominant tenement on the Landowners' land and because the Homeowners are the "point source" of the pollution under the Clean Water Acts. The Homeowners counterclaimed against the Landowners. The defendants seek to hold Barker liable as financial director of Portsmouth because, according to defendants, the town is the owner of the pipe that is discharging the sewage into the Sakonnet and therefore the town should be held liable under the state and federal Clean Water Acts.

Previous to today, this Court has executed an attachment on the Landowners' property for $ 3.5 million and has imposed a temporary restraining order on Q.L.C.R.I. and David LaRoche. The restraining order mandates that sewage be prevented from entering the Sakonnet River from Q.L.C.R.I.'s land. [5] Still before this Court are various summary judgment motions and preliminary injunction motions.

5 The temporary restraining order requires Mr. LaRoche to install collection tank(s) that will intercept the sewage coming from the Homeowners' houses. These tanks are to be pumped as they fill up. The order was imposed on March 5, 1990, and was to remain in effect, by agreement of the parties, for twenty days. The Court ordered the parties to submit briefs on certain issues within 10 days. The new counsel for Mr. LaRoche then requested, on the day briefs were due, a 30-day extension to file his brief. The Court granted the

extension until April 13. The plaintiffs, who had already filed their briefs, were given until April 20 to file responses. Based on the timing established in the initial deadlines, the TRO was extended to May 2. Mr. LaRoche's brief was delivered to the Court Clerk's Office after closing on April 16. Plaintiffs' responses were accordingly delayed. The United States government, which had initially promised to deliver a requested amicus brief in early April, informed the Court that it could not submit its brief until May 4 (the government's brief was not actually submitted until May 14). On April 25, the Court asked for and received permission from Mr. LaRoche to extend the TRO for an additional two weeks until May 16.

[**7] I. BACKGROUND

The Sherwood Village subdivision in Portsmouth, Rhode Island, was developed near the Sakonnet River in the middle 1950s. The development contains thirty-three single-family residences and a number of undeveloped lots. The developer laid sewer lines under the streets of the development, and all thirty-three homes are connected to these sewer lines. The lines under the streets ran to a tract of land owned by the developer where, in the 1950s and early 1960s, the sewage was collected in a large communal septic tank, then deposited in a leaching field and chlorinated before being drained through an outfall pipe into the Sakonnet River (the septic system). Within recent memory the Homeowners have not paid sewage fees for the disposal of their waste water; it is unclear if they ever have. Sometime before 1969, the developer sold the land containing the septic system, as well as an adjacent track of undeveloped land along the Sakonnet River, to Sarfco, Inc.

By 1969 the septic system had failed and raw sewage was running into the Sakonnet River. The state closed the River to shellfishing in the immediate area of the development, [*628] and swimming in the area has [**8] been prohibited. The Rhode Island Department of Environmental Management investigated the septic system in 1979. This investigation revealed that raw sewage was running directly from the leaching field, on the surface of the ground for approximately 250 feet, into the Sakonnet River and into the basement of a home [6] located between the septic system and the River. Sewage also reached the River through the outfall pipe. Approximately 8,000 gallons per day of raw sewage was reaching the River from the failed system. The state repeatedly advised Sarfco of this problem, but Sarfco took no action to correct the system. After holding a formal hearing, DEM issued a notice of violation under Rhode Island law to Sarfco. The decision and order that issued from this hearing (the 1979 Order) held Sarfco solely responsible for correcting the septic system. An appeal was taken by Sarfco to the Providence Superior Court; that appeal was dismissed with prejudice by stipulation. Sarfco never complied with the Order. The town of Portsmouth, with a permit from DEM, [7] made emergency repairs to the outfall pipe. The town billed Sarfco for these repairs, placing a lien on the property when the bill went [**9] unpaid. Sarfco eventually paid. The home into which sewage ran is uninhabitable.

6 This home, which belongs to the Souza family, is not one of the Sherwood Village homes, although the land on which it is located was initially part of the subdivision developer's land. The home is not connected to the failed septic system.

7 The DEM permit gave Portsmouth permission to make "emergency repair" to Sarfco's septic system. The permit specifically stated that "this approval in no way seeks to abridge or amend the outstanding order versus Sarfco, Inc. dated 17 July 1979." Response of Third Party Defendant Donna Barker in Her Capacity as Finance Director for the Town of Portsmouth to the Memoranda Submitted by the Defendants Herein, Exhibit B.

Sarfco sold the land to defendants Dutra and Alofsin in 1981. Dutra and Alofsin knew of the outstanding 1979 DEM Order when they bought the property. Sarfco, Inc. was defaulted by the Rhode Island Secretary of State sometime after this sale. In 1983 Dutra and Alofsin were [**10] served with notices of violation of state water pollution laws; the Homeowners were served with similar notices. No hearings were held on these notices of violation. The notices were not complied with.

Late in 1986 defendants Dutra and Alofsin sold their property to defendant Q.L.C.R.I. Again the buyers had knowledge of the outstanding 1979 DEM Order. In 1988 Q.L.C.R.I. was contacted by the United States Army Corps of Engineers about the raw sewage entering the Sakonnet River. The Corps pointed out that no permit had been issued by any federal or state agency that could authorized the outfall pipe in the river or could authorize the discharge into the river. Q.L.C.R.I. was notified of the criminal sanctions for violation of the Clean Water Act. The Corps requested answers to certain questions within fifteen days. Also in 1988, DEM sent Q.L.C.R.I. a letter demanding that an acceptable plan for a sewage treatment facility be submitted immediately.

The case is now before this Court on numerous motions. [8] Because the solutions to many of the motions rely on the same [*629] questions of law, this opinion will

first address the relevant questions of law. The motions will then be [**11] dealt with individually.

> 8 1) The Friends of Sakonnet have filed a motion seeking summary judgment on liability and have asked for an injunction to prevent further polluting of the Sakonnet River. 2) The Attorney General and Director of DEM have moved for summary judgment against Q.L.C.R.I. on liability. 3) The defendants have moved to amend their answer to the Friends of Sakonnet Complaint to add the affirmative defense of failure to join indispensable parties. 4) The defendants have moved for summary judgment against the Attorney General and Director of DEM. 5) Defendants Dutra and Alofsin have moved for summary judgment against the Friends of Sakonnet. 6) Third-party defendant Barker has moved for summary judgment against third party plaintiffs (defendants). 7) Defendants Q.L.C.R.I., David LaRoche, and the LaRoche Grantor Income Trust have moved for a preliminary injunction against the Homeowners ordering that they be held financially responsible for all measures for which the above-named defendants may be held responsible. 8) Defendants Dutra and Alofsin have requested that this Court hold further hearings before ruling on the plaintiffs' preliminary injunction motion.

[**12] II. POINT SOURCE

A. Background

The federal Clean Water Act, which is closely tracked by the state's clean water act, [9] decrees that "the discharge of any pollutant by any person [without a permit] shall be unlawful." 33 U.S.C. § 1311(a). The Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Much of the legal debate in this case has revolved around the definition of "point source"; the plaintiffs and Homeowners are claiming that the Landowners/defendants as owners of the septic system are the point source and thus should be held liable under the law. The Landowner/defendants claim 1) that because the pollution comes from the Homeowners, they are the point source and should be held liable, 2) that because the pollution is being discharged through a pipe [**13] installed by the town of Portsmouth, the town is liable, and 3) that because the land between the septic system and the Sakonnet River, under which the pipe runs, is owned by third parties, the Souza family, the Souzas are the point source and liable under the state and federal Clean Water Acts.

> 9 The Rhode Island law states: "It shall be unlawful for any person to discharge any pollutant into the waters except as in compliance with the provisions of this chapter and any rules and regulations promulgated hereunder and pursuant to the terms and conditions of a permit." R.I.Gen.Laws § 42-12-5(b).

Although the definition of a point source is important, by focusing on this definition, the parties in this case are isolating one subsection from the rest of a law that was written broadly to reach "to the fullest extent possible those sources emitting pollution into rivers, streams and lakes." *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979). The words "point source" should not be separated [**14] from the words "addition of any pollutant," nor disassociated from what they are defining, "discharge of a pollutant." Dwelling on the words "point source" in isolation can lead to absurd results that do not promote the purpose of the Clean Water Act. [10] That purpose is to restore and maintain the chemical, physical and biological integrity of the nation's waters and to eliminate the discharge of pollutants into the navigable waters. 33 U.S.C. § 1251(a)(1). To do this, Congress has placed liability with those in control of the pollutants being discharged.

> 10 Some of those absurd results have been proposed by the parties in this case. It has been suggested that the town of Portsmouth is solely liable simply because it was responsible for the installation of a discharge pipe that forced the raw sewage to run through a pipe and be dumped out in the Sakonnet River rather than allowing the sewage to continue to run down the surface of the ground to the River. It has also been suggested, subtly, that the owners of the land between the septic system and the River are liable because the pipe from the system runs under their land before reaching the River. *See* Subsection B, *supra*.

[**15] The parties have attempted to fit the facts in this case to those of the leading cases interpreting 33 U.S.C. § 1311(a). Those cases have focused on the question of what is and what is not point source pollution. The question has usually been raised in the context of a defendant claiming that the pollution coming from his or her property is not point source pollution and thus does not fall under the permit requirements of 33 U.S.C. § 1342. The courts in these cases have broadly interpreted

the definition of point source to reach all pollution that comes from a confined system. *See, e.g., Sierra Club v. Abston Construction Co., Inc.*, 620 F.2d 41 (5th Cir. 1980); *Earth Sciences*, 599 F.2d 368; *Fishel v. Westinghouse Electric Corp.*, 640 F. Supp. 442 (M.D.Pa. 1986); [*630] *United States v. Saint Bernard Parish*, 589 F. Supp. 617 (E.D.La. 1984); *O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642 (E.D.Pa. 1981). There was no intentional pollution in these cases; there were no pipes or man-made devices that carried the pollutants from the confined system or collection point to the navigable waters. The discussion in these cases was motivated by whether there was [**16] a point source for the pollution entering navigable waters, not who was responsible for the pollution if there was a point source.

These cases give great importance to the point source because the *existence* of a point source was contested. The concept of point source was developed to distinguish pollution resulting from simple erosion over the surface of the ground from pollution that has been collected or comes from a confined system. [11] "Point source" is in the definition of "discharge of a pollutant" to distinguish kinds of pollution, not to establish the source of liability. Liability must lie with the person or persons causing "the addition of any pollutant to navigable waters." [12]

11 "When Congress established the National Pollutant Discharge Elimination System (NPDES) in 1972 and concomitantly created a new approach to regulating and abating water pollution, it drew a distinct line between point and nonpoint pollution sources. Point sources are subject to direct federal regulation and enforcement under the Act. Nonpoint sources, because of their very nature are not regulated under the NPDES." *Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 849 (9th Cir. 1987) (citation and footnote omitted).

[**17]

12 Even the cases specifically concerned with determining if a point source exists seem to recognize this. In *Sierra Club*, although the court was not considering whether the defendant owned the "conveyance" for the pollutants, the Sixth Circuit's determination of liability is based on control of the pollutants that ultimately reach navigable waters. "Gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the miner at least initially collected or channeled the water and other materials. A point source of pollution may also be present where miners design spoil piles from discarded overburden such that, during periods of precipitation, erosion of spoil pile walls results in discharges into a navigable body of water by means of ditches, gullies and similar conveyances, even if the miners have done nothing beyond the mere collection of rock and other materials. The ultimate question is whether pollutants were discharged from 'discernible, confined, and discrete conveyance[s]' either by gravitational or nongravitational means. Nothing in the [Clean Water] Act relieves miners from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water. Conveyances of pollution formed either as a result of natural erosion or by material means, and which constitute a component of a mine drainage system, may fit the statutory definition and thereby subject the operators to liability under the Act." *Sierra Club*, 620 F.2d at 45.

[**18] B. Sherwood Village Septic System

There is no question in this Court's mind that the owners of the failed septic system are liable under 33 U.S.C. § 1311 for the noxious flow that has poured freely into the Sakonnet River for the last twenty-one years. Under § 1311, such a discharge from a privately owned treatment works without a permit is illegal. [13] Only the owners of the septic system could have obtained a permit for the discharge from their system. [14] When arguing that they are not a point source, the defendants are apparently challenging the validity of the regulations of the Environmental Protection Agency (EPA) that specifically require privately owned treatment works to obtain an NPDES permit. In determining that private treatment works must obtain an NPDES permit, the EPA must have determined that these works are discharging point source pollution. [15] For the reasons [*631] set forth below, this Court finds the Environmental Protection Agency's interpretation of the Clean Water Act in these regulations to be eminently reasonable and consistent with Congress' intent. *See Shanty Town Associates, Ltd. v. Environmental Protection Agency*, 843 F.2d 782, 790 (4th [**19] Cir. 1988).

13 The owners of the Sherwood Village septic system are required to obtain an NPDES (national pollutant discharge elimination system) permit under 33 U.S.C. § 1342 as they are discharging pollutants into navigable waters. *See also* 40 C.F.R. §§ 122.21(a) and 122.44(m).

14 Of course, neither the state nor the federal officials would have issued a permit for the discharge of raw sewage. See Regulations For the Rhode Island Pollutant Discharge Elimination System, Rules 9(f) and 16.05.

15 NPDES permits are only issued for the discharges of point source pollution. 33 U.S.C. § 1342(a). Furthermore, the EPA does not have discretion to determine what categories of point source discharges need a permit. *Natural Resources Defense Council, Inc. v. Costle*, 186 U.S. App. D.C. 147, 568 F.2d 1369, 1374 (D.C. Cir. 1977), although it can consider how to implement the permit program. *Id.* at 1381-83.

The defendants' attempt to strain the definition of "discharge of a pollutant" in order to [**20] relieve themselves of liability and to impose it on the town of Portsmouth or on Mr. and Mrs. Souza makes complete nonsense out of the Clean Water Act. Congress intended that the Clean Water Act eliminate the discharge of pollutants into the nation's waters. However, Congress realized that this goal had to be tempered by practicality, and it set up a system by which persons would be allowed to discharge pollutants if they first obtained a permit. [16] The Act requires those in control of the pollutants to use the best available control technology (BACT) to prevent harmful pollutants from being discharged before a permit will be issued for the discharge. It is those persons who violate the permit effluent limitations or discharge without a permit that 33 U.S.C. § 1311(a) seeks to hold liable. [17]

16 Congress ordered the Administrator of the Environmental Protection Agency to "develop and publish . . . criteria for water quality accurately reflecting the latest scientific knowledge" on a variety of topics. 33 U.S.C. § 1314. The Administrator also establishes regulations based on these criteria and, with the states, is responsible for the permitting system under which a person may obtain a permit to discharge pollutants into navigable water. *See* 33 U.S.C. §§ 1311 *et seq.*

[**21]

17 "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

By attempting to hold either the town or the Souzas liable, the defendants are saying the law reaches those who have absolutely no control over the processes that the permit system regulates. Neither the town nor the Souzas could obtain a permit for the discharge into the Sakonnet River from the Sherwood Park septic system, yet the defendants would have this Court hold one of them liable for not obtaining a permit before another's pollution flowed through their property. [18] Do the defendants really believe the law requires, or should require, either the town or the Souzas to implement the BACT, which would be a new septic system, when the pollution is coming from the Homeowners and the defendants' failed septic system?

18 Even if the Clean Water Act is interpreted as pinning liability on the owner of the actual "point" at which the unpermitted pollution flows into navigable waters, neither the town nor the Souzas could be held liable. Although the town installed the outflow pipe that conducts the sewage into the middle of the Sakonnet River, the owners of the septic system at the time paid the town for the work. The fact that the town had to impose a lien on Sarfco's property before the work was paid for, does not vitiate Sarfco's responsibility for this work. In the case of the Souzas, the pipe that runs under their property from the septic system is subject to an easement against their property. That easement was for the benefit of Fred R. Alofsin, the original developer of Sherwood Village, and his heirs and assignees "for the purpose of allowing access to the Sakonnet River, and to repair and maintain the sewerage discharge pipe which is located underground through this right of way." *See* Memorandum of Carolyn Rose, a.k.a. Carolyn McElroy and Paul E. Buff, Exhibit A. The easement passed to Fred Alofsin's successors in ownership of the land on which the septic system is located. *See Thomas v. Ross*, 119 R.I. 231, 376 A.2d 1368 (1977); *Crawford Realty Co. v. Ostrow*, 89 R.I. 12, 150 A.2d 5, (1959).

[**22] The defendants have further attempted to avoid liability under the federal and state Clean Water Acts by seeking either to share liability with the Homeowners or to place liability for the discharges exclusively with the Homeowners. None of defendants' arguments concerning the liability of the Homeowners will relieve the Landowners of liability. Although the EPA in their regulations interpreting the Clean Water Act have clearly stated that the users of a private treatment works are point sources, the discharges of the users do not in any way relieve the owners of the treatment works accepting the users' discharge [*632] from responsibility for the treatment works' discharges. Under the EPA's interpretation of the Clean Water Act, both the Homeowners and the Landowners are discharging from point sources. [19] However, only the question of the Landowners' liability under the state and federal Clean Water Acts is before this Court.

19 In its amicus brief for this Court, the EPA bases its determination that both the Homeowners and Landowners are discharging pollution from point sources into navigable waters on the Clean

Water Act's "broad definition of 'discharges of a pollutant'" and on the Act's exception for certain dischargers discharging through publicly owned treatment works in § 1311(b)(1). This Court makes no determination on the reasonableness of the EPA's decision to consider domestic users of a privately owned treatment works to be point sources. For the purpose of the motions presently before the Court, this need not be addressed.

[**23] Although the EPA has determined that users of private treatment works are "discharging a pollutant" as defined in § 1362(12), as the federal and state regulations are set up, domestic users of private treatment works are not required to obtain an NPDES permit. [20] The law only requires the treatment works into which the domestic users are discharging to have a permit.

20 Rule 16.05 of the Regulations for the Rhode Island Pollutant Discharge Elimination System (which is identical to 40 C.F.R. § 122.44(m)) sets procedures by which the Director of DEM can issue permits to privately owned treatment works; this Rule allows the Director to include conditions applicable to users in a permit for the treatment works and allows the Director to require separate permits for the users. However, Rule 9(f) (which tracks 40 C.F.R. § 122.3(g)) lists discharges of pollutants into privately owned treatment works as an activity that does not require a permit.

