LEXSTAT TORTS SECOND 824

Restatement of the Law, Second, Torts
Copyright (c) 1979, The American Law Institute

Case Citations

Rules and Principles

Division 10 - Invasions of Interests in Land Other Than by Trespass

Chapter 40 - Nuisance

Topic 2 - Private Nuisance: Elements of Liability

Restat 2d of Torts, § 824

§ 824 Type of Conduct Essential to Liability

**The conduct necessary to make the actor liable for either a public or a private nuisance may consist of**

**(a) an act; or**

**(b) a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest.**

**COMMENTS & ILLUSTRATIONS: Comment:**

*a.* The rule stated in this Section is applicable to both public and private nuisances. At common law a public nuisance could be created either by an affirmative act or by a failure to act on the part of one who was under a duty to act to prevent or abate the nuisance. If common law crimes are still in existence, this rule has been carried over; it has also been carried over under general statutes providing a penalty for public nuisances, either without definition or with broad definitions that are construed to include all common law public nuisances. If, however, there are special statutes declaring that certain invasions of the public interest are public nuisances, the statute may either provide or be construed to mean that only some kinds of conduct, such as affirmative acts or particular kinds of acts, are within the crime. In that case, only the designated conduct will afford a basis for tort liability for a public nuisance; and to that extent the rule here stated is modified.

*b. Acts.* The word "act" is defined in § 2. In the ordinary case, the liability stated in § 822 arises because one person's acts set in motion a force or chain of events resulting in the invasion. The acts may be a direct and immediate cause of the invasion, as in the case where the noise from the actor's operation of a riveting machine is the thing complained of, or they may be an indirect cause of the invasion, as in the case where the offensive smells from a garbage pile or other physical condition created by the actor are the thing complained of. So far as the actor's liability is concerned, it is immaterial whether he does the acts solely in the pursuit of his own interests or whether he is acting for another, gratuitously, under contract or as the other's servant or agent. It is enough that his acts are a legal cause of the invasion.

*c. Acts of servants and agents.* Under the rules of the law of Agency one may be legally responsible for the acts of another just as if he had personally done the act. (See Restatement (Second) of Agency §§ 215-267). It is not within the scope of this Restatement to state the rules governing liability for the acts of servants or agents, but it should be observed that the word "act" in Clause (a) of this Section comprehends the hiring of servants to do acts as well as the doing of these acts in person.

*d. Independent contractors, lessees and licensees.* Under certain circumstances the employer of an independent contractor, a lessor or a licensor may incur liability for invasions caused by his contractor, lessee or licensee. (See §§

834-837). Thus the term "acts" in Clause (a) of this Section comprehends the hiring of an independent contractor, the making of a lease and the granting of a license.

*e. Failure to act.* One is ordinarily subject to no liability to another merely because he has failed to take positive action to prevent another from being harmed. (See § 314). There are, however, certain circumstances under which the law imposes a duty on a person to take positive action for the protection of another and subjects him to liability if he fails to meet the standard of action required in the particular case. (See §§ 838-840).

**REPORTERS NOTES:** *Comment e*: For cases in which the defendant was under a duty to take positive action to prevent a nuisance, see Brent v. Haddon, Cro.Jac. 555, 79 Eng. Rep. 476 (1619); Todd v. Flight, 9 C.B. (N.S.) 377, 142 Eng.Rep. 148 (1860); Broder v. Saillard, L.R. 2 Ch.Div. 692 (1876); Caldwell v. Gale, 11 Mich. 77 (1862); Crommelin v. Coxe & Co., 30 Ala. 318 (1857); State v. Guillory, 339 So.2d 970 (La.App.1976); Pinney v. Berry, 61 Mo. 359 (1875); CEW Management Corp. v. First Federal Sav. & L. Ass'n, 88 Wis.2d 631, 277 N.W.2d 766 (1979).

For cases in which the defendant was under no duty to take action see Bellflower v. Pennise, 548 F.2d 776 (8th Cir. 1977); Brown v. McAllister, 39 Cal. 573 (1870); Roberts v. Harrison, 101 Ga. 773, 28 S.E. 995 (1897); Harndon v. Stultz, 124 Iowa 734, 100 N.W. 851 (1904); Giles v. Walker, 24 Q.B.D. 656 (1890); Stearn v. Prentice Bros. Ltd., [1919] 1 K.B. 394; Sparke v. Osborne, 7 Comm.L.Rep. 51 (Austr. 1908).

**CROSS REFERENCES:** ALR Annotations:

Bells, carillons, and the like as nuisance. 95 A.L.R.3d 1268.
Liability of abutting landowner for injury to municipal employee engaged in construction or repairing sewers or drains. 58 A.L.R.3d 1085.
Liability of oil and gas lessee or operator for injuries to or death of livestock. 51 A.L.R.3d 304.
Abutting owner's liability for injury from ice formed on sidewalk by discharge of precipitation due to artificial conditions of premises. 18 A.L.R.3d 428.
Nonencroaching vegetation as a private nuisance. 83 A.L.R.2d 936.
Liability for property damage caused by vibrations, or the like, without blasting or explosion. 79 A.L.R.2d 966.
Landowner's or occupant's liability in damages for escape, without negligence, of harmful gases or fumes from premises. 54 A.L.R.2d 764.
Liability of landowner for damages caused by overflow, seepage, or the like resulting from defect in artificial underground drain, conduit, or pipe. 44 A.L.R.2d 960.
Undertaking establishment as nuisance. 39 A.L.R.2d 1000.
Airport operator's rights and remedies as to uses of adjoining land interfering with aircraft operation. 25 A.L.R.2d 1454.
Tourist or trailer camp, motor court or motel, as nuisance. 24 A.L.R.2d 571.
Use of phonograph, loud-speaker, or other mechanical or electrical device for broadcasting music, advertising, or sales talk from business premises, as nuisance. 23 A.L.R.2d 1289.
Animal rendering or bone-boiling plant or business as a nuisance. 17 A.L.R.2d 1269.
Liability of owner or operator of park or other premises on which baseball or other game is played, for injuries by ball to person on nearby street, sidewalk, or premises. 16 A.L.R.2d 1458.

Digest System Key Numbers:

C.J.S. Nuisances §§ 84, 86, 111 et seq., 139.
West's Key No. Digests, Nuisance 42, 79, 80.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Real Property LawTortsNuisanceElementsReal Property LawTortsNuisanceTypesPrivate NuisanceReal Property LawTortsNuisanceTypesPublic Nuisance

LEXSEE 314 A.2D 1

**Ballet Fabrics, Inc. v. Four Dee Realty Co., Inc.**

**[NO NUMBER IN ORIGINAL]**

**Supreme Court of Rhode Island**

**112 R.I. 612; 314 A.2d 1; 1974 R.I. LEXIS 1477**

**January 17, 1974**

**PRIOR HISTORY:** [***1] CIVIL ACTION, before Supreme Court on appeal of defendant from judgment entered in Superior Court following jury verdict for plaintiff and specification of certain alleged errors in rulings by Cochran, Jr.

**DISPOSITION:** Heard and appeal denied and dismissed, judgment affirmed.

**COUNSEL:** *Higgins, Cavanagh & Cooney, John P. Cooney, Jr., John T. Walsh, Jr.*, for plaintiff.

*Hanson, Curran, Bowen & Parks, A. Lauriston Parks, Kenneth R. Neal*, for defendant.

**JUDGES:** Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

**OPINION BY:** DORIS

**OPINION**

[*613] [**2] This civil action for negligence was tried to a Superior Court justice and a jury which returned a verdict for the plaintiff. The case is before us on the defendant's claim of appeal from the judgment entered in accordance with the verdict.

In August, 1966, defendant was the owner of a large industrial complex, located in the city of Pawtucket. The plaintiff, Ballet Fabrics, Inc., which was substituted as plaintiff during trial, is the successor to Durabond Corporation. [1] [*614] Both are wholly owned subsidiaries of International Stretch Products, Inc., the original plaintiff.

1 Durabond Corporation merged with Ballet Fabrics, Inc., the surviving corporation, in 1970. See plaintiff's Exhibit No. 2.

[***2]

In 1966, plaintiff occupied the first floor of defendant's premises under an oral lease. Blezard Yarn Co. occupied the second floor and Miles Fabrics, and others, [**3] occupied the third floor. In August, 1966, defendant employed a maintenance supervisor and maintenance crew of five or six men to service the tenants of the complex.

On August 6, 1966, toilets on the third floor of defendant's building in which plaintiff was a tenant overflowed and water flowed through the second and first floor ceilings causing damage to fabric stored on the first floor and owned by plaintiff. The plaintiff notified defendant that it had sustained water damage, which damage is not the subject matter of any claim or suit against defendant.

A few days later, J. Dwight Douglas, an official of defendant corporation, was notified that the toilets were still overflowing. After investigation, Douglas determined there was a blockage in the drain pipe and engaged Henry DeSousa, d/b/a AAA Electric Master Rooter Co., to remove the blockage.

Henry DeSousa testified that on August 12, 1966, the day following his engagement by Douglas, he and two of his employees arrived at the premises of defendant. [***3] They went to the office of defendant where DeSousa gave an estimate to some person whom he was unable to identify. He stated that defendant did not provide any of its maintenance crew to assist or advise him in removing the blockage. DeSousa proceeded to the second floor of defendant's premises and observed water all over the floor as a result of the overflowing of toilets on the third floor. These were the same toilets that had overflowed on August 6. DeSousa testified that he observed crudely drawn "out of order" signs on the men's and ladies' toilet facilities on the third floor. He further testified that after viewing [*615] the problem on the second and third floors, he and his men removed the clean-out plug from the pipe located on the ceiling of the

second floor and by use of his rooting equipment began to remove the blockage from the drain. DeSousa further testified that he used two 55-gallon drums to catch the water which flowed from the pipeline when he opened the clean-out plug. The pipeline was approximately 75 to 80 feet in length. During the course of the operation, DeSousa discovered that a calendar or grinding machine situated on the third floor and owned [***4] and operated by Miles Fabrics was emptying water into the pipeline. DeSousa requested that Miles turn off the machine, which request was refused. DeSousa testified that he and his men nevertheless completed the work and removed the blockage. He further stated that during the entire operation no water overflowed onto the floor from the two 55-gallon drums.

Nicholas Corrente, plaintiff's superintendent, testified that he was called to the building on August 12, 1966. He found water flowing through the second floor ceiling onto plaintiff's fabric. He ordered the fabric covered in order to protect it from the water, and immediately proceeded to the second floor to investigate. He observed a man, whose identity was unknown to him, dressed in work clothes, talking to the owner of Blezard Yarn, the second floor tenant. He testified that the floor area was saturated with water, that he observed a steady stream of water flowing from the drain near the ceiling into one of the 55-gallon drums, both of which were filled, and that the water was overflowing onto the floor and through the ceiling onto plaintiff's fabric on the first floor.

Larry Alkins, general manager of plaintiff at the [***5] time of the incident, testified and generally corroborated the testimony of Mr. Corrente. In addition, he testified as to the [*616] ownership of the damaged fabric and the amount of damages sustained by plaintiff.

J. Dwight Douglas, secretary of defendant corporation, testified that on August 6, 1966 he investigated the toilets overflowing on the third floor and had chemicals placed in the toilets. A few days later, he was notified that the toilets were still causing [**4] problems, and, after an investigation, it was determined there was a blockage in the drain line. As a result, he called Mr. DeSousa to arrange removal of the blockage, and ordered one of his employees to put up "out of order" signs on the toilets. He further testified that he was not at the plant the day that DeSousa and his men worked on the pipeline.

After both parties had rested, defendant moved for a directed verdict on the ground that there was no evidence to indicate negligence on the part of defendant, and further that if any negligence existed it was that of the independent contractor for which defendant was not liable. After the jury had returned its verdict in favor of plaintiff, the trial [***6] justice denied defendant's motion for a directed verdict. Thereafter, defendant's motion for a new trial was denied by the trial justice.

We now consider the assignment of errors raised by defendant's appeal. These are that the trial justice erred in denying defendant's motion for a directed verdict, erred in denying its motion for a new trial, and also erred in giving instructions to the jury.

I

Denial of Motion for a Directed Verdict

The defendant contends that by placing chemicals in the overflowing toilets, placing "out of order" signs on the toilets, and finally engaging DeSousa to remove the blockage from the drain line, defendant had exercised reasonable care for the protection of its tenants, and was therefore [*617] not negligent. The defendant directs our attention to the general rule that one who engages an independent contractor to perform work is not liable for the negligent acts of the contractor or his employees in performing the work contracted for. 26 A.L.R.2d 1052, § 8 (1952). The plaintiff concedes that DeSousa is an independent contractor, but asserts that the case falls squarely within the exceptions set forth in 2 Restatement (Second) *Torts* [***7] § 416 at 395 and § 427 at 415 (1965), which establish conditions under which negligence is attributed to an employer of independent contractors. [2]

2 2 Restatement (Second) *Torts* § 416 reads as follows:

> "*Work Dangerous in Absence of Special Precautions.* One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

Comment *a* of § 416 states:

> "There is a close relation between the rule stated in this Sec-

tion, and that stated in § 427, as to dangers inherent in or normal to the work. The two rules represent different forms of statement of the same general rule, that the employer remains liable for injuries resulting from dangers which he should contemplate at the time that he enters into the contract, and cannot shift to the contractor the responsibility for such dangers, or for taking precautions against them. The rules stated in the two Sections have been applied more or less interchangeably in the same type of cases, and frequently have been stated in the same opinion as the same rule, or as different phases of the same rule."