III. ACTIONS AGAINST PAST OWNERS

A. Clean Water Act

Defendants [**24] Dutra and Alofsin, past owners of the Sherwood Village septic system, argue that they cannot be held liable under the Clean Water Act because any violation for which they are responsible is in the past. According to these defendants, the Supreme Court in *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S. Ct. 376, 98 L. Ed. 2d 306 (1987), decided that the Clean Water Act does not confer jurisdiction in citizens' suits for wholly past violations. While this statement is true, *Gwaltney* does not provide the definitive answer that the defendants attribute to it.

In *Gwaltney* the Court did decide that a citizen's suit could not be brought for wholly past violations of the NPDES permit conditions; however, that holding was referring to the violation of the Act being in the past. In the present case, the violation of the Act has been continuing and was occurring when the suits in this case were filed. It is only a *violator*, not the *violation*, that can be said to be in the past. This distinction is not merely semantic. In the *Gwaltney* situation, no further polluting of the nation's waters is taking place because the violation has ceased; [**25] the purpose of the Act has been achieved. In the present Sakonnet situation, the polluting continues, although the actor polluting has changed.

The question in *Gwaltney* was whether a person who has violated the Act should be able to avoid liability under a citizen's suit when the violation has ceased prior to the commencement of the suit. The Supreme Court unanimously answered yes to that question. The question in the Sakonnet River situation is whether a person who has violated the Clean Water Act may avoid liability by relinquishing ownership of the polluting source although the violation continues. Although the two situations are distinct, the plain language of the citizens' suit statute, 33 U.S.C. § 1365(a), [21] that prompted the Supreme Court in *Gwaltney* to find no liability is controlling in the present case. The phrase "any person . . . who is alleged to be in violation" is clearly directed to a present violation by [*633] the person against whom the citizen suit is brought. Defendants Dutra and Alofsin are not presently violating the Act. Even if a court, as is the case with this Court, does not believe that Congress contemplated a specific situation or outcome [**26] when drafting a law, [22] that court cannot graft exceptions onto the law. The court "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984). It is the legislative branch's responsibility to correct any defects that may be present in the law.

21 In relevant part, 33 U.S.C. § 1365(a) provides: "Any citizen may commence a civil action on his own behalf (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation. . . ."

22 Freeing defendants Dutra and Alofsin from liability for their violations simply because they have ceased controlling the pollution source impedes achievement of the Clean Water Act's purpose. This result encourages violators to transfer control of their property to avoid liability. Although the transfer by Dutra and Alofsin to Q.L.C.R.I. may not have been motivated by the threat of a suit, it was done with the knowledge that the septic system they were selling was in continuous violation of the federal and state Clean Water Acts. A key consideration in *Gwaltney*, as well as *Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.*, 807 F.2d 1089 (1st Cir. 1986), was that a violation must be continuing for a court to have jurisdiction over a citizen's suit. In this case, the violation of the Clean Water Acts

has continued unabated. Thus, simply because of the present-tense wording of the statute, these defendants are able to avoid responsibility for their violations of the law because they sold their property, not because they stopped violating the law.

[**27] Further, the notice requirement of § 1365(b)(1)(A) [23] would serve little purpose in a suit against past owners of a pollution source. "The purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney*, 108 S. Ct. at 382-83. Notice to Dutra and Alofsin by the plaintiffs of their intention to file suit does not give these defendants a chance to bring the pollution source into violation; they have no control over the pollution source. [24]

23 That section provides: "No action may be commenced under subsection (a)(1) of this section prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order. . . ."

24 However, the notice requirement serves little purpose if an owner or operator can simply transfer control of the pollution source before the filing of a citizen's suit and avoid liability. This is what defendants Dutra and Alofsin have done.

[**28] B. Nuisance

Defendants Dutra and Alofsin rely on this Court's decision in *City of Manchester v. National Gypsum Co.*, 637 F. Supp. 646 (D.R.I. 1986) when they assert that as past owners of the septic system they cannot be sued under a theory of nuisance for damages caused by their pollution of the Sakonnet River. Their reliance is misplaced. *National Gypsum* turned on the fact that the defendant was never in control of the instrumentality alleged to constitute the nuisance when the damage was alleged to have taken place. [25] That is not the case here. Dutra and Alofsin owned and controlled the septic system between 1981 and 1986, during which time pollutants from the system flowed into the Sakonnet River. This Court has discovered no Rhode Island (or other) precedent that bars recovery of nuisance damages simply because the defendants no longer control the instrumentality alleged to have caused the nuisance. If Rhode Island courts allow suits for nuisance damages to go forward although the nuisance itself has already been abated, *see Weida v. Ferry*, 493 A.2d 824, 826 n. 3 (R.I. 1985), it follows that suits should be allowed, if within the statute of limitations, against [**29] one who is alleged to have caused damages by a nuisance even if that person no longer controls the alleged nuisance. In both situations, the damaged caused by the defendant's alleged operation of a nuisance is in the past and an injunction against the defendant would serve no purpose. The paramount question [*634] is whether the defendant was in control of the instrumentality alleged to have created the nuisance when the damage occurred. There is no dispute in this case that defendants Dutra and Alofsin were in control of the septic system between 1981 and 1986.

25 Also, the decision in *National Gypsum*, although decided by this Court, was based on New Hampshire law and thus is not binding precedent for this case.

IV. EFFECT OF THE 1979 ORDER AND THE 1983 NOTICES OF VIOLATION ISSUED BY THE RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

This Court has no authority to enforce the 1983 notices of violation issued by the Department of Environmental Management against defendants Dutra and Alofsin and [**30] against the Homeowners. As there was no hearing or final adjudication on these notices, there is nothing to enforce.

Defendants David LaRoche, Q.L.C.R.I., Inc., and the LaRoche Grantor Income Trust concede that the 1979 Order against Sarfco, Inc. is binding under the doctrine of collateral estoppel upon themselves as successors in interest to Sarfco. These defendants do not contest this Court's discretion to enforce this Order under the Court's discretionary pendent jurisdiction. [26] As the Order arose from the same set of facts and issues that are presented to this Court on the federal Clean Air Act claim, [27] the Court will exercise its pendent jurisdiction over this claim.

26 Defendants Dutra and Alofsin do contest the collateral estoppel effect of this Order and urge the Court not to exert its pendent jurisdiction because this will result in unfair prejudice to the defendants. First, the state plaintiffs' are not asking for summary judgment on this issue against defendant Dutra (defendant Alofsin is not a defendant in the state plaintiffs' suit, and enforcement of the 1979 Order is not part of the Friends of Sakonnet Complaint). Second, the challenges of Dutra and Alofsin to the use of collateral estoppel are without merit.

[**31]

27 Defendants Dutra and Alofsin challenged the identity of issues and facts between the present

situation and the situation at the time of the 1979 Order. *See* Memorandum of Law Requested From Bernard R. Sutra and Eugene Lawrence Alofsin by Judge Pettine on February 26, 1990, at 7-8. This Court has demonstrated in Section II above that the installation of the outfall pipe by the town of Portsmouth and the ownership of the land between the septic system and the River by the Souzas is not a material fact to the determination of liability under the state and federal Clean Water Acts. Furthermore, the defendants are mistaken in their argument that Sarfco, against whom the 1979 Order was issued, owned the land between the septic system and the River. The Souzas owned this land at the time of the 1979 Order. Affidavit of Frank H. Souza, para. 1.

The Court does agree with defendant LaRoche that the Order does not solve all the problems. The Order determined that the defendants' predecessor in interest was in violation of the state's Clean Water Act and that the predecessor in interest must reconstruct [**32] and repair the septic system according to plans approved by the state. The hearing officer stated that the state law speaks only to ownership and control of the septic system, and Sarfco owned and controlled the system and was therefore liable under the law. The officer also stated that although Sarfco's claim that the Homeowners had assumed a pro rata responsibility for the system's maintenance raised "an interesting question of equity," such questions were immaterial to the determination of liability under the state Clean Water Act. The hearing officer was only determining liability under that Act. The officer did not rule out an equitable claim against the Homeowners, he simply decided that it had nothing to do with the issues he was empowered to hear.

This Court does not believe, as the Homeowners have argued, that an equitable claim by the Landowners against the Homeowners is barred by the federal Clean Water Act. In *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S. Ct. 805, 811, 93 L. Ed. 2d 883 (1987), the Supreme Court ruled that a state's common law is pre-empted by the Clean Water Act to the extent that the state law "stands as an obstacle to the accomplishment [**33] and execution of the full purposes and objectives of Congress." An equitable suit against the Homeowners will not change the liability of the Landowners under the Clean Water Act, nor will it affect the Landowners' responsibility to erect a new septic system if so ordered by this Court under the authority of the Clean Water Act. All that [*635] an equitable suit will do is to determine whether the Homeowners have an obligation to indemnify, partially or fully, the Landowners for their expenses. The Homeowners' argument would nullify even an explicit agreement between an owner of a septic system and its users that the users would pay for maintenance.

V. DISPOSITION OF THE MOTIONS [28]

28 In analyzing the summary judgment motions below, this Court is required to examine the record in a light most favorable to the non-moving party. This does not mean that the Court accepts allegations of fact by the non-movant that are not substantiated by some evidence. But if the non-movant can show that a material fact is in dispute summary judgment will not issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir. 1988). In this case it is important to note that the mere existence of *some* factual disputes will not prevent summary judgment; the factual dispute must be material in that the dispute's determination in favor of the non-moving party could lead a jury to find a verdict for the non-moving party.

[**34] A. Summary Judgment Motion of Friends of Sakonnet

The Friends of Sakonnet have moved for summary judgment on the issues of liability under the federal Clean Water Act and the state common law of nuisance against all defendants named in their suit. [29] Summary judgment is granted against LaRoche and Q.L.C.R.I. on the issue of liability under the federal Clean Water Act; judgment against defendants Dutra and Alofsin on this issue is denied. Summary judgment is denied against all defendants on the issue of liability under the common law of nuisance.

29 These plaintiffs, as well as the state plaintiffs, have also requested injunctive relief. For this Court's ruling on a preliminary injunction, *see* Section VI, *infra*.

Based on the above discussions of "point source" and liability of former owners, the appropriateness of these summary judgment decisions on Clean Air Act liability is clear. In their first memorandum of law accompanying their objection to summary judgment, the defendants argued that it was [**35] in dispute whether there was sewage seeping into the Sakonnet River. However, the plaintiffs did present testimony and documentation of testing done after the plaintiffs had filed suit. Transcript of Hearing, February 26, 1990, at 3, and Statement of Material Facts Not in Dispute in Support of the Motion for Partial Summary Judgment of Plaintiffs Friends of the Sakonnet, Exhibit 7. The defendants did

not challenge these statements and test. Simple averments that there is no proof of pollution have no weight in the face of plaintiffs' direct proof. Other facts that the defendants claim are missing or in dispute are not material to the determination of liability for summary judgment.

The Court is unwilling to grant summary judgment at this time on the nuisance claim as the issue has hardly been discussed in the memoranda submitted by the parties. Further, no evidence has been submitted that the individual plaintiffs in this suit have suffered a particularized harm to their interests as required in a private nuisance suit.

B. Summary Judgment Motion of State Plaintiffs

The motion of the Attorney General and Director of DEM for summary judgment on the liability of Q.L.C.R.I. under [**36] the state and federal Clean Water Acts, the 1979 Order, and Rhode Island common law of public nuisance is granted in its entirety. This defendant has conceded liability under the Clean Water Act and the 1979 Order (the 1979 Order determined the issue of liability under the state Clean Water Act, and this defendant does not challenge the collateral estoppel effect of that Order). *See* Memorandum of Defendants/Third Party Plaintiffs LaRoche, Q.L.C.R.I. and LaRoche Grantor Income Trust on Summary Judgment and Preliminary Injunction Issues, at 2-3. Under Rhode Island law, "[a] public nuisance is an unreasonable interference with a right common to the general public: it is behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." *Citizens* [*636] *for Preservation of Waterman Lake v. Davis*, 420 A.2d 53, 59 (R.I. 1980). It is undisputed that the pollution coming from the Sherwood Village septic system is responsible for polluting the Sakonnet River and closing that area of the River to shellfishing. *See* Complaint (C.A. No. 88-705), Exhibit 1. Further, the illegal dumping of sewage into the state rivers is a nuisance [**37] per se. *See* 58 Am. Jur.2d *Nuisances* § 18 (1989); *see also Board of Purification of Waters v. Town of East Providence*, 47 R.I. 431, 133 A. 812 (1926).

C. Defendants' Motion To Amend Answer

Defendants seek to amend their Answer to add the affirmative defense of failure to join indispensable parties. The motion is denied; joinder of the parties that the defendants consider indispensable has been accomplished through defendants' own third-party complaint. The defense of failure to join indispensable parties under Fed.R.Civ.P. 12(b)(7) is not a defense against the merits of the case, it will only result in a dismissal of the case if a party cannot be joined and the court determines that this failure to join will result in undue prejudice to one of the parties. Fed.R.Civ.P. 19(b).

D. Defendants' Motion For Summary Judgment Against State Plaintiffs

Defendants moved for summary judgment on the grounds that either the Homeowners or the town of Portsmouth was the "point source" of the pollution flowing into the Sakonnet and, therefore, the defendants could not be held liable under the Clean Water Act. The motion is denied. *See* Section II, *supra.*

E. Motion For Summary [**38] Judgment by Defendants Dutra and Alofsin Against Friends of Sakonnet

In this motion defendants reassert their contention that they cannot be held liable under either the Clean Water Act or Rhode Island's common law of nuisance because they no longer own the land on which the septic system is located. The motion is granted in part. These defendants cannot be held liable, as a matter of law, under a citizen's suit of the federal Clean Water Act. *See* Section II, *supra.* Claim One of the Friends of Sakonnet suit as it applies to defendants Dutra and Alofsin is dismissed. Summary judgment, as it relates to the common law of nuisance (Claim Two), is denied. *See* Section III, *supra.*

F. Third-Party Defendant Barker's Motion for Summary Judgment

Third Party Defendant Barker, in her capacity as financial director of the town of Portsmouth, moves for summary judgment on defendants/third party plaintiffs' claims against her. The motion is granted. *See* Section II, *supra.*

G. Defendants Q.L.C.R.I. Motion For Preliminary Injunction Against the Homeowners

Defendants David LaRoche, Q.L.C.R.I., and the LaRoche Grantor Income Trust have asked for a preliminary injunction requiring [**39] the Homeowners immediately to assume financial responsibility for the temporary pumping that the defendants are now responsible for under the TRO issued by this Court on March 5, 1990, and for the construction of a new septic system. This motion is scheduled for hearing following the completion of the trial presently before this Court, *Beiser v. Jamestown Boat Yard.* The Court does not have sufficient uncontroverted facts before it to make the determinations necessary. The promises and obligations between the Homeowners or their predecessors and the developer of Sherwood Village in regard to the responsibility of each to maintain the septic system are clouded. Further, the source of, amount of, and responsibility for the groundwater that is infiltrating and overburdening the system is unclear (the statements of defendants' expert at

the March 5, 1990, hearing differ from those in defendants' memorandum in support of this motion on this subject). If this Court is to construct an equitable and viable solution for this situation, it must have answers to these, and other, questions.

[*637] Further, the Court requests that both the DEM and defendant LaRoche have specific plans [**40] to offer this Court for a permanent solution. These plans should include specifications for a new facility, cost estimates, estimates of time it will take to build, and determinations as to the source of and solutions for groundwater infiltration. All information necessary for this Court to make a determination for a permanent solution should be available. Further, defendant LaRoche should present his plans to the DEM prior to this hearing; the DEM must approve the technical aspects of any solution this Court reaches. The Homeowners should be given an opportunity to review any plans that will be submitted to this Court.

Defendants have requested that this Court not rule on the plaintiffs' motion for preliminary injunction until this motion is decided. They argue that the financial burden is too great and that the Homeowners are legally responsible for the disrepair of the existing system and the construction of a new system. However, the Court cannot, without a hearing, make the findings of fact necessary for the legal conclusions the defendants ask this Court to draw. Further, it is not inequitable to require these defendants to bear the costs of this Court's temporary solution. [**41] The defendants are in violation of state and federal laws when sewage runs from their septic system to the Sakonnet River; they have known about this violation since they acquired the land of which the system is located. If defendants had taken steps to achieve a solution earlier, before these suits were filed, they would not have had to bear this cost. It is defendants own flagrant violation of the law that has brought on this financial burden.

H. Defendants Dutra and Alofsin's Motion For Further Hearings Before Issuance of Preliminary Injunction

Defendants Dutra and Alofsin argue that questions concerning their ownership of land under which the sewer pipes run need to be resolved before a preliminary injunction can issue. As demonstrated in Section II, *supra*, these issues are not material to a determination of liability under the Clean Water Acts. The motion is denied.

VI. PRELIMINARY INJUNCTION

A preliminary injunction is issued against LaRoche, Q.L.C.R.I., and the LaRoche Grantor Income Trust. The Court finds:

1. There is sufficient probability of success by the plaintiffs for this injunction. These defendants are in violation of the federal and state Clean Water [**42] Acts, Rhode Island common law of nuisance, and an Order from the Rhode Island Department of Environmental Management. Each of these violations is based on the defendants' release of raw sewage from their septic system into the Sakonnet River without a permit. These laws require the defendants to cease discharging pollutants into the navigable water.

2. If the pollution is allowed to resume flowing until a permanent solution is found and constructed, irreparable harm will result to the plaintiffs and the public. The health hazards, which have been demonstrated by testing for the coliform bacteria and which are testified to by the closing of the River to shellfishing and swimming, are too great. There is no potential irreparable harm to the defendants.

3. The defendants knew of these violations before they bought the property containing the failed septic system in 1986, and they made no, or minimal, efforts to correct the situation until these suits were filed. The defendants have executed two paper land transactions that have reduced the equity in their land on which the septic system is located by over $ 2 million. Transcript of Hearing, March 1, 1990, at 27-29. Although this money [**43] went to the defendants, none of it has been used to correct the noxious situation their failed septic system is causing.

IT IS THEREFORE ORDERED THAT:

1. The defendants shall pump or otherwise remove sewage as needed from the holding tanks installed in early March 1990 on the property of Q.L.C.R.I., Inc., in the Sherwood Village development in the town [*638] of Portsmouth, Rhode Island. The sewage thus pumped is to be transported to appropriate disposal facilities. Such pumping must prevent the discharge of pollutants into the Sakonnet River or the backing up of sewage in the sewer lines leading to the holding tanks.

2. The Attorney General shall pledge the state's credit as bond in the amount of $ 150,000 during the pendency of this restraining order.

3. Pursuant to Rhode Island Gen.Laws § 46-12-22, the Attorney General, the Director of the Department of Environmental Management, and their agents, while in the performance of their duties, may, at all reasonable times enter the premises, plant or equipment belonging to Q.L.C.R.I.