Section 427 reads as follows:

"*Negligence as to Danger Inherent in the Work.* One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

[***8]

[*618] It is well settled that in passing on a motion for a directed verdict, the trial justice must view all the evidence in the [**5] light most favorable to the adverse party, draw all reasonable inferences from the evidence favorable to that party, and refrain from weighing the evidence and passing upon the credibility of the witnesses. If, after taking such a view, the trial justice concludes that there exist issues upon which reasonable men might draw conflicting conclusions, the motion for the directed verdict should be denied and the case submitted to the jury for its determination. *D'Andrea* v. *Sears, Roebuck & Co.*, 109 R. I. 479, 287 A.2d 629 (1972); *Maggi* v. *DeFusco*, 107 R. I. 278, 267 A.2d 424 (1970); *Dawson* v. *Rhode Island Auditorium, Inc.*, 104 R. I. 116, 242 A.2d 407 (1968).

It is apparent that the trial justice concluded that on the evidence there were several controvertible factual issues presented which required submission to the jury for determination.

These issues were:

1. Whether defendant exercised proper care and precaution in assigning work to be done by the independent contractor.

2. Whether defendant should have [***9] foreseen unusual risks involved in the work to be performed after having been informed of the previous overflowing and damage.

3. Whether defendant knew or should have known of the existence and use of the calendar or grinding machine by one of its tenants and failed to so advise the independent contractor.

4. Whether water overflowed from the 55-gallon drums during the unblocking operation.

Our reading of the record persuades us that the trial justice correctly applied the rule, and, having found controvertible [*619] facts, properly denied defendant's motion for a directed verdict and submitted the case to the jury.

II

Denial of Defendant's Motion for New Trial

The defendant next contends that the verdict was against the law, against the evidence, against the law and evidence and the weight thereof, and that consequently the trial justice erred in denying its motion for a new trial. We have examined the decision of the trial justice on said motion and concluded that he performed the duties required of him as dictated in *Barbato* v. *Epstein*, 97 R. I. 191, 196 A.2d 836 (1964).

When the trial justice follows the rule set forth in *Barbato*, the appellant on [***10] appeal must persuade this court that the trial justice was clearly wrong or overlooked or misconceived material evidence on a controlling issue of the case or was otherwise clearly wrong. *Blume* v. *Shepard Company*, 108 R. I. 683, 278 A.2d 848 (1971). This the defendant has failed to do. We consequently find no error by the trial justice and affirm his denial of defendant's motion for a new trial.

III

Denial of Requested Instructions to the Jury

We move now to defendant's contention that the trial justice failed to properly instruct the jury on defendant's liability for the acts of an independent contractor in performing work allegedly causing plaintiff's damages. The defendant requested that the trial justice instruct the jury as follows:

> "You are instructed that the defendant, Four Dee Realty, is not liable for the negligent acts of Mr. DeSousa, d/b/a/ AAA Electric Master Rooter Co., and/or his employees in the manner and method of performing his work."

[*620] This instruction was properly disallowed since its allowance in effect was a motion [**6] for a directed verdict which already had been properly denied by the trial justice. A giving of such an [***11] instruction would only mislead or confuse the jury and was therefore properly disallowed.

The defendant further requested that in the event the trial justice failed to give the above instruction, he instruct the jury that it is the general rule that an employer is not liable for the negligent acts of an independent contractor, and further instruct the jury as to the definition of an independent contractor. The trial justice did not instruct as requested by defendant. He instead instructed the jury as follows:

> "Now, on independent contractor, it is the general rule that one who hires an independent contractor is not responsible for the negligent acts of that contractor or that contractor's employees in the manner and method of performing the work for which the independent contractor was hired. Independent contractor is one who is engaged to perform services for another according to his own skill and judgment as to the manner or method of performance, free from the control and direction of the person for whom the services are being performed, in all matters connected with the manner or method of performance, except as to when and where, in general, it should be done and the [***12] results or product of the work.
>
> This general rule of non-liability for an employer of an independent contractor who negligently causes injury in the performance of his work is not without exception. The employer of an independent contractor cannot escape liability for injuries caused by the failure of an independent contractor to exercise due care in the performance of work which is inherently or intrinsically dangerous. Also, the employer of an independent contractor cannot escape liability for injuries caused to the third party person by the negligence of the independent contractor where the work to be performed by the independent contractor is of [*621] such a nature that it would reasonably be expected to cause injury to such third persons unless the employer of the independent contractor takes special precautions to see that no such injury results."

It is well settled that a trial justice is required to instruct the jury as to the law applicable to the facts as the jury may be warranted in finding them, and his failure to do so, if objection be timely made, constitutes grounds for a new trial. He will not be faulted if the instruction as given states the correct rule [***13] of law and substantially conforms to instructions requested. *Goldis* v. *Fairchild*, 103 R. I. 746, 241 A.2d 298 (1968).

There can be no doubt that, on the record before us, DeSousa was an independent contractor. The plaintiff concedes that it can recover only if the emptying of the drain falls within one of the exclusions referred to by the trial justice in his charge. The defendant now claims that the charge, as it related to the exclusions, was confusing. However, the transcript shows that at the conclusion of the charge, defendant's sole complaint was its belief that there was nothing "inherently dangerous" about the "cleaning out of pipes or the fixing of backed-up toilets." At no time did it ever complain, as it does now, of any ambiguity. If defendant was concerned about such an ambiguity, it should have sought further clarification. *State* v. *Amado*, 109 R. I. 53, 280 A.2d 324 (1971).

The general rule as to an employer's immunity from liability for the torts of his independent contractor has been well established. There are, however, numerous exceptions to this rule. The Restatement devotes some 20 sections to the exceptions. *See* 2 Restatement (Second) [***14] *Torts* §§ 410-429 (1965). This court has in the past recognized several of these exceptions. An employer has been held liable (1) on the ground of his being subject to a non-delegable duty. *Webbier* v. *Thoroughbred Racing Protective* [*622] *Bureau, Inc.*, 105 R. I. 605, [**7] 254 A.2d 285 (1969); or (2) in respect to work that by its very nature is likely to cause harm

unless proper precautions are taken, *Sroka* v. *Halliday*, 39 R. I. 119, 97 A. 965 (1916); or (3) with respect to work which is unquestionably inherently dangerous, *Blount* v. *Fong*, 48 R. I. 453, 138 A. 52 (1927); or (4) where the owner of a structure without formally accepting the contractor's work assumes practical control by appropriating it to the use for which it is built, *Read* v. *East Providence Fire District*, 20 R. I. 574, 40 A. 760 (1898).

The defendant apparently looks upon the phrase "inherently or intrinisically dangerous" as being synonymous with "extra hazardous." It has been said that this phrase is not susceptible to a precise definition and that it is easier to state the principle than to apply it. *Whalen* v. *Shivek*, 326 Mass. 142, 93 N.E.2d 393 (1950). [***15] The trial justice first alluded to the "inherently dangerous" exception but then proceeded to embody in his charge the essential and pertinent portions of §§ 416 and 427 of the Restatement. In fact, the language he used is substantially similar to that referred to in *Sroka*. *Sroka* preceded the Restatement by 49 years.

In the commentary following § 427, the authors [3] emphasize that to a "considerable extent" § 427 is a duplicate of § 416. They also stress that the work being done by the contractor need not be the type that is classified as ultra hazardous, but that the employer's immunization from liability is inoperative when the contractor's work involves [*623] a "risk" which is "recognizable in advance" or when the employer has special reason to contemplate such a risk under the particular circumstances under which the work is being done. Prosser observes that liability may attach to the employer even if the risk could not be classified as "unavoidable," provided the contractor's proposed method of doing his job is likely to lead to a "special" risk. Prosser, *Torts* § 71 at 473-74 (4th ed. 1971). It is obvious, then, whether one uses the words "inherently [***16] or imminently dangerous" or a "risk" which is "recognizable in advance" or "special risk", that there is no definite fixed standard which one can apply when seeking to determine if the employer is liable for his independent contractor. The answer must be supplied on a case-by-case basis.

3 The Restatement speaks of liability for "physical harm." *Bassham* v. *Owens-Corning Fiber Glass Corp.*, 327 F.Supp. 1007 (D. N.M. 1971). This phrase has been defined as meaning "physical injury." However, in following the spirit expressed in *Temple Sinai-Suburban Reform Temple* v. *Richmond*, 112 R. I. 234, 308 A.2d 508 (1973), we will apply §§ 416 and 427 whether the risk is a threat to one's life, limb or property.

Here, the landlord can be charged with constructive notice of the third floor calendar machine, its attachment to the main drain, and its discharge capacity. The machine measured 8 feet in width and 30 feet in length. The plaintiff's engineer testified that the tie-in between the machine and the [***17] six-inch drain was clearly visible from the second floor. Given the ceiling-high position of the clean-out plug and the potential drainage from the third floor, there was a "recognizable in advance" or "special risk" that once DeSousa's rooter removed the obstruction, injury would result to the first floor tenant's property unless the defendant had taken proper precautions. It is conceded that at no time prior to rotation of the rooter did any one of the defendant's staff inform DeSousa of the potential deluge that could make its way to the lower floors. Had this been done, DeSousa would have amassed enough 55-gallon drums and the overflow been avoided.

We see no error in the charge.

The defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed.

LEXSEE 742 A.2D 273

**East Coast Collision & Restoration, Inc. v. Robert Allyn et al.**

**No. 98-404-Appeal.**

**SUPREME COURT OF RHODE ISLAND**

**742 A.2d 273; 1999 R.I. LEXIS 225**

**December 5, 1999, Decided**
**December 5, 1999, Opinion Filed**

**PRIOR HISTORY:** [**1] Appeal from Superior Court. Kent County. (KC 91-732). Fortunato, J.

**DISPOSITION:** The appeal is sustained, and the judgment of the Superior Court is reversed. The case are hereby remanded to the Superior Court, with our direction that judgment be entered for the owners.

**COUNSEL:** Michael Kiselica, For Plaintiff.

Raymond A. Lafazia, For Defendant.

**JUDGES:** Present: Weisberger, C.J., Lederberg, Bourcier, Flanders, and Goldberg, JJ., Concurring.

**OPINION**

[*274] **PER CURIAM.** This case came before the Supreme Court for oral argument on November 3, 1999, pursuant to an order directing the parties to appear in order to show cause why the issues raised on appeal should not be summarily decided. Robert Allyn (Allyn) and Chester Vanderpyl, III (Vanderpyl) (collectively, owners), have appealed the trial justice's denial of their motions for judgment as a matter of law and for a new trial. After hearing the arguments of counsel for the parties and after examining the memoranda submitted, we are of the opinion that cause has not been shown. Therefore the issues raised by this appeal will be summarily decided.

In 1987, East Coast Collision and Restoration, Inc. (tenant) leased a building in Exeter, Rhode Island, [**2] from the owners, who had constructed the building to the tenant's specifications, to use as the site of the tenant's auto body repair business. Rather than hiring a general contractor to oversee construction of the building, the owners hired the necessary contractors for each phase of the construction. About eighteen months after the tenant occupied the building, the owners constructed an addition to the building, which the tenant occupied for the same purposes.

Electrical problems began after the tenant moved into the original building, including dimmed and flickering lights, tripped circuit breakers, and electrical shocks received from touching the steel railing of a garage door. There was also a fire in the main fuse panel. The tenant told Vanderpyl of the problems, and the fuse panel was repaired, but the other problems continued. The tenant was unaware of any actions that were taken to correct them. On February 11, 1990, a fire broke out, completely destroying the premises, including vehicles and equipment owned by the tenant.

On June 27, 1991, the tenant filed a complaint in Superior Court, alleging that [*275] the owners negligently maintained, repaired, and operated the premises [**3] and that this negligence resulted in the fire that caused damages to the tenant. At a jury trial held in January 1998, a number of experts testified about the cause of the fire. Deputy State Fire Marshal Gerald Leddy testified that a malfunction in the wiring most probably caused the short circuit that started the fire, although he was unable to identify what caused the malfunction. Another expert testifying on behalf of the tenant stated that he believed damaged insulation on a wire caused the fire and that the insulation was most likely damaged at the time of installation by either an electrician or a carpenter. The owners presented two witnesses who were unable to identify the cause of the fire.

At the close of evidence, the trial justice instructed the jury on several issues that are in dispute in this appeal. The jury was instructed that it should determine whether the owners were general contractors, and if they were, whether they constructed the building in a non-negligent fashion by requiring work to be done safely. The trial justice also instructed the jury on causation and additionally instructed that the lease could provide evi-

dence that the owners had the duty to maintain [**4] the electrical system. The jury returned a verdict for the tenant, and judgment was entered on January 20, 1998. Pursuant to Rules 50(b) and 59 of the Superior Court Rules of Civil Procedure, the owners filed a motion for judgment as a matter of law and a motion for a new trial. The trial justice denied both motions, and the owners have appealed.

In support of their motion for judgment as a matter of law, the owners asserted that as landlords they could not be held liable for a failure to repair or maintain the premises because the law does not impose such a duty on lessors of nonresidential property absent a covenant to the contrary. They further argued that as landlords they were not liable for damages resulting from a hidden defect. We agree with both arguments. On appeal, the owners also argued that there was no legal basis under which they could be held liable as general contractors.

Before we review the substance of the owners' arguments, we must deal with the tenant's claim that the issue of general contractor liability is not properly before us because the owners did not preserve their objection at trial. It is true that this Court has stated that "general objections to instructions, [**5] without specific grounds, are not a sufficient basis for review by this court." *Dyson v. City of Pawtucket*, 670 A.2d 233, 237 (R.I. 1996). However, we have also held that this rule will not be interpreted rigidly in order to overlook trial errors. *Id.* In *Dyson,* we determined that if a request was made to charge differently, and objection was made to the failure to charge in accord with the request, that would be sufficient to preserve the issue for appeal. *Id.* In the case at bar, the owners did request alternative instructions on the issues of general contractor and landlord liability. Thus, the issue is properly before us.