VII. CONCLUSION

For the reasons stated above, defendant Q.L.R.C.I. is in violation of the state and federal Clean Water Act, the

1979 [**44] Order of the Department of Environmental Management, and the common law of public nuisance. Defendant David LaRoche is in violation of the federal Clean Water Act. The claim against defendants Dutra and Alofsin under the federal Clean Water Act is dismissed. A preliminary injunction is entered against defendants Q.L.C.R.I. and LaRoche. A hearing will be held on defendant Q.L.C.R.I.'s motion for a preliminary injunction against the Homeowners in Sherwood Village. This hearing will take place following the completion of the trial presently before this Court (*Beiser v. Jamestown Boat Yard*). Counsel should notify this Court forthwith as to all matters that are still pending in this case.

LEXSEE 31 RI 295

**PAYNE & BUTLER vs. PROVIDENCE GAS COMPANY.**

**[NO NUMBER IN ORIGINAL]**

**SUPREME COURT OF RHODE ISLAND**

**31 R.I. 295; 77 A. 145; 1910 R.I. LEXIS 83**

**July 16, 1910, Decided**

**PRIOR HISTORY:** [***1] TRESPASS ON THE CASE. Heard on exceptions of defendant and on constitutional questions. Questions answered and exceptions overruled.

**DISPOSITION:** Exceptions overruled.

**HEADNOTES**

(1) *Liability for Escape of Waste Products into Public Waters.*

Where a corporation is permitted to manufacture illuminating gas, for its own emolument and profit, it is with the implied, if not express, limitation that it shall not become a public or private nuisance; that, if it creates deleterious and poisonous substances, it will dispose of the same without injury to others, and if it allows its deleterious waste product to contaminate the waters of the State, it is liable to any person injured thereby in his private capacity and apart from being one of the public, provided he can trace to its origin the noxious substance whereby he is damaged.

(2) *Property in Shell-Fish Planted in Public Waters.*

One who deposits shell-fish in public waters, not a natural oyster or quahaug bed, for the purposes of culture and growth, and defines the land so as to give public notice of the fact that he has exclusive possession, continues to maintain his possession of the same, and, in an action for injury caused to said shell-fish, sufficient title is shown by proof that he was in possession, under a claim of right not disputed by anyone having a better title.

Such possession by a plaintiff, in either the ground or shell-fish, can not be questioned by a mere wrongdoer.

(3) *Natural Oyster Grounds.*

Pub. Laws, cap. 853, passed March 23, 1901, "Of private and several oyster fisheries," is not in derogation of Cons. R.I., art. I, § 17: "The people shall continue to enjoy and freely exercise all the rights of fishery and the privileges of the shore," etc.

By the Revolution and acknowledgment of independence by the British government, this State succeeded to the public rights of British subjects, whether originally belonging to the crown or exercised by parliament, which rights were added to the rights derived from the charter, and the public rights formerly exercised by parliament came under the control of the legislature. After the adoption of the constitution of 1843, the legislature had these powers, less the power taken for the Federal government, and also less whatever powers were taken from it by the State constitution.

Prior to the adoption of the constitution, the rights of fishery were subject to the control of the General Assembly, and as by Cons. R.I., art. 1, § 17, the rights of the legislature were not abridged, the whole subject of fisheries is under the control of the legislature, and they may delegate the administration of their regulations to such officers as they see fit.

(4) *Leases of Oyster Grounds Not Subject to Collateral Attack.*

Leases of oyster grounds valid on their face, can not be attacked in a collateral proceeding.

(5) *Construction of Act Relative to Private Oyster Fisheries.*

Section 7 of chapter 853, of March 29, 1901, explained.

(6) *Construction of Act.*

In sections 13-17 of said act relating to applications for leases, the question is not to whom the land shall be leased, but *if* certain land shall be taken for private oyster fisheries. This is the only question which can be heard by the commissioners upon the application, or by the court upon appeal.

The question of to whom the land shall be let after surveying and platting, is within the discretion of the commissioners, from which no appeal is provided.

(7) *Construction of Act.*

The successive steps by which the leasing of oyster ground is to be accomplished under the act are:--

1. Application for lease, upon which notice is to be given of the time and place where the question, "shall the land be leased?" will be determined.

2. If no appeal is taken from this public question, the land is surveyed and platted into acre lots.

3. To whom shall the land be let? Decision of commissioners final.

4. Question of leasing land, lot by lot; whenever the minds of the parties concur in regard to the letting of a particular lot, an agreement to lease that lot is accomplished.

There is no limit to the number of acres that may be included in one lease if the agreements to lease the lots were separately made. The length of time consumed in making the agreements is of no consequence if they were made separately.

(8) *Validating Leases. Constitutional Law.*

As the leases in question were valid they needed no validating, and the court will not consider the constitutionality of the validating act, Pub. Laws, cap. 1574 of 1908.

**COUNSEL:** James C. Collins, Jr., Percy W. Gardner, for plaintiff.

Edwards & Angell, for defendant.

Walter F. Angell, Seeber Edwards, Francis B. Keeney, of counsel.

**JUDGES:** Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ. GREENE, C. J.

**OPINION BY:** DUBOIS; GREENE

**OPINION**

[*297] [**146] DUBOIS, C. J. This is an action of trespass on the case brought by the plaintiffs against the defendant to recover damages for injury to their oysters and quahaugs, and to their grounds, and for the expense of cleaning the same caused and made necessary by the deposit in the Providence river of tar, oils, and other deleterious substances manufactured by the defendant.

The plaintiffs' declaration is in five counts, whereof the first count reads as follows: "For that on, to wit, the first day of October, 1903, and on divers other days and times between that day and the commencement of [**147] this suit the defendant corporation was located and engaged in the business of the manufacture of illuminating gas and kindred products in the [***2] city of Providence having two gas works or plants located on the west bank of the Providence river; that in the process of the manufacture of said gas and kindred products large quantities of coal, petroleum, oils, and other materials were used; that from said manufacture of gas and kindred products large quantities of coal tar, water-gas tar, oils and other substances which are the products of and the refuse from the manufacture of illuminating gas and kindred products, were produced;

"That on, to wit, the days and times aforesaid said defendant discharged and suffered and allowed to escape from its premises to and into said Providence river, large quantities of said coal tar, water-gas tar, oils and other substances; that said coal tar, water-gas tar, oils and other substances floated in and upon the waters of said Providence river and were carried by the currents and tides in said Providence river down said river and were deposited in large quantities in the waters and on the bottom of said river and of the upper part of Narragansett Bay into which said river empties; that said coal tar, water-gas tar, oils, and other substances aforesaid are of a nature very injurious and poisonous [***3] to the healthy growth of all kinds of [*298] shell-fish which grow in said waters and with which they come in contact.

"That the plaintiffs on, to wit, the first day of October, 1903, and from that time to the time of bringing the suit were the holders and occupants of a large acreage of ground located under the waters of said Providence river and the upper part of Narragansett Bay; that said ground consisted of, to wit, three lots or parcels of land, the first of which is located on, to wit, the easterly portion of Great Bed, to wit, westerly and northerly of the Beacon, so called, the second lying northerly of Sabin's Point, and easterly of the channel; the third southerly of Sabin's Point and northerly of Crescent Park wharf and easterly of the channel, being in area in the aggregate amount of, to wit, twenty-eight acres; that said land was held by virtue of valid leases and granted by the State of Rhode Island to them for the purpose of growing shell-fish, and which were in full force and effect throughout all said times; that said ground during the time alleged was used and occupied by the plaintiffs being properly and sufficiently staked, marked, designated, and identified [***4] by said plaintiffs; that upon said ground the plaintiffs at the time aforesaid had a large quantity of oysters, quahaugs and other shell-fish upon said ground occupied, as aforesaid, which were the property of the plaintiff, being

in the amount of, to wit, forty thousand bushels; that they were engaged in the business of selling shell-fish and had a large trade and business which they supplied from the shell-fish upon said grounds; that said shell-fish were ready for the market and were being grown for the market, and said shell-fish and trade were of great value;

"That thereafter on said days and on the times heretofore alleged, said coal tar, water-gas tar, oils and other substances discharged, suffered and allowed to escape into the Providence river by the defendant corporation, as aforesaid, were carried down said river by said currents and tides and deposited in and upon said grounds used, and occupied by said plaintiffs as aforesaid and in and upon said oysters, quahaugs, and other shell-fish deposited on the grounds described as aforesaid, and [*299] greatly injured and destroyed the same, impairing their growth and rendering them unfit, for market; that said plaintiffs [***5] were at said several times engaged in the business of selling shell-fish and were dependent upon the shell-fish upon those grounds to supply their trade and customers; whereby and by means thereof said oysters, quahaugs and other shell-fish of the said plaintiffs were killed and destroyed, and covered by the said coal tar, water-gas tar, oils and other substances and the like, and greatly hindered in growth and value, and said plaintiffs were greatly hindered and prevented from taking, selling and marketing the same and were deprived of all the profits and benefits which would have arisen and accrued to them therefor, whereby and by means whereof said plaintiffs have suffered great loss and been greatly injured."

In the second count the cause of action is set out as follows: "The defendant failed to use due care and to take the necessary steps to prevent" the discharge and deposit of said substances in the Providence river. The plaintiffs, in this count, rely upon the leases of oyster grounds, which are set forth with considerable particularity, and then allege injury to their shell-fish growing upon the same.

The third count sets forth its cause of action in these terms: "That said [***6] defendant deposited and stored said coal tar, water-gas tar, oils and other substances which are the products of and refuse from the manufacture of gas, in and upon its premises, and its said plants near to and adjacent to said Providence river; that it failed to properly care for, control and guard said coal tar, water-gas tar and other substances, so as to keep the same upon its premises and to prevent their discharge and escape into the waters of the Providence river, but on the contrary on said days and times aforesaid it discharged the same and suffered, permitted and allowed the same to escape from its premises and to run into the waters of said Providence river." This count likewise declares upon the leases from the State and alleges injury to their shell-fish from these oils, water-gas tar and coal tar.

The fourth count differs in one material [**148] respect from the [*300] foregoing counts in not declaring upon the leases of oyster beds as the basis of recovery. The allegation of property in the shell-fish is made to depend on possession, and is set out as follows: "That the plaintiffs on to wit, the first day of October 1903 and throughout the period from that [***7] time until the commencement of this suit were the sole holders and occupants of a large acreage of ground of said Providence river and the upper part of Narragansett Bay covered by the tide waters of said river and bay; that said ground consisted of, to wit, three lots or parcels" (here follows specific designation); "that said ground when taken and accepted by them did not have other shell-fish growing upon it, but was free from the same; that said ground at the times alleged was used and occupied by the plaintiffs and was properly and sufficiently staked, marked, designated and identified by said plaintiffs, so as to clearly indicate the ground to which they claimed the use and possession for the planting and growing of oysters, quahaugs and other shell-fish and the gathering of the sets of oysters, quahaugs, and other shell-fish; that upon said ground occupied, as aforesaid, the plaintiffs at the said several times had a large quantity of oysters, quahaugs, and other shell-fish, which were the property of the plaintiffs, being in the aggregate amount of, to wit, forty thousand bushels." . . .

The fifth count likewise declares upon a possessory claim, irrespective of any leases [***8] from the State. The wrongful act, charged against the defendant, is set out in the same language as in the first count.

The defendant pleaded the general issue to each of the five counts, and also pleaded specially that the plaintiffs were not the owners of said oysters, quahaugs, and other shell-fish, thereby raising the question of the validity of the leases declared upon in the first, second, and third counts. The plea to the fourth count denies that the plaintiffs were the sole holders and occupants of the ground described in said count, and also denies that said ground was free from all shell-fish.

The plaintiffs' replications were formal, and on the issue thus joined the case proceeded to trial.

[*301] The verdict of the jury was in favor of the plaintiffs for $ 17,280. During the course of the trial numerous exceptions, to the introduction of testimony, to the charge of the court to the jury, and to his refusal to charge as requested, were taken by the defendant, and two constitutional questions were raised. After the rendition of the verdict the defendant filed its motion for a new trial, which was denied. The defendant has brought the constitutional questions to this [***9] court by certi-

fication from the judge presiding at the trial, as well as by bill of exceptions.

The constitutional questions so certified are as follows:

"First: Is said chapter 1574 in conflict with Section 10 of Article 1 of the Constitution of Rhode Island in so far as by validating said leases, it subjects the defendant to liabilities to which the defendant was not subject at the time of the commencement of this action?

"Second: Is said chapter 853 of the Public Laws, so far as it attempts to authorize the making of the leases in the declaration mentioned, in conflict with Section 17 of Article 1 of the Constitution of Rhode Island?"

The bill of exceptions filed in this court sets forth twenty-two grounds of exception, of which only the 1st, 2d, 3d, 4th, 15th, 16th, 18th, and 19th are now pressed. These exceptions are as follows:

"First: Refusal of the trial judge to grant the defendant's motion for a new trial, the motion so far as relied on in this court being based on the following grounds:

"1. That the verdict is against the law.

"2. That the verdict is against the evidence and the weight thereof.

"3. That the verdict is against the law and the evidence.

"4. That the [***10] damages assessed therein are excessive.

"Second: During the trial of said cause the plaintiffs offered in evidence a lease of oyster beds number 299 from the State of Rhode Island to William L. Sunderland, dated April 13, 1901; also lease of oyster beds numbered 454 from the State of Rhode Island to William L. Sunderland, dated August 1, 1902; also lease of oyster beds numbered 466 from the State of [*302] Rhode Island to Payne & Butler, dated January 24, 1903; also lease of oyster beds numbered 320 from the State of Rhode Island to Walter H. Butler, dated June 17, 1901, which said leases are marked respectively Plaintiffs' Exhibits 1, 2, 3, and 4. The defendant objected to the introduction of leases numbered 299, 454, and 320 on the ground that they were not leases made to the plaintiffs in this case, and there were no assignments thereof in writing; and to the introduction of all the leases on the ground that it did not appear that in making said leases or in agreeing to let the property covered by the leases, the shell-fish commissioners proceeded in accordance with the requirements of the statutes of the State, or that they acted within the jurisdiction conferred upon them [***11] by the statutes of the State. Further objection was made to the introduction of said leases, in so far as they were admitted on the ground that they had been validated by Chapter 1574 of the Public Laws, passed by the General Assembly of the State of Rhode Island at its January session, 1908, that said act was unconstitutional and void because it is in contravention of the first section of the 14th amendment of the Constitution of the United States, and also in contravention of section 10 of Article 1 of the Constitution of the State of Rhode Island; that said validating act is not by its terms or by any proper construction thereof retroactive. The presiding justice overruled [**149] the defendant's objections and allowed the leases to be introduced to which exception was taken.

"Third: The presiding justice allowed one of plaintiffs' witnesses to testify in regard to the amount of quahaugs and little-necks that were on the land known as the beds south of Sabin's Point which William L. Sunderland had leased from the State but which Payne & Butler claim to hold under a verbal arrangement with Sunderland, the purpose of such testimony being to lay a claim for damages by reason of [***12] injury to such quahaugs and little-necks. Objection was made to this testimony on the ground that the land in question was shown by the evidence introduced by the plaintiffs to be under a lease not to the plaintiffs, but to William L. Sunderland, and [*303] also on the further ground that it appears by the leases and by the statutes of the State that these lots were not leased for the cultivation of little-necks and quahaugs, but that they are and must be leased for the cultivation of oysters only.

"Fourth: The presiding justice permitted one of plaintiffs' witnesses to testify as to the market price of little-necks such as were grown on the Sabin's Point ground in the spring and summer of 1904.

"Fifteenth: At the conclusion of the evidence the counsel for the defendant moved that all leases heretofore introduced in evidence in behalf of the plaintiffs be stricken from the record on the ground that it appears from the testimony that the commissioners of shell-fisheries in making said leases did not act in accordance with the authority conferred upon them by statute. This motion was denied, to which exception was taken.

"Sixteenth: This ground of exception is based upon the [***13] refusal of the trial judge to give the following instructions as requested by defendant's counsel:

"'1. The plaintiffs cannot recover on the ground that they are lessees of any of the grounds described in the declaration, because the laws under which the alleged leases purport to be made are in contravention of Section 17 of Article 1 of the Constitution of the State of Rhode Island, and are therefore void.

"'II. The plaintiffs cannot recover on the ground that they are lessees of any of the grounds described in the

declaration and in the leases produced in evidence because the shell-fish commissioners, in making said leases, did not proceed in accordance with the requirements provided by the State authorizing them to make such leases, and the leases are therefore void.

"'III. The plaintiffs cannot recover on the ground that they are lessees of any of the grounds described in the declaration and in the leases produced in evidence because the shellfish commissioners had no jurisdiction or authority to make said leases.

"'IV. The injury suffered by the plaintiffs, if any, is an [*304] injury suffered by them in common with the general public; and they have no right of action [***14] for such injury.

"'V. The plaintiffs cannot recover for injury to quahaugs located on any of the premises described in their declaration.

"'VIII. The plaintiffs cannot recover for injury to quahaugs on land leased to W. L. Sunderland.

"'IX. The plaintiffs cannot recover for injury to quahaugs on land leased to W. H. Butler.

"'X. The plaintiffs cannot recover on the ground that the leases, although originally invalid, were made valid by the act passed at the January session, A. D. 1908, because

"' (1) There is nothing in said act which shows that it was intended to operate retrospectively as to the rights or liabilities of the defendant. And it cannot therefore be construed to operate retrospectively as to the rights and liabilities of this defendant.

"'(2) If the statute is construed to operate retrospectively as to the rights or liabilities of this defendant it is as to this defendant in violation of Article I, Section 10 of the Constitution of Rhode Island and of Article XIV, Section 1 of amendments to the Constitution of the United States, and is therefore void.'

"XV. If the jury find that the application of Payne & Butler which resulted in the lease to them offered in evidence [***15] was as follows: 'June 17. John S. Payne and W. H. Butler of East Providence make application for 21 acres of oyster grounds in the Providence river on Great Bed southerly of Starve Goat Island and near the same,' and that the notice published by the commissioners upon said application was as follows: 'John S. Payne and W. H. Butler, both of East Providence, make application for 21 acres of oyster grounds in said river on Great Bed, southerly of Starve Goat Island and near the same. Friday, July 4th, time of hearing. Friday, July 4, A. D. 1902, at, 10 o'clock at the office of commissioners of shell fisheries, State House, is hereby appointed the time and place for consideration of same. July 4th being a legal holiday, the above hearing to be held at the same time and place on the following day, July 5th, to which time and place [*305] the hearing will be adjourned.' And that the action of the Commissioners upon said application was as follows:--'Providence, Dec. 11, 1902. It was unanimously voted to grant the said application as applied for,' they should find that the lease is invalid.