When deciding a motion for judgment as a matter of law, the trial court views the evidence in the light most favorable to the nonmoving party and gives to that party the benefit of all reasonable inferences that properly may be drawn from the evidence, without weighing the evidence or assessing the credibility of the trial witnesses. *Morrocco v. Piccardi,* 674 A.2d 380, 382 (R.I. 1996). When the Supreme Court reviews the trial justice's decision on the motion, it is bound by the same rules and applies the same analysis [**6] as does the trial justice. *Id.*

We must first consider whether the owners could be held liable as general contractors. The general rule is that one who employs an independent contractor is not liable for the negligent acts of that contractor. *Focus Investment Associates, Inc. v. American Title Insurance Co.* 797 F. Supp. 109, 112 (D.R.I. 1992), *aff'd. in* [*276] *part, vacated in part* 992 F.2d 1231 (1st Cir. 1993); *Ballet Fabrics, Inc. v. Four Dee Realty Co.* 112 R.I. 612, 621, 314 A.2d 1, 6 (1974). In the present case, it is undisputed that the workers who constructed the building were independent contractors. Thus, under the general rule the owners are not liable for any negligent acts of an electrician or carpenter that caused the defect that started the fire.

The rule concerning liability for the negligence of independent contractors is not without exceptions. In particular, it has been held that a general contractor may be held liable for the negligence of his or her subcontractors. *Pastorelli v. Associated Engineers, Inc.,* 176 F. Supp. 159, 165-66 (D.R.I. 1959), *cited with approval in Maggi v. De Fusco* 107 R.I. 278, 283, 267 A.2d 424, 427 (1970). [**7] In that case, however, there was evidence that the general contractor had explicitly assumed the duty to supervise the work of the subcontractors. *Pastorelli,* 176 F. Supp. at 162. In the case at bar, there is no evidence that the owners assumed such a duty. Further, they were not builders by occupation and did not regularly engage in the business of constructing buildings. These defendants, therefore, do not fit within the limited exception to the general rule that the employer of an independent contractor is not liable for the contractor's negligence.

The tenant went on to argue that we should apply the exception that imposes liability on the employer of an independent contractor when the work is unquestionably inherently dangerous as discussed in *Ballet Fabrics, Inc.* 112 R.I. at 622-23, 314 A.2d at 7. That case, however, is easily distinguishable from the facts before us. It was absolutely clear that the plumbing problem in *Ballet Fabrics* was extremely likely to cause damage to a tenant if it was not properly repaired, and the independent contractor's negligent act that did cause damage was open and obvious. *Ballet Fabrics*, 112 R.I. at 614-15, 314 A.2d at 3. [**8] In the case at bar, the specific hidden defect was unknown to all parties until the fire occurred, and there was no evidence presented that the owners knew or could have known of any allegedly negligent acts committed by the independent contractors who constructed the building. Moreover, we refrain from establishing a rule that every time a person hires an electrician, the work involved is "unquestionably inherently dangerous" such that the employer is held liable for the electrician's negligence.

We must also address the tenant's argument that the owners may be held liable as landlords because they had a duty to maintain the building's electrical system. The general rule in Rhode Island is that, absent an explicit covenant to the contrary, the lessor of nonresidential space has no duty to repair or maintain that portion of the premises leased to the lessee. *Walsh v. Israel Couture Post, No. 2274 V.F.W.* 542 A.2d 1094, 1097-98 (R.I.

1988). The tenant argued that there was sufficient evidence for the jury to find that the owners had assumed a duty to repair, and it found support for this argument in two facts. First, there was a provision in the lease that provided that the owners [**9] shall be given access to the building for maintenance purposes. Second, the owners paid the electrician who repaired the main fuse panel after a small fire.

Unfortunately, neither the clause in the lease nor the isolated instance in which the owners undertook a repair, considered separately or together, is sufficient to impose on the owners a duty to repair or maintain the electrical system of the leased building. We have stated that a provision in a lease reserving to the lessor the right to enter and make repairs, standing alone, does not obligate the lessor to make repairs. *Givens v. Union Investment Corp.*, 116 R.I. 539, 544, 359 A.2d 40, 42 (1976). With respect to the tenant's argument that the owners assumed the duty to repair by paying for the repair of the fuse panel, we point out that this Court has not considered what conduct by a lessor evinces an assumption of the duty to [*277] repair or maintain the leased premises. Although such an assumption may be possible, we do not believe that there was sufficient evidence for a jury to find such assumption here, a case involving only one instance in which the lessor made a repair. Thus, neither the lease nor the owner's [**10] efforts to repair the fuse panel have imposed a duty on the owners to repair and maintain the building in this case.

Finally, the tenant argued that because the owners may be charged with constructive knowledge of the defect by virtue of having hired the independent contractors who allegedly caused the defect, the owners may be held liable for the damage caused by the defect. The general rule is that the lessor of real property is not liable for damages caused by hidden or latent defects in existence at the time the property was leased unless the lessor knew of the defect and the lessee did not. *Monti v. Leand* 108 R.I. 718, 721-22, 279 A.2d 743, 745-46 (1971). Again, there may be circumstances in which the lessor's liability could be based on constructive knowledge of a bidden defect. In the case at bar, however, there was no evidence that the owners were aware or could have been aware of the allegedly negligent act that created the defect. Further, it was acknowledged at oral argument that there was no evidence in the case of any method by which the owners could have reasonably become aware of the existence of the hidden defect. The mere fact that the lessor hired [**11] the independent contractor who allegedly caused the defect, with no other evidence indicating that the lessor knew or should have known of the defect, is not sufficient to give rise to constructive knowledge that would justify imposing liability for damage caused by a hidden defect.

In conclusion, as a matter of law there was not sufficient evidence to support a finding by the jury that the owners were liable for the negligent acts of the independent contractors who constructed the building. In addition, there was insufficient evidence to support a finding that the owners had assumed the duty to maintain the building's electrical system, or to support a finding that the owners had constructive knowledge of the hidden defect that caused the fire. The trial justice erred in denying the owners' motion for judgment as a matter of law. Therefore, the appeal is sustained, and the judgment of the Superior Court is reversed. The papers in the case are hereby remanded to the Superior Court, with our direction that judgment be entered for the owners.

LEXSEE 93 NE2D 393

**ELIZABETH B. WHALEN, administratrix, *vs.* JENNIE SHIVEK & another (and two companion cases [1]).**

1 The companion cases are by the same plaintiff against Rossano Construction Company, Inc., and against Modern Die & Machine Company.

**Supreme Judicial Court of Massachusetts, Suffolk**

**326 Mass. 142; 93 N.E.2d 393; 1950 Mass. LEXIS 924; 33 A.L.R.2d 74**

**January 4, 5, 1950.**
**June 13, 1950.**

**PRIOR HISTORY:** [***1] THREE ACTIONS OF TORT. Writs in the Superior Court dated February 27, 1946, in the first two actions, and November 25, 1947, in the third action.

The actions were tried before *Broadhurst*, J.

**COUNSEL:** *J. W. Lobdell*, for the defendants Shivek and another.

*D. H. Fulton*, for Rossano Construction Company, Inc.

*L. Brown, (W. P. Cunningham* with him,) for Modern Die & Machine Company.

*J. S. McKenney, (J. N. Esdaile* with him,) for the plaintiff.

**JUDGES:** QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

**OPINION BY:** SPALDING

**OPINION**

[*144] [**395] SPALDING, J. Shortly after three o'clock on the afternoon of January 7, 1946, William B. Whalen, the plaintiff's intestate, was killed when a number of large stone blocks, forming the parapet of a building, fell on him as he was walking along the sidewalk on Hancock Street in the Dorchester section of Boston. His administratrix brings these actions against the owners of the building, Jennie Shivek and Jennie Vershbow (hereinafter called the owners); the tenant thereof, Modern Die & Machine Company [**396] (hereinafter called the tenant); and Rossano Construction Company, Inc. (hereinafter called the contractor), [***2] which the tenant had engaged to do certain work on the building. [1]

1 The administratrix also brought an action against the husband of each of the owners. But these actions need not concern us, for in each of them a verdict was directed for the defendant and the plaintiff did not except.

In the case against the owners the declaration is in four counts. Counts 1 and 2 are based on negligence and seek recovery respectively for conscious suffering and death. The third and fourth counts are for conscious suffering and death and differ from the first and second counts in that they allege a nuisance. The declarations in the actions against the tenant and the contractor are based on negligence, against the tenant and the contractor are based on negligence, suffering and a count for death. At the conclusion of the evidence the owners, the tenant, and the contractor presented motions for directed verdicts, which were denied. A verdict was returned for the plaintiff on each count in each action. Exceptions to the denial fo these motions, to numerous rulings on evidence, and to portions of the charge and the judge's action with respect to various requests for instructions bring [***3] the cases here.

The following facts could have been found: On October 9, 1945, the owners acquired title to a building in Dorchester [*145] and on the same day leased it to the tenant. [1] It was an "L" shaped one story building, one portion of which fronted on Hacock Street and another on Pleasant Street. The wall of the building on Hancock Street - and it is that wall with which we are concerned here - was about eighteen feet high and thirty-five to forty feet long. It was constructed of cement or cast stone blocks. In the middle of the wall was a sliding door, on either side of which was a large window. Running along the top of the windows and the door was an iron rail which supported a concrete beam. The rail protruded out beyond the beam, forming a support for a fac-

ing of cast stone four inches thick which extended to the top of the concrete beam or roof. Extending above the roof for three feet was a parapet consisting of cast stone blocks of alternating thickness backed by bricks. Including the blocks and the bricks, the thickness of the parapet was about twelve inches. Originally the parapet above the door was capped by an ornamental pediment, but this had been [***4] removed prior to the purchase of the building by the present owners.

1 The term of the lease was for three years from October 9, 1945. - REPORTER.

The building described above ad been built in 1926 for use as a garage. The tenant, however, intended to use it for a machine shop, and on December 12, 1945, entered into a contract with the contractor which called for extensive alterations. These included the removal of the parapet mentioned above and its replacement with brick. Prior to the accident on January 7, 1946, the condition of the wall and parapet on the Hancock Street side of the property had been observed by several witnesses and the following is a summary of what they saw: The mortar between the stone blocks of the parapet was loose or missing, leaving a space through which "you could see daylight." Between the stone front and the bricks behind it was an opening, large enough for a boy to put his hand into, that ran the entire length of the wall. The stone blocks in the parapet tilted [*146] out toward the street. The extent of this tilt was variously estimated as from one and one half inches to four inches.

Prior to and at the time of the accident two [***5] employees of the contractor were observed working either on the brick backing or on the stone facing of the parapet with hammers, crowbars, and various other tools. There were no barriers of any kind placed on the sidewalk below to keep people from passing in front of that portion of the building where the work was being done. At the time the plaintiff's intestate was injured all of the cement blocks in the facing and parapet on the Hancock Street side of the property fell onto the sidewalk. These blocks were about ten inches high and twenty inches long and weighed from one hundred seventy-five to two hundred pounds. It is conceded that the plaintiff's intestate was in the exercise of due care, that the accident caused his death, and that there was evidence of conscious suffering. Other evidence will be recited as occasion requires.

1. The contractor's motion for a directed verdict was rightly denied. The [**397] evidence amply warranted a finding that the men working on the parapet at the time of the accident were employees of the contractor engaged in performing work under the contract, and no contention has been made to the contrary. In carrying on its work on that [***6] part of the building which was immediately adjacent to the sidewalk the contractor was under a duty to perform it in a manner that would not create an unreasonable risk of harm to members of the public who might use the sidewalk. The evidence, in our opinion, warranted a finding that this duty was violated. The facts that at the time the contractor's employees were working on the parapet it was in an obvious state of disrepair; that it contained heavy cement blocks and was adjacent to a public sidewalk; that it tilted appreciably toward the street; that the contractor's employees were working on it with hammers, crowbars, [1] and other [*147] tools; and that no barriers of any kind were erected to prevent people from walking on the sidewalk below, were sufficient to warrant a finding of negligence on the part of the contractor. *O'Neil* v. *National Oil Co.* 231 Mass. 20, 26. *McGinley* v. *Edison Electric Illuminating Co. of Boston,* 248 Mass. 583, 587.

1 One witness testified that just before the accident the contractor's employees were loosening bricks on the parapet; that one of the men was prying at a cement block with something that looked like a crowbar; and that he (the witness) looked away for three or four seconds and then heard a crash.

[***7] The contractor argues that the proof against it left the question of its liability in the realm of speculation and conjecture. But we think that the evidence went beyond this. True, there was evidence that the parapet was in a defective condition at the time the contractor commenced to work on it. For this condition, of course, it was not responsible. But it was responsible for what was done thereafter. And, as we have indicated above, one of the circumstances to be taken into consideration on the question of its negligence was the condition of the parapet when it started to work on it. That the owners or the tenant may also be liable because of the condition of the parapet does not relieve the contractor of liability if its negligence contributed to cause the injury complained of. *Edgarton* v. *H. P. Welch Co.* 321 Mass. 603, 611. The jury could have found that the acts of the contractor's servants were a substantial factor in causing the injury. That is sufficient. *Corey* v. *Havener,* 182 Mass. 250. *Ouligham* v. *Butler,* 189 Mass. 287, 293. *Shultz* v. *Old Colony Street Railway,* 193 Mass. 309, 321. *Field* v. *Gowdy,* 199 Mass. 568, 572. *Burke* [***8] v. *Hodge,* 217 Mass. 182, 184. *Camp* v. *Rex Inc.* 304 Mass. 484, 488.

During the course of the trial counsel for the contractor obtained from one witness (who had demonstrated with gestures how the crowbar was used on the parapet) a description of the gestures for the record. Another witness gave a description of a sketch of the parapet which he had made and which had been marked as a

chalk. With respect to the witnesses' descriptions of the sketch and gestures the judge ruled, in substance, subject to the contractor's exception, that the jury were not bound by them and could consider the gestures and the sketch themselves if they saw [*148] fit. There was no error. Because a witness may have described a gesture or a sketch does not entitle a party to a ruling that the description alone can be treated as evidence. True, the description gets into the record and the gesture and sketch do not. But that is a difficulty inherent in the trial of cases. Moreover, many gestures and sketches might be difficult to describe accurately in words. Views ordinarily cannot be accurately reproduced in a record, yet this has never been considered a sufficient reason for not [***9] permitting them or for limiting the judge or jury to considering only so much of the view as may have been described in court. See *Keeney* v. *Ciborowski*, 304 Mass. 371, 372-373.