"Eighteenth: The presiding justice charged the jury that Chapter 1574 of the Public Laws, January [***16] session, 1908, entitled, 'An act to validate existing leases of oyster grounds,' was effective to cure any defect or omission in the proceedings of the shell-fish commissioners in granting the leases in evidence, to which exception was taken.

"Nineteenth: The presiding justice charged the jury that the defendant has not produced sufficient evidence to show that the shell-fish commissioners did not act regularly or to rebut the presumption that they acted regularly, and that, therefore, the leases are valid, to which the defendant excepted."

In the consideration of the first exception, [**150] that the verdict is against the law and the evidence, and that the damages awarded are excessive, a brief statement of the facts may be of service:

It appears that some time before 1901 the plaintiffs had obtained possession of some small pieces of oyster land and were engaged in the business of oyster culture separately in a small way. About 1901 they began to carry on business jointly and to secure more ground. Walter H. Butler then held two acres of oyster ground south of Sabin's Point, under lease No. 320. In 1902 the plaintiffs sublet four acres of ground, adjacent to this ground, [***17] from W. L. Sunderland, who held it under lease No. 454. Previously John S. Payne had sublet, of said W. L. Sunderland, two acres of ground adjacent to this land located south of Sabin's Point. In consequence of this subletting, the plaintiffs were permitted by Sunderland to have the use of said ground for planting oysters and other shell-fish, for a consideration paid to him, and thereafter they entered upon the land and enjoyed this use. The plaintiffs planted all this ground--eight acres in all--lying south of Sabin's Point, with oysters and little-necks, or quahaugs, and used it generally [*306] as a private and several oyster fishery. It was buoyed, staked, and defined, as such grounds commonly are, so as to clearly define the ground so exclusively occupied and claimed by them. It was further shown by the plaintiffs that all the eight acres of ground which lay south of Sabin's Point and opposite Camp White had a hard mud bottom, the result of the ground having been used a few years before by the city of Providence as a dumping ground for the mud taken from the river in connection with certain excavations. The ground was not "a

natural oyster ground," and it did not have oysters [***18] and other shell-fish growing upon it naturally when it was occupied and planted by the plaintiffs, or either of them, or by W. L. Sunderland. The other piece of land occupied and planted by the plaintiffs at the time of the injuries complained of was a tract of twenty acres situated to the west and north, and near to the Beacon, so called, south of Starve Goat Island and west of the channel. This land was leased by the plaintiffs under lease No. 466. This ground was occupied by the plaintiffs in the fall of 1902, and was planted by them with a quantity of oysters of varying ages and sizes. This ground was buoyed off, marked, and designated by the plaintiffs in the customary manner adopted by all holders of oyster grounds in Narragansett Bay. It was occupied exclusively by the plaintiffs, and no claim was ever made of a right to occupy the same by any other person.

The defendant corporation was engaged in the manufacture of illuminating gas and its by-products in the winter of 1903-4, and up to the present time, for use in the city of Providence and adjacent territory. It was the only corporation there engaged in the manufacture of gas in any quantities, and the only one which had [***19] a gas plant located upon or near to the shore of any of the waters flowing through the city of Providence. The defendant had two plants,--one located upon the west bank of the Providence river, a little to the south of Point street bridge, known as the North Station, or the West Station,--either name being used,--and the other located on the west bank of the Providence river, but farther south, at the foot of Public street, and was known as the South Station. Prior to March 28, [*307] 1904, coal gas and water gas were manufactured at each of these two plants, though water gas was manufactured much more extensively at the South Station. The ground in the vicinity of the South Station, and especially immediately to the south of it, was "made" and composed chiefly of cinders, ashes, and general refuse matter. This is largely true of the ground upon which the South Station stands.

It is the injury caused by the escape of water-gas tar, and other injurious by-products and refuse from the manufacture of gas, from the plants of the defendant into the Providence river, and thence by means of the currents and tides to and upon the oyster beds and tide-flowed land of the plaintiffs, and [***20] the damages consequently following, of which the plaintiffs complain. The oyster beds and tide-flowed land of the plaintiffs are situated about two miles below the defendant's gas plants.

It appears that the winter of 1903-4 was a particularly severe one, and that the upper part of the bay and the river were frozen over in January, 1904, and remained so for some eight weeks or so, during which time the plaintiffs as well as other oyster men were prevented from taking oysters from the oyster beds on account of the freezing of the river. At the time they left off work in January, 1904, the oysters and little-necks were apparently in good marketable condition. But immediately upon resuming the work of catching oysters and little-necks in March and April, 1904, after the ice had broken up, some of the shell-fish were found to be dying, and the flavor of those which were not dying was so affected as to render them unmarketable. They had the peculiar flavor of gas, which is pungent, disagreeable, and so repellent to the taste as to make them uneatable. The escape of the water-gas tar and refuse matter into the river continued throughout the years of 1904 and 1905, and caused more or less [***21] damage to the shell-fish during both years.

The plaintiffs claimed damages for injuries caused to them, both by acts of commission and omission, on the part of the defendant corporation, to the following property: (1) to the [*308] oysters upon their several beds; (2) to the little-necks, or quahaugs, upon the [**151] beds; and (3) to the ground itself by rendering the same unfit for the planting of oysters and other shell-fish thereon, because of the settling upon it of water-gas tar and other by-products from the defendant's gas plant.

Water-gas tar is a peculiar and distinct chemical substance which is a by-product of the manufacture of water gas. Water gas, which of itself is non-luminous, requires the injection into it of carbons, and this is done by the use of a low grade of petroleum which is passed into a chamber containing the gas at a high temperature, where it is decomposed into a gas and mixed with the water gas, and thereby supplies the necessary particles of carbon to cause light when the gas is burned. From this process there is a refuse, which is collected when the gas is cleansed and cooled, which is known as water-gas tar. This substance has practically [***22] the same density which salt water of the upper waters of Narragansett Bay has. It will, therefore, float in suspense in the water for long distances before it settles. It was easily carried by the tides and currents to the plaintiffs' beds, and even farther south. Water-gas tar is of a viscous, or sticky, nature. It is repellent to the nature of the oyster, which will not admit it; and while this is present in the water in any quantity the oyster will not feed, and will therefore eventually starve itself to death. It also kills the vegetable organism in the water, which naturally exists in large amounts, and which furnishes the chief food upon which the oyster and other shellfish live. By this lack of food the oyster is starved and destroyed.

The defendant claimed: (1) that the oysters, etc., were killed by anchor ice; (2) that they were "drowned" by the heavy freshets of fresh water coming down the three rivers which flow into Providence river; (3) that the plaintiffs cannot recover for shell-fish which the plain-

tiffs had placed upon the ground sublet from W. L. Sunderland; and (4) that all the leases were void; and therefore the plaintiffs could not recover.

There was no dispute [***23] as to the market value of the oysters or little-necks. There was a dispute as to the amount of shell-fish [*309] which the plaintiffs claimed to have. The fact that the ratio of deaths among oysters and little-necks was from 50 per cent. to 75 per cent. in 1904, was not disputed.

The testimony further shows that all the ground lying south of Sabin's Point, was not a natural oyster or quahaug ground. The ground was free from either when it was buoyed, staked in, and occupied by the plaintiffs.

The defendant's chief defence is a claim that all the leases in issue are void through a failure on the part of the commissioners of shell fisheries to issue them in accordance with the terms of the law.

The validity of the defendant's first exception, based upon the refusal of the trial justice to grant the defendant's motion for a new trial, upon the ground that the verdict was against the law and the evidence, and that the damages awarded are excessive, depends upon the proof of title of the plaintiffs to the grounds and shell-fish thereon which are the subject of this controversy and the evidence relating to the connection of the defendant with the damage to said land and the impairment [***24] and destruction of the shell-fish thereon belonging to the plaintiffs. An examination of the transcript of testimony suffices to convince us that there is a strong preponderance of evidence in favor of the plaintiffs upon their contention that the oysters and quahaugs were injured and killed by water-gas tar and kindred products manufactured by the defendant and by it allowed to escape from its premises into the Providence river and public waters of the State. The defendant is not required by law to manufacture water gas or any other gas. It is permitted to manufacture either, for its own emolument and profit, but with the implied, if not express, limitation that it shall not become a public or private nuisance; that if it creates deleterious and poisonous substances, it will safely dispose of the same without injury to others. And any manufacturer who allows his deleterious waste product to contaminate the waters of the State, be they public or private, is liable to any person who is injured thereby in his private capacity and apart from being merely one of the public, provided he can trace to [*310] its origin the noxious substance whereby he is damaged. This the plaintiffs [***25] have done. The damage was proved to have been occasioned by water-gas tar coming from the premises of the defendant. They make and must confine and safely keep this and other dangerous and deadly products of their manufacture at their peril. Gen. Laws, 1909, cap. 144, § 6, reads as follows: "SEC. 6. No person or corporation shall deposit in, or allow to escape into, or shall cause or permit to be deposited in, or allowed to escape into, the waters of Providence or Warren harbors or Providence or Warren rivers, any material used in connection with, or product of, the manufacture of gas, which may cause disagreeable odors or defile the surface of vessels, boats, or other property, or the shores of said Providence or Warren harbors or rivers, or injure the healthy growth of fish or shell-fish in said waters. Every person or corporation violating the provisions of this section shall be fined for each offence one hundred dollars, one-half thereof to the use of the state, and one-half thereof to the use of the complainant. It shall be the duty of the harbor commissioners to prosecute cases under complaints brought in accordance with this section."

It is sufficiently shown that the defendant [***26] is responsible for the damage done, and there is ample evidence as to the amount of the damages. In these respects the verdict is [**152] supported by the evidence. But by the pleadings the title. of the plaintiffs is put in issue, and it is necessary for them to maintain the same by a fair preponderance of the evidence.

As to the property of the plaintiffs upon the eight acres of tide-flowed ground, lying south of Sabin's Point, sublet by W. L. Sunderland to the plaintiffs, none of which was a natural oyster or quahaug bed, and upon which the plaintiffs deposited oysters and quahaugs, otherwise known as littleneck clams, or little-necks, belonging to them, for the purposes of growth and culture of the same for the use and benefit of the plaintiffs, which land was buoyed, staked, and defined by them so as to give public notice, in the customary manner, of the fact that they had exclusive possession of the same for the purposes aforesaid, we are of the opinion that the plaintiffs [*311] have shown sufficient title by proof that they were in possession, under a claim of right, not disputed by any one claiming to have a better or other or any title to the same, and that by so [***27] depositing the shell-fish upon said land in the public waters of the State the plaintiffs did not abandon the same, but continued to maintain their possession of said shell-fish in a manner fully recognized and held to be sufficient from time immemorial. See *Fleet* v. *Hegeman*, 14 Wend. 42; *Brinckerhoff* v. *Starkins*, 11 Barb. 248; *Sutter* v. *Van Derveer*, 47 Hun 366, 122 N. Y. 652; *Cook* v. *Raymond*, 66 Conn. 285, 33 A. 1006; *Grace* v. *Willets*, 50 N.J.L. 414, 14 A. 559; *Decker* v. *Fisher*, 4 Barb. 592; *Wooley* v. *Campbell*, 37 N.J.L. 163.

In *Sutter* v. *Van Derveer, supra*, the plaintiff deposited small oysters in Jamaica Bay in a bed defined by stakes and buoys, and left them there to grow. Later, when he was raising them for the purpose of sending them to market, the defendant drove off the plaintiff's men and took possession of the oysters. Defendant at-

tempted to justify this action under a lease or license obtained from the Board of Auditors granted under a statute which authorized any inhabitant of Jamaica to use a portion of [***28] the land under the public waters of the town on which there was no planted bed of oysters for the purpose of planting oysters therein, and, provided the land was not a planted bed of oysters, such board was authorized to give the applicant a certificate or license. It was held that the certificate of the defendant did not cover the oyster bed of the plaintiff, because that was already planted and occupied. The court said, at page 367: "Jamaica bay is an arm of the sea, and its waters are tidal and public, and all the inhabitants of the State have a common right to the use of the same for navigation, fishing, and all other purposes of a public character, and the plantation of oysters in such waters is a legitimate exercise of such common right, and they remain the property of the person so planting them, and their conversion by another furnishes a cause of action to the owner. ( *Post* v. *Kreischer*, 103 N.Y. 110, 8 N.E. 365.) Oysters planted in tidal waters on a well-marked and clearly defined bed, where there were no natural oysters before, are the personal [*312] property of the planter and he may maintain an action for their conversion. *Fleet* v. *Hegeman*, 14 Wend. 42; [***29] *Decker* v. *Fisher*, 4 Barb. 592; *Lowndes* v. *Dickerson*, 34 Barb. 586. Oysters are classified in law with animals *feroe naturoe* in which a qualified property may be acquired, by possession, both by the civil and common law, and such property continues so long as the dominion of the owner is maintained. It is protected by the law to the same extent as an absolute property, and every invasion of the same is redressed in the same manner. When they are reclaimed or taken from their natural beds and collected together for the purposes of growth or multiplication, they cannot be retained in actual manual possession and they must be deposited in their native element, and so long as they remain within such control as will enable the owner to resume actual possession of them at his pleasure his ownership will continue. . . . Oyster beds are marked and defined by stakes and buoys to give notice to the world of the exercise of the common right to use the public waters of the State by the occupant, and that the oysters have not been abandoned. They are, when so planted, entirely within control; and the purpose is to taken them up at pleasure when they [***30] become suitable for the market. The traffic in oysters has become very expanded, and their cultivation has come to be a very extensive business. The oysterman plants his oysters in their natural soil and element with regularity, and expects to gather their growth with as much certainty as the farmer plants his grain in the soil, and expects to harvest and enjoy the crop; and, for all practical purposes, the title to the oysters is as valuable and certain as the title to grain or any other article of commerce."

We are further of the opinion that the defendant is in no position to question the possession of the plaintiffs in either the ground or the shell-fish, being a mere wrongdoer in the premises.

As to the other twenty acres of oyster ground, whereon oysters grew naturally, other and different questions are presented; and among them arises the question of the constitutionality of the legislation relative to the leasing of oyster grounds [*313] in this State. A consideration of the subject involves an inquiry into the nature of the right thereby granted. It has been decided that the privilege of locating oyster beds on public lands, and of planting and taking oysters therefrom, [***31] is merely a license which may be revoked at the pleasure of the legislature, and which ceases with the use of the land for that purpose. It is also subject to the public's right of navigation [**153] and of fishery, and if it interferes therewith, the oysters or clams, etc., may be removed as a nuisance. 19 Cyc. 998, and cases cited. Even if it should be regarded in this State as a license for a definite term, it is still but a license, for there is no right of renewal in the lessees at the expiration of their term. The defendant claims that "Pub. Laws, cap. 853 (passed March 23, 1901), as interpreted by the shell-fish commissioners in leasing the State oyster lands to the plaintiffs, is unconstitutional because it grants an exclusive fishery." This is a peculiar method of raising a constitutional question. There is only one body that is authorized to interpret the statutes of this State with the view of determining their constitutionality. Under article XII of the amendments to the constitution of the State, adopted in November, 1903, section 1: "The supreme court shall have final revisory and appellate jurisdiction upon all questions of law and equity." Furthermore, a statute [***32] is constitutional or not, as the case may be, without reference to the interpretation of any board or boards of commissioners. It is deemed to be constitutional until this court shall have decided that it is not. In answering the constitutional question sought to be raised we will consider the question to be whether said chapter 853 is in derogation of article I, section 17 of the constitution--"The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state. But no new right is intended to be granted, nor any existing right impaired, by this declaration." What rights, then, had the people under the charter and usages of this State? By the common law all persons have a common and general right of [*314] fishing in the sea, and in all other navigable or tidal waters; and no one can maintain an exclusive privilege to any part of such waters unless he has acquired it by grant or prescription. This right is subject to the paramount right of navigation, 19 Cyc. 992, and cases cited. According to some authorities the crown has no

power, since the [***33] passage of Magna Charta, to grant a several right of fishery in navigable tide waters, except where the right had already been enjoyed for some time prior to that statute. By other authorities, however, it is held that Magna Charta has no effect, and in no way restricts the power of the crown to grant such a several right of fishery, 19 Cyc. 994, note, and cases cited. There is no question made but that, since Magna Charta, the crown and parliament together could grant such a right. If we concede that under the charter from the crown this State received only such rights as the crown could grant, and even that under Magna Charta the crown could not grant an exclusive or several right of fishery, then the State indeed lacked the authority that remained in the parliament of Great Britain.

In *Lakeman* v. *Burnham*, 7 Gray 440, Chief Justice Shaw, referring to the cases of *Weston* v. *Sampson*, 8 Cush. 347; *Com.* v. *Alger*, 7 Cush. 53; and *Dunham* v. *Lamphere*, 3 Gray 268, said: "By these cases, we think the following propositions are well established: That by the Revolution, and by the acknowledgment of our independence [***34] by the British government, the State of Massachusetts succeeded to all public rights of British subjects, whether originally belonging by prerogative to the Crown, or exercised and administered by Parliament in due course of law; that by the charter of the colony of Massachusetts the people and settlers of the territory acquired not only the right of soil, but a right to the shores and arms of the sea, for all useful purposes of navigation and fishery; that since that charter no exclusive right of navigation or fishery, on the sea shores or in the bays or arms of the sea, could be acquired, *except under the authority of the colonial, provincial, or constitutional government, administered by the legislature by act or resolve.*" This reasoning is equally appropriate to the [*315] State of Rhode Island. As "by the Revolution and by the acknowledgment of our independence by the British government" this State "succeeded to all public rights of British subjects, whether originally belonging by prerogative to the Crown, or exercised and administered by Parliament in due course of law," the public rights to which we so succeeded were thereby added to the rights and powers derived from [***35] the charter, and the public rights and powers formerly exercised and administered by parliament naturally and necessarily came under the control of the legislature. So at that time we had the authority of both crown and parliament. And we continued to have that unrestricted until the adoption of the federal constitution. Thus, the legislature of this colony had from the date of the granting of the charter, July 8, 1663, to the time of the Revolution, 1776, or, according to Chief Justice Shaw, later to the date of the acknowledgment of our independence by the British government, the powers conferred by the charter; from the Revolution or the time of the acknowledgment of our independence to May 29, 1790, when we adopted the federal constitution, the legislature had the combined powers of crown and parliament, and thereafter until May, 1843, the date of the adoption of our constitution, the General Assembly had the full powers of crown and parliament less whatever power had been granted to the federal government. After the adoption of the State constitution the legislature had the powers of crown and parliament aforesaid, less the power taken therefrom for the federal government and [***36] also minus whatever powers were taken from it by the constitution of the State: "In every sovereign State, there resides an absolute and uncontrolled power of legislation. [**154] In Great Britain this complete power rests in the Parliament; in the American States it resides in the people themselves as an organized body politic. But the people, by creating the constitution of the United States, have delegated this power as to certain subjects, and under certain restrictions, to the Congress of the Union; and that portion they cannot resume, except as it may be done through amendment of the national constitution. For the exercise of [*316] the legislative power, subject to this limitation, they create, by their State constitution, a legislative department upon which they confer it; and granting it in general terms, they must be understood to grant the whole legislative power which they possessed, except so far as at the same time they saw fit to impose restrictions. While, therefore, the Parliament of Britain possesses completely the absolute and uncontrolled power of legislation, the legislative bodies of the American States possess the same power, except, first, as it may [***37] have been limited by the constitution of the United States; and, *second*, as it may have been limited by the constitution of the State. A legislative act cannot, therefore, be declared void, unless its conflict with one of these two instruments can be pointed out.