[**398] The contractor argues that it was prejudiced by the manner in which the judge dealt with the contract and specifications under which the alterations on the building were being made. We see no basis for this contention. The judge charged the jury that the contract was being admitted on the question of control and that nothing contained in it "[enlarged] upon the duty owed by the contractor to any member of the public." At the conclusion of the charge there was a colloquy between the judge and counsel for the contractor, during which the latter directed the judge's attention to provisions in the contract and specifications by which the contractor was to carry liability insurance protecting the tenant against claims for personal injuries and death arising out of the work under the contract, and suggested that these portions of the documents be eliminated before they were taken by the jury. The judge adopted the suggestion, and the agreement and specifications were given to the jury with [***10] the objectionable portions eliminated. No exception was taken to this method of dealing with the matter. It would appear that the contractor got all that it asked for or was entitled to. No contention is or could be made that the contract or specifications were wholly inadmissible.

Likewise without merit is the exception relating to the lease. The lease, which was clearly admissible on the question of control as between the owners and the tenant, [*149] was admitted in evidence. At the pre-trial of the case the owners and the plaintiff agreed that the property had been leased to the tenant "which lease was in full force and effect at the time of the alleged accident." The contractor excepted to various rulings of the judge to the effect that the contractor could not attack the validity of the lease. The rulings were right. Neither the plaintiff nor the parties to the lease had challenged it. The contractor had no standing to do so, for it did not in any way affect its liability, and the judge so instructed the jury.

The contractor was in no way harmed by the direction of verdicts for the defendants in the actions brought against the two male defendants, husbands [***11] of the owners, and its exception to that action is without merit. See *Warren* v. *Boston & Maine Railroad*, 163 Mass. 484, 485-486; *Munroe* v. *Carlisle*, 176 Mass. 199, 201. If anyone was harmed by that ruling it was the plaintiff and she took no exception.

Other exceptions argued by the contractor have not been overlooked. We find nothing in them that requires discussion.

2. The tenant's exceptions arise out of the denial of its motion for a directed verdict, rulings on evidence, portions of the charge, and the denial of certain of its requests for instructions.

The judge did not err in denying the tenant's motion for a directed verdict. In support of its motion the tenant argues that it entrusted the making of the alterations, including the removal of the parapet, to the contractor, and that at the time of the accident the contractor rather than the tenant was in control of the premises. Since, it is argued, the work under the contract was not inherently dangerous, there is no basis for holding the tenant answerable for what was done by the contractor.

There can be no doubt on the evidence that the contractor was performing work on the building as an independent [***12] contractor rather than as employee of the tenant. The contrary has not been argued. In general it may be [*150] said that "the employer of an independent contractor is not subject to liability for bodily harm caused to another by a tortious act or omission of the contractor or his servants." Restatement: Torts, § 409. *Herrick* v. *Springfield*, 288 Mass. 212, 216. *Ferguson* v. *Ashkenazy*, 307 Mass. 197, 200. But there are numerous exceptions to this rule. Indeed, it has been said with some plausibility that the general rule is "now primarily important as a preamble to the catalog of its exceptions." [1] One of these [**399] exceptions is that where the nature and circumstances of the work to be performed are such that injury to others will probably result unless precautions are taken, the employer is answerable for the failure of an independent contractor to take such precautions. *Wetherbee* v. *Partridge*, 175 Mass. 185. *McGinley* v. *Edison Electric Illuminating Co. of Boston*, 248 Mass. 583, 586. *Herrick* v. *Springfield*, 288 Mass. 212, 216-217. *Pannella* v. *Reilly*, 304 Mass. 172, 173. *Ferguson* v. *Ashkenazy*, 307 Mass. 197, [***13] 201. It has frequently been said that the work of the independent contractor for which the employer is held liable on this principle must be inherently or intrinsically dangerous. [2] Because the language used in stating

this exception, however it may be phrased, is not susceptible of accurate definition, it is easier to state the principle than to apply it.

1 *Pacific Fire Ins. Co.* v. *Kenny Boiler & Manuf. Co.* 201 Minn. 500, 503. The American Law Institute in its Restatement of Torts ( §§ 410-429) devotes some twenty sections to the exceptions.

2 See, for example, Restatement: Torts, § 427, where the rule is stated as follows: "One who employs an independent contractor to do work which is inherently dangerous to others is subject to liability for bodily harm caused to them by the contractor's failure to exercise reasonable care to prevent harm resulting from the dangerous character of the work." See also *Berman* v. *Greenberg,* 314 Mass. 540, 543; Prosser on Torts, § 64.

It has been held in the following cases that a finding that the work performed by the independent contractor was inherently dangerous was warranted. *Thompson* v. *Lowell, Lawrence,* [***14] *& Haverhill Street Railway,* 170 Mass. 577 (exhibition of marksmanship by hadless man). *Wetherbee* v. *Partridge,* 175 Mass. 185 (blasting). *Herrick* v. *Springfield,* 288 Mass. 212 (burning timber land). *Pannella* v. *Reilly,* 304 Mass. 172 [*151] (use of poisonous spray in vicinity of vegetable garden). *Ferguson* v. *Ashkenazy,* 307 Mass. 197 (fumigating by poisonous gas). On the other hand, findings that the work was inherently dangerous were held not to be warranted in the following cases. *Boomer* v. *Wilbur,* 176 Mass. 482 (repairing chimney). *Davis* v. *John L. Whiting & Son Co.* 201 Mass. 91 (painting shutters). *Regan* v. *Superb Theatre, Inc.* 220 Mass. 259 (use of staging in painting theatre marquee). *Pickett* v. *Waldorf System, Inc.* 241 Mass. 569 (washing windows). *McCarthy* v. *Waldorf System, Inc.* 251 Mass. 437 (operation of sidewalk elevator). *Berman* v. *Greenberg,* 314 Mass. 540 (use of machine to produce steam in removal of wallpaper).

We recognize that the principle with which we are concerned does not apply to cases where the danger does not come from work performed with proper skill and care, [***15] "but comes only from an unskillful or negligent act of the contractor or his servants, even if a lack of skill or care on the part of some of the persons engaged in the business reasonably may be expected." *Davis* v. *John L. Whiting & Son Co.* 201 Mass. 91, 93. But we are of opinion that a finding was warranted in this case that the removal of the parapet by the contractor, in the circumstances disclosed here, involved work of such kind that it would probably cause injury to persons using the sidewalk below unless special precautions were taken. While the present case bears a superficial resemblance to *Boomer* v. *Wilbur,* 176 Mass. 482, on which the tenant heavily relies, we think that it is distinguishable. There the contractor was engaged to repair the defendants' chimney and while the work was going on a brick fell on the sidewalk and injured the plaintiff. The work there involved consisted in taking bricks off of the chimney for a few feet and relaying them. What happened, the court said, was "a mere detail of the work" arising from negligence which was not a probable consequence of the work. A different case is presented here where the contractor was engaged in [***16] removing from a building bordering on a public sidewalk a parapet containing [*152] blocks weighing approximately two hundred pounds and in a state [**400] of disrepair. See *Covington & Cincinnati Bridge Co.* v. *Steinbrock,* 61 Ohio St. 215. Compare *Engel* v. *Eureka Club,* 137 N.Y. 100.

In view of the foregoing the judge did not err in refusing to grant the tenant's ninth request to the effect that the work called for by the contract between it and the contractor could be performed without any inherent danger to the public.

The tenant excepted to the refusal of the judge to instruct the jury in accordance with its sixth request, which in substance was that there was no evidence that the tenant authorized the existence or continuance of a nuisance on its premises while they in the control of the contractor. An exception was also taken to the following instruction given by the judge: "Neither does the tenant absolve himself from responsibility if, at the time he lets a contract for alteration of the building, that condition of nuisance still remains." The quoted sentence followed an instruction to the effect that the owners were not absolved from liability [***17] by letting the premises to the tenant if the condition of the premises at the time of the letting constituted a nuisance. As will be seen later, the instruction with respect to nuisance was germane to the case against the owners. But at the time the cases were submitted to the jury the question of nuisance was of no materiality in the case against the tenant. Originally the plaintiff's declaration in that case was based on negligence and nuisance, and another ground which need not concern us. At the conclusion of the evidence and before the charge the plaintiff presented a substituted declaration, in two counts, based on negligence, which was allowed. Apparently both counsel for the tenant and the judge labored under the misapprehension that the issue of nuisance was still in the case against the tenant and to the extent indicated above the judge discussed the question in his charge. Counsel for the tenant at no time directed the judge's attention to the fact that the issue was no longer in the case. Reading the charge as a whole and having in [*153] mind the pleadings under which the case was submitted, we think that the jury were given to

understand that the basis of [***18] recovery against the tenant was negligence. We are confirmed in this conclusion by the following special question submitted to the jury by the judge: "Was the work of taking down the Hancock Street parapet inherently dangerous to travellers in that street?" By answering that question in the affirmative at the time they returned their verdict it is apparent that the jury must have understood that the issue with respect to the tenant was negligence arising from the operations of the contractor for which, because it involved work which they could and did find was inherently dangerous, the tenant was answerable. These exceptions must be overruled.

An architect whom the tenant had employed to prepare plans for the alterations of the building was asked by the tenant, "Was there anything that you observed about that parapet which led you, in the light of your experience as an architect, to believe that it was unsafe?" Upon objection of the plaintiff this question was excluded, subject to the tenant's exception. The expected answer was that this witness "observed nothing to lead him to believe it was unsafe." The judge might have permitted this question to be answered, but we do not [***19] think that its exclusion was error. The architect had already testified at some length as to what he observed with respec to the parapet. He testified that it was for appearances rather than safety that the parapet was being removed and that he saw "no evidence of the wall leaning." His answer to the excluded question would have added little or nothing to his previous testimony.

The other exceptions argued by the tenant reveal no prejudicial error.

3. The owners excepted to the denial of their motion for a directed verdict. We think that this exception should be overruled. The rule in this Commonwealth in a situation of the sort under consideration is this: The owner of premises upon which there is a nuisance or a condition that plainly will lead to one cannot avoid liability [**401] to a third person who [*154] is injured thereby outside the premises by showing that prior to the injury he had let the premises to another. In such a case the landlord is deemed by the act of letting to have contemplated or authorized the continuance or maintenance of the nuisance. If, however, the premises are a nuisance not in themselves, but in consequence of the use made of them [***20] by the tenant, then the question is whether this use is authorized by the landlord. "If the premises can be used by the tenant in the manner intended by the landlord, either as shown by the construction of the premises, or by the terms of the lease, or by other evidence, without becoming a nuisance, the landlord is not liable for the acts or neglect of the tenant which creates the nuisance. If the tenant creates the nuisance without authority of the landlord, and after he has entered into occupation as tenant, the landlord is not liable." *Lufkin* v. *Zane,* 157 Mass. 117, 112. *Dalay* v. *Savage,* 145 Mass. 38, 41. *Clifford* v. *Atlantic Cotton Mills,* 146 Mass. 47. *Coman* v. *Alles,* 198 Mass. 99, 102-103. *Hill* v. *Hayes,* 199 Mass. 411, 415-416. *Cerchione* v. *Hunnewell,* 215 Mass. 588, 589. *Howard* v. *Central Amusement Co.* 224 Mass. 344. *Nichols* v. *Donahoe,* 309 Mass. 241, 242. *Brazinskos* v. *A. S. Fawcett, Inc.* 318 Mass. 263, 265-266. Applying these principles to the evidence, we are of opinion that the judge did not err in submitting the case against the owners to the jury. It could have been found that, at the time they leased [***21] the building to the tenant, the condition of the parapet was such as to constitute a nuisance and a source of danger to persons using the sidewalk below ( *Howard* v. *Central Amusement Co.* 224 Mass. 344, 346), and that the owners knew or ought to have known of that condition. Their responsibility for that known of that condition. they leased the property to the tenant. The jury could have found that the nuisance and the negligence of the contractor combined to cause the injury. See *Burke* v. *Hodge,* 217 Mass. 182, 184-185.

The owners direct our attention to the fact (which is borne out by the record) that their motion for directed verdicts with respect to counts 1 and 2 was specifically based on a [*155] variance between the pleadings and the proof. See *Weiner* v. *D. A. Schulte, Inc.* 275 Mass. 379, 385. These counts alleged negligence on the part of the owners in the maintenance of property within their control. There was no evidence that the property was within their control. On the contrary, the evidence, and the stipulations made at the pre-trial of the case, required the finding that the control had passed to the tenant. *Fanciullo* v. *B.G.* [***22] *& S. Theatre Corp.* 297 Mass. 44, 51. The jury, however, found for the plaintiff on all four counts of the declaration. On two of the counts (those based on nuisance) the case was rightly submitted to the jury, as we have indicated above. We fail to see how in these circumstances the owners were harmed by the refusal of the judge to direct verdicts on the counts for negligence. See *Erickson* v. *Buckley,* 230 Mass. 467, 470.

The owners excepted to the refusal of the judge to grant numerous requests for instructions. Requests numbered 1, 2, and 3 in substance asked the judge to charge that the parties had made a binding agreement at the pre-trial to the effect that the owners had leased the building to the tenant and had completely divested themselves of control. This exception must be overruled. The pre-trial report was in evidence and the judge specifically read that portion of it in which it was agreed that the owners had leased the property in question to the tenant and that the lease was in full force and effect at the time of the accident. Having done so, he ought to have gone farther

and told the jury that under the lease control passed to the tenant, instead of [***23] leaving that question, as he did, to the jury. But we think that the jury could hardly have been in any doubt on the question of control in [**402] view of the terms of the lease. [1] Moreover, control was not decisive of the question of liability. As stated above, the owners, if they let the building on which a nuisance existed, would be liable even if they had divested themselves of control.