"It is to be borne in mind, however, that there is a broad difference between the constitution of the United States and the constitutions of the States as regards the powers which may be exercised under them. The government of the United States is one of *enumerated* powers; the governments of the States are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look in the national constitution to see if the grant of specified powers is broad enough to embrace it; but when a State law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the constitution of the United States or of the State we are able to discover that it is prohibited. We look in the constitution of the United States for *grants* of legislative power, but in the constitution of the State to ascertain if any *limitations* have been imposed [***38] upon the complete power with which the legislative department of the State was vested in its creation. Congress can pass no laws but such

as the constitution authorizes either expressly or by clear implication; while the State legislature has jurisdiction of all subjects on which its legislation is not prohibited. 'The law-making power of the State,' it is said in one case, 'recognizes no restraints, and is bound by none, except such as are imposed by the constitution.' That instrument [*317] has been aptly termed a legislative act by the people themselves in their sovereign capacity; and is therefore the paramount law. Its object is not to *grant* legislative power, but to *confine* and *restrain* it. Without the constitutional limitations, the *power* to make laws would be *absolute*. These limitations are created and imposed by express words, or arise by necessary implication. The leading feature of the constitution is the separation and distribution of the powers of the government. It takes care to separate the executive, legislative, and judicial powers, and to define their limits. The executive can do no legislative act, nor the legislature any executive act, and [***39] neither can exercise judicial authority." Cooley, Const. Lim. (7th ed.), p. 241.

Moreover, the question is no longer an open one, for it has been finally determined in this State. The case of *State* v. *Cozzens*, 2 R.I. 561, is decisive upon this point: "This was an indictment under the 'act for the preservation of oysters and other shell-fish within this State,' and charged the defendant with stealing oysters of the value of $ 40, from a private oyster bed in Narragansett Bay. The indictment was tried in the Court of Common Pleas, before Staples, J., and the defendant found guilty. The cause was brought before this court upon the following exceptions to the rulings in the court below, to wit:

"1. Because the defendant requested the court, by his counsel, to charge the jury, that the 8th, 9th, 10th, 11th, 12th, and 13th sections of the act, entitled 'an act for the preservation of oysters and other shell-fish in this State,' and the acts in amendment and explanatory of said act, were unconstitutional and void, and in violation of and repugnant to the 17th section of the declaration of certain Constitutional Rights and Privileges in the first article of the Constitution [***40] of this State, which section provides that 'the people shall continue to enjoy and freely exercise all the rights of fishery and the privileges of the shore to which they have been heretofore entitled under the charter and usages of this State;' which charge the court refused to give, but did charge the jury that said several acts [*318] and sections were constitutional and binding upon the citizens of this State.

"2. Because he offered evidence to show that the place where the said offence was alleged to have been committed is and has been freely enjoyed and used from the earliest settlement of this State to the time of the offence alleged in the indictment, as a common and public fishery, where the people of the State have been accustomed, under the charter and usages of this State, to fish for oysters and other shell-fish, which said evidence the court refused to allow to pass to the jury.

"3. Because the defendant offered to prove and did prove that the said places in the indictment mentioned had been freely used and enjoyed by the people of this State down to the commission of the said alleged offence, as a public and common quahaug fishery, and that said fishery for quahaugs [***41] has been interrupted, interfered with and destroyed by the planting of the oyster beds [**155] in question, and requested the court to charge the jury, that if they believed said beds did interfere with the public use and enjoyment of said quahaug fishery, then the act of the commissioners in leasing said beds was in violation of and repugnant to the said 17th section of said bill of rights, which charge the court refused to give.

"4. Because the defendant's counsel requested the court to charge the jury that no power to lease a natural oyster bed exists in the legislature of this State or in the commissioners by them appointed, and that any lease so executed is unconstitutional and void, which charges the court refused to give.

"5. Because the court refused to charge the jury that said acts and parts of acts, and the doings of the commissioners under the same are in violation of the principles of the common law.

"6. Because the court refused to charge the jury that no exclusive right could exist in the proprietors of any private oyster bed to take from said bed oysters, the natural growth of said bed, and that the defendants had a perfect right to take such oysters, so naturally [***42] growing on any natural oyster bed, [*319] without molestation, and that the crime alleged in said indictment could not be committed by taking any such natural oysters; but did charge that the proprietors of said bed had, under the lease granted by the said commissioners, the exclusive right to take oysters planted or naturally growing thereon.

"*Ames*, for the State.

"*Rivers*, for the defendant.

"GREENE, C. J., delivered the opinion of the court.

"We are of opinion that the Declaration of Rights and Privileges, contained in the seventeenth section of the first article of the constitution, was intended to be carried into effect by legislative regulation, such regulation having for its object to secure to the whole people the benefit of the constitutional declaration, and being necessary for that purpose. In pursuance of this object, the first section of the act, under which this indictment was preferred, provides that no oysters shall be taken from the common fisheries between the fifteenth day of

May and the fifteenth day of September; the second section prohibits the taking of quahaugs or clams from Long Bed, West Bed, or from Great Bed, during the same time; the third [***43] section provides that no person shall take from any public oyster bed more than three bushels in twenty-four hours, nor plant on a private bed oysters taken from a public bed; and section fourth prohibits the use of dredges in taking oysters. These sections restrict the right of fishery, and it will not be contended that they are unconstitutional. We refer to them to show that legislative restriction is indispensable to secure to the public the benefit of the oyster fishery.

"We will consider the exceptions in the order in which they are taken. The first comprehends the 8th, 9th, 10th, 11th, 12th, and 13th sections of the act in question. We will consider each of these sections. The 8th provides for the appointment of commissioners and defines in part their duty. If the General Assembly had power to make regulations upon this subject, we think they had power to appoint commissioners to carry those regulations into effect. The 9th and 10th sections [*320] provide for the leasing of land covered by the public waters for a private or several oyster ground or fishery, the commissioners taking special care not to include any old oyster bed, which in their opinion can for the greater [***44] advantage of the public be used as a free and common oyster fishery. The commissioners are required personally to inspect the land to be leased, and their decision, in granting the lease of an old oyster bed, is conclusive of the fact that such oyster bed can be used more to the public advantage as a private bed under lease than as a public bed. We understand the object of these sections is not the benefit of the lessees of the private bed, but, by holding out motives to them to plant and cultivate oysters, to secure to the public a more abundant supply. In other words, the constitutional right is so regulated as to reserve to the public the greatest benefit. The act also reserves a rent to the State. The 11th and 12th sections are necessary to protect the oyster beds of the lessees, and if the 8th and 9th are valid, these must be also. The 13th section provides for the time when the act shall go into effect. If the act be otherwise unexceptionable, this section is.

"The first exception also comprehends the act in amendment and explanatory of the act in question. We see nothing unconstitutional in that act.

"We think the ruling of the court, as stated in the second exception, was [***45] proper, If the offence had been committed on a private bed, it was immaterial whether or not the place had been used as a common and public fishery for oysters and other shell-fish.

"Neither can we sustain the third exception. If the private bed had been a common quahaug fishery, and said fishery had been interrupted, interfered with and destroyed by the planting of the oyster bed, this did not affect the validity of the lease of the oyster bed and the liability of the defendant for taking oysters therefrom.

"The remaining exceptions are disposed of in what we have already said.

"Exceptions overruled."

[*321] In the case of *State* v. *Medbury*, 3 R.I. 138, this court, referring to the constitution, art. 1, § 17, said: "This section of the constitution leaves the rights of fishery and privilege of the shore, where they were--it neither diminishes or adds to them."

In the case of *Clark* v. *Providence*, 16 R.I. 337, 340, [**156] 15 A. 763, which was a suit in equity for an injunction to restrain the defendant city from filling in part of the cove basin and from alienating or diverting the land surrounding said basin, now used as a public [***46] park, but formerly tide-flowed and reclaimed by filling, to other uses, this court said: "Second. The complainants ask an injunction, because they are citizens and residents of the city of Providence, and as such entitled to enjoy and freely exercise all the rights of fishery and privileges of the shore to which the people of the State have been heretofore entitled under the charter and usages of the State, and because the cove basin being covered by tide water, an act of the General Assembly authorizing the filling, or partial filling of it, is in derogation of these rights and privileges and in conflict with the Constitution, article 1, section 17. This section reads as follows: 'The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore to which they have been heretofore entitled under the charter and usages of this State. But no new right is intended to be granted, nor any existing right impaired, by this declaration.' It is clear that this section leaves the rights of the people as they existed previously to the constitution. It neither diminishes nor adds to them as was decided by this court in *State* v. *Medbury*, 3 R.I. 138. [***47] It is necessary, therefore, to know what the rights and privileges of the people were under the charter and usages of this State before the constitution was adopted, in order to decide whether they are infringed by the act of the General Assembly.

"The act must be taken to be constitutional unless the contrary appears: for in our opinion the General Assembly has in this matter the authority, not simply of the English crown, but of both crown and parliament, except so far as it has been [*322] limited by the Constitution of the State, or by the Constitution and laws of the United States. *Gould* v. *Hudson R. R. Co.*, 6 N.Y. 522; *The King* v. *Montague*, 4 B. & C. 598. There is little in the Rhode Island Reports to enlighten us on this point. In *State* v. *Medbury*, 3 R.I. 138, the court held that the pro-

vision of the colonial charter, in regard to fisheries, does not relate to the shell fisheries of the State, but was designed to continue to the people of New England the right more especially to prosecute the cod fishery in Rhode Island waters, as they had been accustomed to prosecute it before the charter was granted. In [***48] *State* v. *Cozzens*, 2 R.I. 561, the court held that the General Assembly has power to lease portions of the tidewaters of the State for private oyster fisheries to the complete exclusion, for the exercise of the shell fisheries thereon, of all but the lessees, even though the leases include portions of natural oyster and quahaug grounds, notwithstanding said section 17. Neither of these decisions give any support to the claim of the complainants, but, so far as they bear, are adverse to it. It is common knowledge that the citizens of the State have always been accustomed to dig clams freely along the shores of the bay and river wherever they could be found, and, subject to some legislative regulations, to fish in the deeper waters; and because this has been so, and because formerly citizens were accustomed to clam and fish in the cove, the complainants take it for granted that they are entitled, under section 17 to clam and fish there in the same manner forever, and that therefore any act of the General Assembly which authorizes the filling, or partial filling of the cove, thus lessening their ability to do so, must be unconstitutional and void. But it is also common [***49] knowledge that there are many places where fish and clams were formerly taken which are now solid land made by filling out the shores, either with the tacit acquiescence or with the implied or express consent of the General Assembly. The acts of the General Assembly establishing, or authorizing the establishing, of harbor lines, some of which existed before the constitution, Digest of 1822, pp. 484, 485, go to show that the assumption of the complainants is too broad, and that these [*323] rights of clamming and fishing are enjoyed in subordination to the paramount authority of the General Assembly to regulate and modify, and, to some extent at least, to extinguish them."

Prior to the adoption of the State constitution the legislature of the State had full authority to grant exclusive rights of fishery in the public waters of the State. And in at least two instances they exercised this right, as appears from the following "Charter to L. Wilcox and E. Carpenter," granted January, 1822: "Whereas Leonard Wilcox and Earl Carpenter have preferred their petition to this Assembly, setting forth that they have made arrangements for importing and keeping on hand a regular supply of oysters [***50] for the use of the inhabitants of the town of Providence and its vicinity, and prayed that an act may be passed securing to them the exclusive right to take oysters on a piece of ground in Providence river, to be by them cultivated, and improved by them for that purpose:

"SECTION 1. *Therefore, be it enacted by the General Assembly, and by authority thereof it is enacted:* That the said Leonard Wilcox and Earl Carpenter, their heirs, executors, administrators, and assigns, may and they are hereby authorized and empowered to, import from without this State, and deposit for growth and increase, on the piece of ground, situated in Providence river, to be hereafter more particularly described, such quantities of oysters as they may think proper, not less, however, than three hundred bushels per year; and to have and enjoy the entire and exclusive right to fish and take oysters from the same; that the piece [**157] of land or flat on which the said oysters shall be deposited and taken as aforesaid shall be located by George Field, and Philip Allen, Esquires, who are hereby appointed a committee for that purpose, and are hereby authorized to set off and locate two acres of land or [***51] flat in such part of Providence river as they may think proper to be improved by them, the said Wilcox and Carpenter, for the purposes aforesaid: and to make their report into the secretary's office when and in what manner they shall have located the same.

"SEC. 2. *And be it further enacted*, that any person or [*324] persons who shall fish for and take oysters on such piece of land or flat as said committee shall locate as aforesaid, shall forfeit and pay, for every such offence, to and for the use of the said Wilcox and Carpenter, their heirs, executors, administrators, or assigns, a sum not less than ten nor more than fifty dollars, to be recovered by action of debt in any court proper to try the same; and the boat or boats, with the other fishing tackle employed in taking such oysters, shall be forfeit: *Provided, however*, that before any oysters shall be deposited on said piece of ground, to be located by said committee as aforesaid, the said Wilcox and Carpenter, their heirs, executors, administrators or assigns, shall erect and cause at all times during the continuance of this act to be kept up, at each of the two corners of said piece of land or flat nearest the [***52] shore, a permanent post, with painted boards on each post, with hands pointing towards the bounds of the said piece of land or flat, and with the penalty for fishing thereon, painted in legible letters on each board; and whenever the said posts and boards shall not be kept up in manner as aforesaid, the said Wilcox and Carpenter shall not be entitled to recover the forfeitures aforesaid; and any person or persons who shall pull down or damage such posts or boards or shall make fast any vessel or boat to them, shall be liable to pay a sum not less than two nor more than ten dollars, to, and for the use of the said Wilcox and Carpenter as aforesaid, to be recovered as aforesaid: *And, provided, also*, that the said Wilcox and Carpenter shall first agree with the owner or owners of the adjacent land or shore: *And provided, further*, that nothing in this act shall prevent the

owner or owners of said shore from erecting any wharf or wharves thereon.

"SEC. 3. *And be it further enacted*, that this act shall continue in force for seven years, and no longer.

"SEC. 4. *And be it further enacted*, that if the said Leonard Wilcox or Earl Carpenter, or either of them, shall take, or [***53] cause to be taken, any oysters, in any part of this State, without the limits of said two acres, after such limits shall have been defined by the committee aforesaid, and for the purpose of depositing said oysters, so taken, within said limits, and shall so deposit [*325] the same within said limits, the said Wilcox and Carpenter, or either of them so taking and depositing as aforesaid, shall forfeit and pay a sum not less than ten nor more than fifty dollars; to be recovered by action of debt in any court proper to try the same; one moiety of said sum to and for the use of any person who shall sue for and recover the same, and the other moiety thereof to and for the use of the State.

"SEC. 5. *And be it further enacted*, that this act, together with the report of the committee locating and defining the limits of the two acres of land or flat, as hereinbefore required, shall be published in one of the newspapers printed in Providence, three weeks successively."--and also in "An Act to authorize Ephraim Gifford to plant a bed of oysters in Mount Hope Bay," passed at the October session, 1827, as follows: "SECTION 1. *Be it enacted by the General Assembly, and by the authority* [***54] *thereof it is enacted:* That Ephraim Gifford, of Bristol, in this State, and his heirs, executors, administrators and assigns, shall be and hereby are authorized to import from without the same, and deposit, for growth and increase, on a certain piece of ground situated in Mount Hope Bay, and contiguous to common fence point, near the mouth of town pond creek, not exceeding forty rods along the shore of said point, nor twenty rods from low water mark, towards the channel of said Bay, such quantities of oysters as he or they may think fit, not less, however, than fifty bushels; and the said Gifford, and his said representatives, shall have and enjoy the exclusive right to take oysters from the said piece of ground for the period of ten years from the passage of this act.

"SEC. 2. *And be it further enacted*, that any person or persons who shall fish for and take any oysters on said piece of land, until the expiration of said ten years, shall forfeit and pay for every such offence, to and for the use of said Gifford, or his said representatives, the sum of ten dollars, to be recovered in an action of debt, before any justice of the peace in the county of Newport or Bristol; and the [***55] boat or boats, so employed in taking any such oysters, shall be forfeited: *provided, however*, that before any oysters shall be deposited on said [*326] piece of ground as aforesaid, the said Gifford shall erect and cause to be kept up, at each of the corners of said piece of ground, a buoy or a permanent post, with a painted board on each post or buoy, with a hand thereon pointing inward, to designate the spot, with the penalty for fishing for oysters thereupon; and whenever said posts or buoys shall cease to be kept up, neither of said penalties shall be incurred; and any person or persons who shall remove, pull down or destroy, or in any way damage either of said posts, buoys, or [**158] boards, shall forfeit and pay the sum of ten dollars, to be recovered and appropriated as aforesaid: *provided, however*, that before any part of this act shall take effect, said Gifford shall obtain the consent of the owner or owners of the land on the shore adjoining the said piece of land, for the appropriation thereof as aforesaid.

"SEC. 3. *And be it further enacted*, that if the said Gifford, or any one or more of his said representatives, shall take or cause to be taken any [***56] oysters in any part of this State, without the limits of said piece of land, for the purpose of depositing the same thereon, he or they, as the case may be, shall forfeit and pay, to and for the use of this State, the sum of twenty dollars for every such offence, to be recovered in an action of debt, in any court proper to try the same.