1 The lease, which was in evidence, stated that it was a demise of the "entire premises."

[*156] Question of more difficulty arise out of the denial of the owners' fourth, fifth, sixth, and seventh requests. [1] Under the lease here it was provided that "The lessee ... shall be responsible for the condition of the premises leased, and ... shall have the right to make ... alterations and improvements in and upon said premises" with an exception not here material. The tenant further agreed to save the owners "harmless from all loss and damage occasioned by ... any nuisance made or suffered on the premises," and to make no use thereof "which shall be unlawful, improper ... or offensive ... or injurious to any person or property." The owners argue that these requests were sufficient [***24] to direct the judge's attention (see *Higgins* v. *Pratt,* 316 Mass. 700, 712) to the principle that in view of the covenants contained in the lease the owners cannot be said to have contemplated the continuance of a nuisance on the premises, if there was one. These requests were not only refused but were not given in substance.

1 These are: "4. By virtue of the terms of the lease, the lessee, Modern Die & Machine Co. had covenanted with the lessor to save them harmless for any nuisance on the premises and to be responsible for the condition of the premises leased. 5. By virtue of the terms of the lease, the defendants Jennie Shivek et al, as against members of the public, had the right to rely upon the Modern Die & Machine Co. managing the premises in such a way as to prevent their being a nuisance. ... 6. If the jury should find that a nuisance existed at the time of the making of the lease in October of 1945, due to the want of repair of the premises, the defendants Jennie Shivek et al are not liable in this action for the use of the premises in such a way as to do harm, merely because there was a manifest possibility of their being used in such a way. The liability will stop with the tenant whose intervening wrong is the immediate cause of the damage. ... 7. Assuming the jury should find from all the evidence that the condition or state of repair of the wall and parapet was such that at the time of the execution of the lease it probably would fall upon the public sidewalk at some time during the term of the lease, the defendants cannot be said to have contemplated such a happening."

[***25] Whether a landlord who lets premises on which there is a nuisance can avoid liability to third persons because of covenants contained in the lease which place a duty on the tenant to repair the premises or remedy the nuisance, or to save the landlord harmless from its consequences, is a question on which there are differing opinions. The American Law Institute in its comment under § 379 of its Restatement of Torts (which states the rule that the lessor does not escape liability by leasing property on which a nuisance exists), [*157] takes the following view: "The fact that the lessee's performance of his duty to demolish, alter or repair the dangerous condition ... would have made the building safe, does not affect the lessor's liability. And this is so although the lessee has expressly covenanted in the lease to demolish, alter or repair the building. Such a covenant gives the lessor a right to recover from the lessee any damages which he is forced to pay under the rule stated in this Section, but does not affect the lessor's liability to persons injured outside the premises" (comment d). This view is supported by the great weight of authority in this country. *Calder* [***26] v. *Smalley,* 66 Iowa, 219, 223. *Mitchell* v. *Brady,* 124 Ky. 411, 416. *Nugent* v. *Boston, Concord & Montreal Railroad,* 80 Maine, 62, 78-79. *Isham* v. *Broderick,* 89 Minn. 397, 400. *Bixby* v. *Thurber,* 80 N.H. 411, 415. *Ingwersen* v. *Rankin,* 18 Vroom, 18, 21. *Swords* v. *Edgar,* 59 N.Y. 28. *Junkermann* v. *Tilyou Realty Co.* 213 N.Y. 404, 409. [**403] Prosser on Torts, page 652. 32 Am. Jur., Landlord & Tenant, § 759. In England a contrary rule obtains. *Pretty* v. *Bickmore,* L.R. 8 C.P. 401. *Gwinnell* v. *Eamer,* L.R. 10 C.P. 658.

To ascertain the rule in this Commonwealth it is necessary to review several of the decisions on which the owners rely. In *Dalay* v. *Savage,* 145 Mass. 38, 40, the court, after stating the rule that, by leasing premises on which there is a nuisance, the lessor does not avoid liability to persons injured outside the premises, added the qualification "unless the tenant has agreed with his landlord to put the premises in proper repair." This was dictum.

In *Clifford* v. *Atlantic Cotton Mills,* 146 Mass. 47 (decided shortly after *Dalay* v. *Savage* ), the court per Holmes, J., [***27] without deciding the question, observed that "courts have differed when the nuisance existing at the time of the lease was due to want of repairs, and the tenant had covenanted to make repairs" (page 49).

In *Cerchione* v. *Hunnewell,* 215 Mass. 588, the plaintiff was injured by slipping on ice on a sidewalk which had formed by water discharged from a spout on a building [*158] owned by the defendants. The trial judge, subject to the defendants' exceptions, refused to allow them to show that the building was demised for a term of twenty years under a lease by which the lessee took possession of the entire premises in their then condition, with the right to make such alterations and repairs as it might deem expedient or to remove the building and erect a new one, and covenanted to save the lessors harmless from all loss or damage occasioned by any nuisance made or suffered on the premises, and from any claim or damage arising from neglect in not removing snow or ice from the sidewalks bordering on the premises. The court, after stating the rule that a landlord may be liable where he lets premises on which a nuisance exists, said, "But where there is a transfer of possession [***28] to a tenant under a genuine lease, by which he is given the right to make alterations and even to replace the existing structures by new, and agrees to save the lessor harmless from damages arising from any nuisance and especially from unremoved snow and ice, it cannot be said that the landlord contemplates the existence of ... [the nuisance] .... The effect, in shielding a landlord from liability, of an express agreement in a lease, putting a duty upon the tenant to relieve against a nuisance, or the conditions from which a nuisance may be produced ... is recognized in *Dalay* v. *Savage,* 145 Mass. 38, 42; *Cavanagh* v. *Block,* 192 Mass. 63, 65, 66; *Quinn* v. *Crimmings,* 171 Mass. 255, 256; *Pretty* v. *Bickmore,* L.R. 8 C.P. 401; and *Gwinnell* v. *Eamer,* L.R. 10 C.P. 658" (pages 589-590). A majority of the It is to be noted that in the *Cerchione* case the court took the view that no nuisance existed on the premises at the time the lease was made. That came about, as the court observed, because of the "wrongful conduct of the tenant in failing to prevent the improper accumulations of ice upon the adjacent sidewalk" (page 590). The court, however, [***29] went on to say, "Under the lease offered in evidence it does not appear that the landlord let a nuisance and took rent as compensation for the use of the nuisance. [*159] If he had done this, the landlord might have been liable. But whether the nuisance should exist or not depended solely upon the act or omission of the tenant. In such case the tenant and not the landlord is liable" (page 590).

In *Howard* v. *Central Amusement Co.* 224 Mass. 344, which held a lessor liable who had let property on which there was a nuisance, the court took occasion to point out that the lessor "took no precaution to guard against such danger, or to provide, that the tenant should do so" (page 346). That statement, however, [**404] was not necessary to the decision because no covenant by the tenant was there involved.

In *Brazinskos* v. *A. S. Fawcett, Inc.* 318 Mass. 263, on facts quite similar to those in *Cerchione* v. *Hunnewell,* effect was given to provisions in a lease whereby the tenant agreed to make repairs and to hold the lessor harmless for injuries to persons or property, and it was held that because of these provisions and the fact that no nuisance existed [***30] when the premises were leased it could not be said that the landlord contemplated the existence of the nuisance.

It would thus appear that only in *Cerchione* v. *Hunnewell* and in *Brazinskos* v. *A. S. Fawcett, Inc.* has it actually been held that effect would be given to covenants of the sort here involved. In both of these cases no nuisance was in existence when the premises were let. So far as we have been able to discover no case decided by this court has ever gone to the extent of holding, as the dicta in *Dalay* v. *Savage* and other cases suggest, that a landlord can by such covenants escape liability to a third person stemming from a nuisance where, as here, the nuisance was in existence when the lease was made. Probably in the *Cerchione* and *Brazinskos* cases the landlord could have defended successfully without reliance on the covenants. *Clifford* v. *Atlantic Cotton Mills,* 146 Mass. 47. *Coman* v. *Alles,* 198 Mass. 99. But however that may be, we are not disposed to hold that covenants of the sort here involved can relieve a landlord from liability for nuisance to persons injured outside the premises in a case like the present where [***31] the nuisance existed at the time [*160] of the letting. It is one thing to let premises on which there is no nuisance, and quite another to let premises on which a nuisance already exists. Even if the tenant is diligent about performing his covenants in the latter situation, there is bound to be an interval of time (as is illustrated by the present case) during which the nuisance would exist. We think it would be contrary to sound public policy to allow a landlord to avoid liability in such a case merely because his tenant had agreed to protect him against it. The rights of a stranger, who was not a party to the agreement, ought not to be thus affected. For an able and exhaustive statement of the reasons for so holding see opinion of Judge Folger in the leading case of *Swords* v. *Edgar,* 59 N.Y. 28, 36-39.

It follows that the judge did not err in the denial of requests numbered 4, 5, 6, and 7. To discuss the exceptions to the denial of other requests argued by the owners would unduly prolong this opinion to no useful purpose. The denial of these requests reveals no error. Most of them are governed by what has been said above.

*Exceptions overruled.* [***32]

LEXSEE 356 A.2D 207

**Edith F. Roberts, Adm'x v. Donald E. Kettelle et al. Peter Chapman, Guardian et al. v. Donald E. Kettelle et al.**

**[NO NUMBER IN ORIGINAL]**

**Supreme Court of Rhode Island**

**116 R.I. 283; 356 A.2d 207; 1976 R.I. LEXIS 1278**

**April 23, 1976**

**PRIOR HISTORY:** [***1] CIVIL ACTIONS to recover damages resulting from automobile collision, before Supreme Court on appeals of all parties following trial and jury verdicts in Superior Court, Needham, J., presiding, heard and plaintiffs' appeals denied and dismissed, defendants' appeals also denied and dismissed, judgments and orders appealed from are affirmed and cases remitted to Superior Court for further proceedings.

**DISPOSITION:** Appeals denied and dismissed, defendants' appeals also denied and dismissed, judgments and orders appealed from are affirmed and cases remitted to Superior Court for further proceedings.

**COUNSEL:** *Joseph A. Kelly, Carroll, Kelly & Murphy*, for plaintiffs.

*Joseph V. Cavanagh*, for defendant Donald E. Kettelle.

*Charles H. Anderson*, for defendant Martha D. Roberts.

**JUDGES:** Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

**OPINION BY:** PAOLINO

**OPINION**

[*285] [**210] This case arises from a tragic automobile accident which occurred in the southbound lanes of Interstate Route 95 in the city of Warwick on the night of February 6, 1970. On that evening, seven young people were traveling from Boston, Massachusetts to Old Lyme, Connecticut, in a three-seated, heavy-duty station [***2] wagon known commercially as an International Travel-all. Seated from left to right in the front seat were the defendant-driver Martha D. Roberts, the plaintiff's decedent Robin Roberts, and the second plaintiff, Akiko Sasamoto. The middle seat was occupied by Katharine Hotarek and Olivia Campo and the rear seat contained Edward Ritz and Edith Roberts, the sister of the plaintiff's decedent and of the defendant.

This group had spent the day in Boston where Robin resided as a college student and had as their destination the Roberts' home in Old Lyme. Martha, who was 17 years old at the time and who had been a licensed driver for 7 or 8 months prior to the date in question, assumed driving duties that day upon leaving the Boston city limits to which point Edward Ritz had piloted them.

[*286] The group proceeded southerly without incident until they reached a point on the highway some seven to eight-tenths of a mile north of the East Greenwich turnoff. At that particular location, the asphalt surface attains a width of four lanes, each lane being 12-feet wide. The two left lanes are clearly marked as East Greenwich-bound while those on the right are equally clearly marked as [***3] the through lanes of Interstate Route 95 bound for New York City and other points south. At this juncture Martha swung her vehicle from the third lane in which she had been traveling into the fourth lane in order to pass a slower vehicle. Just as she accomplished this incursion into the left-hand lane, Martha became suddenly aware of defendant state trooper Kettelle's police car which she described as a vehicle with red flashing lights that appeared to have stopped immediately in front of her. She could not then retreat to the third lane as her vehicle was parallel to the automobile which she had intended to pass. She [**211] therefore applied the brakes on her Travel-all and swerved to the left in an effort to avoid defendant Kettelle's automobile.

Martha's efforts were to no avail in that her vehicle struck the rear of the preceding vehicle with enough force to leave the latter facing in the direction from which it had come, and her own car struck the guardrail located on the median area and overturned once coming to rest on its side. As a result of the mishap Robin Rob-

erts was killed and Akiko Sasamoto suffered severe personal injuries resulting in several hospitalizations [***4] for the treatment of a fractured pelvis, a fractured lumbar vertebra and a ruptured spleen.

While these events were unfolding, a separate set of facts was developing which have a bearing on several aspects of this case. On the same evening when Martha Roberts and company sojourned homeward on Interstate [*287] Route 95, a noted local underworld figure and his female companion were killed by shotgun blasts emanating from a late model white Cadillac with out-of-state registration plates as the pair left the woman's home in the Pawtuxet section of Cranston. A description of said vehicle was broadcast to all state police vehicles and all officers were advised to be on the lookout in order to avert the alleged gunman's escape from the state of Rhode Island.

Trooper Kettelle was traveling southward on Interstate Route 95 in the city of Warwick near the interchange of Rhode Island Route 117 when he received the above-described bulletin. He decided to assume a post about 2 miles south of Route 117 in a dirt and macadam path marked "Official Use Only" which traverses the median area just north of the East Greenwich turnoff described in the first part of this opinion. As he approached [***5] his destination he directed his car into the fourth left-hand lane and began to decelerate. Kettelle testified that at this point in time he activated his red flashing signal light in order to avoid becoming "a sitting duck." It is unclear whether this comment indicates that his intention in lighting the signal apparatus was to announce his presence to following vehicles and thus to avoid any rear-end collisons or whether he intended to evade detection by the suspected killers. When he was two-to-three-tenths of a mile north of the so-called "official turnoff," trooper Kettelle's vehicle was traveling, by his own estimate, no more than 40 miles per hour and, by some witnesses' estimates, his vehicle was at a complete standstill. The maximum speed allowed on that stretch of road on that date in 1970 was 60 miles per hour and the minimum allowable speed was 15 miles per hour less or 45 miles per hour. In any event, it was at this juncture that the Roberts' vehicle, being operated as described above, came into contact with the Kettelle vehicle.