"SEC. 4. *And be it further enacted*, that this act shall be published in the newspaper printed at Warren, and in one of the newspapers printed at Newport, three weeks successively before the same shall take effect."

These are instances of the manner in which the legislature exercised its powers over the rights of fishery, to which the people were entitled under the charter and usages of the State, and illustrate the fact that they were subject to the control of the General Assembly. The rights which the General Assembly had in 1822 and 1827 were not abridged by the foregoing provisions of article 1, section 17, of the constitution, for it is expressly stated therein *"no new right is intended to be granted, nor any existing right impaired, by this declaration."* In other words, no change was made. No greater privileges were reserved to the people [***57] than they already had, and no powers or [*327] rights of the General Assembly were thereby abridged. Therefore the whole subject of fisheries, floating and shell-fish, and all kinds of shell-fish, whether oysters, clams, quahaugs, mussels, scallops, lobsters, crabs, or fiddlers, or however they may be known and designated and wherever situate within the public domain of the State of Rhode Island, are under the fostering care of the General Assembly. It is for the legislature to make such laws, regulating and governing the subject of lobster-culture, oyster-culture, clam-culture or any other kind of pisciculture, as they may deem expedient. They may regulate the public or private fisheries. They may even prohibit free fishing for a time and for

such times as in their judgment it is for the best interest, of the State so to do. They may withhold from the public use such natural oyster beds, clam beds, scallop beds or other fish beds as they may deem desirable. They may make a close time within which no person may take shellfish or other fish, and generally they have complete dominion over fisheries and fish as well as all kinds of game. We find no limitation, in the constitution, [***58] of the power of the General Assembly to legislate in this regard, and they may delegate the administration of their regulations to such officers or boards as they may see fit. Considered in this light, chapter 853, aforesaid, is not obnoxious to the constitution. The defendant's second exception must be overruled. The leases therein mentioned were not subject to attack in a collateral proceeding. The leases are valid on their face. The defendant can not, therefore, attack their validity collaterally. The validity of such grants can only be attacked by a proceeding in equity or in proceedings between those who are claiming title to the same property but through different grants. If good upon its face, then the defendant who makes no claim to the title is bound by it. It is not harmed in its own property rights and it can not go behind the lease.

The presumption is that the lease is valid if good upon its face, and it is presumed that the acts of the judicial body which granted it are all valid. "*Omnia proesumuntur rite et solemniter* [*328] *esse acta.*" They are presumed to know the law and to have followed it in case of each necessary step. This presumption is necessary for [***59] the security of titles. It is easy to understand how very uncertain all titles would become if they were subject to collateral attack. Such a rule would practically allow new and distinct issues to be raised and tried within a case. This is not the policy of the law. It would tend to unsettle titles, and lay them open to frequent and unexpected attacks. Grants are evidences of title of a higher order than the ordinary transfer of property rights, and should not be thus subject to collateral attack. The law has wisely placed this safeguard about this form of conveyance in order that titles may have stability and security. The justice of the Superior Court was right when he admitted those leases, as they were valid on their face, and the defendant did not raise a question as to anything appearing upon the face of the instruments. It attempts to attack the leases by going behind the face of the instrument and attacking the actual transactions. As a third party and a stranger to the title, and one who makes no claim to the title, it can not raise this issue.

The principle that a grant or patent from the State cannot be collaterally attacked and can be questioned only in a direct proceeding [***60] in equity, unless the grant is void upon its face, is a rule of law which has been recognized throughout the history of jurisprudence in this country, and has received general recognition by the various States in the Union. As early as 1815, Marshall, C. J., in *Polk's Lessee* v. *Wendal et al.*, 9 Cranch 87, 3 L. Ed. 665, approved the principle in the following words (p. 98): "The laws for the sale of public lands provide many guards to secure the regularity of grants, to protect the incipient rights of individuals, and also to protect the State from imposition. Officers are appointed to superintend the business; and [**159] rules are framed prescribing their duty. These rules are in general directory and when all the proceedings are completed by a patent issued by the authority of the State, a compliance with these rules is pre-supposed. That every prerequisite has been performed, is an inference properly deducible and which every [*329] man has a right to draw from the existence of the grant itself. It would therefore be extremely unreasonable to avoid a grant in any court for irregularities in the conduct of those appointed by the government to supervise [***61] the progressive course of a title from its commencement to its consummation in a patent." And concluded by stating that any review of such a grant is a matter of equitable jurisdiction unless the grant is absolutely void upon its face. This has continued to be the rule recognized by the federal courts. *Chandler* v. *Calumet, etc., Min. Co.*, 149 U.S. 79, 37 L. Ed. 657, 13 S. Ct. 798; *Patterson* v. *Winn*, 11 Wheat. 380, 6 L. Ed. 500; *Bealmear* v. *Hutchins*, 148 F. 545; *Oliver* v. *Pullam*, 24 F. 127.

In *New York Central & Hudson River Ry. Co.* v. *Aldridge*, 135 N.Y. 83, 32 N.E. 50, which was an action to recover land, both parties to the suit claiming title through patents from the State, but defendant's patent having been granted prior to plaintiff's in point of time, the plaintiff contends that, although the defendant's patent was prior in time, it was invalid because the defendant was not the owner of the adjoining upland, and that consequently it could not obtain a grant to the particular lands in question, being lands under tide water, and the statute making it necessary to own the upland [***62] in order to have a valid title to the tide-flowed lands. The court says, at page 91: "The patent to the defendant being prior in point of time to that granted to plaintiff, would seem to make the title of the defendant the better of the two. The plaintiff answers this by stating that the defendant was not the owner of the adjoining upland, and consequently could not legally obtain a grant of these lands under water. . . . The simple claim that the patent of the defendant is void because he was not the upland proprietor (even if well founded in fact), *could not be urged in this action, which is a purely legal one*, to obtain possession of real estate on the ground that plaintiff is the owner thereof. There is no fact set up in the complaint calling for the exercise of the equitable powers of the court, and the plaintiff must succeed by showing the better legal title. It has been *frequently held that a patent*

*such as this, which is not void on its face, and which required evidence dehors the instrument to show its invalidity,* [*330] *can only be assailed in a direct proceeding to review the action of the commissioners, or by an action in equity to set aside the patent.* ( *Blakslee Co.* v. *Blakslee's Sons Iron Works*, 129 N.Y. 155, 29 N.E. 2, [***63] and cases cited.) The claim that defendant could not legally obtain a grant of these lands because not the owner of the upland, is thus disposed of, so far as this action is concerned."

The rule is re-asserted in *Archibald* v. *N. Y. C. & H. R. Ry. Co.*, 157 N.Y. 574, 52 N.E. 567, where plaintiff's title from the State was attacked because it was granted upon certain conditions, and it was contended that these conditions had not been complied with. The court says (p. 581): "It is said that the grantees did not apply the property to any such uses within the time specified, and we will assume that that is so. But this does not enable the defendant to treat the prior patent as invalid or void, or permit an attack upon it in a collateral way. If there had been a breach of the conditions subsequent in the grant, the defendant is not at liberty to take advantage of that omission. The State only can claim the right to vacate the patent for breach of conditions subsequent, and then only in a direct action or proceedings for that purpose. The defendant can raise no such question in this court." *Brady* v. *Begun*, 36 Barb. 533; *Morgan* v. *Turner*, 35 Misc. 399, 71 N.Y.S. 996; [***64] *Blakslee Mfg. Co.* v. *Blakslee's Sons Iron Works*, 129 N.Y. 155, 29 N.E. 2; *Jackson* v. *Marsh*, 6 Cow. 281; *Jackson* v. *Hart*, 12 Johns. 77; *Jackson* v. *Lawton*, 10 Johns. 23.

In *Houston et al.* v. *State*, 124 Ga. 417, 52 S.E. 757 (1905), which was an indictment charging the taking of oysters from the private bed of the complainant, the defendant attempted to justify on the ground of no title in the complainant, by stating that the State could grant only inhabitable or cultivable land. The deed under which the complainant held had attached to it a plat which was marked "marsh land." The court, after stating that such a patent could not be collaterally attacked unless it was apparent on its face that it was void, and stating, further, that the mere fact that the words "marsh land" appearing on the face of the document was not sufficient to say that it was [*331] not issued in accordance with law, says, at page 419: "When the application for the grant was before the ordinary his decision that the land could be lawfully granted was judicial in its nature, and it is entitled to all the [***65] presumptions which usually attach to judgments rendered by a court of competent jurisdiction." And in replying to the contention that the grant was procured by fraud, the court says: "The fraudulent procurement of the grant would not authorize a collateral attack upon it. Only in a direct proceeding to which the State was a party could it be set aside on the ground that it was improvidently granted or was procured by fraud. *Calhoun* v. *Cawley*, 104 Ga. 335, 30 S.E. 773. Even if the grant was not authorized by law, it is not open to collateral attack, its illegality not appearing on its face. *Vickery* v. *Scott*, 20 Ga. 795. It [**160] follows that the grant was properly admitted in evidence." *Patterson* v. *Buchanan*, 37 Ga. 560; *Tison* v. *Yawn*, 15 Ga. 491; *Sykes* v. *McRory*, 10 Ga. 465; *Winter* v. *Jones*, 10 Ga. 190.

In *Chauvin et at.* v. *Louisiana Oyster Commission et al.*, 121 La. 10, 46 So. 38 (1907), the opinion shows that the oyster commission of Louisiana was given jurisdiction by a broad statute over all beds of rivers, lakes, bays, sounds, [***66] etc., and the shell-fish growing thereon, with power to lease the same. The commission attempted to lease land which the plaintiff held under a title from the State. The commission in its official capacity attacked the plaintiff's title on the ground that a portion of the tract conveyed to the plaintiff consisted of tide-flowed land; that such land could not legally have been conveyed to the plaintiff by the State, and that therefore the commission had jurisdiction over this land and might lease it. The court says (p. 15): "The answers to this contention are (1) that neither the State nor any of its agents can attack its solemn patent, valid on its face, in a collateral proceeding."

If the commission, a legally constituted agent of the State, could not in this capacity attack the validity of such a title, certainly an entire stranger to the title, and particularly a wrongdoer, could not come in and make such an attack.

In *American Assn. Limited* v. *Innis etc.*, 109 Ky. 595 (1901), [*332] which was an action to enforce a vendor's lien, it was alleged that the patents issued to the defendant were fraudulent, etc., and that the conditions precedent to granting [***67] the title required by the statute, had not been conformed to. Among others was a condition that not more than 200 acres should be granted to any person. A former opinion of the court had held, in the face of this statute, that any person might file any number of orders or requests for surveys for 200-acre strips. The court says that, while such an interpretation does not seem to it to be altogether reasonable, yet the fact that many persons have acted upon it and thereby acquired more than 200 acres apiece, and that consequently vast vested interests having been built up and so many innocent persons would be injured by upsetting the opinion, that they will not disturb it. See page 606. The court further says, at page 607: "It is settled law that the validity of a patent cannot be inquired into in a collateral proceeding, unless the patent is void upon its face, or has been issued under such circumstances as the statute declares to be fraudulent. . . . Another point relied on, is that appellees could not acquire title by merely surveying

a base line and then platting the entries upon this line. . . . The identical question was raised and construed in the case of *Cain* v. *Flynn*, 4 Dana 499. [***68] It was held that a patent could not be questioned collaterally on this ground or parol evidence admitted to show the fact." *Frazier* v. *Frazier*, 81 Ky. 137; *Little* v. *Bishop*, 9 B. Mon. 240; *Taylor* v. *Fletcher*, 7 B. Mon. 80; *Hardin* v. *Cain*, 2 B. Mon. 56; *Underwood* v. *Crutcher*, 7 J.J. Marsh. 529; *Jennings* v. *Whitaker*, 4 T.B. Mon. 50; *Allen* v. *Pulliam*, 66 S.W. 722; *Uhl* v. *Reynolds*, 64 S.W. 498.

In *American Dock & Improvement Co.* v. *Trustees of Public Schools*, 39 N.J. Eq. 409, the court adopts for that State the law as laid down by Marshall, C. J., in *Polk's Lessee* v. *Wendal*, 9 Cranch 87, 3 L. Ed. 665.

In the case of *Harrington* v. *Goldsmith*, 136 Cal. 168, 68 P. 594, which was a partition suit, the defendant denying that either the plaintiff or himself was owner of any part of the land, questioning accuracy of the description in the patent, etc., the court [*333] says, at page 169: "The patent from the State of California, which included the lands in question, [***69] was evidence of the title of the grantees therein, and was admissible in evidence in support of the plaintiff's claim. It was not void upon its face, and could not be attacked collaterally for any irregularity of proceedings upon which it was issued. See *Doll* v. *Meador*, 16 Cal. 295." *Peabody* v. *Prince*, 78 Cal. 511, 21 P. 123; *Worcester* v. *Kitts* (App.), 96 P. 335.

In *Martin* v. *Brown*, 62 Tex. 485, 488, the court held: "Generally if a patent has been issued by an officer authorized to grant it, and whose duty it was to examine and pass upon the evidence upon which it was issued, and some irregularity or illegality has supervened in the preliminary proceedings, the patent could only be impeached therefore by the State or some individuals having an equity in the land at the time the patent issued. *Todd* v. *Fisher*, 26 Tex. 239." *Carter* v. *Clifton*, 44 Tex. Civ. App. 132, 98 S.W. 209; *Heil* v. *Martin* (Civ. App. 1902), 70 S.W. 430; *Greenwood* v. *McLeary* (Civ. App. 1894), 25 S.W. 708. The presumption is in favor of the regularity [***70] of the grant. There is also a strong presumption that duly constituted officials will perform their official duty, and that all proceedings by them are regular. Wigmore states the rule in section 2534, where he says: "The general experience that a rule of official duty, or a requirement of legal conditions, is fulfilled by those upon whom it is incumbent has given rise occasionally to a presumption of due performance. . . . It may be said that most of the instances of its application are found attended by conditions: First, that the matter is more or less in the past, and incapable of easily procured evidence; secondly, that it involves a mere formality, or detail of required procedure, in the routine of a litigation or of a public officer's action; next, that it involves to some extent the security [**161] of apparently vested rights, so that the presumption will serve to prevent an unwholesome uncertainty; and finally, that the circumstances of the particular case add some element of probability."

A similar principle was laid down in the case of *State* v. *Board of Aldermen*, 18 R.I. 381, 28 A. 347, with regard to official acts, [*334] when the court said [***71] (p. 382): "The rule is well established that if an inferior court has jurisdiction, every intendment is to be made to support its judgment. . . . The principle applies equally to statutory tribunals as to courts, and on certiorari to review the proceedings of commissioners, boards or other officers, the presumptions are all in favor of their rightful action, and of their proceeding in a manner authorized by law."

The courts are nearly all of one opinion upon this question. The patent or lease from the State is treated as of a higher order than an ordinary grant of an individual. This rule is a necessary and essential rule to quiet titles, and prevent such attacks as are attempted to be made in this case. For the same reason, every presumption is made in favor of the acts of all State bodies having judicial powers. There would never be a certainty in any property resting upon a grant, if every stranger could attack its validity.

Furthermore, if the proceedings of the shell-fish commissioners could be inquired into in this proceeding, it could only be with reference to the twenty acres of ground on Great Bed. We have examined the record regarding the action of the shell-fish commissioners [***72] in respect of the letting, and find no illegality or irregularity in the same.

Summarized, the objections of the defendant may be said to be, the lease is void because:

1. The commissioners agreed to lease more than one acre at a time to one firm.

2. The commissioners violated the statute, in making the lease, by receiving, advertising, and granting an application for a lease of lots in bulk, instead of requiring, advertising, and granting leases upon separate applications for each lot of one acre.

3. The shell-fish commissioners violated the law in agreeing to lease, and in leasing, the twenty-one acres to Payne & Butler, on one and the same day.

4. The commissioners failed to give notice, in the advertisement, of the day, hour, and place where the land will be let.

[*335] The claim of the defendants is based upon an entire misapprehension of the object and scope of the

statute (Pub. Laws, cap. 853, passed March 29, 1901), which reads as follows:

'SECTION 1. There shall be elected by the general assembly, in grand committee, five commissioners of shell fisheries, one from each county, who shall hold office for the term of five years and until their successors, respectively, [***73] shall be elected and qualified to act. Any vacancy that may occur in said offices while the general assembly is not in session may be filled by the governor until such time as some person elected by the general assembly, in grand committee, to fill such vacancy, shall be qualified to act. Any person elected by the general assembly to fill such vacancy shall hold office for the unexpired term of the person whose place he is elected to fill. They shall have power and authority to elect a clerk and prescribe his duties: *Provided*, that nothing in this act shall be so construed as to affect the tenure of office of the present commissioners of shell fisheries, who shall continue to hold their offices for the terms for which they were elected.

"SEC. 2. The said commissioners, previous to entering upon the duties of their office, shall severally give a bond, with sureties satisfactory to the general treasurer, in the sum of one thousand dollars, with condition to faithfully perform the duties of the office according to law.

"SEC. 3. The said commissioners shall make annual report to the general assembly, at its January session, of their doings and the condition of this department of [***74] the public service, including a detailed statement of all moneys received and expended on account thereof.

"SEC. 4. The said commissioners shall have an office in the state house in the city of Providence, where the maps, charts, books, leases, and other property connected with said commission shall be kept.

"SEC. 5. Each of said commissioners shall, by virtue of his office, make complaints for any violation of the laws of this state relating to shell fisheries, and of any subsequent amendments thereof, without giving recognizance or surety for costs.

[*336] "SEC. 6. The said commissioners may appoint such deputies as they shall deem necessary for the detection and prosecution of any violation of the laws of this state relating to shell fisheries. Each of said deputies appointed as aforesaid shall be, by virtue of his office, a special constable, and as such deputy may, without warrant, arrest any person found violating any of said laws, and detain him for prosecution not exceeding twenty-four hours, and may seize any boat or vessel used in such violation, together with her tackle, apparel, and furniture, and all implements belonging thereto. Said commissioners may make all [***75] necessary regulations for the enforcing of said laws, and they shall be allowed their actual disbursements made in carrying the same into effect.