[*288] Actions were instituted in the Superior Court by the estate of the decedent Robin Roberts for wrongful death and on behalf of [***6] Akiko Sasamoto, a minor and a citizen of Japan, for pain and suffering and medical expenses. Both complaints named the driver Martha D. Roberts and trooper Kettelle as parties defendant.

The cases came to trial before a justice of the Superior Court and a jury in June 1974. On June 10, 1974, the jury returned verdicts in favor of each plaintiff against each defendant. Damages in the wrongful death suit were assessed against defendant Kettelle in the amount of $ 40,000 and against defendant Martha D. Roberts in the same amount. In the personal injury action the award was $ 2,800 for medical expenses to Peter Chapman, Guardian, against both defendants and $ 5,000 for pain and suffering in favor of Akiko Sasamoto, p.p.a., against both defendants. Upon the recording of the verdict, counsel for plaintiffs objected on the ground of his belief that the jury had misunderstood the trial justice's instructions and halved the awards. He opined that the verdicts should be doubled and moved that the jury be polled as to the amount of the award intended [**212] by them. The justice denied the motion upon a finding that the jury had clearly followed the instructions and the jury was polled [***7] in the ordinary manner, each juror responding that he or she intended an award of $ 40,000 against both defendants in the wrongful death suit. Judgments were entered accordingly.

At this juncture, the trial justice denied the motions for a directed verdict of each defendant upon which decision had been reserved. All parties thereupon filed Super. R. Civ. P. 59 motions for a new trial; defendants on the ground that the verdict was against the law, the evidence and the weight thereof, and plaintiffs on the ground that the damages were grossly inadequate. The plaintiffs also [*289] filed a so-called "Motion for Relief" under Super. R. Civ. P. 60 and accompanied said motion with the affidavits of each of the 12 jurors who sat on the case to the effect that each had intended that the damages in the wrongful death action were to be $ 80,000 against both defendants and that the award to Akiko Sasamoto was intended to be $ 2,800, medical expenses, and $ 10,000, pain and suffering.

The trial justice denied the motions for new trial filed by each defendant and the Rule 60 motion filed by plaintiffs. Regarding the latter motion, the trial justice ruled that a motion which directs the [***8] court to consider affidavits of the jury is inappropriate and not the proper subject matter for Super. R. Civ. P. 60. The trial justice then proceeded to reject consideration of the affidavits in the context of plaintiffs' Super. R. Civ. P. 59 motions for a new trial. Upon full consideration of those motions, however, the trial justice found, on the basis of all relevant evidence other than the jurors' affidavits, that the jury's award was inadequate to compensate for the losses suffered. The motions for a new trial were therefore granted in both cases on the issue of damages alone unless the defendants filed an additur of $ 50,000 in the wrongful death action, raising the total verdict to the full sum of $ 90,000, and an additur of $ 10,000 in the personal injury action, thereby increasing the total verdict in

that case to $ 15,000. Orders to this effect were entered on July 3, 1974.

All parties filed appeals in this court. These appeals raise several significant issues and for the sake of clarity each will be dealt with individually.

I

The first point raised by defendant Kettelle in his appeal from the denial of his motion for a directed verdict is that because he was responding [***9] to an emergency call displaying his emergency signal lights, he was exempt from [*290] the minimum speed regulations. On this basis, he asserts that no negligence can be ascribed to him and that he is thus entitled to have a verdict directed in his favor. He cites G. L. 1956 (1968 Reenactment) § 31-12-6 [1] as the source of this exemption and the gravamen of his position is that the operator of an emergency vehicle enjoys a per se exemption from vehicle speed laws. The defendant Kettelle is of the belief therefore that his traveling at a speed less than the 45 miles per hour minimum was, in these circumstances, nonnegligent. The defendant Roberts, who relies on a finding of Kettelle's negligence in order to enjoy the partial shelter of joint and several as opposed to sole liability, vigorously opposes this position. In her brief, defendant Roberts joins in the position of plaintiffs and asserts that Kettelle's argument under § 31-12-6 [**213] conveniently omits reference to the companion provision § 31-12-9. [2] The thrust of this argument is that the latter section, in specifying that the law does "* * * not relieve the driver of an authorized emergency vehicle from [***10] the duty to drive with due regard for the safety of all persons" or "* * * protect the driver from the consequences of his reckless disregard for the safety of others," imposes a duty of due care on the drivers of emergency vehicles.

1 General Laws 1956 (1968 Reenactment) § 31-12-6 reads as follows:

> "Emergency vehicles -- Times when entitled to special privileges. -- The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in § 31-12-7, but subject to the conditions stated in §§ 31-12-8 and 31-12-9."

2 General Laws 1956 (1968 Reenactment) § 31-12-9 reads as follows:

> "Due care by emergency vehicles. -- The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

[***11]

The statutes in question do, indeed, provide for certain [*291] privileges to be extended to drivers of emergency vehicles and the operation of these privileges will negate an allegation of negligence. This statutory exemption, however, is contingent upon the results of a two-tiered inquiry. At the threshold, the finder of fact must determine whether a vehicle indeed qualifies as an emergency vehicle under the statute. Secondly, if it is found that an emergency exists, the finder of fact must focus its investigation on the question of whether the driver's conduct in the emergency constitutes a reckless disregard for the safety of others. Conversely, if no emergency is found to exist, the driver's conduct is to be scrutinized under standards applicable to all other drivers, that is, whether he was negligent.

Our review of the language of § 31-12-6 and of the cases in other jurisdictions interpreting similar statutes leads us to conclude that a vehicle is "responding to an emergency call" when the occupant or occupants of said vehicle honestly believe that an emergency exists and when that belief is a reasonable one. *Bravata* v. *Russo*, 41 Misc.2d 376, 378, 245 [***12] N.Y.S.2d 702, 704 (1963).

We direct our attention now to the standard to be applied in evaluating the conduct of a driver in emergent circumstances. We clearly cannot accept defendant Kettelle's view that the driver of an emergency vehicle is entitled to a per se exemption from traffic speed regulations. Section 31-12-9 clearly delineates the parameters of the privilege by imposing upon such drivers a "duty to drive with due regard for the safety of all persons." That section further denies protection under the privilege to such drivers who execute their duties with a "reckless disregard for the safety of others." These terms have specific legal meanings which, in the absence of contrary indications, we will assume the General Assembly in-

tended them to have as employed in § 31-12-9. Recklessness is perceived [*292] by virtually all authorities to differ in kind rather than in degree from negligence. *E.g.*, Prosser, *Torts*, § 34 at 185 (4th ed. 1971). This court has held that recklessness, in the context of a penal statute, imparts a disregard by the accused for the consequences of his act and an indifference to the safety of life and limb. A driver of a motor vehicle [***13] may be convicted of reckless operation of said vehicle where the evidence shows that he has embarked upon a course of conduct which demonstrates a heedless indifference to the consequences of his action. *State* v. *Lunt*, 106 R. I. 379, 383, 260 A.2d 149, 151 (1969). We believe that this characterization of recklessness is equally appropriate in the context of the remedial statute under consideration here. Thus, where the driver of an authorized emergency vehicle, when responding to an emergency call, operates his vehicle in such a manner as to demonstrate a heedless indifference to the consequences of his action, the finder of fact must conclude that he has exhibited a reckless disregard for [**214] the safety of others and thus withhold the privileges extended to him under § 31-12-6.

We reiterate at this point that an initial finding that no emergency existed obviates the necessity to inquire into the question of whether the driver exhibited a reckless disregard for the safety of other users of the highway. Such a nonemergency driver is bound by all the rules of the road and other traffic regulations and is liable for the consequences of his negligence.

We turn now [***14] to a consideration of the trial justice's denial of defendant Kettelle's motion for a directed verdict. In passing on such a motion, the trial justice must view all the evidence in the light most favorable to the adverse parties, draw all reasonable inferences from the evidence favorable to those parties, and refrain from weighing the evidence and passing upon the credibility of the witnesses. If, after taking such a view, the trial justice concludes [*293] that there exist issues upon which reasonable men might draw conflicting conclusions, the motion for the directed verdict should be denied and the case submitted to the jury for its determination. *Ballet Fabrics, Inc.* v. *Four Dee Realty Co.*, 112 R. I. 612, 618, 314 A.2d 1, 4-5 (1974). Our review of the record insofar as it reflects the trial justice's deliberations on the present issue reveals that he correctly perceived and executed his duty. We hold that he was also correct in his conclusion that reasonable men might reach differing conclusions regarding the emergent nature of the call to which defendant Kettelle was responding at the time of the collision and regarding the question of his negligence under the [***15] circumstances. There is evidence on the record which, when viewed in the light most favorable to plaintiffs and to defendant Roberts, reasonably supports the conclusions that no emergency existed and that defendant Kettelle was negligent. Regarding the existence of an emergency, the evidence shows that Kettelle was under no specific instructions to assume the particular post in the "official turnoff"; that he was responding to an all-points bulletin regarding the shooting suspects; and that, even assuming the suspects would be fleeing by way of Interstate Route 95, he was at least several minutes ahead of such suspects. Regarding the question of Kettelle's negligence there is evidence that he was driving well below the minimum allowable speed while in the "high-speed" lane of the highway. There was even testimony to the effect that his vehicle was not completely on the road surface and that it had come to a complete stop there. We find no error in the denial of defendant Kettelle's motion for a directed verdict, [3] in the [*294] submission of these questions to the jury, or in the manner that they were submitted.

3 The defendant Roberts also submitted a motion for a directed verdict on the ground that Rhode Island law does not permit intrafamilial suits between siblings. The issue, though argued by all concerned parties in their briefs, was waived for consideration at oral argument by agreement of counsel.

[***16]

II

The defendant Kettelle further claims in the context of the denial of his motion for a directed verdict, that even if his conduct was negligent, such negligence could not, as a matter of law, constitute a proximate cause of plaintiffs' injuries. His position is that such conduct created no more than a past condition or circumstance which left defendant Martha Roberts' failure to keep a lookout as the sole proximate cause of said injuries. To support this contention, defendant offers the case of *Burr* v. *Fall River News Co.*, 75 R. I. 476, 67 A.2d 694 (1949), wherein this court upheld a directed verdict in favor of the defendant which had been premised upon uncontradicted evidence that a collision of the plaintiff's automobile with the rear end of the defendant's truck was [**215] proximately caused by the blinding headlamps of an oncoming bus rather than the absence of a visible taillight from the rear of the defendant's truck. This court held on those facts that the failure to maintain such taillights, though negligent, became merely a past condition or circumstance which was displaced by an intervening independent cause so that such original negligence in no [***17] way continued to operate effectively in whole or part as the proximate or concurring cause of the accident. *Id.* at 481-82, 67 A.2d at 696-97. *Accord, Brey* v. *Rosenfeld*, 72 R. I. 316, 321-22, 50 A.2d 911, 913 (1947). We fail to perceive the applicability of this doctrine to the facts of the case at bar. For negligent conduct

to be considered a past condition or circumstance, the *Burr* test requires that such negligent conduct must have become totally inoperative as a cause of the injury. We cannot accept defendant Kettelle's proposition that his negligence in driving slowly in the high-speed lane of Interstate Route 95 was rendered totally inoperative by [*295] the intervening negligence of Martha Roberts. The jury was clearly justified in finding that the negligence of both defendants concurred to produce the proximate cause of plaintiffs' injuries.

In *Aldcroft* v. *Fidelity & Cas. Co.*, 106 R. I. 311, 259 A.2d 408 (1969), we held that an intervening act will not insulate a defendant from liability if his negligence was a concurring proximate cause which had not been rendered remote by reason of the secondary cause which intervened. The test for remoteness [***18] is whether the intervening act could reasonably have been foreseen as a natural and probable result of the original act of negligence of the defendant. If it could have been so foreseen, the intervening negligence is not so remote as to prevent the original act from being considered at law as merely a concurring cause of the injury. *Id.* at 314, 259 A.2d at 411. In the case presently before us, it seems clear that defendant Kettelle could reasonably have anticipated that another vehicle being negligently driven at a rate of speed in excess of the maximum speed limit would approach him from the rear in the high-speed lane of an interstate highway. Thus, his original negligence is not so remote as to be considered merely a past condition or circumstance. The question was properly submitted to the jury for their consideration of whether the negligence of both defendants concurrently caused plaintiffs' injuries.

III

The defendant Kettelle's next assignment of error is that the trial justice erred in his instruction to the jury regarding proximate cause. The substance of his position is that, after having defined proximate causation to the jurors, he failed to instruct them that [***19] a verdict could not be rendered against a defendant unless negligence on the part of that particular defendant was found to be the proximate cause of the accident. The instruction as it was [*296] delivered to the jury, in defendant Kettelle's view, invited a verdict against him upon a finding that his conduct factually rather than proximately caused the mishap.

This court has often expressed the rule that, in the absence of peculiar circumstances, an imprecise portion of a charge shall not be lifted from its context in order to determine whether or not its effect was prejudicial. *Nardolillo* v. *Ward Foods, Inc.*, 113 R. I. 255, 259, 319 A.2d 651, 654 (1974). A reading of even that short portion of the instruction quoted in defendant Kettelle's brief indicates that the instruction, when read as a whole, clearly conveys to the jury the fact that a verdict for plaintiffs would require the two-part finding that defendant was negligent and that his negligence was the proximate cause of the injury. We hold therefore that there was no error in the trial justice's instruction to the jury regarding defendant Kettelle's negligence as the proximate cause of plaintiffs' injuries.

[***20] [**216] A second challenge to the trial justice's instructions relates to that portion of those instructions which is recorded in the transcript as follows:

> "The driver of an authorized emergency vehicle when responding to an emergency call *and* when in the pursuit of actual or suspected violator of the law * * * may exercise the privileges set forth in the statute." (Emphasis added.)