"SEC. 7. Said commissioners may, unless otherwise by statute prohibited, agree to lease in the name of the state, by public auction or otherwise, to any suitable person, being an inhabitant of this state, any piece of land within the state, covered by four feet of tide-water at mean low tide as delineated upon the plats in the office of commissioners of shell fisheries, and not within any harbor line, to be used as a private and several oyster fishery for the planting and cultivation of oysters thereon, upon such terms and conditions as they may deem proper, but not for a [**162] longer term than ten years or for a shorter term than five years, nor for a rent of less than ten dollars per annum for every acre to be leased, where the water is of the depth of less than twelve feet at mean low water, as shown on the plats in the office of the commissioners of shell fisheries, and not agreeing to lease more than one acre at a time in one lot or parcel to one person or firm; but in drawing such leases said commissioners may include in the [***76] instrument of lease one or more acres of land so leased by them, and all such leases shall be made and executed free of expense to the lessees; and neither of such commissioners shall at any time be interested in any lease of ground for planting oysters, or in the cultivation or product thereof: *Provided, however*, that in Little Narragansett Bay, and in Pawcatuck river below "Pawcatuck rock," so-called, the said commissioners may let such land on terms as to time and rentals as may seem to them best.

[*337] "SEC. 8. The said commissioners may let and lease any lands within the state covered by tide-water where the said water is of the depth of at least twelve feet according to the plats in the office of the commissioners of shell fisheries at the average low water, for the purpose of having the said land used in planting and cultivating oysters in the deep waters of Narragansett bay and tributaries, at an annual rental of not less than five dollars per acre, for a term not exceeding ten years from such letting.

"SEC. 9. Any person who shall wrongfully make claim to any public oyster ground, of which he has no lease or title from the state, by erecting bounds or monuments [***77] thereon of any description, or otherwise claiming title to such land, shall for the first offence pay a fine of twenty dollars and costs, and for every subsequent offence pay a fine of fifty dollars and costs, one-half thereof to the use of the state and the other half to the complainant.

"SEC. 10. The said commissioners shall cause the original surveying and platting of all lands for planting and cultivating oysters under provisions of this chapter to be done at the expense of the state and without charge to the lessees; and the state auditor shall draw his order for the payment of said surveys and platting upon the general treasurer, upon properly presented vouchers approved by said commissioners, and the general treasurer shall pay said orders, out of any moneys that may be in his hands not otherwise appropriated.

"SEC. 11. The said commissioners may at the request of the lessee, for cause shown, cancel or modify any lease, or they may remit or abate the rent reserved therein if it shall be made to appear to the satisfaction of the commissioners that it would be equitable so to do.

"SEC. 12. The said commissioners shall not let any land north of a line extending across Providence [***78] river from Field's Point to Kettle Point; or let any lands west of a line drawn from Warwick Neck light, to Pojack Point, at Potowomut Neck; or let any land between Pomham light and Nayatt light or between Pawtuxet Neck and Rocky Point in-shore from land [*338] already leased; or let any of the ponds in Little Compton, Charlestown, South Kingstown, New Shoreham, Tiverton, or Westerly; or let the channel between Long Neck and Marsh Island flats, from the channel in Providence river to the bridge in Pawtuxet: *Provided, however*, that nothing in this act shall be so construed as to affect any of the lands which have been leased or the releasing thereof.

"SEC. 13. The said commissioners shall give notice of every application for a lease of land for the planting of oysters by publication twice a week for two successive weeks in some daily newspaper published in the city of Providence, and also once a week for two successive weeks in some newspaper published in the county nearest to which the ground is located, describing the land therein applied for and giving the name and residence of the applicant and the day, hour, and place where the land will be let; which day shall in all [***79] cases where the first hearing upon such an application is to be had be upon the first or third Friday of the month, and the commissioners may give such further notice of such application as they may deem to be necessary to inform persons interested of the pendency of such application, and the actual costs of publishing said notices shall be paid by the applicants.

"SEC. 14. Said commissioners may adjourn such hearing from time to time, and may issue process to compel the attendance of witnesses for either party, and shall give notice to all parties who have appeared before them upon any application of the time and place when their decision will be given; and such decision shall be final, unless appellate proceedings are taken and prosecuted as hereinafter provided.

"SEC. 15. Any person aggrieved by the decision of the commissioners upon any application for a private or several oyster ground or oyster fishery may petition the common pleas division of the supreme court within and for the county nearest to which said land so applied for lies, for a reversal or modification of such decision, in like manner and with the same procedure, excepting where a different procedure is provided [***80] in this act, as prescribed in sections fifteen and sixteen of chapter [*339] forty-six in the case of petition for relief for over-assessment for taxes.

"SEC. 16. Application for citation in such case shall be made to the clerk of said common pleas division within five days from the day such decision shall have been made, and the petitioner shall, at or before the time for filing his petition, file with said clerk a copy of the proceedings before the commissioners, and a bond, signed by him or by [**163] some one in his behalf, with sufficient surety, in the sum of fifty dollars, payable to said clerk for the use of the state, with condition to prosecute such petition to final judgment and to pay such witness fees and the costs of summons incurred by any party opposing such petition as the court shall award, in case the decision of the commissioners shall not be reversed.

"SEC. 17. Such case shall be heard and tried in the same manner as other cases entered upon the docket of said court, and the judgment of the court (which shall be entered immediately upon the rendition of decision or verdict) shall be conclusive upon the question whether said land shall or shall not be [***81] leased, and the commissioners shall grant or refuse a lease accordingly.

"SEC. 18. Such leases shall be executed by such lessee, as well as by said commissioners, in two parts, one part thereof to be delivered to such lessee and the other part thereof to be retained by said commissioners and recorded in a book kept for that purpose, and shall contain proper covenants for the payment of rent and the performance of the conditions and observance of the restrictions therein set forth, with proper clauses reserving to said commissioners a right to re-enter on behalf of the state and to terminate said lease for breach of any of said covenants.

"SEC. 19. Said commissioners shall before granting any such lease cause the land to be leased as aforesaid to be surveyed and platted, and shall in all cases cause proper bounds with marks thereon to be set up either on the shore opposite and nearest to such land to be leased as aforesaid, in order to define the limits thereof, or shall cause such land to be leased as [*340] aforesaid to be marked with stakes or buoys at the corners of the ground

leased, with such marks thereon as they may direct. Such bounds, stakes, or buoys, with the marks [***82] thereon, shall be renewed whenever the commissioners shall direct.

"SEC. 20. The drawing and executing of such leases, the original surveying and platting, shall be done by said commissioners without expense to the lessees. The setting up of the bounds, stakes, or buoys shall in all cases be done by the lessee under the direction of the commissioners.

"SEC. 21. Every person who shall wilfully injure, deface, destroy, or remove such marks or bounds, or deface any mark thereon, or shall tie or fasten any boat or vessel to any such stake or buoy, shall be fined twenty dollars for each offence, one-half thereof to the use of the state and one-half thereof to the use of the complainant. Every such person shall, in addition thereto, be liable in an action of the case to pay double damages and costs to the person who shall be injured by having the marks and bounds, stakes, or buoys of their said lots injured, defaced, removed, or destroyed as aforesaid.

"SEC. 22. The oysters planted or growing in any private oyster ground leased as aforesaid shall, during the continuance of the lease, be the personal property of the lessee of such oyster ground.

"SEC. 23. Every person who shall work a [***83] dredge, pair of oyster tongs, or rakes, or any other implement for the taking of shell-fish of any description, upon any private and several oyster ground or bed without the consent of the lessee or owner thereof, or who shall, while upon or sailing over any such ground or bed, cast, haul, or have overboard any such dredge, tongs, rake, or other implement for the taking of shell-fish of any description, under any pretence or for any purpose whatever, without the consent of such lessee or owner, shall for the first offence be fined not exceeding twenty dollars or be imprisoned not exceeding thirty days, and for every subsequent offence shall be fined not exceeding one hundred dollars or be imprisoned not exceeding six months.

"SEC. 24. Said commissioners shall from time to time [*341] diligently inspect and ascertain whether or not the terms and restrictions of the leases are kept and performed in a just and proper manner, and whether or not the rents are punctually paid; and in case said terms and restrictions are not kept, and performed, or said rents are not punctually paid, the commissioners shall forthwith enter upon the land so leased and terminate the lease.

"SEC. 25. [***84] The commissioners may, in the name of the state, institute any legal proceedings that may be necessary for the collection of such rent. The commissioners may take possession of any lot leased, upon which the rent shall not have been paid, and may dispose of said lot with all the oysters thereon at public auction to the highest bidder, first giving notice of the time and place of sale by publishing the same at least once each week for two successive weeks in some newspaper published in the city of Providence, with power to adjourn such sale from time to time, giving like notice of such adjournment; to make and execute to the purchaser at such sale a good and sufficient conveyance of all the right, title, and interest of said lessee in and to the lot leased, together with the oysters thereon; and to receive the proceeds of such sale, and from said proceeds to retain all sums due and owing the state for rent as aforesaid, together with all expenses incident to such sale, rendering and paying the surplus of said proceeds of sale, if any there be over and above the amounts so to be retained as aforesaid, to said lessee, his heirs, executors, administrators, or assigns.

"SEC. 26. Every [***85] person who shall take oysters from any private and several oyster bed, except between the hours of sunrise and sunset, shall be fined twenty dollars for each offence, one-half thereof to the use of the state and one-half thereof to the use of the complainant; and every boat or vessel used or in any way employed in so doing shall, [**164] together with its tackle, apparel, furniture, and implements on board, be forfeited.

"SEC. 27. Every person who shall wrongfully take and carry away oysters from a private oyster bed shall for the first [*342] offence be fined fifty dollars and be imprisoned for thirty days, and for every subsequent offence shall be fined one hundred dollars, and be imprisoned for six months.

"SEC. 28. Any police constable may, in view of the commission of any offence against the provisions of this act upon any of the public waters of the state, arrest the offender without warrant and detain him for prosecution not exceeding twenty-four hours.

"SEC. 29. Every person who shall wilfully break up, damage, or injure any bed of oysters, or any tract of land leased from the state for an oyster bed, by depositing thereon earth, stones, or dredgings or scoopings [***86] from the river or docks, or in any other manner, shall be fined not exceeding five hundred dollars, one-half thereof to the use of the state and one-half thereof to the use of the complainant; and shall forfeit his boat or vessel, with her tackle, apparel, and furniture, and all the implements by him used in injuring such oyster bed.

"SEC. 30. Every person convicted a second time of a violation of any of the provisions of this act shall, in addition to the penalties herein before mentioned, be deprived of the privilege of fishing for oysters in the waters

of the state for the space of three years thereafter, under penalty of thirty days imprisonment for each offence.

"SEC. 31. Every person who shall take more than two bushels of oysters during any one day from Trustan pond, in South Kingstown, shall be fined not less than five dollars nor more than twenty dollars for every bushel so taken above two bushels.

"SEC. 32. Each of said commissioners shall be by virtue of his office a special constable, and, as such commissioner, may arrest any person found violating any of the provisions of this act, and may seize any boat or vessel, with her tackle, apparel, and furniture, and all implements [***87] belonging thereto, when employed in taking oysters or in injuring any oyster bed in violation of the provisions of this act, and shall make complaint when called upon to do so, for all such violations, and in any such complaint he shall not be required at the [*343] time of complaint or thereafter to enter into recognizance or in any way to become liable for the costs that may accrue thereon; and the attorney-general shall, when notified to do so by the complainant, prosecute all such complaints in the court where the same shall be made or be pending; and all cases of appeal thereof from the sentence of a district court, and all questions arising under the same, or under any complaint and warrant made under the provisions of this act, in either division of the supreme court, shall be conducted by said attorney-general.

"SEC. 33. A surveyor may be employed to fix the place or otherwise to designate the locality of any violation of the provisions of this act, and reasonable charges of such surveyor for such service shall be allowed by the court, if said employment shall be by said court deemed to have been necessary; and such charges when allowed as aforesaid shall be taxed in [***88] the bill of costs.

"SEC. 34. All leases of oyster grounds heretofore granted by the commissioners of shell fisheries to any party or parties residents of this state are hereby validated and confirmed.

"SEC. 35. Chapter 170 of the General Laws and all acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect from and after its passage."

It is evident that by the provisions of section 7 the commissioners are authorized to agree to lease to certain suitable persons *any piece of land within the State* covered by four feet of tide-water at mean low tide, without reference to the size or extent of the same, for certain prices to be determined by them within certain limits, and not agreeing to lease more than one acre at a time in one lot or parcel to one person or firm; but in drawing the leases, said commissioners may include one or more acres of land so leased by them. The meaning of the section with reference to the agreements to lease is perfectly plain, whatever may be the reason for the requirement, and that is that the minds of the proposed lessee and those of the commissioners shall meet upon separate propositions to lease each acre. And [***89] as this may be done by auction; for example, [*344] acre lots could be put up for sale separately even on the same day, and as often as the bidding ceased and the hammer fell, and the lot, offered for sale, was struck off to the highest bidder, that would constitute an agreement to lease; or, if, as in the present case, blank leases had been prepared with the numbers, designating each acre lot proposed to be leased, filled in, and before the execution of the same by the parties, the clerk of the commissioners should read to the proposing lessee the numbers of each of the lots in the proposed lease, seriatim, while the expectant lessee followed the same on a plat, whereon the land to be leased was delineated and which contained the corresponding numbers to those set out in the lease, and if the clerk should pause after each number so read by him to give the applicant an opportunity to signify his acceptance or rejection of the offer of the commissioners to lease said land thus tendered to him by their clerk, an affirmative answer, either orally expressed or by nods or signs, or by acquiescence however indicated, would constitute an agreement to lease which would be effective as [***90] to each and every lot upon which the minds of the contracting parties so met. It matters not how short the interval [**165] of time between the reading of the numbers, if it was long enough to enable the tender to be accepted and, as a matter of fact, it was accepted. The fact that the agreements of lease were all made in one day, or one afternoon, or one hour or less, is not of the slightest importance. The rule that the law knows no fraction of a day is inapplicable in a case of this kind. The agreements were not agreements "to lease more than one acre at a time" if they were made at different instants of time.

The provisions of sections 13, 14, 15, 16, and 17 relate to applications for a lease of land for the planting of oysters, and the notice to be given thereon in order that the public may be heard upon the question whether said land shall or shall not be leased. The question is not to whom, if any one, it shall be leased. That question is not before the commissioners or before the court upon appeal. The question is one of public interest, to wit: shall certain land be taken from the free and common oyster fisheries for the purposes of a private and [*345] several oyster [***91] fishery? This is the only question that can be heard by the commissioners at the first hearing upon the application, or by the court upon appeal. The proceedings had before the commissioners and upon appeal before the court are analogous to the proceedings had upon the writ of *ad quod damnum*, which is defined

to be "A writ issuing out of and returnable into chancery, directed to the sheriff, commanding him to inquire by a jury what damage it will be to the king, or any other, to grant a liberty, fair, market, highway, or the like. The name is derived from the characteristic words denoting the nature of the writ, to inquire how great an injury it will be to the king to grant the favor asked; Whishaw, Fitzherbert, Nat. Brev. 221; Termes de la Ley." Bouv. Law Dict. The commissioners, in the first instance, and upon appeal the court or jury, are called upon to inquire whether the granting of such application will be injurious to the public. In the "oyster act" of January, 1844, section 10, commissioners of the shell fisheries, or any two of them, were required, before granting any leases of private or several oyster grounds, or oyster fisheries, to personally inspect the land asked [***92] to be leased, and to decide upon the propriety of leasing the same, taking special care not to include in the land so leased, any old oyster bed, or any part of any old oyster bed *which in their opinion can for the greater advantage of the public be used as a free and common oyster fishery*, but their decision in the premises, proved by the execution of the lease, shall in all cases and for all purposes *be final and conclusive* thereupon. This legislation, passed less than a year after the adoption of the constitution by the people of the State, is a pretty fair contemporaneous construction of the powers of the General Assembly in the matter of shell fisheries under that instrument. The fact that in said act no appeal was provided to be taken from the decision of the commissioners is evidence that the General Assembly deemed that the public rights were amply conserved without further provision.

Chapter 853, aforesaid, section 19, provides that the commissioners shall before granting any such lease cause the land to be leased to be surveyed and platted. It is manifest that before [*346] the land is surveyed and platted it can not be definitely located in acre lots, and, [***93] therefore, before such surveying and platting is accomplished that it would be impossible for the parties to enter into an agreement of lease concerning acre lots thereafter to be ascertained; and as the commissioners are required to survey and plat the land before granting the lease, they are forbidden to grant or even to agree to lease before such survey and plat has been made. Furthermore, the question of to whom the land shall be let after said surveying and platting is a matter entirely within the discretion of the commissioners, from which no appeal is provided. In case of two or more applicants for the same land, the decision of the commissioners must prevail; for, even if a person deeming himself aggrieved by the decision of the commissioners should attempt to take an appeal under the provisions aforesaid, and if he should succeed in getting his case heard by the court or jury, the only judgment that could be rendered in the case is, as we have already seen, that the "land shall or shall not be leased." And so, if the jury should find that the land shall not be leased, a finding that would be nugatory if the commissioners had previously decided that it shall be leased and no [***94] appeal had been taken from their finding in that regard, the verdict would not assist the appellant who wished the land to be leased and leased to himself. And if the jury should find that the land shall be leased, that would not assist him because he was not aggrieved in that part of the finding by the commissioners, and the jury are powerless to decide to whom it shall be leased, and such a verdict would therefore be but a barren victory, if indeed an appellant could ever hope to get as far as that on such a claim.

There is nothing irregular, or illegal, in the application, advertisement or proceedings before the commissioners.

The transcript shows that on June 17th, 1902, John S. Payne and Walter H. Butler, of East Providence, made application for thirty-one (21?) acres of oyster ground on Great Bed southerly of Starve Goat Island and near the same. It also shows that on June 21, 1902, the application was advertised in the Providence Telegram, as follows:

[*347] "John S. Payne and W. H. Butler, both of East Providence, make application for twenty-one acres of oyster ground in said river on Great Bed all southerly of Starve Goat Island and near the same. Friday, July 4, A. [***95] D. 1902, at ten [**166] o'clock, at the office of the Commissioners of Shell Fisheries, State House, is hereby appointed the time and place for consideration of the same. The above hearing to be held at the same time and place on the following day, July 5th, to which time and place the hearing will be adjourned."

On July 5, 1902, the records of the shell-fish office contained the following: "Office of the Commissioners of Shell Fisheries, Providence, July 5, A. D. 1902. Meeting called for the purpose of considering applications of Robert Pettis for land near Bullocks Point; John S. Payne and W. H. Butler, George C. Bell, of Warwick, Charles C. Miller, of Providence, Sidney A. Balcom, of East Providence, for land in Providence river, being a part of Great Bed. Present, members of Board. To the granting of land applied for by Mr. Pettis there was no objection, and the same was granted.