The defendant Kettelle alleges that by substituting the italicized word "*and*" in place of the word "or" which appears in § 31-12-6 [4] the trial justice gave the jury the impression that Kettelle must have been in the actual pursuit of an alleged violator of the law in order to be entitled to the privileges under the statute. Since he was clearly not engaged in such pursuit, defendant contends that this amounted to an instruction that he was negligent.

4 See note 1 *supra* for text of G. L. 1956 (1968 Reenactment) § 31-12-6.

[*297] This question may be disposed of in the same manner as [***21] the previous question. That is, we must examine the charge as a whole in order to determine whether any part thereof was prejudicial to defendant's case. *Handy* v. *Geary*, 105 R. I. 419, 432, 252 A.2d 435, 442 (1969).

The trial justice did use the conjunctive "and" instead of the disjunctive "or" as he alluded to the statute which lists the times when a driver of an authorized emergency vehicle can exercise the privileges delineated in § 31-12-7, but he also informed the jury that the police car was an authorized emergency vehicle and that the one issue to be decided was whether Kettelle was responding to an emergency call. The trial justice pointed out to the jury that since there was no statutory definition of what constitutes an emergency call, he would refer them to the dictionary definition of "emergency," which he read to them as "an unforseen combination of circumstances which calls for immediate action." We believe that when the emergency call portion of the charge is read and listened to in its entirety, the jury was fully informed that it could find that Kettelle was responding to

an emergency call in an authorized vehicle and that, as such, he was entitled to [***22] use the privileges listed in § 31-12-7. The panel was also told that the statutory privileges afforded no protection to Kettelle if he operated his vehicle in reckless disregard of the safety of others. The trial justice's inadvertent reference to "and" instead of "or" might have been erroneous, but it was totally harmless.

IV

The defendant Kettelle continues by raising several interrelated challenges to the trial justice's denial of his motion for a new trial. Essentially, all the points he raises in this respect amount to a broad allegation that the trial justice misconceived or disregarded evidence regarding defendant's statutory exemption from speed laws, defendant's [*298] use of flashing signal lights and the question of Martha Roberts' intervening negligence. This is coupled with a general assertion that the verdict against Kettelle was contrary to the weight of the credible evidence.

A trial justice, when acting on a motion for a new trial, has been characterized as "a thirteenth juror." His duty is to independently review all material evidence in the light of his charge to the jury, passing upon the weight thereof and assessing the credibility of the witnesses [***23] who have appeared before him. He may reject some evidence or testimony, either because it was impeached or contradicted, or because other circumstances render it inherently improbable. He is also at liberty, in ruling on such a motion, to draw such inferences as are reasonable in view of other testimony and evidence which are in the record. *Gordon* v. *Campanella Corp.*, 112 R. I. 417, 420, 311 A.2d 844, 847 (1973).

[**217] Turning to the present case, we note that the trial justice, after correctly reciting his duty in this regard, embarked upon a lengthy review of the record evidence bearing on the issue of defendant Kettelle's liability, drawing therefrom several inferences consistent with the jury's finding that Kettelle and Martha Roberts were concurrently negligent. Specifically, the trial justice made note of the fact that every witness, except Kettelle, while admitting that Kettelle's signal light was operating, testified that it was observed for only a span of four to five seconds. It was also pointed out that several statements made by defendant Kettelle himself were at variance with other prior segments of his in-court testimony. The Superior Court justice [***24] surmised, therefore, that defendant Kettelle failed to utilize his signal light until he was in the high-speed lane and within an area only several hundred yards from the turnoff he was seeking. He concluded that, weighing all the evidence, it was his opinion that without the [*299] concurrent negligence of both drivers, Kettelle in turning his signal light on in close proximity to the scene of the accident and Martha Roberts in failing to keep a proper lookout, the mishap would not have occurred. The defendant Kettelle has failed to persuade us that the trial justice, in passing on his motion for a new trial, was clearly wrong or that he overlooked or misconceived material evidence on a controlling issue in this case. Thus, we find no error in the denial of defendant Kettelle's motion for a new trial.

V

On their appeal, plaintiffs' primary contention is that the trial court erred in rejecting the affidavits of all 12 jurors and in consequently denying their Super. R. Civ. P. 60 "Motion for Relief." They argue that, because these affidavits were offered in this case only to show that the jury's true verdict was not recorded, the rule that a verdict rendered by a jury may [***25] not be impeached upon evidence from a juror is inapplicable. The plaintiffs maintain that an enlightened construction of the Rules of Civil Procedure would permit the use of affidavits to correct an obviously inadvertent mistake.

Even though the decisions of many courts support the view that where a jury's error is latent and not apparent from the face of the verdict it may be proper to receive affidavits from individual jurors to ascertain the true verdict, *see, e.g., Freid* v. *McGrath*, 135 F.2d 833, 834 (App. D.C. 1943), we are of the opinion that a contrary rule is dictated by considerations of sound public policy. This court has unwaveringly adhered to the position that jurors' affidavits when offered to prove what any of the jurors may have done either before or during their deliberations cannot be used to impeach their verdict. *State* v. *Palmigiano*, 115 R. I. 166, 168, 341 A.2d 742, 743 (1975). The rule is solidly grounded in the premise that admission of [*300] such affidavits undermines the stability of jury verdicts and corrodes the purity of trials by jury. *Phillips* v. *Rhode Island Co.*, 32 R. I. 16, 21, 78 A. 342, 343 (1910). We perceive no [***26] reason why this rule should not apply with equal force to a situation where the alleged error is that the jury erroneously reported its true verdict. The public interest requires that litigation be terminated and to that end the jury verdict should possess a conclusiveness that will preserve the stability of the jury trial as an instrument for doing substantial justice. *Palumbo* v. *Garrott*, 95 R. I. 496, 502, 188 A.2d 371, 374 (1963). To allow jurors' affidavits even for the limited purpose sought here would tend to pollute our system of independent deliberations by the jury. Every party who was dissatisfied with a jury verdict would feel able at least to attempt to effect a revision thereof. Such a situation leaves jurors open to harassment and intimidation long after they have been discharged from their official duties and thus after they are outside the watchful eye of the court.

[**218] In view of the foregoing we find no error in the denial of plaintiffs' Super. R. Civ. P. 60 "Motion for Relief" on the ground that the affidavits submitted in conjunction therewith were inadmissible.

VI

The final issue raised by these appeals is whether the trial justice erred [***27] in granting plaintiffs' motions for a new trial unless defendants consented to additurs of $ 50,000 and $ 10,000 in the Roberts and Sasamoto cases respectively.

As a corollary to their position that the jury erred in its reporting of the verdict to the court, plaintiffs contend that, at the very least, they were entitled to a new trial on the question of damages as per their Super. R. Civ. P. 59 motions. They contend further that the trial justice was correct and justified in finding that the verdicts as [*301] reported were grossly inadequate and thus in granting the motions for a new trial on the issue of damages conditional upon agreement to additurs by both defendants.

The defendants retort by suggesting that a trial justice is justified in setting aside a verdict only if it reflects passion, prejudice, partiality or corruption. They argue that the reported verdicts in this case were not contrary to the weight of the evidence or grossly inadequate; that damages, especially in a case for wrongful death, are extremely speculative; that the trial justice abused his discretion and invaded the province of the jury by revising the amounts originally awarded; and that the trial [***28] justice, while disallowing the use of affidavits in ruling on a motion for a new trial, was obviously influenced by the jurors' affidavits submitted in this case.

In ruling on a motion for a new trial on the ground of inadequacy of damages, a trial justice has fundamentally the same duties as he has in passing on motions for a new trial generally. As noted above, he acts as the "thirteenth juror" and in the exercise of his independent judgment he must weigh all the material evidence on the question of damages and pass on the credibility of the witnesses. After the evidence-sifting process is completed, and liability is established, a new trial on the question of damages should be granted, if there is a demonstrable disparity between the award and the damages sustained such that the verdict is not truly responsive to the merits of the controversy and fails to do substantial justice between the parties. *Grenier* v. *Royal Cab, Inc.*, 114 R. I. 11, 15, 327 A.2d 272, 274 (1974). If the trial justice finds that a new trial is warranted on the question of damages, it is his duty, before ordering a new trial thereon, to give the plaintiff an opportunity to file a remittitur or the [***29] defendant [*302] an additur. 1 Kent, *R. I. Civ. Prac.* § 59.4 (1969). [5] This court will not disturb a trial justice's finding that an award is grossly excessive or inadequate unless he is clearly wrong. *Armes* v. *United Elec. Rys.*, 74 R. I. 450, 451, 62 A.2d 131, 131 (1948).

5 This practice stems from G. L. 1956 (1969 Reenactment) § 9-23-1 which was repealed by P. L. 1972, ch. 169, § 9. Section 9-23-1 provided specifically that additurs or remittiturs be made available as alternatives to new trials on the question of damages. The practice remains viable by virtue of the provision of Super. R. Civ. P. 59(a)(1) that new trials are available after a jury trial "* * * for any of the reasons for which new trials have heretofore been granted * * *."

In the instant case, the trial justice, correctly perceiving his duty in the circumstances, thoroughly reviewed the record evidence and preserved on the record those facts which influenced his decision. He justified the additur of $ 10,000 [***30] in the Sasamoto case by exhaustive recitation of the testimony bearing on the extent of her injury and the pain and suffering to which she was subjected insofar as each had a bearing on the amount of damages. The trial justice admitted that plaintiff Sasamoto had made a good recovery and had returned to most normal activities by June 1970, but he made express note of uncontradicted [**219] evidence that she suffered some residual effects of the injuries such as the loss of her spleen, abdominal scars from the surgery, and a sensitivity to temperature changes. On the basis of these findings we cannot say that the trial justice was clearly wrong in granting a new trial on the ground that the award was inadequate or that the additur of $ 10,000 represented an abuse of discretion.

Responding to the motion for a new trial on the issue of damages in the Robin Roberts wrongful death action, the trial justice recalled for the record all of the trial testimony regarding the Roberts family's status in life and the expert testimony as to Robin's projected life income and expenses. He noted that her income could conceivably [*303] range from $ 196,000 to $ 235,000 as a potential college [***31] graduate. We hold in these circumstances, therefore, that the trial justice did not err in his conclusion that the verdict of $ 40,000 against both defendants did not truly respond to the merits of the controversy and that it failed to achieve substantial justice between the parties, nor did he err in granting the plaintiff's motion for a new trial unless the parties filed an additur of $ 50,000.

The plaintiffs' appeals are denied and dismissed. The defendants' appeals are also denied and dismissed. The judgments and orders appealed from are affirmed and the case is remitted to the Superior Court for further proceedings.

LEXSEE 259 A.2D 408

**Ralph Aldcroft v. The Fidelity and Casualty Company of New York**

**[NO NUMBER IN ORIGINAL]**

**Supreme Court of Rhode Island**

**106 R.I. 311; 259 A.2d 408; 1969 R.I. LEXIS 630**

**December 4, 1969**

**PRIOR HISTORY:** [***1] CIVIL ACTION, involving action against insurer to recover damages caused by uninsured motorist, before Supreme Court on appeal by defendant from judgment entered by McKiernan, J., of Superior Court, following jury verdict for plaintiff, heard and appeal denied, and judgment affirmed.

**DISPOSITION:** Appeal denied, and judgment affirmed.

**COUNSEL:** *John F. McBurney*, for plaintiff.

*Graham, Reid, Ewing & Stapleton, Edward J. Regan*, for defendant.

**JUDGES:** Roberts, C. J., Paolino, Powers and Kelleher, JJ. Joslin, J., did not participate.

**OPINION BY:** ROBERTS

**OPINION**

[*312] [**410] This is a civil action brought to recover damages for injuries sustained by the plaintiff as the result of a collision between two motor vehicles. The case was tried to a jury in the Superior Court, a verdict was returned for the plaintiff in the amount of $ 5,000 plus interest and costs, and judgment entered therefor. Subsequently the defendant's motion for a new trial was denied, and it is now in this court prosecuting an appeal from the judgment.

At the time of the collision plaintiff Ralph Aldcroft, a member of the Pawtucket police department, was a passenger in a police cruiser responding to an emergency call [***2] to investigate a traffic accident. The police cruiser was being operated by another member of the police department, Frank Reddington. It is not disputed that plaintiff had been issued a policy of insurance by defendant, in which he was the named insured. The policy included coverage for injuries received by the acts of uninsured motorists. The plaintiff, claiming that the operator of the other involved car was an uninsured motorist as defined under [*313] the terms of the policy, brought the instant action against defendant.

The police cruiser was proceeding east on the left-hand side of Church Street, and [**411] the operator testified that the emergency light was flashing and that the siren was being sounded. It is conceded that, when the police cruiser was approaching the intersection of Pine and Church Streets, the traffic light which controls traffic at the intersection was showing a red signal for traffic approaching on Church Street. The operator of the police car testified that he saw the red signal, slowed down before reaching the intersection, and then proceeded to enter the intersection against the red signal. At that time he observed that a motor vehicle [***3] being operated by Donald Wiberg north along Pine Street was also entering the intersection. Patrolman Reddington, the operator of the police cruiser, testified that he attempted to avoid the collision by turning to his left but was unable to do so. It is apparently conceded that, at the time of the collision, the traffic light was showing a green signal for traffic moving in a northerly direction along Pine Street.

We cannot agree with defendant's contention that plaintiff has failed to prove the negligence of Wiberg in the operation of his motor vehicle at the time of the collision. The transcript discloses that as Wiberg approached the intersection he observed that a line consisting of several cars had come to a halt at the green light. Assuming, he testified, that the first car in the line had "stalled," he proceeded to pass these cars, moving toward the green light and entering the intersection at a low rate of speed. There is also evidence that the siren of the police cruiser was being sounded as it approached the intersection. This evidence, in our opinion, would be sufficient to warrant the jury's finding that Wiberg was negligent in the operation of his vehicle at the [***4] time of the collision.