"To all the land applied for on Great Bed a strong protest was presented signed by eighty-four persons claiming the said land to be a source of great revenue to the public fishers. To support the claims of the protestants appeared Abner Hart of Pawtuxet, a shell-fish dealer, but not a fisherman; [***96] Mr. Charles A. Aldrich of East Providence, who was a small bed-holder; and a gentleman by the name of Woodward who had followed a number of callings and who now claims to be a fisherman. The claims of the applicants were ably pre-

sented by Mr. Payne, Mr. Bell, and Mr. Butler, basing their claims upon a desire of shell fishermen of small means who are desirous of becoming oyster producers upon their own holding, upon such lands as they with their means would make them--enable them to hold. After a very full hearing the commission took the matter into consideration and examination, and voted to continue said application until the second day of December, A. D. 1902, at ten o'clock A. M."

[*348] On December 11, 1902, the following entries are made:

"Meeting this day called to order. A quorum present, Mr. Wilbour, the president, in the chair. Reading of the records of the last meeting approved. The question before the commission being the lease of land applied for by Messrs. Payne and Butler, George C. Bell, Charles E. Miller, Sidney A. Balcom, was continued until this meeting. After brief consultation of the same it was unanimously voted to grant the said application as applied for. [***97] "

Upon this action being taken, the word "granted" was written opposite the above advertisement referring to the Payne and Butler application.

The defendant thereupon makes the following claim:

"Whatever may be the legal effect of these recorded acts, it is entirely clear that on December 11, 1902, the *application* of Payne and Butler for a private oyster fishery *was granted*, and the clerk of the Shell-fish Commission himself so testified. In response to the question, 'What was done after the granting--*after the Commission decided to grant the application*, what was done? What were the other steps?' he answered, 'The engineer was informed of the *granting of the application*, the hearing had been held, and--directed to go down there and make a survey," and argues as follows: "Counsel for the defense contend that, both by the intention of the parties as disclosed by the record, and because of the provisions of the statute, the legal effect of the granting of this application was the acceptance by the commission of the offer contained in the application consummating a contract to lease, and that, at that moment, the agreement to lease contemplated by section 7 was made. [***98] The record of the Shell-Fish Commissioners shows that on July 5th, at a meeting called 'for the purpose of considering applications filed, the *land* was granted ("to the granting of land applied for by Mr. Pettis there was no objection, and the same was granted"). The record also shows that the granting of the application to Payne and Butler and others on Great Bed was opposed, that a hearing at which different interests were represented was held, and that the issue discussed was *whether the land should be* [*349] *leased.* It also appears that after consideration of the issue thus framed, the application was continued, and that at an adjourned meeting where '*the question before the commission* (was) *the lease of land applied for by Messrs. Payne and Butler*,' etc., it was said 'After brief consultation *of the same* it was unanimously voted to *grant the said application* as applied for.' In the face of this testimony, it is inconceivable that it was understood by the parties that the granting of the application meant merely that 'they (the state engineer) might survey.' If the legal effect of granting the application was merely an authorization of a survey by the [***99] state engineer, as is stated by Mr. Collins, it can readily be seen that the granting of the application confers absolutely no right upon the applicant. And if this was the intention of the parties, it is inconceivable, not only that they should confine their discussion before the commissioners to the question as to *whether the land should be leased*, but that there should be any opposition at all to the granting. No one could or would object to a survey of the public waters by the state engineer, nor is that official required to be authorized for that purpose by the granting of an application for an exclusive fishery. It is also inconceivable that the commissioners would have held several meetings at which apparently the only question considered was the advisability of *leasing the land* before granting the application, if the only effect of granting the application would be an authorization of a survey giving no rights to the applicant. The disclosed intention of the parties, aside from any necessary legal consequence attached to the act by the statute, shows that the granting of the application was something more [**167] than permission to survey, and that it was in fact, [***100] in the contemplation of the parties, a contract, an agreement to lease when the subsequent statutory steps had been performed.

"It is clear, however, from the statute that the granting of an application does confer substantial rights on the applicant. Public Laws, Chapter 853, § 15, as amended by C. P. A. § 1209, provides that 'any person aggrieved by the decision of the commissioners upon any application for a private or several oyster [*350] fishery, may petition the Supreme Court for a reversal or modification of such decision.'

"Since the granting of an application by the commissioners after a full and extended hearing must be a *decision* upon the application, it necessarily follows that the granting of the application, in the contemplation of the statute, confers substantial rights on the applicant, since, otherwise, no one interested in the granting or withholding of the land from lease *could be aggrieved*, and the provision for appeal would be useless. The granting of the application cannot, as contended by the clerk of the Shell Fsh Commission, spend its force in directing a survey of the land to be made without affecting in any manner the applicant's interest [***101] in the land applied for.

"It should also be noted that if the clerk of the Shell-Fish Commission is correct in his views as to the legal effect of granting the application, and if the granting of the application confers no rights on the applicant, then the advertisement published is clearly defective. Public Laws, Chapter 853, § 13, is peremptory that the notice of the application shall contain, not only a description of the land, and the residence of the applicant, but also 'the day, hour, and place where the land will be let.' The only day, hour, and place advertised by the commissioners, as is shown by the record, is a time and place for a *consideration of the application.* If, therefore, the consideration of the application culminating in its being granted means merely permission to the engineer to survey, without giving any contract rights to the applicant, the day set out in the advertisement can under no circumstances be the day, hour and place *where the land will be let*, and the advertisement is for that reason defective.

"The clerk of the Shell-fish Commission evidently believed that the granting of the application could not confer rights upon the applicant because [***102] a survey and plat of the land had not yet been made. Public Laws, Chapter 853, § 19, however, simply prohibits the *granting* of the lease before survey and platting, and in no way affects the question as to whether the granting of the application is or is not an *agreement* to lease. It is [*351] believed that effect cannot be given to the several portions of this statute unless the granting of the application is an agreement to lease followed, provided an appeal is not taken within five days, and provided the land is platted, staked and buoyed, by the granting of the lease itself. It is submitted, therefore, that both the intention of the parties, and the provisions of the statute, show that the legal effect of granting an application is the consummation of a contract to lease, and is the agreement to lease under section 7.

"If the contract to lease was made at the time the application was granted it is manifest since twenty-one acres were applied for and granted that an agreement to lease more than one acre at a time in one lot or parcel was made. It is also clear under the decision of *State* v. *Burdick* (15 R.I. 239, 1886, 2 A. 764), that because of [***103] this defect the lease Plaintiffs' Exhibit 3, is void.

"For the reasons given above, counsel for the defense, believe that the agreement or agreements to lease the twenty-one acres to Payne & Butler on Great Bed, were made on December 11, 1902, the date the application was granted. If, however, the court should be of the opinion that this was not the legal effect of the granting of the application under the facts disclosed in this case, and that the testimony of the clerk of the Shell-fish Commission was sufficient to negative the consummation of the agreement to lease, as of that date, then the undisputed testimony of the same witness and of Mr. Payne, the plaintiff executing the instrument of lease for Payne and Butler, shows affirmatively that no agreement or agreements to lease were made until after the instrument of lease (Plaintiffs' Exhibit 3) was drawn, and read to Mr. Payne, on the day of, and immediately prior to, its execution. Mr. Collins, the clerk of the Shell-fish Commission, says, 'No lease can contain more than one acre at a time, and some of them less than an acre--fraction of an acre,--are read over to the applicant, and he assents, he is required to assent to the [***104] desire to take those lots. If we read over, five, six, eight, and he says, "Nine, I don't want," *as we let them lot by lot*, I suppose we are compelled to give him a lease up to that point; and then, if it is all satisfactory, [*352] all looked over carefully lot by lot, then he consents to that, the agreement is made, it is put in one lease, or is in one lease, and then it is signed by the parties.' Payne's description of the procedure followed in connection with the granting of the lease (Plaintiffs' Exhibit 3) is to the same effect. Plaintiffs' counsel said, 'You are testifying in regard to the date of the lease, what was done at that time?'

"MR. PAYNE: 'Why, the clerk of the commission read the lease over--had two leases, and he read one of them over, what was said on it, the numbers of acres, and so forth, all down the whole of the list, passed me the other one, and I read that, and then he handed me the one he had and asked me to sign it, and I am pretty sure I signed for the [**168] firm. I am pretty sure I did.'

"Mr. Collins also says that it was customary for the commissioners to hear objections to running out the leases even after the numbers of the lots were [***105] put on the leases from the charts and plats, long after the application had been granted. So long as either party was at perfect liberty to withdraw, and so long as the commissioners were in a position to consider the advisability of letting the land, it is clear that there could be no *agreement* to lease. Payne, however, and indeed any applicant, as is shown by this testimony, had the right to refuse to take lots even when the duplicate instrument of lease was being read on the day of, and immediately prior to, signing. So, also, Mr. Collins says positively that the *agreement* to lease was made immediately prior to the signing, and necessarily, therefore, on the date the instrument was executed. if, therefore, the legal effect of granting the application is not an agreement to lease as contended by counsel for the defense, then the undisputed testimony conclusively shows that the agreement or agreements to lease the lots embraced in one instrument of lease were made on a single day, that day being the day of the execution of the instrument of lease.

"The testimony also shows, that, according to the customary practice of the Shell-fish Commission, the only attempt at a separate [***106] agreement to lease

each acre in a group of lots containing [*353] more than one acre and included in the same instrument of lease, consisted in reading the lot numbers *seriatim* from the previously drawn instrument of lease. Thus, Mr. Collins in describing the customary procedure of commission in agreeing to lease, and in leasing land says, 'If we read over five, six, eight, and he says, 'Nine, I don't want,'' *as we let them lot by lot*, I suppose we are compelled to give him a lease up to that point.' Assuming for the moment that the procedure outlined by Mr. Collins does affect a separate agreement to lease each separate acre, and assuming also that this customary procedure was followed in agreeing to lease the twenty-one acres on Great Bed to Payne & Butler, it is apparent that these separate agreements made on the same day, *are part of one and the same transaction* in point of time. Counsel, therefore, contend, even though these assumptions were found to be true, that under the meaning naturally attributed to the words, 'at a time,' and under the meaning given them by judicial construction, such agreements would violate that portion of section 7 of the statute which [***107] prohibits the commissioners from 'agreeing to lease more than one acre at a time in one lot or parcel,' since they are agreements to lease more than one acre in one lot or parcel at a time.

"Thus in *Hunter et al.* v. *Wetsell*, 84 N.Y. 549 (1881), where the plaintiff sued for the purchase price under an oral contract covered by that portion of the statute of frauds which provides that 'Every contract for the sale of any goods, etc., shall be void. . . . unless the buyer shall *at the time* pay some part of the purchase money,' and the evidence showed that contemporaneously with the oral statement of the contract, plaintiff delivered the check, but there was no evidence as to time of its payment, Finch, justice, after holding that the giving of the check *was not payment*, said (p. 554): 'It would be an entirely reasonable and just construction to say that the delivery of the check and its presentment and payment constituted one continuous transaction, and should be taken as such without reference to the ordinary delay attendant upon turning the check into money. The statute does not mean rigorously, *eo instanti*. It does contemplate [*354] that the contract [***108] and the payment shall be at the same time, in the sense that they constitute part of one and the same continuous transaction. We think, therefore, that there was payment "at the time" within the meaning of the statute.'

"In *United States* v. *Buchanan*, 9 F. 689 (1881), it was held, in an indictment under § 3324 of the Revised Statutes of the United States providing a penalty for failure to obliterate the revenue stamp *at the time* of *emptying* such cask, that the words '*at the time*' did not require an obliteration at the very instant the cask is emptied, but the act ought to be done in a convenient time considering the surrounding circumstances affording evidence of reasonable delay. The same construction of these words is adopted in *Rice* v. *K. P. Ry. Co.*, 63 Mo. 314 (1876), and in *Goggin* v. *K. P. Ry. Co.*, 12 Kan. 416 (1874).

"It is clear from these authorities that under the customary and usual construction of the words 'at a time' they include more than an instantaneous fraction of a second. It necessarily follows, therefore, that the procedure adopted by the Shell-fish Commission in the granting of this [***109] lease, in which the agreement or agreements to lease twenty-one acres were separated only by the time it took the clerk to read the number of the lots, made all the agreements part of one transaction, a transaction which included also the signing of the instrument of lease, and is not in compliance with the provision of the statute against leasing more than one acre 'at a time.'"

The defendant fails to take into consideration the successive steps by which the leasing is to be accomplished: first, the application for a lease of oyster ground, upon which notice is to be given, by the commissioners to the public, of the time and place where the land will be let, that is, where the question: Shall the land be leased or not? will be determined, which hearing may be adjourned from time to time. If the commissioners shall at the hearing grant the application, that is, if they shall conclude that the land shall be [**169] leased, that is, shall be taken from the public and let for private purposes in the future, the public question, and the only public question in the matter, will be thereby determined; and from such determination an appeal is [*355] given to any person aggrieved. [***110] If no appeal is taken, the next step will be to have the land surveyed and platted. After the land has been surveyed and platted into acre lots, then, but not before then, the question: To whom shall this land be let? can arise. This is not a public question, and is of interest only to applicants; and in the case of competing applicants, or in case the commissioners should refuse to grant in its entirety the application of a sole applicant, the decision of the commissioners in respect to the same will be final and conclusive, and no appeal therefrom is provided. As the public has no interest in the question, To whom shall the land be leased? no notice of the time and place of the hearing upon that question, by publication or otherwise, is necessary. When the matter does come up for determination, after the land has been surveyed and platted into acre lots, then the applicant and the commissioners meet and for the first time the question of leasing the lots is to be considered lot by lot, and whenever the minds of the parties concur in regard to the letting of a particular lot, an agreement to lease that lot is thereby accomplished. There is no limit to the number of acres that may [***111] be included in any one lease under the statute,

so long as the agreements to lease the lots were separately made. That is, the statute requires the commissioners to consider the question of leasing acre by acre, so that the advisability of letting the same shall be scrutinized in particular and not in general. They are forbidden to determine the question, in this manner: We will let you this tract of twenty-one acres if you will lease the same. But they may dispose of the matter in this manner: Of the twenty-one acres delineated on this plat as lots numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 18, 20, and 21, each containing one acre of land, do you want to lease lot No. 1? If you do, you may have it. If the applicant signifies his acceptance of the offer so made, an agreement to lease that lot is reached. And so, if the same method is pursued as to each of said lots with the same result, an agreement to lease each and every lot has thereby been made. And the length of time consumed in making the agreements is of no consequence so long as they were made [*356] separately. In this manner the statute would be complied with literally. It was not necessary [***112] for the plaintiff to prove that this method was followed in the case of the lease in question, although he has done so; for the lease recites the fact, and all presumptions are in favor of the legality of the acts of the commissioners.

Each lease is regular and valid on its face.

The lease in question reads as follows:

"No. 466.

"THIS INDENTURE, of two parts, made and entered into on this 24th day of January in the year of our Lord, one thousand nine hundred and three by and between the STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, on the one part, and John S. Payne & W. H. Butler both of East Providence in the county of Providence in said State, of the other part WITNESSETH, that the said State doth hereby lease, devise, and let unto the said Payne & Butler a certain piece of land in Providence river lying and being, and covered with tide water, containing about 21 acres and bounded and described as follows, to wit: Being lots numbered 6 to 8 incl. 14 to 16 incl. 22 to 24 incl. 47 to 49, incl. Section 3. 189 to 191 incl. 168 to 173 incl. Section 4, in the book of 'Leased Oyster Beds surveyed and platted under the direction of the Shell-Fish Commissioners, 1880,' by Shedd & [***113] Sawyer, civil engineers.

"Said lots were leased separately, but are included in one lease for convenience.

"To have and to hold to them the said Payne & Butler, executors, administrators and assigns, to their use as a private or several oyster fishery, for the planting and producing of oysters, for and during the term of ten years from the day of the date hereof, on the terms and conditions (among others) that the said lessee, their executors or administrators, shall pay therefor to the General Treasurer of said State, during the said term, the yearly rent per acre, of 10 dollars in manner hereinafter provided. And the said State doth hereby covenant with the said lessee, their executors, administrators and assigns, [*357] that they may and shall occupy the premises hereby leased during the term aforesaid peaceably and quietly, and free from all lawful claim and demand of all persons whomsoever, other than as hereinbefore or hereinafter set forth: the said lessee for themselves their executors, administrators and assigns (with a reservation of his rights to claim remission or abatement, as by law provided), doth covenant with said State, that they will pay to the General Treasurer, [***114] for the use of said State, the sum of two hundred and ten dollars on the first day of January in each year during the term aforesaid.

FURTHERMORE: This lease is made and accepted--*subject to* the provisions of existing laws relating to oyster fisheries, and to a reserved right of the State to amend said laws as it shall deem expedient (reference to the same being here made); and also *subject to* the further conditions following, to wit: *First*--That he shall at all times erect, place or renew the bounds, stakes or buoys, with marks thereon for defining the premises, as and when required by the commissioners. *Second*--That he shall pay all expenses of renewing stakes or bounds, and rent, to the General Treasurer, as aforesaid. *Third*--That he shall not underlet or assign the premises to any person whomsoever, without the assent, in writing, of the commissioners. *Fourth*--That he will not knowingly or wilfully violate any provision of the laws at [**170] any time in force relating to the oyster grounds or oyster fisheries within the State; *and fifth*--That in event he shall refuse or neglect to comply with or conform to these conditions, or any or either of [***115] them, the said commissioners may, on the part of said State, reenter upon said leased premises and terminate the lease, and declare the same forfeited, and dispose of the lessee's interest in the said land, together with all the oysters thereon, at public auction, to the highest bidder, upon giving one week's notice of such sale in some newspaper printed in the city of Providence; and the lessee, their executors, administrators or assigns, shall be holden to pay all damage that shall thereby be sustained by said State.

"IN WITNESS WHEREOF, the Commissioners of Shell Fisheries hereunto subscribe the name of said State, and set their names [*358] as commissioners, and the said lessees hereunto set their hands the day and year aforewritten.

"THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, by

"Signed, sealed and delivered in

presence of

"P. H. WILBOUR,

"JAMES M. WRIGHT,

"SAMUEL B. HOXIE, JR.,

"JOHN H. NORTHUP,

"WM. T. LEWIS, JR.,

"*Commissioners of Shell Fisheries.*

"PAYNE & BUTLER, *Lessee.*"

As the leases in the case are valid, they need no validating; therefore it becomes unnecessary to consider the constitutionality of the validating act, Pub. Laws, 1908, [***116] cap. 1574, which may have been passed out of abundant caution.

There is no merit in any of the defendant's exceptions and the constitutional question must be answered in the negative. The defendant's exceptions are therefore overruled, and the case is remitted to the Superior Court with direction to enter judgment on the verdict.