[*314] Neither do we agree with the contention of defendant that the negligence of Wiberg was rendered remote by the intervening act of negligence of a responsible third person -- in this instance, the operator of the police cruiser. It is well settled, as defendant contends, that the negligent act of a defendant may, by reason of the intervening negligence of a responsible third party, be rendered remote and relieve the defendant of liability. *Reek* v. *Lutz*, 90 R. I. 340, 158 A.2d 145; *Floyd* v. *Turgeon*, 68 R. I. 218, 27 A.2d 330.

However, this court noted in *Denisewich* v. *Pappas*, 97 R. I. 432, 437, 198 A.2d 144, 147: "* * * it is equally well established that an intervening act will not insulate a defendant from liability if his negligence was a concurring proximate cause which had not been rendered remote by reason of the secondary cause which intervened." We went on to say that the test in these cases must be whether the intervening act could reasonably have been foreseen as a natural and probable result of the original act of negligence of the defendant. If it could have been so foreseen, the intervening negligence is not [***5] so remote as to prevent the original act from being considered at law as merely a concurring cause of the injury. In the instant case the intervening negligence upon which defendant relies is that of the operator of the police cruiser. In the circumstances that exist in this case it seems clear that Wiberg could be charged with reasonably foreseeing that another vehicle would be moving along Church Street into the intersection.

The defendant has urged also that it was error to overrule its objection to an inquiry as to whether, after the collision had occurred, a bystander had asked Wiberg, "What is the matter, didn't you hear the siren?" When the objection to this question was overruled, he answered: "That's correct, she did say, 'What is the matter, didn't you hear the siren?' And I said, 'I heard nothing, I saw nothing.'"

[*315] It is our opinion that, if the overruling of the objection to the admission of this evidence was error, it was certainly not prejudicial. Testimony was adduced through the operator of the police cruiser that he was sounding the siren at the time [**412] he approached and entered the intersection and that, in fact, he had turned it off after [***6] the impact. It is clear then that other testimony was adduced without objection to the effect that the siren was being sounded at the time of the collision. In such circumstances we hold that overruling of the objection in this case did not constitute prejudicial error. *Geaber* v. *Spink*, 78 R. I. 198, 80 A.2d 882; *Isherwood* v. *Vendettuoli*, 73 R. I. 437, 57 A.2d 171.

We turn to consider defendant's contention that the damages awarded plaintiff should be reduced by the amount paid him as wages and medical expenses by his employer, the city of Pawtucket. In the course of trial, plaintiff testified that he had lost no wages during the period of his incapacity, and the court sustained objection to a question as to whether he had been paid medical expenses by the city. In its charge the court instructed the jury that the payment of wages during the incapacity of plaintiff was without materiality on the question of damages. The defendant now urges that the trial justice erred in so instructing the jury.

In this state we have adhered to the collateral source rule, so called, setting it out in *Perry* v. *New England Transportation Co.*, 71 R. I. 352, 359, 45 A.2d [***7] 481, 485. In that case we said: "The weight of authority in this country is to the effect that, in the absence of a statute to the contrary, the amount of recovery from a third person who is responsible for a person's injury is not affected by the mere receipt by the plaintiff of wages or salary from his employer for the period of his injury or a gratuity from a collateral source independent of the defendant." We reiterated this [*316] rule in *Audette* v. *New England Transportation Co.*, 71 R. I. 420, 46 A.2d 570, and in *Coia* v. *Eastern Concrete Products Co.*, 85 R. I. 128, 127 A.2d 858, in each case again emphasizing that we follow the weight of authority, there being no statute in this state to the contrary. In *Oddo* v. *Cardi*, 100 R. I. 578, 218 A.2d 373, we held that the collateral source rule is to be given a comprehensive application.

We perceive no reason why we should modify the position we take with respect to the collateral source rule unless the legislature, in express terms or by necessary implication, so requires. We do not understand that defendant here is arguing that the legislature has by statute provided for some abrogation of the collateral [***8] source rule. In its brief defendant directs our attention to the provisions of G. L. 1956, § 45-19-1, [1] as amended by P. L. 1960, chap. 126, sec. 1. This statute requires the municipalities of this state to pay to firemen or policemen who are injured or become ill in the line of duty their full salary and medical expenses during their period of incapacity. It does not, however, argue, as we understand its brief, that this statute was intended by the legislature to mandate abandonment or modification of the collateral source rule. While we hesitate to dignify a hoary cliche by quoting it as a rule of law, it is our opinion [*317] that if, in enacting § 45-19-1, the legislature had intended [**413] to abrogate the collateral source rule, it would have said so in express terms.

1 Section 45-19-1 reads: "Whenever any police officer or fireman of any city or town shall be wholly or partially incapacitated by reason of injuries received or sickness contracted in the performance of his duties, the respective city or town by which said police officer or fireman is em-

ployed, shall, during the period of such incapacity, pay such police officer or fireman the salary or wage to which the said police officer or fireman would be entitled had he not been so incapacitated, and in addition thereto shall pay such medical, surgical, dental, optical, or other attendance or treatment, nurses and hospital services, medicines, crutches and apparatus for such period as is necessary. As used in this section, the term 'police officer' shall mean and include any chief or other member of the police department of any city or town, regularly employed at a fixed salary or wage. As used in this section, the term 'fireman' shall mean and include any chief or other member of the fire department of any city or town, regularly employed at a fixed salary or wage."

[***9]

The defendant argues also that the amount of damages plaintiff may recover under the insurance contract is limited by a provision thereof entitled "Limits of Liability." This clause of the contract provides that damages payable thereunder for the injuries sustained as a result of the negligent act of an uninsured motorist are to be reduced by "* * * the amount paid and the present value of all amounts payable on account of such bodily injury under any workmen's compensation law, disability benefits law or any similar law."

The precise question, then, is whether an insurer may by the terms of the contract of insurance offered pursuant to the uninsured motorist coverage statute, § 27-7-2.1, abrogate the limits of the liability established by that statute. The statute, by reference to the provisions of § 31-31-7, establishes the limit of liability thereunder at $ 10,000 for bodily injury or the death of one person in any one accident. The defendant, however, contends that, where the parties have entered into a contract of insurance providing that the amount of damages awarded an insured thereunder is to be reduced by any amounts paid the plaintiff under a workmen's compensation [***10] act, a disability benefits law, or another similar law, the contract limitation as to liability is controlling. In this respect, defendant relies upon its contention that § 45-19-1 is either a compensation law or a similar law, and, therefore, the salary and medical expenses paid to plaintiff by the city of Pawtucket are to be deducted from the jury's verdict.

Whether or not § 45-19-1 is to be characterized as a workmen's compensation act or a disability benefits law, we cannot agree with defendant's contentions. We have held that contracts provided by insurance carriers must invoke those [*318] constitutionally valid conditions imposed by the legislature. *Allstate Insurance Co.* v. *Fusco*, 101 R. I. 350, 223 A.2d 447. We had under consideration in that case the same statute that is now before us, § 27-7-2.1 [2] We there held that such contracts are to be construed in the light of the public policy as mandated by the legislature and binding on insurance carriers licensed to do business in this state. In enacting this statute, the legislature intended that, as a matter of public policy, protection should be given the named insured in such policies against economic [***11] loss resulting from injuries sustained by reason of the negligent operation of uninsured motor vehicles or hit-and-run motor vehicles.

2 Section 27-7-2.1 reads: "No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in § 31-31-7 as amended, under provisions approved by the insurance commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom, provided that the named insured shall have the right to reject such coverage."

[***12] To implement the public policy so stated, the statute mandates that no policy of liability insurance against bodily injury or death shall be delivered or issued for delivery in this state unless coverage is provided therein in the limits for bodily injury or death set forth in § 31-31-7, that is, $ 10,000 for bodily injury to one person in any one accident, for the protection of the person insured thereunder. This protection runs against the owners or operators of uninsured motor vehicles and requires that the named insured within the policy to be issued have the right to reject such coverage.

We are persuaded that, in enacting § 27-7-2.1, the legislature intended to give [**414] an insured motorist operating on the [*319] public ways protection against the economic loss that might result from the negligent operation of uninsured motor vehicles. The protection was to be in an amount of at least $ 10,000 for bodily injury or death in the case of one person in any one accident, and the legislature commanded that this protection be made available to every insured to whom a policy is issued for liability insurance unless specifically rejected. Nothing in the statute warrants [***13] the issuance of a

policy providing for such protection of the insured motorist in any lesser amount or in any alternative amount. The coverage directed in the statute must be given unless the insured rejects it in specific terms. We certainly are unable to agree that it was ever intended to provide a benefit for the insurance carrier.

The coverage in the policy delivered to the insured in the instant case is different from that mandated in the statute. It requires the insured, if he desires to accept the policy so issued, to agree that any award of damages or amount paid him under a workmen's compensation or a similar piece of legislation be deducted from any award of damages he may recover from the tort-feasor. Nothing in the statute, in our opinion, confers upon the insurer any authority to require an insured to accept a policy proffered for delivery which contains such a limitation upon the mandated statutory coverage. In *Standard Accident Insurance Co.* v. *Gavin, Fla.*, 184 So.2d 229, the Florida court, in considering a similar statute and a policy containing a similar provision for a reduction of any award recovered from the tort-feasor, held that the insurance companies [***14] are without power to insert provisions in a policy that would restrict the coverage afforded therein in a manner contrary to the intent of the statute.

Because we take this view, we find that the provisions of the policy limiting the liability of the insured as is therein provided are, by virtue of § 27-7-3, void, and the policy [*320] is to be construed as having included within its terms coverage against damage by uninsured motorists up to the extent of the statutory limit, that is, $ 10,000 for bodily injury to one person in any one accident. It is our conclusion, then, that the court did not err in instructing the jury that the amount of wages or medical expenses paid plaintiff here by the city of Pawtucket is without materiality in the instant case.

The defendant further argues that Wiberg was not an uninsured motorist as that phrase is defined in the policy of insurance issued by defendant. The policy provides that defendant shall "* * * pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile * * *." An uninsured automobile is therein defined as one with respect [***15] to which there is "* * * no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such automobile * * *."

The defendant, in pressing this argument, directs our attention to the transcript, wherein it appears that at the trial there was an oral agreement that Wiberg had, subsequent to the accident, posted a bond in the amount of $ 3,500 with the Registry of Motor Vehicles, apparently pursuant to the terms of the Safety Responsibility Act of the State of Rhode Island, chap. 31 of title 31. It argues that the bond was given as security for the payment of damages for the personal injury which might have resulted from the accident through fault on the part of Wiberg. It appears from the transcript that plaintiff conceded that such a bond had been filed but that he denied that it was material to any issue raised in the case.

The defendant appears to urge that if Wiberg was partially insured at the time because of this bond, although it was procured subsequent to the time of the accident, [**415] this [*321] bond would be available for the payment of claims arising [***16] out of the accident. It seems to us that this is to urge that the most plaintiff can recover, suing under the uninsured motorist provision of the insurance policy, is the amount of $ 1,500 and that he must look to the bond to recover the remainder of the award given him by the jury. We are unable to agree with this contention. The issue with which we are confronted is whether the subsequent posting of the liability bond, made applicable by its terms to the prior accident, operates to make Wiberg a partially insured motorist at the time of the accident and, therefore, at that time not an uninsured motorist.

The contract provisions are to be interpreted in the light of the purpose for which the legislature enacted § 27-7-2.1. *Allstate Insurance Co.* v. *Fusco, supra.* The legislature, in our opinion, enacted this statute for the purpose of providing, as a matter of public policy, protection of the named insured in policies to be issued for protection against financial loss resulting from the operation of uninsured motor vehicles. It clearly intended that this protection was to be included up to the amount of $ 10,000 for a single person *in the policy that was to be issued* [***17] *pursuant to the statute* and was to become effective if not rejected by the named insured. In other words, the legislature, in our opinion, intended that the protection to be given to the motorist by an uninsured motorist clause was to be contained in the policy to be issued for the convenience of the named insured.

The provision set out by defendant in its policy issued to this plaintiff defines an uninsured motor vehicle as one with respect to which no liability policy is "applicable at the time of the accident." It is well established in this state that words used in a contract of insurance are to be given their plain, ordinary, and usual meaning in seeking the intent of the parties. *Nagy* v. *Lumbermens Mutual* [*322] *Casualty Co.*, 100 R. I. 734, 219 A.2d 396. If we apply this principle for the interpretation of contracts to the provision here under consideration, it is our opinion that the term "applicable" in the circumstances means an uninsured vehicle is one where no liability bond was "in effect" at the time of the accident. For this reason, we are of the opinion that the contract contem-

plated that a vehicle would be an uninsured vehicle within its terms when [***18] no liability insurance was in effect at the time the accident occurred.

The defendant, in urging a contrary view, relies on the case of *Allstate Insurance Co.* v. *Fusco, supra*, a case that is clearly distinguishable, in our opinion, from that which is now before us. In *Fusco* coverage against liability for bodily injury was in effect at the time the accident occurred but in a lesser amount than that prescribed in § 27-7-2.1. We held that the tort-feasor was an uninsured motorist, at least to the extent of the deficiency in the coverage, and, therefore, was liable as an uninsured motorist under the terms of the policy. It must be realized, however, that in *Fusco* the trial court had held that the tort-feasor was not an uninsured motorist under the terms of the contract which defined an uninsured motor vehicle. Therefore, what we were really holding was that the tort-feasor was an uninsured motorist, at least to the extent that the coverage in effect at the time of the accident was less than the statutory minimum, and could be sued as such under the terms of the policy. In our opinion, *Fusco* does not stand for the proposition that insurance against liability obtained [***19] subsequent to an accident will operate so as to change the status of the tort-feasor from that of an uninsured motorist at the time of the accident to one who was partially insured at the time of the accident.

The appeal of the defendant is denied, and the judgment is affirmed.

[*323] Joslin, J., did not participate.